**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: CROP INPUTS ANTITRUST LITIGATION | Case No. 4:21-md-02993-SEP |
| | MDL No. 2993 |
| This Document Relates to: | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| ALL CASES | **JURY TRIAL DEMANDED** |

1.    Plaintiffs Randi Handwerk, Dan Flaten, Ryan Bros., Inc., Michael J. Ryan, Leon Pfaff, Eagle Lake Farms Partnership, Brad DeKrey, Tyler Schultz, Hapka Farms, Inc., Amy Hapka, Beeman Berry Farm, LLC, Wunsch Farms, Kenneth Beck, John Vehrenkamp, Justin Pic, Tom Burke, JSB Farms, LLC, Duane Peiffer, Darren Duncan, Jones Planting Co. III, George Potzner, Melinda Budde, Charles Lex, Jason Canjar, John C. Swanson, and James Koch d/b/a Vienna Eqho Farms on behalf of themselves individually and on behalf of all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint to recover injunctive relief, treble damages, and other relief as appropriate, based on Defendants' Bayer CropScience, LP, Bayer CropScience, Inc., Corteva, Inc., Pioneer Hi-Bred International, Inc., Cargill Inc., BASF Corporation, Syngenta Corporation, Winfield Solutions, LLC, Univar Solutions, Inc., Federated Co-Operatives Ltd., CHS Inc., Nutrien Ag Solutions Inc., Growmark Inc., Growmark FS, LLC, Simplot AB Retail Sub, Inc.,

and Tenkoz, Inc. (collectively, "Defendants") violations of federal and state antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment laws of the several States.[1]

2.      Plaintiffs seek to represent a class and sub-classes consisting of persons and entities who purchased Crop Inputs, for their own use and not for resale, in the United States from at least as early as January 1, 2014, through the present (the "Class Period") from the Defendants, or through Defendants' authorized retailers.

## NATURE OF ACTION

3.      This action arises from an unlawful agreement between Defendants—manufacturers, wholesalers, and retailers of Crop Inputs—to artificially increase and fix the prices of seeds and crop protection chemicals such as fungicides, herbicides, and insecticides ("Crop Inputs") used by farmers throughout the United States.

4.      The market for Crop Inputs used by American farmers is one of the largest markets in the world with annual sales exceeding $65 billion.

5.      Defendants Bayer CropScience, Inc., Bayer CropScience, LP, Corteva, Inc., Pioneer Hi-Bred International, Inc., Syngenta Corporation, and BASF Corporation (the "Manufacturer Defendants"), together with Defendants Cargill Inc., Tenkoz Inc., Winfield Solutions, LLC, and Univar Solutions, Inc. (the "Wholesaler Defendants"), and Defendants CHS Inc., Nutrien Ag Solutions Inc., Growmark Inc., Simplot AB Retail Sub, Inc., and Federated Co-Operatives Ltd. (the "Retailer Defendants"), collectively have established a secretive distribution process that keeps Crop Inputs prices inflated at supracompetitive levels and, in furtherance of their conspiracy, denies farmers access to relevant market information, including transparent

---

[1] Plaintiffs file this Consolidated Amended Class Action Complaint pursuant to the Court's August 20, 2021 Order, ECF 61.

pricing terms that would allow comparison shopping and better-informed purchasing decisions, and including information about seed relabeling practices that would enable farmers to know if they are buying newly developed seeds or identical seeds repackaged under a new brand name and sold for a higher price.

6.     The cost of Crop Inputs is increasing at a significantly faster rate than profits from farmers' crop yields. The skyrocketing Crop Inputs prices are causing farmers to take on significant operating debt and often forcing them into bankruptcy. Not surprisingly, American farmers who are critical to the nation's food supply are facing a crisis. Neither the cost increases nor the price disparities are attributable to any independent legitimate cause, such as weather or other factors.

7.     Beginning at least as early as 2014, the advancement of technology allowed for the launching of new ecommerce Crop Inputs sales platforms that increased price transparency to farmers. These platforms, including Farmers Business Network ("FBN") and Agroy, Inc., became successful with farmers by providing price comparison tools which allowed farmers to view what other farmers were paying for the same Crop Inputs.

8.     Viewing this success, Defendants conspired to boycott these ecommerce Crop Inputs sales platforms because of the threat they posed to Defendants' market position, power and price control. For example, the Manufacturer Defendants and Wholesaler Defendants agreed not to sell to ecommerce Crop Inputs sales platforms and enforced strict discipline on Retailer Defendants who failed to comply with the boycott. Defendants Syngenta, Bayer, BASF, and Corteva used audits and inspections of their authorized retailers to ensure that ecommerce Crop Inputs sales platforms were unable to obtain Crop Inputs from their authorized retailers.

9.     Defendants' boycott succeeded. As a result of Defendants' anticompetitive conduct, ecommerce Crop Inputs sales platforms such as FBN were unable to purchase Crop Inputs from Defendants. This was a devastating blow to these sales platforms and directly harmed farmers by eliminating a lower-cost option for purchasing these Crop Inputs. Defendants, on the other hand, as the dominant manufacturers and sellers, benefitted from the lack of lower-cost options for farmers on these ecommerce platforms.

10.     As a direct and proximate result of their anticompetitive conduct, Defendants have maintained supracompetitive prices for Crop Inputs by denying farmers access to accurate pricing information and have injured farmers by forcing farmers to accept opaque price increases that drastically outweigh any increase in crop yields or market prices.

11.     Defendants' anticompetitive conduct is the subject of an ongoing investigation by the Canadian Competition Bureau ("CCB") and the United States Federal Trade Commission ("FTC").

12.     A Canadian federal court has found that there is sufficient evidence to require Defendants to also produce records concerning their coordinated anticompetitive conduct in the United States.

13.     The FTC is likewise investigating anticompetitive conduct in the Crop Inputs market.  At least one Defendant, Corteva, has been subpoenaed by the FTC—ordering it to submit documents related to Crop Inputs "in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(d) and 1367 because this is a class action in which the amount in controversy exceeds $5,000,000 and in

which some members of the proposed Class are citizens of a state different from some Defendants, and because Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.  The Court has further jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  Plaintiffs seek actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct. Plaintiffs also seek injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).

15.     Venue is appropriate in this district because Defendants reside or transact business within this district, and they transact their affairs and carry out interstate trade and commerce, in substantial part, in this district and/or have an agent and/or can be found in this district. Venue is also appropriate within this district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c) and (d).

16.     This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, shipped, sold, and/or delivered substantial quantities of Crop Inputs throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District. This Court also has jurisdiction (e) pursuant to 18 U.S.C. § 1965(b) based on personal jurisdiction over one or more Defendant(s) existing in this Court; (f) pursuant to Fed. R. Civ. P. 4(k); and/or (g) because

Defendants sought transfer of the actions in this MDL to this Court and thereby acquiesced to personal jurisdiction in this Court.

17.    Defendants' and their co-conspirators' conduct, as described herein, was within the flow of, was intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## TRADE AND COMMERCE

18.    The relevant market for this lawsuit is the market for Crop Inputs in the United States, including the manufacturing market for Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs.

19.    During the Class Period, each Defendant sold Crop Inputs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial District.

20.    During the Class Period, Defendants collectively controlled a majority of the market for Crop Inputs in the United States.

21.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused injury in the United States.

## PARTIES

**Plaintiffs**

22.    Plaintiff Randi Handwerk was a resident at all relevant times of South Dakota. During the Class Period and while residing in South Dakota, Plaintiff Handwerk indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Handwerk suffered injury as a result of Defendants' conduct alleged herein.

23.      Plaintiff Dan Flaten was a resident at all relevant times of North Dakota. During the Class Period and while residing in North Dakota, Plaintiff Flaten directly and indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Flaten suffered injury as a result of Defendants' conduct alleged herein.

24.      Plaintiff Ryan Bros., Inc., was an Iowa family farming corporation at all relevant times with its principal place of business in Ryan, Delaware County, Iowa. During the Class Period and while conducting business as an Iowa corporation, Plaintiff Ryan Bros. directly and indirectly purchased one or more Crop Inputs, for its own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Ryan Bros. suffered injury as a result of Defendants' conduct alleged herein.

25.      Plaintiff Michael J. Ryan was a resident at all relevant times of Iowa and was owner of Ryan Bros. During the Class Period and while residing in Iowa, Plaintiff Ryan directly and indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Ryan suffered injury as a result of Defendants' conduct alleged herein.

26.      Plaintiff Leon Pfaff was a resident at all relevant times of Wisconsin. During the Class Period and while residing in Wisconsin, Plaintiff Pfaff indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Pfaff suffered injury as a result of Defendants' conduct alleged herein.

27.      Plaintiff Eagle Lake Farms Partnership is an Arkansas partnership and had its principal place of business in Arkansas at all relevant times. During the Class Period and while operating in Arkansas, Plaintiff Eagle Lake Farms directly and indirectly purchased one or more

Crop Inputs, for its own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Eagle Lake Farms Partnership suffered injury as a result of Defendants' conduct alleged herein.

28.     Plaintiff Brad DeKrey was a resident at all relevant times of Wyoming. During the Class Period, Plaintiff DeKrey indirectly purchased one or more Crop Inputs in North Dakota, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff DeKrey suffered injury as a result of Defendants' conduct alleged herein.

29.     Plaintiff Tyler Schultz was a resident of the state of Minnesota at all times relevant to this conspiracy. During the Class Period, and while residing in Minnesota, Plaintiff Schultz indirectly purchased one or more Crop Inputs, for his own use and not for resale, that were manufactured or sold by one or more Defendants. Plaintiff Schultz suffered injury as a result of Defendants' conduct alleged herein.

30.     Plaintiff Hapka Farms, Inc. is a Minnesota corporation and had its principal place of business in Minnesota at all relevant times. During the Class Period and while operating in Minnesota, Plaintiff Hapka Farms directly purchased one or more Crop Inputs, for its own use for its farming operation and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Hapka Farms suffered injury as a result of Defendants' conduct alleged herein.

31.     Plaintiff Amy Hapka was a resident of Minnesota at all relevant times. During the Class Period and while residing in Minnesota, Plaintiff Hapka directly purchased one or more Crop Inputs, for her own use in her farming operation and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Hapka suffered injury as a result of Defendants' conduct alleged herein.

32.     Plaintiff Beeman Berry Farm, LLC is a Michigan corporation and had its principal place of business in Michigan at all relevant times. During the Class Period and while operating in Michigan, Plaintiff Beeman Berry Farm indirectly purchased one or more Crop Inputs, for its own use for its farming operation and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Beeman Berry Farm suffered injury as a result of Defendants' conduct alleged herein.

33.     Plaintiff Wunsch Farms is a Michigan sole proprietorship and had its principal place of business in Michigan at all relevant times. During the Class Period and while operating in Michigan, Plaintiff Wunsch Farms directly and indirectly purchased one or more Crop Inputs, for its own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Wunsch Farms suffered injury as a result of Defendants' conduct alleged herein.

34.     Plaintiff Kenneth Beck was a resident at all relevant times of Illinois. During the Class Period and while residing in Illinois, Plaintiff Beck indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Beck suffered injury as a result of Defendants' conduct alleged herein.

35.     Plaintiff John Vehrenkamp was a resident at all relevant times of Wisconsin. During the Class Period and while residing in Wisconsin, Plaintiff Vehrenkamp indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Vehrenkamp suffered injury as a result of Defendants' conduct alleged herein.

36.     Plaintiff Justin Pic was a resident at all relevant times of North Dakota. During the Class Period and while residing in North Dakota, Plaintiff Pic indirectly purchased one or more

Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Pic suffered injury as a result of Defendants' conduct alleged herein.

37.     Plaintiff Tom Burke was a resident at all relevant times of Pennsylvania. During the Class Period and while residing in Pennsylvania, Plaintiff Tom Burke indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Tom Burke suffered injury as a result of Defendants' conduct alleged herein.

38.     Plaintiff JSB Farms, LLC is a Minnesota corporation and had its principal place of business in Minnesota at all relevant times. During the Class Period and while operating in Minnesota, Plaintiff directly and indirectly purchased one or more Crop Inputs, for its own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff suffered injury as a result of Defendants' conduct alleged herein.

39.     Plaintiff Duane Peiffer was a resident at all relevant times of Iowa. During the Class Period and while residing in Iowa, Plaintiff Peiffer directly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Peiffer suffered injury as a result of Defendants' conduct alleged herein.

40.     Plaintiff Darren Duncan was a resident at all relevant times of Illinois. During the Class Period and while residing in Illinois, Plaintiff Duncan directly and indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Duncan suffered injury as a result of Defendants' conduct alleged herein.

41.     Plaintiff Jones Planting Co. III is a general partnership and had its principal place of business in Mississippi at all relevant times. During the Class Period and while operating in

Mississippi, Plaintiff Jones directly and indirectly purchased one or more Crop Inputs, for its own use for its farming operation and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Jones suffered injury as a result of Defendants' conduct alleged herein.

42. Plaintiff George Potzner was a resident at all relevant times of Iowa. During the Class Period and while residing in Iowa, Plaintiff Potzner indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Potzner suffered injury as a result of Defendants' conduct alleged herein.

43. Plaintiff Melinda Budde was a resident at all relevant times of Kansas. During the Class Period and while residing in Kansas, Plaintiff Budde indirectly purchased one or more Crop Inputs, for her own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Budde suffered injury as a result of Defendants' conduct alleged herein.

44. Plaintiff Charles Lex was a resident at all relevant times of Iowa. During the Class Period and while residing in Iowa, Plaintiff Lex indirectly purchased one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Lex suffered injury as a result of Defendants' conduct alleged herein.

45. Plaintiff Jason Canjar was a resident at all relevant times of Pennsylvania. During the Class Period and while residing in Pennsylvania, Plaintiff Canjar indirectly purchased in Pennsylvania and New York one or more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Canjar suffered injury as a result of Defendants' conduct alleged herein.

46. Plaintiff John C. Swanson was a resident at all relevant times of New York. During the Class Period and while residing in New York, Plaintiff Swanson directly purchased one or

more Crop Inputs, for his own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff Swanson suffered injury as a result of Defendants' conduct alleged herein.

47.     Plaintiff James Koch d/b/a Vienna Eqho Farms is a sole proprietorship and had its principal place of business in Wisconsin at all relevant times. During the Class Period and while operating in Wisconsin, Plaintiff James Koch d/b/a Vienna Eqho Farms directly purchased one or more Crop Inputs, for its own use and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff James Koch d/b/a Vienna Eqho Farms suffered injury as a result of Defendants' conduct alleged herein.

48.     Plaintiffs include persons and entities that purchased directly from Defendants, indirectly from Defendants, or both directly and indirectly from Defendants.

**Manufacturer Defendants**

49.     Defendant Bayer CropScience Inc. is a wholly owned subsidiary of Bayer AG headquartered in St. Louis, Missouri and incorporated in New York that develops, manufactures, and sells Crop Inputs in the United States. Bayer AG is a multinational pharmaceutical, chemical, and agriculture company. It organizes itself into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the same level of management.

50.     Defendant Bayer CropScience LP is a wholly owned subsidiary of Bayer AG headquartered in Research Triangle Park, North Carolina, and is a crop science company that sells Crop Inputs in the United States.

51.     Bayer CropScience Inc. and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division. Bayer Canada is a subsidiary of Bayer AG, and therefore shares a common corporate parent with Bayer CropScience Inc. and Bayer CropScience LP.

52.     Defendant Corteva Inc. is a domestic corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

53.     Defendant Pioneer Hi-Bred International, Inc., is an Iowa corporation headquartered in Johnston, Iowa, that develops, manufactures, and sells Crop Inputs in the United States. Pioneer is a wholly owned subsidiary of Corteva. Corteva Incorporated is a Delaware corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

54.     Defendant BASF Corporation is headquartered in Florham Park, New Jersey, and is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States. BASF Corporation and its Canadian counterpart, BASF Canada, share a common corporate parent: BASF SE.

55.     Defendant Syngenta Corporation is the main U.S.-based operating subsidiary of Syngenta AG, and is headquartered in Wilmington, Delaware. Syngenta develops, manufactures, and sells Crop Inputs in the United States.

**Wholesaler Defendants**

56.     Defendant Cargill, Inc. is a domestic corporation headquartered in Minnetonka, Minnesota. Cargill owns and operates a wholesaler, AgResource Division, which sells and distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Cargill, Inc., was an active wholesaler in the U.S. Crop Inputs industry, at least until it sold its crop inputs business to Agrium, Inc., in 2016. Cargill Inc.'s Canadian subsidiary, Cargill Limited, is a subject of the Canadian

Competition Bureau's investigation into anticompetitive conduct in the Canadian Crop Inputs market. Cargill holds itself out as a connected, global enterprise: "With 200 facilities across North America, and links to markets all over the world, we have the capacity as well as the expertise to connect growers with end users around the globe,"[2] Cargill also represents that it "offers U.S. and Canadian farmers a range of . . . crop inputs, and agronomic services . . . ."[3]

57.     Defendant Tenkoz Inc. is one of the largest Crop Input distributors in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country.[4] Tenkoz is incorporated and headquartered in Georgia. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

58.     Defendant Winfield Solutions, LLC, is a domestic corporation headquartered in Arden Hills, Minnesota and incorporated in Delaware. Winfield Solutions is a Crop Input wholesaler and sells Crop Inputs in the United States. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield Solutions is also a major Crop Input retailer that operates as a cooperative owned by its members, which are 650 Crop Input retail businesses operating 2,800 retail locations throughout the United States and parts of Canada. Winfield Solutions LLC and its Canadian counterpart, Winfield United Canada, have a common corporate parent: Land O'Lakes, Inc.

---

[2] *Agriculture*, CARGILL.CA, https://www.cargill.ca/en/agriculture (last visited Sept. 16, 2021).
[3] *North America Farmer Services*, CARGILL.COM, https://www.cargill.com/agriculture/north-america-farmer-services (last visited Sept. 16, 2021).
[4] *Profile*, TENKOZ.COM, http://www.tenkoz.com/index.asp (last visited Sept. 16, 2021).

59.     Defendant Univar Solutions, Inc. is a domestic corporation headquartered in Illinois and incorporated in Delaware. Univar Solutions, Inc. is a Crop Input wholesaler and sells Crop Inputs in the United States. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Univar Solutions Canada is a subsidiary of Univar Solutions, Inc.

**Retailer Defendants**

60.     Defendant CHS Inc. is one of the largest crop input wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick-and-mortar stores. CHS Inc. is incorporated and headquartered in the state of Minnesota and sells Crop Inputs in the United States.

61.     CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

62.     Defendant Nutrien Ag Solutions, Inc. is both a Crop Input wholesaler and the largest Crop Input retailer in the United States. It sells Crop Inputs to farmers throughout the United States and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Nutrien Ag Solutions, Inc. is incorporated in Delaware and has its principal place of business in Colorado. Nutrien Ag Solutions, Inc. is the retail division of the world's largest crop inputs company.[5]

63.     Defendant GROWMARK, Inc. d/b/a Farm Supply or FS, is a large Crop Input retailer headquartered in Illinois with brick-and-mortar locations throughout the Midwestern

---

[5] *About Us*, NUTRIEN AG SOLUTIONS, https://www.nutrienagsolutions.com/about-us (last visited Sept. 16, 2021).

United States and sells Crop Inputs in the United States. Growmark is incorporated in Delaware. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

64.     Defendant Simplot AB Retail Sub, Inc. f/k/a Pinnacle Agriculture Distribution, Inc. is a large Crop Input wholesaler and retailer that operates 135 retail locations across 27 states and sells Crop Inputs in the United States. Simplot is headquartered and incorporated in Mississippi. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

65.     Defendant Federated Co-operatives Ltd. is a large Crop Input retailer. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to exclude competition in the Crop Input market.

## FACTUAL ALLEGATIONS

66.     Farmers in the United States are being squeezed on both ends, currently experiencing drastically increasing operating expenses while revenue and profits from their crop yields remain stagnant. For example, between 1995 and 2011, the cost of growing soybeans and corn tripled while yields for those same crops rose by only 18.9% and 29.7% respectively.

67.     This trend has continued in recent years. One study found that seed, fertilizer, and pesticide costs were 32% of crop revenue between 1990 and 2006, 36% of revenue between 2006 and 2015, but 48% of crop revenue in 2015.[6] In a 2018 survey, 80% of farmers reported that their

---

[6] Schnitkey, G. and S. Sellars, "Growth Rates of Fertilizer, Pesticide, and Seed Costs over Time." *farmdoc daily* (6):130, Department of Agricultural and Consumer Economics, University

costs continued to increase, and many farmers cannot pay their outstanding operating debts—estimated at well over $400 billion in 2019. The rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

68.     The rate of cost increases is not attributable to any legitimate cause, as research and development expenditures have decreased over the past several years. Instead, the increases are a result of unjustifiably inflated, supracompetitive prices because of Defendants' anticompetitive conduct, including their group boycott of ecommerce Crop Inputs sales platforms such as FBN.

69.     Defendants purposefully structured the Crop Inputs market to be both secretive and opaque to obscure pricing data and product information that farmers need to make informed purchasing decisions. Because farmers lack the objective information and data needed to evaluate their purchases, they are forced to pay higher prices for Crop Inputs than a competitive market would offer. On top of this, farmers are unable to buy Crop Inputs without paying for the unnecessary overhead of brick-and-mortar retailers.

70.     The Manufacturer Defendants, who develop and produce between 75% to 90% of name brand Crop Inputs, guard their product prices from consumers. The Manufacturer Defendants allow their products to be sold only by wholesalers, including the Wholesaler Defendants, retailers owned or operated by the manufacturer, and licensed "authorized retailers" such as the Retailer Defendants. Absent an agreement among the Manufacturer Defendants to boycott ecommerce Crop Inputs sales platforms, any single Manufacturer Defendant would have

---

of Illinois at Urbana-Champaign, July 12, 2016, https://farmdocdaily.illinois.edu/2016/07/growth-rates-of-fertilizer-pesticide-seed-costs.html (last visited Sept. 16, 2021).

benefited by selling Crop Inputs to FBN or another ecommerce Crop Inputs sales platform as an additional chain of distribution.

71.     Through the contracts granting "authorized retailer" licenses, the Manufacturer Defendants require strict confidentiality and prohibit "authorized retailers" from disclosing to their customers the manufacturers' prices or any incentives, rebates, or commissions offered by the manufacturers to the authorized retailers. This lack of price transparency increases the Manufacturer Defendants' profits. As a result, Manufacturer Defendants have an incentive to collude with each other and with wholesalers and retailers to prevent actions (such as the entry of ecommerce Crop Inputs sales platforms like FBN) that would result in price transparency.

72.     Taking advantage of farmers' lack of access to objective pricing or performance data, Manufacturer Defendants take seeds that have long been on the market and simply repackage them under a new brand name so that they can be sold at a higher price. This practice causes farmers to overpay for seed that could have been purchased for less from a different brand or other source, and/or to have less genetic diversity in seeds across their farms than they anticipated.

73.     At the retail level, pricing is similarly opaque and obscured. Wholesalers' contracts with authorized retailers contain strict confidentiality provisions, prohibiting retailers from disclosing the price paid to the wholesaler for Crop Inputs or the price at which retailers sell those exact same Crop Inputs to other farmers. In addition, retailers bundle the sale of Crop Inputs with other services, such as spraying or applying chemicals, which further obscures the individual cost of any Crop Input or bundled service.

74.     Since 2014, ecommerce Crop Inputs sales platforms sought to compete with the opaque and inefficient wholesale and retail systems by offering modernization, increased price transparency, and direct access to Crop Inputs.

75.     Initially, ecommerce Crop Inputs sales platforms were successful. For example, more than 12,000 farmers signed up for FBN's service that provided objective performance data on Crop Inputs, and 6,000 farmers signed up for FBN's electronic sales platform.

76.     Wholesaler and Retailer Defendants recognized the threat posed by these ecommerce Crop Inputs sales platforms to their market position, power and profit margins. A report published by CoBank, a cooperative partly owned by Crop Inputs retailers and a major lender to grain cooperatives, explained that price transparency would enable farmers to negotiate with Crop Inputs retailers and decrease their profit margins:

> Despite relatively low sales, e-commerce companies pose a threat to brick-and-mortar ag retailers in two ways. First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency for product prices.
>
> These e-commerce sites provide farmers with several sources of product price information that are just clicks away. Farmers can then leverage that information in negotiations with local brick-and-mortar retailers. Traditional ag retailers that bundle products and services together under the product price are losing some customers to e-commerce sites that provide only the product. The e-commerce channel allows cost-sensitive farmers to eliminate service costs like custom application and product warranties.[7]

77.     In 2016, Defendant CHS sent a letter to farmers discouraging them from using FBN by falsely claiming that although FBN would be able to offer the same products at lower costs, "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."

---

[7] https://www.cobank.com/corporate/news/ag-retailers-look-to-retool-strategy-for-success (last visited Sept. 16, 2021) ; *see also Ag Retailers Look to Retool Strategy for Success in the Era of E-Commerce*, GLOBENEWSWIRE, https://rss.globenewswire.com/news-release/2019/02/20/1738614/0/en/Ag-Retailers-Look-to-Retool-Strategy-for-Success-in-the-Era-of-E-Commerce.html (last visited Sept. 16, 2021).

78.     Despite claims that FBN is not in touch with the Farm Belt, eighty to ninety percent of FBN's employees are located in rural communities in South Dakota, Montana, Alberta, and Australia. They have dozens of facilities around the United States, including distribution centers and warehouses, and hundreds of farmer dealers in communities. As FBN co-founder Charles Baron explained to *Chief Executive*: "So when [competitors] say FBN isn't local, that's absurd. Besides, the most important 'local business' in the farm system is the farmer's farm; it's the core economic engine. And that's where we are."[8]

79.     FBN does not sell farmers' data to other companies, and only shares data if directed to by farmers.[9]

80.     CropLife America is a trade association made up of major Crop Inputs manufacturers, wholesalers, and retailers, and serves as an ideal vehicle for collusion. Only manufacturers and distributors of Crop Inputs are eligible for full membership in CropLife America. CropLife America's board of directors is chaired by an executive from one of the Manufacturer Defendants, currently Paul Rea from BASF and previously Suzanne Wasson from Corteva. The current board also includes an executive from Winfield Solutions' parent company, Land O'Lakes. For the 2016-19 term, CropLife America's board of directors included executives from Defendants Bayer, Growmark, Tenkoz, and Simplot. In addition, Syngenta Crop Protection is a member of CropLife America. The board is exclusively composed of representatives from large Crop Inputs manufacturers, distributors, and retailers, making it an ideal vehicle for collusion. There is not a single representative for farmers or farmer groups on CropLife America's

---

[8] Dale Buss, "Farmers Business Network Plows New Ground," *Chief Executive* (Dec. 23, 2020), https://chiefexecutive.net/farmers-business-network-plows-new-ground/ (last visited Sept. 16, 2021).
[9] FBN Terms of Service, FBN.COM https://www.fbn.com/page/show/tos (last visited Sept. 16, 2021).

board of directors, despite CropLife America's expressed mission to "help ensure growers and consumers have the technologies they need to protect crops, communities, and ecosystems from the threat of pests, weeds, and diseases in an environmentally sustainable way." Defendants used CropLife America as an instrument to promote their antagonism to and boycott of these ecommerce Crop Inputs sales platforms, such as FBN.

81.     CropLife America publishes the trade publication CropLife Magazine, which repeated the concerns expressed by CoBank about the threat posed by ecommerce Crop Inputs sales platforms to Crop Inputs retailers' business. In February 2016, CropLife stated it was "concerned that the retailer could be disintermediated—i.e., that electronic platforms would 'cut out the middle man'—allowing growers to find product conveniently and at a lower market price," and decried the "devil known as 'price transparency,'" stating that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."

82.     CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts"—clearly identified the threat posed by ecommerce Crop Inputs sales platforms to retailers and wholesalers at its 2017 annual meeting. CropLife's coverage of the event reported that "three letters . . . continually cropped up no matter what the topic of conversation happened to be – FBN (Farmers Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council described how FBN had negatively affected their business during 2017 by cutting into their already slim margins on various products." One PACE Council member observed, "I think it

would be crazy, stupid to ignore [FBN]. Even if they end up going away, the business model they've introduced to agriculture will probably be tried by someone else."[10]

83.    In February 2018, CropLife reported on a local "huge price war in chemicals" in Iowa in 2017 as a result of FBN competing in the market. A retailer competing with FBN urged that "'ag retailers need to get proactive' in dealing with the threat of disintermediation." Another retailer noted that "as we get more competitive with the FBNs of the world, we'll obviously have to cut back on services and support (at times). But what concerns me is when . . . the legal implications of that is you are a big business now and the regulatory burden becomes more significant."

84.    When the consolidation and anti-competitive effects of the Crop Inputs market have been called into question, Defendants have regularly coordinated through CropLife America to fight threats to their market power. For example, when Senator Elizabeth Warren targeted Defendants Bayer, Corteva, and Syngenta for recent mergers consolidating the Crop Inputs industry and squeezing out small family farms, CropLife America spoke out on behalf of Defendants to justify the consolidation. Similarly, when the Ninth Circuit concluded that EPA's registrations of Manufacturer Defendants' dicamba pesticide products did not adequately consider the products' anti-competitive effects, CropLife America wrote on behalf of its member companies, including Defendants, in support of the EPA decision.

85.    The Agricultural Retailers Association ("ARA") is a non-profit trade association that represents the interests of agricultural retailers and distributors across the United States. Its mission is to "support its members in their quest to maintain a profitable business environment

---

[10] Eric Sfiligoj, *Farmers Business Network: 'Crazy, Stupid' . . . to ignore*, CROPLIFE, https://www.croplife.com/editorial/farmers-business-network-crazy-stupid-ignore/ (last visited Sept. 16, 2021).

. . . ." The ARA's board of directors is currently chaired by Rod Wells of Growmark and includes board members from Defendants Nutrien, CHS, Winfield Solutions, Corteva, Growmark, Bayer, BASF, and Syngenta, *inter alia*.

86.     ARA hosts an annual "Conference & Expo" where more than 650 ag retailers attend, representing 85% of the industry.  These conferences provide abundant opportunities for Defendants to coordinate and collude to eliminate price transparency and preclude innovative e-commerce solutions from disrupting the traditional agricultural supply chain. Indeed, a "Roman Coliseum-esque clash" between FBN and an ag retail consultant (Steve Watts of Farrell Growth Group ("FGG")) was the "main event" at the 2017 annual conference, where Mr. Watts announced his belief that it was time for the Crop Inputs retailers to take steps to affirmatively combat the intrusion of e-commerce entities.  The ensuing topics of conversation amongst ARA members once FBN left the conference provided ample opportunity to build upon Mr. Watts' explicit calls to action.

87.     FGG provides other opportunities for coordination and collusion among Crop Input retailers and wholesalers. Specifically, FGG provides benchmarking information for ag retail companies to "analyze industry trends along with retail performance side by side with industry averages… at an individual company level"[11] – not unlike benchmarking in the meat industry that launched federal criminal charges and a litany of securities and antitrust lawsuits. FGG recently

---

[11] *See* WinField United, *Farrell Growth Group Expands Benchmarking Services into Canada with Winfield United Canada* (Mar. 27, 2021), https://www.croplife.com/management/farrell-growth-group-expands-benchmarking-services-into-canada-with-winfield-united-canada/ (last visited Sept. 16, 2021); https://www.farrellgrowth.com/farrell-growth-group-expands-benchmarking-services-with-winfield-united-canada (same); *see also*, Kelly Farrell, *Good Fortune Is Often Disguised as Good Execution*, THE SCOOP (Apr. 14, 2021) ("Farrell Growth Group's MIX program compares financial statements of top ag retailers and measures overall performance as pretax income as a percentage of sales.").

announced its expansion of this aspect of its business in a partnership with Winfield United Canada. *Id.*

88.     FGG's benchmarking service is designed to "provide private one on one interpretation and apples vs. apples analysis of each participant's reports in meetings at participant's offices. . . ."[12] FGG's benchmarking program manager Kelly Farrell claims a "well-run benchmarking program" must consider the following:

a.  Financial statements must be restated to a comparable format. If the company performing the benchmarking simply compiles the financial statements of the group and does not make adjustments *to ensure each company's financial statements are stated on a comparable basis*, the final product will be of limited value. This approach requires more time and expense but is truly essential if you are looking for meaningful comparisons.

b.  Be selective. You need to be confident in the abilities of the company doing the benchmarking. In addition to knowledge of accounting principles and the benchmarking process, it is also ideal the firm understands your industry.

c.  Confidentiality is essential! You must have confidence your financial statements are being handled with care. Consider having the benchmarking done by a neutral source rather than someone with a vested interest in your business.

d.  Know the companies in your comparison group. There is certainly value in seeing *where you stand within a group of all your peers.* But if you are looking to be the best, then you will want to *compare yourself to the best.*

e.  Consider a benchmarking service that includes a peer-to-peer meeting. *Discussing with peers how they achieve results* and implement intelligence into the business can help you accomplish the next level of performance.[13]

89.     FGG studies shared data through its benchmarking service marketed as "MIX," which stands for "Management Information Excellence." Having established a partnership with

---

[12]     *SeeManagement Information Excellence (MIX)*, FARRELL GROWTH GROUP, https://www.farrellgrowth.com/management-information-excellence-mix/ (last visited Sept. 16, 2021).

[13] Kelly Farrell, *Creating a Continual Improvement Strategy for Your Company*, THE SCOOP (Jan. 19, 2021), https://www.thedailyscoop.com/news/retail-business/create-continual-improvement-strategy (last visited Sept. 16, 2021); http://digitaledition.qwinc.com/publication/?i=691594&article_id=3868026&view=articleBrowser&ver=html5  (same, entitled "Apples to Apples") (emphasis added) (last visited Sept. 16, 2021).

FGG, wholesale crop input seller Winfield United Canada delivers MIX benchmarking insights to retailers through its "The Academy" platform. Winfield United Canada, along with Defendant, Winfield Solutions, is owned by Land O'Lakes, Inc.

90.     As noted in a Bloomberg interview with Peter Carstensen, a law professor and former Justice Department antitrust lawyer, detailed benchmarking analyses can "run afoul of antitrust law… when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion… because it allows co-conspirators to make sure they're all following through on the agreement. 'This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them,' he says. 'That is what creates stability for a cartel.'"[14]

91.     Thus, benchmarking services, including those offered by FGG to agricultural retailers, supply market participants with private competitor data necessary to coordinate and manipulate pricing and stabilize their anticompetitive scheme.

92.     Over the last decade, CropLife America reported that it has improved cooperation and camaraderie with the Agricultural Retailers Association.

93.     The Retailer Defendants and the Wholesaler Defendants knew that retaining their market positions, power and profit margins depended on excluding ecommerce sales platforms from the market, so they conspired to eliminate the platforms' product supply. To do so, the Retailer and Wholesaler Defendants induced the Manufacturer Defendants—who rely on the Wholesaler and Retailer Defendants to recommend and sell their products to farmers—to cut off

---

[14] Christopher Leonard, *Is the Chicken Industry Rigged?*, BLOOMBERG BUSINESSWEEK (Feb. 15, 2017),     https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged (last visited Sept. 16, 2021).

the supply of Crop Inputs to ecommerce Crop Inputs sales platforms. The Retailer Defendants and Wholesaler Defendants are among the largest retailers and wholesalers of Crop Inputs in the United States and, therefore, the Manufacturer Defendants knew they risked the loss of substantial sales if they did not agree to the boycott.

94.     Because the Manufacturer Defendants compete with each other in Crop Inputs product offerings, the Retailer and Wholesaler Defendants have the ability to transfer non-trivial amounts of sales from one manufacturer to another. Although the Manufacturer Defendants produce Crop Inputs that have different brand names, they all produce overlapping Crop Inputs that serve the same purpose and/or contain the same active ingredients. For example, herbicides are grouped by their "mode of action," and the Manufacturers Defendants produce different herbicides that directly compete with one another within those mode of action groups.  For example, Defendant Syngenta's Flexstar® herbicide and Defendant BASF's Sharpen® powered by Kixor® herbicide both use the same "mode of action", both are PPO Inhibitors (Group 14), and directly compete.  Similarly, each Manufacturer Defendant offers corn seeds (and several other Crop Inputs) that directly compete with one another. Therefore, if a Manufacturer Defendant did not agree to the boycott, that manufacturer would risk the loss of substantial sales.

95.     In 2016, Defendant Bayer formed an internal task force to study the long-term competitive impact of FBN's ecommerce Crop Inputs sales platform.

96.     But Defendants' actions were not internal or unilateral. The Manufacturer Defendants agreed with the Wholesaler and Retailer Defendants to cut off the supply of Crop Inputs to ecommerce Crop Inputs sales platforms and Defendants initiated a joint boycott. When ecommerce Crop Inputs sales platforms attempted to purchase Crop Inputs from the Manufacturer and Wholesaler Defendants, they all refused and offered only pretextual excuses for their refusal.

97.     For example, when Syngenta's Head of Crop Protection Sales in the United States, Michael Boden, found out that a small number of branded Crop Inputs had been sold on ecommerce platforms in violation of Defendants' boycott, he falsely claimed that ecommerce Crop Inputs sales platforms would deliver counterfeit products and that, "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

98.     Retailers who failed to comply with the group boycott were penalized by the Defendants. For example, in 2018 Syngenta initiated an audit of its authorized retailers after learning that some retailers had sold Crop Inputs product to ecommerce Crop Inputs sales platforms despite the boycott to identify and punish the retailers who made those sales.

99.     Defendants Bayer, BASF, and Corteva utilize mandatory language in their form contracts with authorized retailers that permit audits of authorized retailers' books and records and on-site inspections at any time. Defendants Bayer, BASF, and Corteva used these contractual provisions to ensure that ecommerce Crop Inputs sales platforms could not purchase name brand Crop Inputs from an authorized retailer.

100.    The impact of Defendants' boycott extended past branded products to generic products (i.e., Crop Inputs sold by non-Defendant manufacturers after the Manufacturer Defendants' patents expire). In a 2018 Forbes article, the CEO of a generic chemical products company stated it was wary of supplying ecommerce Crop Inputs sales platforms because it could anger existing sales channels, but that "[i]n an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."[15]

---

[15] Amy Feldman, *This Scrappy Startup Wants To Save Family Farms. But Big Ag Is Fighting Back*, FORBES,  https://www.forbes.com/sites/amyfeldman/2018/06/19/farming-ag-agriculture-farmers-business-network/?sh=246579466312 (last visited Sept. 16, 2021).

101.    As noted above, the Defendant Wholesalers and Retailers collectively constitute a significant share of the sales of the Manufacturer Defendants, and they were willing to leverage this fact against the Manufacturer Defendants when necessary.

102.    For instance, in 2018, FBN purchased Yorkton Distributors ("Yorkton"), a Canada-based retailer with longstanding supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield. Those agreements would have provided FBN with inventory of Crop Inputs to sell to farmers. Indeed, FBN had inquired with manufacturers prior to purchasing Yorkton about these agreements and "no one indicated they'd be disfavorable."[16]

103.    However, the Wholesaler and Retailer Defendants threatened to retaliate against the Manufacturer Defendants if they honored the agreements. As a result, the Manufacturer and Wholesaler Defendants collectively agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts within a few months of FBN's March 2018 acquisition of Yorkton.

104.    After FBN's purchase, the Wholesaler and Retailer Defendants put pressure on the Manufacturer Defendants to stop supplying Crop Inputs to Yorkton. On March 31, 2018, four days after FBN announced its purchase of Yorkton, Federated warned that the new competitor would upend their business models, writing, "[h]ow our key manufacturing partners decide to engage with this business will be closely observed by us and likely all of our traditional retailing peers across Western Canada." Other market participants have confirmed that this email was also circulated outside of Federated to one or more other industry participants.

---

[16] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850 (last visited Sept. 16, 2021).

105.    After FBN purchased Yorkton, Defendant Univar sent an email to retailers dated April 6, 2018, declaring that it had informed FBN that Univar would cease to conduct business with FBN after July 31, 2018. Univar's email further stated that:

> "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing. . . . If anyone thinks socialism is going to feed the world just call Russia first and see how that worked out."

Finally, Univar's email criticized FBN's model of transparency, stating that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering."

106.    Defendant Univar also sent an email notifying its manufacturer suppliers of its decision not to do business with FBN and provided false and misleading talking points to justify its decision on April 6, 2018

107.    Faced with threats of retaliation from the Wholesaler Defendants and Retailer Defendants, the Manufacturer and Wholesaler Defendants agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts. This all occurred within only a few months of the March 2018 acquisition by FBN and caused Yorkton to lose two-thirds of its branded products.[17] Bayer (on June 15, 2018), Corteva (on August 27, 2018), and Cargill (on August 3, 2018) informed FBN they would no longer sell Crop Inputs, including seeds and pesticides, or sell only limited quantities to Yorkton. Winfield also advised that it would not supply FBN with Crop Inputs on May 8, 2018.

108.    FBN co-founder Charles Baron stated that the response by the Canadian industry after its purchase of Yorkton was similar to the United States' industry response when FBN first

---

[17] *Id.*

launched in 2014, and that "[t]hese actions caused serious harm and really blocked FBN from being able to provide and fulfill a lot of the basic services we provide growers."[18]

109.   The Defendants' boycott of FBN was successful and forced FBN to begin developing its own products that it could sell to farmers through its online marketplace.

110.   The original online marketplace for agricultural chemicals, FarmTrade (formerly known as XSAg.com until summer 2014), was decried by CropLife as a "nasty body blow" and a "draconian" mechanism of cutting out retailers altogether. CropLife characterized FarmTrade as "[a] new Website… [which] offered a virtual playing field for the buying and selling of crop protection products online. Anyone in agriculture could list a product and price offer online and sell to any other entity. We, along with many of you, were concerned that the retailer could be disintermediated – a fancier and less draconian way of saying 'cut out the middle man' – allowing growers to find product conveniently and at a lower market price."[19] FarmTrade's online platform was swiftly combated by crop protection product manufacturers and others in the distribution channel, who "corrected" the "devil" of price transparency, ending the "unnerving and unhappy time." *Id.* While FarmTrade continues to operate, like FBN, it is limited to selling mostly chemicals unencumbered by the restrictions imposed on brand-name chemicals and its business has largely "fall[en] by the wayside."[20]

---

[18] Sean Pratt, *Competition Bureau investigates major crop input makers, sellers*, THE WESTERN PRODUCER (Feb. 13, 2020), https://www.producer.com/news/competition-bureau-investigates-major-crop-input-makers-sellers/ (last visited Sept. 16, 2021).
[19] Paul Schrimpf, *Crop Input Selling: Return of the Price List*, CROPLIFE (Feb. 2, 2016), https://www.croplife.com/editorial/paul-schrimpf/crop-input-selling-return-of-the-price-list/ (last visited Sept. 16, 2021).
[20] Matthew J. Grassi, *What Does FBN's Latest Attempt at Disintermediation Really Mean for Ag Retailers?*, CROPLIFE (Feb. 6, 2017), https://www.croplife.com/iron/what-does-fbns-latest-attempt-at-disintermediation-really-mean-for-ag-retailers/ (last visited Sept. 16, 2021).

111.    As a result of the Defendants' coordinated boycott, farmers are and have been deprived of the opportunity to purchase Crop Inputs at transparent, competitive prices from ecommerce Crop Inputs platforms. Instead, farmers are forced to continue paying artificially inflated prices for Crop Inputs purchased from local retailers subject to Defendants' confidentiality requirements and seed relabeling practices.

112.    Defendants' actions as alleged in this Complaint are against their independent economic self-interests. Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of ecommerce Crop Inputs sales platforms would not have been feasible absent actual coordination and cooperation among Defendants. The boycott could only work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have established itself as the primary supplier to ecommerce platforms and grown its customer base at the expense of its competitors by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

113.    For these reasons, absent an agreement among them, Defendants' actions were against their independent economic self-interest. For any one or more Defendants to provide Crop Inputs to ecommerce platforms presented a significant business opportunity because those platforms: (1) represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant; (2) would simplify the distribution channel and permit Manufacturer Defendants to retain more profit by reducing or eliminating the need for transport costs, rebates, and incentive programs to wholesalers and retailers; and (3) presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market

share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

114.     Certain Defendants are recidivist antitrust violators. Competition experts have noted that past experience with participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists," in which BASF and Bayer are among the top five leading antitrust recidivists. Corteva is also on the list and is among the top forty leading antitrust recidivists.

115.     Economists, retailers, and customers alike recognize that ecommerce retail is distinct from traditional brick-and-mortar retail. Ecommerce has unique characteristics, including the marketing and distribution of products. Economists recognize that the "[i]nternet represents a fundamentally different environment for retailing from traditional retailing."[21] An online channel has different characteristics than a physical channel.[22] Ecommerce has a superior method of transmitting information, effective asynchronous communication, greater flexibility in dealing with information, with far greater interactivity and search capability.[23] Ecommerce retail businesses avoid costs associated with physical store locations.[24] Consumers benefit from greater "information about the available goods and services; an improvement in access to these goods;

---

[21] Forsythe, S.M., & Shi, B. (2003). *Consumer patronage and risk perceptions in Internet shopping*. Journal of Business Research 56, 867–875 at 874.
[22] Katawetawaraks, C., & Wang, C. H. (2011). *Online Shopper Behavior: Influences of Online Shopping Decision*. Asian Journal of Business Research, 1(2), 66-74.
[23] Severin Borenstein and Garth Saloner, *Economics and Electronic Commerce*, JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 15, No.1 (Winter 2001) at 5, https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/Economics%20and%20Electronic%20Commerce.pdf (last visited Sept. 17, 2021); *see also* David VanHoose, ECOMMERCE ECONOMICS (Routledge 2nd Ed. 2011); https://www.routledge.com/eCommerce-Economics/VanHoose/p/book/9780415778985.
[24] *Id.* at 5-6.

and the ability to customize goods to fit the tastes of buyers."[25] Economists recognize that the physical location of the business operating within ecommerce becomes less relevant because the ecommerce market "facilitates production and distribution across borders . . . and can assist in opening markets that were previously closed."[26] The lower transaction and production costs facilitate easier entry into the market and increase competition.[27] Demand side preferences also make online retailing unique in terms of certain factors such as convenience and price.[28]

116.    Defendants recognize that ecommerce sales platforms result in considerable benefits to consumers, most importantly transparency.[29] Defendants have not only boycotted independent ecommerce Crop Inputs sales platforms but are also developing and launching their own ecommerce platforms to trap farmers into their opaque pricing system.[30]

117.    The CCB is formally investigating Defendants' Canadian counterparts for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The CCB inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer

---

[25] *Id.* at 6-7.

[26] Andrew D. Mitchel, *Towards Compatibility: The Future of Electronic Commerce within the Global Trading System*, J Int Economic Law (2001) 4 (4): 683.

[27] *Id.*

[28] Tracey Wallace, The 2018 Omni-Channel Retail Report: Generational Consumer Shopping Behavior Comes Into Focus, https://grow.bigcommerce.com/rs/695-JJT-333/images/report-2018-omnichannel-buying.pdf (last visited Sept. 16, 2021); *see also* Isabel P. Enrique and Sergio Romàn, *The Influence of Consumers' Cognitive and Psychographic Traits on Perceived Deception: A Comparison Between Online and Offline Retailing Contexts*, J Bus Ethics (2014) 119:405–422 (examining the role of several consumers' cognitive and psychographic traits in their perception of retailers' deceptive practices (perceived deception) and the different effects on perceived deception associated with online vis- à-vis in-store shopping, indicating that they need to be considered as distinct experiences for the customer).

[29] Paul Schrimpf and Jackie Pucci, *Online Sales Find Their Niche in Ag Retail*, Crop Life, https://www.croplife.com/crop-inputs/online-sales-find-their-niche-in-ag-retail/ (last visited Sept. 16, 2021) ("[T]he biggest challenge for retailers was price transparency.").

[30] *See id.*

CropScience Inc. and its wholly owned subsidiary Monsanto Canada ULC in the seed and crop protection markets, and whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada.

118.    On February 11, 2020, a Canadian federal court granted in full *ex parte* applications made by Canada's Commissioner of Competition for the production of records against Cargill Limited, Winfield United Canada ULC, Univar Canada Limited, BASF Canada Inc., Bayer CropScience Inc. and its wholly owned subsidiaries Monsanto Canada ULC and Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company and Dow Agrisciences Canada Inc. relating to those practices. Over Defendants' objection, the Canadian federal court found sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States as well.

119.    The United States Department of Justice is monitoring the Competition Bureau's investigation and is deciding whether to launch its own investigation into Defendants' concerted refusal to supply electronic platforms with Crop Inputs. The Competition Bureau noted that the Department of Justice's civil investigation into BASF Corporation had uncovered records of its views of the potential competitive significance of Farmers Business Network in the United States. It also noted that merger review documents of Bayer CropScience LP indicate a substantive consideration of FBN in the United States and its potential competitive significance.

120.    The FTC is also investigating potential anticompetitive conduct in the Crop Inputs market. At least one Defendant, Corteva, has received a subpoena from the FTC. On May 26, 2020, the FTC issued a subpoena to Defendant Corteva, directing it to submit documents pertaining to potential anticompetitive conduct with respect to Crop Inputs. Corteva confirmed in a 10-Q filing that the FTC's subpoena required it "to submit documents pertaining to its crop

protection products generally, as well as business plans, rebate programs, offers, pricing and marketing materials specifically related to its acetochlor, oxamyl and rimsulfuron and other related products in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

## ANTITRUST INJURY

121.    Defendants' anticompetitive conduct has had the following effects, among others:

    a.  Price competition has been restrained or eliminated with respect to Crop Inputs;

    b.  The prices of Crop Inputs have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    c.  Purchasers of Crop Inputs have been deprived of the benefits of free and open competition; and

    d.  Purchasers of Crop Inputs, including Plaintiffs, paid artificially inflated prices.

122.    Throughout the Class Period, Plaintiffs and members of the Class and sub-classes purchased Crop Inputs in the United States, for their own use and not for resale at supracompetitive prices, that were manufactured or sold by Defendants.

123.    It is well recognized that in a multi-level chain of distribution, such as exists here, an overcharge is felt throughout the chain of distribution. As noted antitrust scholar Professor Herbert Hovenkamp stated in his treatise, <u>Federal Antitrust Policy, The Law of Competition and Its Practice</u> 564 (1994):

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below.  For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

124.    The purpose of the Defendants' conspiratorial and unlawful conduct was to fix, raise, stabilize, and/or maintain the price of Crop Inputs.

125.    As a direct and proximate result of the alleged violations of antitrust laws, Plaintiffs and Class members have sustained injury to their business or property, having paid higher prices for Crop Inputs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount to be determined by a jury on competent proof. This is an antitrust injury of the type that the antitrust laws were intended to punish and prevent.

## CLASS ALLEGATIONS

126.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3) on behalf of the following Class and Subclasses, seeking injunctive relief and damages pursuant to federal law on behalf of the Nationwide Class, damages on behalf of the Direct Purchaser Damages Sub-Class pursuant to federal law, and damages on behalf of the Indirect Purchaser and State Law Damages Sub-Class pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states identified herein:

**Nationwide Class (the "Class"):**

All persons and entities in the United States and its territories who purchased, for their own use and not for resale, a Crop Input manufactured by a Manufacturer Defendant during the Class Period.

**Direct Purchaser Damages Sub-Class:**

36

All persons and entities in the United States and its territories who purchased from a Defendant, for their own use and not for resale, a Crop Input manufactured by a Manufacturer Defendant during the Class Period.

**Indirect Purchaser and State Law Damages Sub-Class:**

All persons and entities in the United States and its territories who purchased, in an "Indirect Purchaser" or "State Law" State,[31] from a retailer other than a Defendant, for their own use and not for resale, a Crop Input manufactured by a Manufacturer Defendant during the Class Period.

127.    Specifically excluded from the Class and sub-classes are the following:

a.   Persons or entities that purchased Crop Inputs solely for resale;

b.   Defendants;

c.   The officers, directors, or employees of any Defendant;

d.   Any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant;

e.   Any federal, state governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff;

f.   Any juror assigned to this action; and

g.   Any co-conspirator identified in this action.

128.    **Numerosity**. Because such information is in the exclusive control of Defendants, Plaintiffs do not know the exact number of members of the Class or sub-classes. Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands, if not tens of thousands, of members in the Class, and in each of the sub-classes, and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class

---

[31] The "Indirect Purchaser" and "State Law" States are the states listed in Counts II, III, and IV.

members would be impracticable. Class treatment is the superior method for fairly and efficiently adjudicating this controversy.

129.    **Class Identity**. The above-defined Class and sub-classes are readily identifiable and for which records should exist.

130.    **Typicality**. Plaintiffs' claims are typical of other class members' claims because they were injured through Defendants' uniform misconduct and paid supracompetitive prices for Crop Inputs. Accordingly, by proving their own claims, Plaintiffs will necessarily prove the other class members' claims.

131.    **Common Questions Predominate**. Common legal and factual questions exist as to all Class members. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to the Class and sub-classes as a whole. These questions include but are not limited to the following:

    a.  Whether Defendants engaged in a combination or conspiracy amongst themselves to fix, raise, maintain, and/or stabilize the prices of Crop Inputs in the United States;

    b.  The identity of additional participants in the alleged combinations and conspiracy, if any;

    c.  The duration of the alleged combination or conspiracy and nature of the acts carried out by Defendants in furtherance of the combination or conspiracy;

    d.  Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

e.  Whether the alleged combination or conspiracy had the effect of artificially inflating the price of Crop Inputs sold in the United States during the Class Period;

f.  Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws;

g.  Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and Class members, thereby entitling Plaintiffs and Class members to disgorgement of all benefits derived by Defendants;

h.  Whether Defendants formed an enterprise (the "Crop Inputs Market Manipulation Enterprise") within the meaning of RICO;

i.  Whether Defendants engaged in a pattern of racketeering to defraud purchasers of Crop Inputs through blocking electronic platforms, including FBN, from access to Crop Inputs by agreeing not to sell products to them and misrepresenting the reasons for that decision;

j.  Whether Defendants' conduct caused injury to the members of the Class and sub-classes;

k.  Whether Defendants took actions to conceal their unlawful conspiracy;

l.  The appropriate injunctive and related equitable relief; and

m.  The appropriate measure and amount of damages to which Plaintiffs and other Class members are entitled.

132.  **Adequacy**. Plaintiffs can and will fairly and adequately represent and protect the interests of members of the Class and sub-classes and have no interests that conflict with or are

antagonistic to those of the Class or sub-classes.  Moreover, Plaintiffs' attorneys are experienced and competent in antitrust and class action litigation.

133.    **Superiority**. Class action treatment is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because: among other things, such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

134.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

135.    Defendants have acted on grounds generally applicable to the Class and sub-classes, thereby making final injunctive relief appropriate with respect to the Class and sub-classes as a whole.

**THE APPLICABLE STATUTES OF LIMITATIONS
DO NOT BAR PLAINTIFFS' CLAIMS**

136.    Any applicable statute of limitations for Plaintiffs and the Class and sub-classes has been tolled and/or Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' fraudulent concealment of the conspiracy.

137.    First, group boycotts and other antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants and their co-conspirators engaged in secret conspiracies that did not reveal facts that would put Plaintiffs or the Class and sub-classes on inquiry notice that

there was a conspiracy to fix prices of Crop Inputs, and effectively and affirmatively fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the Class and sub-classes.

138.   In addition, Defendants acted affirmatively to conceal their conspiracy. As discussed above, Defendants have structured the market for Crop Inputs to maximize opacity to deny farmers access to pricing data and product information that farmers need to make informed decisions about Crop Inputs purchases. The Defendants use confidentiality provisions in their contracts to restrict disclosure of the prices of Crop Inputs. Defendants also employ seed relabeling and bundling to further prevent farmers, including Plaintiffs and the Class and sub-classes, from accessing pricing data and information about the Crop Inputs market.

139.   As a result, Plaintiffs and Class members had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiffs and members of the Class and subclasses did not discover, nor could have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing their Complaints, which led to the filing of this Consolidated Amended Class Action Complaint, because of the deceptive practices and secrecy employed by Defendants and their co-conspirators to fraudulently conceal their combination.

140.   Specifically, Plaintiffs and the Class and sub-classes did not have actual or constructive notice of the conspiracy alleged herein until the Canadian Competition Bureau launched its inquiry and issued subpoenas in February 2020, or until Defendant Corteva's September 2020 disclosure that the FTC had subpoenaed Corteva for documents "in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

141.    Additionally, and in the alternative, Defendants' anticompetitive acts are continuing violations of the Sherman Act and accordingly each purchase by Plaintiffs at supracompetitive prices re-starts the statute of limitations. Defendants' anticompetitive conduct began as early as January 1, 2014 and continues through the present. As a direct result of Defendants' unlawful conduct throughout the Class Period, Plaintiffs and Class, and Sub-Class members paid artificially inflated prices for Crop Inputs throughout the Class Period. Defendants' statements and actions described herein demonstrate that they continued to meet during the Class Period in furtherance of the conspiracy. Their meetings were overt acts that began a new statute of limitations because they served to further the objectives of the conspiracy. In this manner, Defendants' new overt acts were more than the inertial consequences of Defendants' initial violation. Rather, their acts were new and independent acts that perpetuated their agreement and kept it current with market conditions. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs, Class, and Sub-Class members.

## CLAIMS FOR RELIEF

### COUNT I
**Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
On Behalf of the Nationwide Class (For Injunctive Relief) and the Direct Purchaser
Damages Sub-Class (for Damages)**

142.    Plaintiffs incorporate and reallege every allegation in the preceding paragraphs, as though fully set forth herein.

143.    As to this count, "the Class" refers to the Nationwide Class (seeking injunctive relief) and the Direct Purchaser Damages Sub-Class (seeking damages).

144.    Beginning in at least 2014, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have explicitly

or implicitly colluded to jointly boycott entities that would have introduced price-reducing electronic sales of Crop Inputs in the United States, in order to artificially raise, fix, maintain, and /or stabilize prices in the Crop Inputs market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

145.     Defendants' actions were not mere independent parallel conduct but took place in the context of multiple facts evincing a conspiracy.

146.     First, the market for Crop Inputs is highly concentrated, as Defendants BASF, Corteva, Syngenta, and Bayer AG dominate production in virtually every Crop Input category, and control 85% of the corn seed market, over 75% of the soybean seed market, and over 90% of the cotton seed market. The wholesale market is just as concentrated, with seven wholesalers accounting for 70% of all sales volume.

147.     Second, an effective boycott of ecommerce Crop Inputs sales platforms would not have been feasible without coordination and cooperation between Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan, otherwise one Manufacturer Defendant breaking with the boycott could have established itself as the primary supplier to ecommerce Crop Inputs sales platforms and grown its customer base by operating a new distribution channel for Crop Inputs, taking market share from its rival manufacturers.

148.     Third, Defendants had a strong motive to conspire to preserve the presently opaque market structure. If ecommerce Crop Inputs sales platforms succeeded in publicly publishing price lists for Crop Inputs, then the Defendants could no longer keep prices confidential and charge varying prices based on geography or through seed relabeling or bundling. The Wholesaler and Retailer Defendants were therefore motivated to conspire amongst themselves and exert pressure

on the Manufacturer Defendants to protect their profits without having to compete on the merits of price and services.

149.     Fourth, Defendants formed and maintained their conspiracy using a high degree of inter-firm communication both directly and through wholesalers and retailers, such as through CropLife America's annual board of directors meeting which specifically discussed the threat posed by the entry of ecommerce Crop Inputs sales platforms. Because no farmer representatives can participate, these meetings provided a forum for collusion.

150.     Fifth, Defendants' actions were against their apparent economic self-interest in the absence of an agreement. Providing Crop Inputs to ecommerce Crop Inputs sales platforms presented a significant business opportunity. Ecommerce Crop Inputs platforms represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant, would simplify the distribution channel and permit Manufacturer Defendants to retain greater profit by eliminating transport costs, rebates, and incentive programs to wholesalers and retailers. Ecommerce Crop Inputs platforms further presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

151.     Sixth, Defendants are antitrust recidivists, which is probative of future collusion. *See*, *e.g.*, *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 500-01 (S.D.N.Y. 2004). Competition experts have noted that past experience participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists," in which

Defendants BASF and Bayer are among the top 5 leading antitrust recidivists, and Defendant Corteva is also listed.

152.    This conspiracy constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

153.    Alternatively, this conspiracy constitutes a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or procompetitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any business justification or pro-competitive benefits proffered by Defendants would be pretextual, outweighed by the anticompetitive effects of Defendants' conduct, and, in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

154.    Plaintiffs and the other members of the Class have been injured, and will continue to be injured, in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Class have paid more for Crop Inputs than they otherwise would have paid in the absence of Defendants' collusive conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

155.    In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including agreeing to boycott ecommerce Crop Inputs sales platforms by refusing to supply Crop Inputs manufactured by Manufacturer Defendants.

156.    The combination and conspiracy alleged herein has had the following effects, among others:

> a.  Price competition in the sale of Crop Inputs has been restrained, suppressed, and/or eliminated in the United States;

    b.   Prices for Crop Inputs sold by Defendants and all their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

    c.   Those who purchase Crop Inputs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

157.    Plaintiffs and Class members have been injured and will continue to be injured by paying more for Crop Inputs manufactured or sold by Defendants than they would have paid and will pay in the absence of the combination or conspiracy as alleged herein.

158.    Plaintiffs and all Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein. Moreover, members of the Direct Purchaser Damages sub-class are entitled to recover damages to the maximum extent allowed under all applicable laws.

### COUNT II
### Violation of the State Antitrust Statutes
### On Behalf of the Indirect Purchaser and State Law Damages Sub-Class

159.    Plaintiffs incorporate and reallege every allegation in the preceding paragraphs, as though fully set forth herein.

160.    As to this count, "the Class" refers to the Indirect Purchaser and State Law Damages Sub-Class.

161.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Crop Inputs in an unreasonable restraint of trade in commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

162.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Crop Inputs.

163.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated Class members who purchased Crop Inputs have been harmed by being forced to pay artificially inflated, supracompetitive prices for Crop Inputs.

164.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

165.    **Arizona.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Ariz. Rev. Stat. Ann. §§ 44-1402,** *et seq.* with respect to purchases of Crop Inputs in Arizona by Class members and/or purchases by Arizona residents.

   a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

   b.  During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

   c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    d. Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, members of the Class seek all forms of relief available under Ariz. Rev. Stat. Ann. §§ 44-1402, *et seq.*

166. **California.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Cal. Bus. & Prof. Code, §§ 16720,** ***et seq.*** with respect to purchases of Crop Inputs in California by Class members and/or purchases by California residents.

    a. During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of Crop Inputs at supracompetitive levels.

    b. The aforesaid violations of Cal. Bus. & Prof. Code § 16720, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Crop Inputs.

    c. For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) fixing, raising, stabilizing, and pegging the price of Crop Inputs.

    d. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of Crop Inputs has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Crop Inputs sold by Defendants have been fixed, raised, stabilized, and pegged at artificially

high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased Crop Inputs directly or indirectly from Defendants have been deprived of the benefit of free and open competition.

e. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property in that they paid more for Crop Inputs than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, members of the Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Cal. Bus. & Prof. Code § 16720.

167. **Connecticut.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Conn. Gen. Stat. § 35-26,** *et seq.* with respect to purchases of Crop Inputs in Connecticut by Class members and/or purchases by Connecticut residents.

a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

      d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. § 35-26, *et seq.* Accordingly, members of the Class seek all forms of relief available under Conn. Gen. Stat. § 35-24, *et seq.*

168.   **Hawaii.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Haw. Rev. Stat. Ann. § 480-1, *et seq.*** with respect to purchases of Crop Inputs in Hawaii by Class members and/or purchases by Hawaii residents.

      a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

      b.   During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

      c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

      d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-1, *et seq.* Accordingly, members of the Class seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq.*

169.     **Illinois.** Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.* with respect to purchases of Crop Inputs by Class members and/or purchases by Illinois residents.

   a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

   b.   During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

   c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

   d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/3, *et seq.* Accordingly, members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. Ann. 10/3, *et seq.*

170.     **Iowa.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Iowa Code §§ 553.4 *et seq.*** with respect to purchases of Crop Inputs in Iowa by Class members and/or purchases by Iowa residents.

   a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Iowa; (2)

Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.4, *et seq.* Accordingly, members of the Class seek all forms of relief available under Iowa Code §§ 553.4, *et seq.*

171.  **Kansas.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Kan. Stat. Ann. §§ 50-101, *et seq.*** with respect to purchases of Crop Inputs in Kansas by Class members and/or purchases by Kansas residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.* Accordingly, members of the Class seek all forms of relief available under Kan. Stat. Ann. §§ 50-101, *et seq.*

172.   **Maine.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Me. Rev. Stat. tit. 10, §§ 1101, *et seq*.** with respect to purchases of Crop Inputs in Maine by Class members and/or purchases by Maine residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Maine; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.   During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. tit. 10, §§ 1101, et seq. Accordingly, members of the Class seek all relief available under Me. Rev. Stat. tit. 10, §§ 1101, et seq.

173.    **Maryland.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Md. Code, Com. Law §§ 11-201,** *et seq.* with respect to purchases of Crop Inputs in Michigan by Class members and/or purchases by Michigan residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Maryland; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.  During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Md. Code, Com. Law §§ 11-201, *et seq.* Accordingly, members of the Class seek all relief available under Md. Code, Com. Law §§ 11-201, *et seq.*

174.    **Michigan.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Mich. Comp. Laws Ann. §§ 445.772,** *et seq.* with respect to purchases of Crop Inputs in Michigan by Class members and/or purchases by Michigan residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially

high levels throughout Michigan; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq*. Accordingly, members of the Class seek all relief available under Mich. Comp. Laws Ann. §§ 445.772, *et seq*.

175.  **Minnesota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Minn. Stat. §§ 325D.51, *et seq.*** with respect to purchases of Crop Inputs in Minnesota by Class members and/or purchases by Minnesota residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§ 325D.51, *et seq*. Accordingly, members of the Class seek all relief available under Minn. Stat. §§ 325D.51, *et seq*.

176.  **Mississippi.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Miss. Code Ann. §§ 75-21-3,** *et seq.* with respect to purchases of Crop Inputs in Mississippi by Class members and/or purchases by Mississippi residents.

    a.  Defendants' Crop Inputs were imported into Mississippi and then sold through Defendants' agents to Mississippi customers, including Plaintiff Jones Planting Co. III at anticompetitive prices.

    b.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

    c.  During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

    d.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

     e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. §§ 75-21-3, *et seq.* Accordingly, members of the Class seek all relief available under Miss. Code Ann. §§ 75-21-3, *et seq.*

177.  **Nebraska.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Neb. Rev. Stat. Ann. §§ 59-801, *et seq.*** with respect to purchases of Crop Inputs in Nebraska by Class members and/or purchases by Nebraska residents.

     a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

     b.  During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

     c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

     d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. Ann. §§ 59-801, *et seq.* Accordingly, members of the Class seek all relief available under Neb. Rev. Stat. Ann. §§ 59-801, *et seq.*

178.  **Nevada.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*** with respect to purchases of Crop Inputs in Nevada by Class members and/or purchases by Nevada residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.* Accordingly, members of the Class seek all relief available under Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*

179.  **New Hampshire.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.H. Rev. Stat. Ann. §§ 356:2, *et seq.*,** with respect to purchases of Crop Inputs in New Hampshire by Class members and/or purchases by New Hampshire residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) members of the Class were

58

deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.H. Rev. Stat. Ann. §§ 356:2, *et seq*. Accordingly, members of the Class seek all relief available under N.H. Rev. Stat. Ann. §§ 356:2, *et seq*.

180.    **New Mexico.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.M. Stat. Ann. §§ 57-1-1, *et seq.*** with respect to purchases of Crop Inputs in New Mexico by Class members and/or purchases by New Mexico residents.

a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, members of the Class seek all relief available under N.M. Stat. Ann. §§ 57-1-1, *et seq*.

181.   **New York.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.Y. Gen. Bus. Law §§ 340, *et seq.*** with respect to purchases of Crop Inputs in New York by Class members and/or purchases by New York residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New York; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

    b.   During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, members of the Class seek all relief available under N.Y. Gen. Bus. Law §§ 340, *et seq*.

182.     **North Carolina.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.C. Gen. Stat. §§ 75-1, *et seq.*** with respect to purchases of Crop Inputs in North Carolina by Class members and/or purchases by North Carolina residents.

a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c. As a direct and proximate result of the Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq*. Accordingly, members of the Class seek all relief available under N.C. Gen. Stat. §§ 75-1, *et. seq*.

183. **North Dakota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.D. Cent. Code §§ 51-08.1-01,** *et seq.* with respect to purchases of Crop Inputs in North Dakota by Class members and/or purchases by North Dakota residents.

   a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

   b. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

   c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

   d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, members of the Class seek all relief available under N.D. Cent. Code §§ 51-08.1-01, *et seq*.

184. **Oregon.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Or. Rev. Stat. §§ 646.705,** *et seq.***,** with respect to purchases of Crop Inputs in Oregon by Class members and/or purchases by Oregon residents.

   a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially

high levels throughout Oregon; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Or. Rev. Stat. §§ 646.705, *et seq*. Accordingly, members of the Class seek all relief available under Or. Rev. Stat. §§ 646.705, *et seq*.

185.   **Rhode Island.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **6 R.I. Gen. Laws Ann. §§ 6-36-4, *et seq.*** with respect to purchases of Crop Inputs in Rhode Island by Class members and/or purchases by Rhode Island residents.

a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.   During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 6 R.I. Gen. Laws Ann. §§ 6-36-4, *et seq.* Accordingly, members of the Class seek all forms of relief available under 6 R.I. Gen. Laws Ann. §§ 6-13.1-1, *et seq.*

186.   **South Dakota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **S.D. Codified Laws §§ 37-1-3.1,** *et seq.* with respect to purchases of Crop Inputs in South Dakota by Class members and/or purchases by South Dakota residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

      d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.D. Codified Laws §§ 37-1-3.1, *et seq*. Accordingly, members of the Class seek all relief available under S.D. Codified Laws §§ 37-1-3.1, *et seq*.

187. **Tennessee.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Tenn. Code Ann. §§ 47-25-101, *et seq.*** with respect to purchases of Crop Inputs in Tennessee by Class members and/or purchases by Tennessee residents.

      a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

      b. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

      c. As a direct and proximate result of the Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

      d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*. Accordingly, members of the Class seek all relief available under Tenn. Code Ann. §§ 47-25-101, *et seq*.

188. **Utah.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Utah Code Ann. §§ 76-10-3101, *et seq.*** with respect to purchases of Crop Inputs in Utah by Class members and/or purchases by Utah residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Utah; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq*. Accordingly, members of the Class seek all relief available under Utah Code Ann. §§ 76-10-3101, *et seq*.

189.  **Vermont.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*.** with respect to purchases of Crop Inputs in Vermont by Class members and/or purchases by Vermont residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*. Accordingly, members of the Class seek all relief available under Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*.

190. **West Virginia.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **W. Va. Code §§ 47-18-4,** *et seq.* with respect to purchases of Crop Inputs in West Virginia by Class members and/or purchases by West Virginia residents.

a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

67

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of W. Va. Code §§ 47-18-1, *et seq*. Accordingly, members of the Class seek all relief available under W. Va. Code §§ 47-18-1, *et seq*.

191.  **Wisconsin.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Wis. Stat. §§ 133.01 *et seq.*** with respect to purchases of Crop Inputs in Wisconsin by Class members and/or purchases by Wisconsin residents.

a.  Defendants' Crop Inputs were imported into Wisconsin and then sold through Defendants' agents to Wisconsin customers at anticompetitive prices.

b.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

c.  During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce, and substantially affected the people of Wisconsin and agricultural growers and producers within Wisconsin.

d.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq*. Accordingly, members of the Class seek all relief available under Wis. Stat. §§ 133.01, *et seq*.

## COUNT III
### Violation of State Consumer Protection Statutes
### On Behalf of the Indirect Purchaser and State Law Damages Sub-Class

192.    Plaintiffs incorporate and reallege every allegation in the preceding paragraphs, as though fully set forth herein.

193.    As to this count, "the Class" refers to the Indirect Purchaser and State Law Damages Sub-Class.

194.    Defendants engaged in unfair competition, or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

195.    **Arizona.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Ariz. Rev. Stat. Ann. §§ 44-1521,** *et seq.*, with respect to purchases of Crop Inputs in Arizona by Class members and/or purchases by Arizona residents.

a.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Crop Inputs were sold, distributed, or obtained in Arizona and took efforts to conceal their agreements from members of the Class.

b.    The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Ariz. Rev. Stat. Ann. § 44-1522(A).

c.    Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout Arizona; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

d.  During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce and consumers.

e.  As a direct and proximate result of the unlawful conduct of Defendants, members of the Class have been injured in their business and property and are threatened with further injury.

f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Ann. § 44-1522, and, accordingly, members of the Class seek all relief available under that statute.

196.  **Arkansas.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Ark. Code §§ 4-88-101,** ***et seq.***, with respect to purchases of Crop Inputs in Arkansas by Class members and/or purchases by Arkansas residents.

a.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Crop Inputs were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from members of the Class.

b.  The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

     c.  Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

     d.  During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

     e.  As a direct and proximate result of the unlawful conduct of Defendants, members of the Class have been injured in their business and property and are threatened with further injury.

     f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann., § 4-88-107(a)(10) and, accordingly, members of the Class seek all relief available under that statute.

197.  **California.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Cal. Bus. & Prof. Code §§ 17200,** *et seq*, with respect to purchases of Crop Inputs in California by Class members and/or purchases by California residents.

     a.  During the Class Period, Defendants marketed, sold, or distributed Crop Inputs in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §§ 17200, *et seq.*, by engaging in the acts and practices specified above.

b.  This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law.

c.  Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code § 16720, *et seq.*, set forth above.

d.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, are otherwise unfair, unconscionable, unlawful or fraudulent, whether or not in violation of Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and whether or not concerted or independent acts.

e.  Defendants' acts or practices are unfair to consumers of Crop Inputs in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200.

f.  Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200.

g.  Members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

     h.   The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

     i.   The unlawful and unfair business practices of Defendants, each of them, have caused and continue to cause the members of the Class to pay supracompetitive and artificially inflated prices for Crop Inputs. Members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

     j.   The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code § 17200.

     k.   As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

198.   **District of Columbia.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **D.C. Code §§ 28-3901,** *et seq.* with respect to purchases of Crop Inputs in D.C. by Class members and/or purchases by D.C. residents.

     a.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Crop Inputs were sold, distributed or obtained in the District of Columbia.

b.  The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Members of the Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Crop Inputs. Defendants had the sole power to set that price and members of the Class had no power to negotiate a lower price. Moreover, members of the Class lacked any meaningful choice in purchasing Crop Inputs because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of Crop Inputs, including their illegal conspiracy to secretly fix the price of Crop Inputs at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Class. Defendants took grossly unfair advantage of members of the Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Crop Inputs.

c.  Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the

Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

d. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code §§ 28-3901, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

199. **Florida.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Fla. Stat. §§ 501.201,** *et seq.***,** with respect to purchases of Crop Inputs in Florida by Class members and/or purchases by Florida residents.

a. Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Florida; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq*., and, accordingly, members of the Class seek all relief available under that statute.

200.    **Hawaii.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Haw. Rev. Stat. Ann. §§ 480-1, *et seq.*** with respect to purchases of Crop Inputs in Hawaii by Class members and/or purchases by Hawaii residents.

      a.   Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supra-competitive, artificially inflated prices for Crop Inputs.

      b.   During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

      c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured and are threatened with further injury.

      d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. Ann. §§ 480-1, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

201.    **Illinois.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **815 Ill. Comp. Stat. Ann. 505/1, *et seq*.** with respect to purchases of Crop Inputs in Illinois by Class members and/or purchases by Illinois residents.

      a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Illinois;

(2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Illinois commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/1, *et seq.,* and, accordingly, members of the Class seek all relief available under that statute.

202.  **Kansas.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Kan. Stat. Ann. §§ 50-623, *et seq.*,** with respect to purchases of Crop Inputs in Kansas by Class members and/or purchases by Kansas residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Kansas commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. Ann. §§ 50-623, *et seq.* and, accordingly, members of the Class seek all relief available under that statute.

203.  **Michigan.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mich. Comp. Laws Ann. §§ 445.901,** *et seq.* with respect to purchases of Crop Inputs in Michigan by Class members and/or purchases by Michigan residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws Ann. §§ 445.901, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

204. **Minnesota.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Minn. Stat. §§ 325F.68, *et seq.***, and **Minn. Stat. § 8.31** with respect to purchases of Crop Inputs in Minnesota by Class members and/or purchases by Minnesota residents.

a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Minnesota commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 325F.68, *et seq.*, and Minn. Stat. § 8.31 and, accordingly, members of the Class seek all relief available under that statute.

205. **Missouri.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mo. Ann. Stat. §§**

**407.010,** *et seq.*, with respect to purchases of Crop Inputs in Missouri by Class members and/or purchases by Missouri residents.

a.  Plaintiffs and the Class purchased Crop Inputs for personal, family, or household purposes.

b.  Defendants engaged in the conduct described herein in connection with the sale of Crop Inputs in trade or commerce in a market that includes Missouri.

c.  Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Crop Inputs were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to members of the Class.

d.  Defendants concealed, suppressed, and omitted to disclose material facts to members of the Class concerning Defendants' unlawful activities and artificially inflated prices for Crop Inputs. The concealed, suppressed, and omitted facts would have been important to members of the Class as they related to the cost of Crop Inputs they purchased.

e.  Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Crop Inputs by making public statements that were not in accord with the facts.

f.  Defendants' statements and conduct concerning the price of Crop Inputs were deceptive as they had the tendency or capacity to mislead members of the Class to

believe that they were purchasing Crop Inputs at prices established by a free and fair market.

g.  Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

h.  The foregoing acts and practices constituted unlawful practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq.*

i.  As a direct and proximate result of the above-described unlawful practices, members of the Class suffered ascertainable loss of money or property.

j.  Accordingly, members of the Class seek all relief available under Mo. Ann. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by Mo. Code Regs. Ann. tit. 15, §§ 60-7.010, *et seq.*, Mo. Code Regs. Ann. tit. 15, §§ 60-8.010, *et seq.*, and Mo. Code Regs. Ann. tit. 15, §§ 60-9.010, *et seq.*, and Mo. Ann. Stat. § 407.025, which provides for the relief sought in this count.

206.  **Montana.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mont. Code §§ 30-14-**

**101,** *et seq.* with respect to purchases of Crop Inputs in Montana by Class members and/or purchases by Montana residents.

    a. Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Montana; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

    b. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

    c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured and are threatened with further injury.

    d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

207. **Nebraska.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Neb. Rev. Stat. Ann. §§ 59-1601,** *et seq*, with respect to purchases of Crop Inputs in Nebraska by Class members and/or purchases by Nebraska residents.

    a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Class were deprived of free

and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Nebraska commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. Ann. §§ 59-1601, *et seq.* and, accordingly, members of the Class seek all relief available under that statute.

208.  **Nevada.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Nev. Rev. Stat. Ann. §§ 598.0903, *et seq.*** with respect to purchases of Crop Inputs in Nevada by Class members and/or purchases by Nevada residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. Ann. §§ 598.0903, *et seq.* and, accordingly, members of the Class seek all relief available under that statute.

209.  **New Hampshire.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*** with respect to purchases of Crop Inputs in New Hampshire by Class members and/or purchases by New Hampshire residents.

a.  Defendants willingly and knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Crop Inputs were sold, distributed or obtained in New Hampshire and took efforts to conceal their agreements from members of the Class.

b.  The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.H. Rev. Stat. §§ 358-A:1, *et seq.*, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by members of the Class and the prices paid by them for Crop Inputs as set forth in N.H. Rev. Stat. §§ 358-A:1, *et seq.* Members of the Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Crop

Inputs. Defendants had the sole power to set that price and members of the Class had no power to negotiate a lower price. Moreover, members of the Class lacked any meaningful choice in purchasing Crop Inputs because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of Crop Inputs, including their illegal conspiracy to secretly fix the price of Crop Inputs at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Class. Defendants took grossly unfair advantage of members of the Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Crop Inputs.

c.  Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

d.  During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

e.  As a direct and proximate result of the unlawful conduct of Defendants, members of the Class have been injured and are threatened with further injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*., and, accordingly, members of the Class seek all relief available under that statute.

210.    **New Mexico.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.M. Stat. Ann. §§ 57-12-1, *et seq.*** with respect to purchases of Crop Inputs in New Mexico by Class members and/or purchases by New Mexico residents.

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Crop Inputs were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from members of the Class.

b. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. Ann. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by members of the Class and the prices paid by them for Crop Inputs as set forth in N.M. Stat. Ann. § 57-12-2(E). Members of the Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Crop Inputs. Defendants had the sole power to set that price and members of the Class had no power to negotiate a lower price. Moreover, members of the Class lacked any meaningful choice in purchasing Crop Inputs because they were unaware of the unlawful overcharge and

there was no alternative source of supply through which members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of Crop Inputs, including their illegal conspiracy to secretly fix the price of Crop Inputs at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Class. Defendants took grossly unfair advantage of members of the Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Crop Inputs.

c. Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

d. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e. As a direct and proximate result of the unlawful conduct of Defendants, members of the Class have been injured and are threatened with further injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

211. **New York.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.Y. Gen. Bus. Law §§ 349,** *et seq.* with respect to purchases of Crop Inputs in New York by Class members and/or purchases by New York residents.

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Crop Inputs were sold, distributed or obtained in New York and took efforts to conceal their agreements from members of the Class.

b. Defendants made public statements about the prices of Crop Inputs that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Crop Inputs; and Defendants alone possessed material information that was relevant to consumers but failed to provide the information.

c. Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased Crop Inputs were misled to believe that they were paying a fair price for Crop Inputs or the price increases for Crop Inputs were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

d. Defendants knew that their unlawful trade practices with respect to pricing Crop Inputs would have an impact on New York consumers and not just the Defendants' direct customers.

e.  Defendants knew that their unlawful trade practices with respect to pricing Crop Inputs would have a broad impact, causing consumer class members who indirectly purchased Crop Inputs to be injured by paying more for Crop Inputs than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f.  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

g.  Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New York; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

h.  During the Class Period, Defendants marketed, sold, or distributed Crop Inputs in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

i.  During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Crop Inputs in New York.

j.  Members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

212.   **North Carolina.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.C. Gen. Stat. §§ 75-1.1, *et seq.*** with respect to purchases of Crop Inputs in North Carolina by Class members and/or purchases by North Carolina residents.

    a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Crop Inputs were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from members of the Class.

    b.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which members of the Class could not possibly have been aware. Defendants publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of Crop Inputs created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, and avoiding the creation of documents which would reveal the antitrust violations.

    c.  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which

resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d.  Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

e.  During the Class Period, Defendants marketed, sold, or distributed Crop Inputs in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

f.  During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Crop Inputs in North Carolina.

g.  Members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

213.  **Oregon.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Or. Rev. Stat. §§ 646.605, *et seq.*** with

respect to purchases of Crop Inputs in Oregon by Class members and/or purchases by Oregon residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §§ 646.605, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

214.   **Rhode Island.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **6 R.I. Gen. Laws Ann. §§ 6-13.1-1,** *et seq.* with respect to purchases of Crop Inputs in Rhode Island by Class members and/or purchases by Rhode Island residents.

    a.   Upon information and belief, one or more members of this Class purchased Crop Inputs for personal, family, or household purposes.

b.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Crop Inputs were sold, distributed, or obtained in Rhode Island.

c.  Defendants deliberately failed to disclose material facts to members of the Class concerning Defendants' unlawful activities and artificially inflated prices for Crop Inputs. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' Crop Inputs prices were competitive and fair.

d.  Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

e.  As a direct and proximate result of the Defendants' violations of law, members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Crop Inputs, likely misled all consumers acting

reasonably under the circumstances to believe that they were purchasing Crop Inputs at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to members of the Class as they related to the cost of Crop Inputs they purchased.

g. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Rhode Island Gen. Laws. Ann. § 6-13.1-1, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

215. **South Carolina.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **S.C. Code Ann. §§ 39-5-10, *et seq.*** with respect to purchases of Crop Inputs in South Carolina by Class members and/or purchases by South Carolina residents.

a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

216.   **South Dakota.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **S.D. Codified Laws § 37-24-6** with respect to purchases of Crop Inputs in South Dakota by Class members and/or purchases by South Dakota residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.   As described herein, Defendants affirmatively concealed their conspiracy and maintained it through deception.

    c.   During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

    d.   As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

    e.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-6, and, accordingly, members of the Class seek all relief available under that statute.

217. **Tennessee.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Tenn. Code Ann. §§ 47-18-101,** *et seq.* with respect to purchases of Crop Inputs in Tennessee by Class members and/or purchases by Tennessee residents.

      a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

      b. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

      c. As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

      d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, *et seq*, and, accordingly, members of the Class seek all relief available under that statute.

218. **Utah.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Utah Code Ann. §§ 13-11-1,** *et seq.* with respect to purchases of Crop Inputs in Utah by Class members and/or purchases by Utah residents.

      a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Utah; (2)

Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. §§ 13-11-1, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

219.  **Virginia.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Va. Code Ann. §§ 59.1-196,** *et seq.* with respect to purchases of Crop Inputs in Virginia by Class members and/or purchases by Virginia residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Virginia; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Virginia commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code Ann. §§ 59.1-196, *et seq*, and, accordingly, members of the Class seek all relief available under that statute.

220.  **Vermont.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*** with respect to purchases of Crop Inputs in Vermont by Class members and/or purchases by Vermont residents.

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Crop Inputs were sold, distributed, or obtained in Vermont.

b.  Defendants deliberately failed to disclose material facts to members of the Class concerning their unlawful activities and artificially inflated prices for Crop Inputs. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that their Crop Inputs prices were competitive and fair.

c.   Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

d.   As a direct and proximate result of Defendants' violations of law, members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

e.   Defendants' deception, including their omissions concerning the price of Crop Inputs, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Crop Inputs at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*, and, accordingly, members of the Class seek all relief available under that statute.

221.   **West Virginia.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **W. Va. Code §§ 46A-6-101, *et seq*.** with respect to purchases of Crop Inputs in West Virginia by Class members and/or purchases by West Virginia residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code §§ 46A-6-101, *et seq.* and, accordingly, members of the Class seek all relief available under that statute.

222.   Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injury consists of paying higher prices for Crop Inputs than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

223.   On behalf of themselves and the Class, Plaintiffs seek all appropriate relief provided for under the foregoing statutes.

## COUNT IV

### Unjust Enrichment
### On Behalf of the Indirect Purchaser and State Law Damages Sub-Class

224.    Plaintiffs incorporate and reallege every allegation in the preceding paragraphs, as though fully set forth herein.

225.    As to this count, "the Class" refers to the Indirect Purchaser and State Law Damages Sub-Class.

226.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Crop Inputs.

227.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the classes in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

**COUNT V**
**Violations of The Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. § 1962(c), (d)**
**On Behalf of the Nationwide Class**

228.    Plaintiffs incorporate and reallege every allegation in the preceding paragraphs, as though fully set forth herein.

229.    As to this count, "the Class" refers to the Nationwide Class.

230.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3).

231.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

232.    Section 1962(d) makes it unlawful for "any person to conspire to violate," among other provisions, Section 1962(c). See 18 U.S.C. § 1962(d).

233.    From at least 2016 to the present, Defendants have worked to manipulate the Crop Input market by blocking access by FBN and other ecommerce Crop Inputs sales platforms to Crop Inputs by working together as an association-in-fact enterprise. These entities all participated directly or indirectly in a scheme to block electronic platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including FBN, and misrepresenting the reasons for that decision (the "Crop Input Market Manipulation Enterprise"). Through the Crop Inputs Market Manipulation Enterprise, Defendants obtained illegal profits.

234.    As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants have illegally extracted billions of dollars from Plaintiffs and the Class. As explained in detail below, Defendants' years-long misconduct violated RICO Sections § 1962(c) and (d).

235.    At all relevant times, Defendants operated as an association-in-fact enterprise, which was formed for the purpose of engaging in a fraudulent scheme to block electronic platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including FBN, and misrepresenting the reasons for that decision.

236.    Each Defendant operated or managed the affairs of an enterprise, the Crop Inputs Market Manipulation Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

A.  **Essential Purpose of the Enterprise Was the Scheme to Defraud.**

237.    At all relevant times, the Crop Inputs Market Manipulation Enterprise: (a) had an existence separate and distinct from each of the Defendants; (b) was separate and distinct from the

pattern of racketeering in which Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Manufacturer Defendants, the Wholesaler Defendants, the Retailer Defendants, and other entities and individuals associated for the common purpose of blocking electronic platforms, including FBN, from access to Crop Inputs by agreeing not to sell products to them and misrepresenting the reasons for that decision.

238.    Defendants dominate all levels of the Crop Inputs market. Through a coordinated enterprise in which they all participated, either directly or indirectly, Defendants have established a secretive supply-chain process using authorized licenses, commissions, rebates, and incentives to keep Crop Input prices inflated at supra-competitive levels and deny farmers access to relevant market information. This opaque Crop Input market prevents farmers from comparison shopping, making better-informed purchasing decisions, and discovering deceptive seed relabeling practices. Defendants also seek to control and capitalize on farmers' data through the development of farm management platforms.

239.    Defendants had a strong motive to conspire to preserve their opaque market structure. If electronic platforms publicly published price lists for specific Crop Inputs, then the Manufacturer, Wholesaler, and Retailer Defendants could no longer keep prices confidential and charge inflated prices for identical Crop Inputs and/or maintain price opacity through seed relabeling and bundling.

240.    The Retailer Defendants and the Wholesaler Defendants knew that to retain their market positions and maintain their profit margins, they had to exclude electronic platforms from the market, so they conspired to cut off the platforms' product supply. Because the Manufacturer Defendants rely on the Retailer and Wholesaler Defendants to recommend and sell the Manufacturer Defendants' products to farmers, the Retailer and Wholesaler Defendants had to

convince the Manufacturer Defendants to agree not to supply FBN and other platforms to make the boycott effective.

241.    Each member of the Crop Inputs Market Manipulation Enterprise shared in the financial windfall generated by the enterprise, and each member shared in the common purpose of forcing farmers to purchase Crop Inputs at supra-competitive prices.

242.    FBN threatened the Defendants' dominant market position and control over Crop Inputs pricing. As a result, rather than compete fairly with FBN, Defendants conspired to block its access to Crop Inputs by engaging in a group boycott. For instance, the Manufacturer, Wholesaler, and Retailer Defendants repeatedly blocked FBN's access to Crop Inputs by agreeing among themselves not to sell products to FBN.

243.    Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent coordination and cooperation among Defendants. Absent an agreement among themselves, Defendants' actions were against their independent economic self-interests.

244.     The Crop Inputs Market Manipulation Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state and national boundaries, such as the marketing, promotion, advertisement and sale or lease of the Crop Inputs throughout the country, and the receipt of monies from the sale of the same.

245.    Within the Crop Inputs Market Manipulation Enterprise, there was a common communication network by which co-conspirators shared information using the interstate mails and wires on a regular basis.

246.    Each member of the Crop Inputs Market Manipulation Enterprise had a systematic linkage to the others through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.

247.    Through the Crop Inputs Market Manipulation Enterprise, Defendants functioned as a continuing unit with the common purpose of furthering the illegal scheme and their common purposes of blocking electronic platforms, including FBN, from accessing Crop Inputs by agreeing not to sell products to these platforms and misrepresenting the reasons for that decision.

248.    The ordinary business of Defendants is to engage in the manufacture, distribution, and sale of Crop Inputs. It is not part of their routine business to engage in acts of mail and wire fraud to block farmer access to alternative market participants and misrepresent the reasons for these decisions.

249.    While Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

250.    Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the exclusive control of Defendants.

251.    This enterprise has continued for over four years (since at least as early as 2016), and the enterprise (and pattern of racketeering) are ongoing and open-ended.

## B.  The Participation of Defendants in the Crop Inputs Market Manipulation Enterprise.

252.    Upon information and belief, Defendants are, and have been, in regular and constant communication regarding the Crop Inputs market.

253.    Upon information and belief, Defendants were all deeply involved in the Crop Inputs Market Manipulation Enterprise.

254.    The Crop Inputs Market Manipulation Enterprise depended upon Defendants working together in shared concert to block new electronic platforms from accessing Crop Inputs and thus trapping farmers into higher-priced purchases in the inefficient and opaque Crop Inputs market. None of the Defendants could have individually pulled off this scheme to defraud. Given the structure of the Crop Inputs industry with the necessary relationships between the manufacturers, wholesalers, and retailers, an effective boycott of new electronic platforms would not have been feasible or possible absent coordination and cooperation among Defendants. The scheme was strengthened by the fact that these major industry players used their prestige and logos to mislead others into believing their misrepresentations about FBN's business model and their decision not to sell to FBN were legitimate.

255.    Defendants have multiple networks for inter-firm communications to form and maintain the Crop Market Manipulation Enterprise through trade association participation and to use their trade industry associations to push their false narratives about FBN and Defendants' refusal to sell to FBN.

256.    One major coordination hub is CropLife America, a trade association that comprises major Crop Inputs manufacturers, wholesalers, and retailers. CropLife's Board of Directors is chaired by an executive from one of the Manufacturer Defendants—currently BASF's Paul Rea and previously Corteva's Suzanne Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, Growmark, Tenkoz, and Simplot. The Board of Directors exclusively comprises representatives from large Crop Inputs manufacturers, distributors, and retailers, making it an ideal vehicle for collusion.

257.    The CEO of CropLife America, Chris Novak, has also echoed and amplified the fearmongering of its Defendant members. To the press, Novak has stated that it is "beginning to hear stories and we're looking for data on counterfeit ag products sold online. It's a major concern that speaks to farmer loss, quality control and lost sales for the industry." However, Novak does not substantiate the "stories" of any concerns with FBN.

258.    The Agricultural Retailers Association ("ARA") hosts an annual in-person industry conference every year, which is attended by representatives from all major Crop Inputs retailers, as well as representatives from each Defendant. These industry conferences provide ample opportunity for Defendants to not only agree among themselves how to block electronic platforms from emerging, but also to coordinate with the other levels of the distribution chain. In fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting.

259.    The coordination through the Crop Inputs Market Manipulation Enterprise to block sales to FBN by Defendants was also not the first time Defendants had worked together to stop similar competition. Prior to 2016, manufacturers and the distribution channel partners recognized the threat from transparent, electronic platforms and worked together to block the threat when XSAg.com entered the market. Similarly, in 2018, Defendants continued to work together through the Crop Input Market Manipulation Enterprise to counter an additional threat: FBN's entrance into the Canadian market. While many Defendants had initially agreed to continue their supply of FBN's Canadian retailer, a coordinated campaign through the Crop Input Market Manipulation Enterprise kicked in including through communications over the wires. The boycott was swift and covered the vast majority of the Crop Input market.

260.     Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have established itself as the primary supplier to electronic platforms and grown its customer base by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

261.     Defendants are in the regular business of making, distributing, and selling Crop Inputs. It is not routine for them to engage in fraudulent activities or to engage in a pattern of mail and wire fraud.

262.     Defendants have worked together on the scheme to defraud in shared concert since at least 2016, when FBN attempted to enter the Crop Input market.

**C.   The Pattern of Racketeering: Mail Fraud and Wire Fraud**

263.     To carry out the scheme to defraud, Defendants knowingly participated, directly or indirectly, and conducted the affairs of the Crop Inputs Market Manipulation Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

264.     The predicate acts of racketeering (18 U.S.C. § 1961(1)) engaged in by Defendants include, but are not limited to:

a.   Mail Fraud:  Defendants violated 18 U.S.C. § 1341 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations, promises, half-

truths, and omissions. In furtherance of this scheme, Defendants used the mails in the following ways, among others:

- Defendants shipped, or caused to ship, via interstate mail Crop Inputs to wholesalers, retailers, and farmer, and others that were distributed and purchased based on Defendants' market manipulation to exclude FBN.

- Defendants used the mails in furtherance of their scheme to defraud and, in fact, could not have accomplished their scheme to defraud without using the mails to ship Crop Inputs nationwide to victims in all fifty states.

b. <u>Wire Fraud</u>:  Defendants violated 18 U.S.C. § 1343 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations, promises, half-truths, and omissions. In furtherance of this scheme, Defendants used the interstate wires.

- Defendants communicated with farmers via wire to provide false pretenses, misrepresentations, promises, half-truths, omissions, and lulling statements about FBN and their illicit boycott. For example:

  o  Upon learning about FBN's 2016 entry into the U.S. market as an electronic Crop Inputs sales platform, CHS officials distributed a letter to farmers attempting to discourage them from using FBN, falsely claiming that although an electronic platform like FBN would be able to offer the same products at cheaper prices, "FBN just does it with little overhead and without returning any profits to you the farmer, while

lining the pockets of investors and big data companies like Google."[32]

o   In fall 2018, after Syngenta's Head of Crop Protection Sales in the U.S. learned that a small number of branded Crop Inputs had been sold on electronic platforms in violation of Defendants' boycott, he falsely claimed in an interview presumably conducted over the wires that electronic platforms would deliver counterfeit products. He further stated that "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."[33]

o   In its attempts to pressure all sellers to participate in the boycott of FBN, Syngenta's Head of U.S. Crop Protection Sales falsely justified its audit initiative by stating in a letter sent to vendors in March 2018: "We have concerns about product integrity, stewardship, and regulatory compliance" and that products sold on FBN could be unreliable.[34]

o   On March 31, 2018, Defendant Federated sent an email message over the wires pressuring its manufacturing partners not to partner with FBN: "How our key manufacturing partners decide to engage with this business will be closely observed by us and likely all of our traditional

[32] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850 (last visited Sept. 16, 2021).
[33] Chris Bennett, "Amazon, Walmart? Farming's Wild Scramble For Online Ag Retail," *The Daily Scoop* (Nov. 5, 2018), https://www.thedailyscoop.com/news/retail-business/amazon-walmart-farmings-wild-scramble-online-ag-retail-0 (last visited Sept. 16, 2021).
[34] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850 (last visited Sept. 16, 2021).

retailing peers across Western Canada." Other market participants have confirmed that this email was also circulated outside of Federated to one or more other industry participants.

o   In announcing its decision not to deal with FBN in Canada, Univar, using the wires, distributed talking points on April 6, 2018, about its decision and urged team members to share these talking points with retailers: "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing . . . If anyone thinks socialism is going to feed the world[,] just call Russia first and see how that worked out." Univar further criticized FBN's business model of bringing market transparency to farmers, declaring that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering." These talking points were also shared over the wires with its manufacturer suppliers on the same day.

▪   Defendants used the interstate wires to receive and process payments from their illicit sales of the Crop Inputs based on a scheme to defraud to block electronic platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including FBN, and misrepresenting the reasons for that decision.

265.   In doing so, Defendants have deceived and cheated farmers out of substantial sums for the last several years.

266.    This pattern of racketeering is open-ended and remains ongoing. Only by pursuing this lawsuit and financially punishing Defendants will the pattern of racketeering at issue here finally cease.

267.    The predicate acts are all related because they were all done in furtherance of the same overall goal and common purpose of the RICO enterprise: to force farmers to pay supra-competitive prices for Crop Inputs by blocking FBN (and dissuading others) from participating in the Crop Input market and bringing increased transparency to farmers.

**D.  Causation and Damages**

268.    Because it forces farmers to remain in an inefficient and opaque Crop Inputs market, the Crop Inputs Market Manipulation Enterprise directly caused farmers to pay more for Crop Inputs than they would have but for Defendants' wrongful conduct. There is a direct and straight line from the scheme to defraud to the damages suffered.

269.    There are no intervening steps or causes that could have prevented or altered or even interfered with the Crop Inputs Market Manipulation Enterprise.

270.    All purchasers of the Crop Inputs purchased Crop Inputs in reasonable reliance upon the representations that the marketplace was functioning efficiently and in accordance with the law.

271.    The exact purchase history of consumers, at the level of the individual consumer, is available from Retailer Defendants, other retailers, and other relevant data sources, so there is no real risk that the class will include any class members who were not harmed by Crop Inputs Market Manipulation Enterprise. The class will include those who purchased the Crop Inputs during the time of the market manipulation.

272.     By reason of and because of the conduct of Defendants, Plaintiffs and Class members have been injured in their property through higher costs, less choice, and/or fewer innovative products or services. Plaintiffs and Class Members are forced to pay more for Crop Inputs than they otherwise would have, have lost choices, and have lost the opportunity to purchase new and innovative products and services.

273.     The violations of 18 U.S.C. § 1962(c) and (d) by Defendants have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(a) and (c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class and sub-classes of all others so similarly situated, respectfully request judgment against Defendants as follows:

A.     That the Court determines that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class and Sub-Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class and sub-classes, once certified;

B.     That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed:

1.   An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.   A *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

      3.  An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

      4.  Acts of unjust enrichment by Defendants as set forth herein.

C.     That Plaintiffs and members of the Class and sub-classes recover damages, to the maximum extent allowed under the applicable federal and state laws, and that a joint and several judgments in favor of Plaintiffs and the members of the Class and sub-classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information;

F.     That for the alleged RICO violations:

      1.  This Court determine that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a

RICO enterprise engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c);

2. This Court find that all Defendants have conspired to conduct and participate in said RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and (d);

3. For an award of trebled damages as consistent with 18 U.S.C. §§ 1964(a) and (c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post-interest, costs and an award that this Court deems just and proper.

G.     Plaintiffs and the members of the Class and sub-classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

H.     Plaintiffs and the members of the Class and sub-classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.     Plaintiffs and the members of the Class and sub-classes have such other and further relief as the case may require and the Court deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Dated: September 17, 2021                    Respectfully submitted,

*s/ Derek Y. Brandt*
**MCCUNE WRIGHT AREVALO, LLP**
Derek Y. Brandt (6228895 IL)
Leigh M. Perica (6316856 IL)
Connor P. Lemire (704702 MA)
231 N. Main Street, Suite 20

Edwardsville, IL 62025
Telephone: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

***Plaintiffs' Liaison Counsel***

*s/ W. Joseph Bruckner (w/consent)*

**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
W. Joseph Bruckner (0147758 MN)
Rebecca A. Peterson (241858 MN)
Robert K. Shelquist (21310x MN)
Brian D. Clark (0390069 MN)
Craig S. Davis (0148192 MN)
100 Washington Avenue So., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
rapeterson@locklaw.com
rkshelquist@locklaw.com
bdclark@locklaw.com
csdavis@locklaw.com

*s/ Sterling Aldridge (w/consent)*

**BARRETT LAW GROUP, P.A.**
John W. "Don" Barrett (2063 MS)
Sterling Aldridge (104277 MS)
Katherine Barrett Riley (99109 MS)
David McMullan, Jr. (8494 MS)
P.O. Box 927
404 Court Square North
Lexington, MS 39095
Telephone: (662) 834-2488
Facsimile: (662) 834-2628
dbarrett@barrettlawgroup.com
sstarns@barrettlawgroup.com
kbriley@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

*s/ Michelle Looby (w/consent)*

**GUSTAFSON GLUEK PLLC**
Dan Gustafson (202241 MN)
Michelle Looby (0388166 MN)
Daniel C. Hedlund (258337 MN)
Daniel J. Nordin (0392393 MN)
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com

***Plaintiffs' Interim Co-Lead Class Counsel***

**COTCHETT, PITRE & MCCARTHY, LLP**
Adam Zapala (245748 CA)
Elizabeth Castillo (280502 CA)
Karin B. Swope (24015 WA)
James G.B. Dallal (277826 CA)
Reid W. Gaa (330141 CA)
840 Malcom Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com
kswope@cpmlegal.com
jdallal@cpmlegal.com
rgaa@cpmlegal.com

**EDELSON LECHTZIN LLP**
Marc Edelson (51834 PA)
Sati Gibson (90316 PA)
3 Terry Drive, Suite 205
Newton, PA 18940
Telephone: (215) 867-2399
Medelson@edelson-law.com
sgibson@edelson-law.com

**HELLMUTH & JOHNSON PLLC**
Michael R. Cashman (206945 MN)
Anne T. Regan (0333852 MN)
Nathan D. Prosser (0329745 MN)
8050 West 78th Street
Edina, MN 55439
Telephone: (952) 941-4005
Facsimile: (952) 941-2337
mcashman@hjlawfirm.com
aregan@hjlawfirm.com
nprosser@hjlawfirm.com

**LABATON SUCHAROW**
Gregory S. Asciolla (2635241 NY)
Karin E. Garvey (2997831 NY)
Jonathan S. Crevier (5592753 NY)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
jcrevier@labaton.com

**PAUL LLP**
Richard M. Paul III (44233 MO)
Ashlea G. Schwarz (60102 MO)
601 Walnut Street, Suite 300
Kansas City, MO 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8108
Rick@PaulLLP.com
Ashlea@PaulLLP.com

**REINHARDT WENDORF & BLANCHFIELD**
Mark Reinhardt (90530 MN)
Garrett D. Blanchfield (209855 MN)
Roberta A. Yard (322295 MN)
332 Minnesota Street, Suite W1050
St. Paul, MN 55101
Telephone: (651) 287-2100
Facsimile: (651) 287-2103
m.reinhardt@rwblawfirm.com
g.blanchfield@rwblawfirm.com
r.yard@rwblawfirm.com

**SHARP LAW LLP**
Ruth Anne French-Hodson (65461 MO)
Rex. A. Sharp (51205 KS)
Isaac L. Diel (39503 MO)
Gregory M. Bentz (33369 MO)

**SPECTOR, ROSEMAN & KODROFF, PC**
William G. Caldes (00062-1995 NJ; 75842 PA)
Icee N. Etheridge (20256-2016 NJ; 322630 PA)

4820 West 75th Street
Prairie Village, KS 66208
Telephone: (913) 901-0505
rsharp@midwest-law.com
rafrenchhodson@midwest-law.com
idiel@midwest-law.com
gbentz@midwest-law.com

Jeffrey J. Corrigan (03078-1999 NJ; 2372654 PA)
Jeffrey L. Spector (03375-2007 NJ; 207208 PA)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
bcaldes@srkattorneys.com
ietheridge@srkattorneys.com
jcorrigan@srkattorneys.com
jspector@srkattorneys.com

**TAUS, CEBULASH & LANDAU LLP**
Archana Tamoshunas (3065661 NY)
Brett Cebulash (2612190 NY)
Kevin Landau (2835668 NY)
Evan Rosin (5255153 NY)
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (212) 931-0704
atamoshunas@tcllaw.com
bcebulash@tcllaw.com
klandau@tcllaw.com
erosin@tcllaw.com

**ZIMMERMAN REED**
David M. Cialkowski (306526 MN)
Brian C. Gudmundson (336695 MN)
Alyssa J. Leary (397552 MN)
1100 IDS Center, 80 S. 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
David.cialkowski@zimmreed.com
Brian.gudmundson@zimmreed.com
Alyssa.leary@zimmreed.com

Hart Robinovitch (240515 MN)
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Telephone: (480) 348-6415
Hart.robinovitch@zimmreed.com

*Plaintiffs' Executive Committee*

## <u>CERTIFICATE OF SERVICE</u>

I, Derek Y. Brandt, hereby certify that on September 17, 2021, I electronically filed the foregoing Consolidated Amended Class Action Complaint using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

s/ Derek Y. Brandt
_____
