# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| | ) |
| IN RE: CROP INPUTS ANTITRUST | ) CASE NO. 4:21 MD 2993 SEP |
| LITIGATION | ) |
| | ) ALL CASES |
| | ) |
| | ) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' JOINT MOTION TO DISMISS
## <u>PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT[1]</u>

---

[1] Motions to Dismiss are being filed contemporaneously by the following Defendants based on separate individualized issues: (1) Cargill, Incorporated, (2) Federated Co-operatives Ltd., (3) Syngenta Corp., and (4) Univar Solutions, Inc. Each of those Defendants also joins fully in this Motion.

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES..........................................................................................v

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND ........................................................................................6

I.       The Parties ........................................................................................................6

II.      The Alleged "Crop Inputs" Market.................................................................7

III.     The Emergence of "Electronic Platforms" ....................................................8

IV.      The Alleged Joint Boycott ............................................................................10

V.       Defendant-Specific Allegations ....................................................................11

         A.       Manufacturer Defendants....................................................................11

         B.       Wholesaler Defendants .......................................................................13

         C.       Retailer Defendants.............................................................................15

LEGAL STANDARD ..................................................................................................16

ARGUMENT ...............................................................................................................17

I.       PLAINTIFFS FAIL TO PLEAD A CONSPIRACY TO BOYCOTT
         ELECTRONIC PLATFORMS. .......................................................................17

         A.       Plaintiffs Fail to Plead a Conspiracy Through Either Direct or
                  Circumstantial Evidence. ....................................................................19

                  1.       Plaintiffs Allege No Direct Evidence of a Conspiracy. ............20

                  2.       Plaintiffs Do Not Plead Circumstantial Evidence of a Conspiracy. ..........20

                           a.       Plaintiffs Do Not Plead Parallel Conduct. ....................20

                           b.       Plaintiffs Fail to Allege Plus Factors Suggestive of a
                                    Conspiracy. ...................................................................23

                                    i.       Each Defendant's Reaction to Electronic Platforms
                                             Was Predictable and Consistent With Its Own Self-
                                             Interest............................................................................23

|  |  | ii. | Defendants' Alleged Opportunities to Conspire Are Nothing More than Routine Trade Association Involvement. | 28 |

|  |  | iii. | Market Concentration Is Not a Plus Factor Because Plaintiffs Have Not Adequately Pled That Any Market Is Concentrated. | 30 |

|  |  | iv. | Government Investigations of a Subset of Defendants or Affiliates Do Not Render the Allegations Any More Plausible. | 32 |

|  |  | v. | Prior Antitrust Violations Are Not Indicative of a Conspiracy. | 36 |

|  | B. | Plaintiffs Rely on Impermissible Group Pleading. | 37 |

II. | PLAINTIFFS HAVE NOT ALLEGED DEFENDANTS CAUSED AN INJURY THAT WOULD CONFER STANDING TO PURSUE ANTITRUST CLAIMS. | 39 |

III. | PLAINTIFFS' SHERMAN ACT CLAIM IS UNTIMELY. | 42 |

|  | A. | Plaintiffs' Claim Should Be Dismissed to the Extent It Is Barred by the Applicable Four-Year Statute of Limitations. | 42 |

|  | B. | Plaintiffs Do Not Plead Fraudulent Concealment. | 43 |

|  |  | 1. | Plaintiffs Do Not Plead Separate Acts of Concealment, Let Alone With Participants. | 44 |

|  |  | 2. | Plaintiffs Do Not Plead Reasonable Diligence. | 46 |

|  | C. | Plaintiffs' "Alternative" Continuing Violation Argument Is Unavailing. | 48 |

IV. | PLAINTIFFS' RICO CLAIM (COUNT V) FAILS AS A MATTER OF LAW. | 49 |

|  | A. | Plaintiffs Fail to Plead the RICO Claim With Particularity. | 51 |

|  | B. | Plaintiffs Fail to Adequately Allege a Pattern of Racketeering. | 53 |

|  | C. | Plaintiffs Fail to Adequately Allege the Existence of an Enterprise. | 53 |

|  | D. | Plaintiffs Lack Standing to Assert Their RICO Claim. | 56 |

V. | ALL OF PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED. | 57 |

|  | A. | Plaintiffs' State-Law Claims Fail for the Same Reasons That Their Federal Antitrust Claim Fails. | 57 |

1. All of Plaintiffs' State Antitrust Claims Fail Because Plaintiffs Have Not Plausibly Alleged the Requisite Conspiratorial "Agreement." ................................................................58

2. All of Plaintiffs' CPA Claims Fail Because Plaintiffs Do Not Plausibly Allege the Requisite Misconduct. ..............................................59

3. All of Plaintiffs' State Unjust Enrichment Claims Fail for Deficient Pleading and Failure to Allege "Unjust" Conduct. ...................................60

B. Plaintiffs Lack Standing..................................................................61

1. All of Plaintiffs' State-Law Claims Fail for Lack of Article III Standing Because Plaintiffs Fail to Allege Cognizable Injuries. ...............61

2. Plaintiffs Lack Standing to Sue Under the Laws of 24 States Where They Do Not Reside or Did Not Suffer Injury...............................61

C. Plaintiffs' State Antitrust Claims Fail in Certain States for Reasons Specific to Those States' Laws. .........................................................................63

1. Five of Plaintiffs' State Antitrust Claims Should Be Dismissed for Failure to Satisfy Filing-Notice Requirements. .........................................63

2. Four of Plaintiffs' State Antitrust Claims Should Be Dismissed for Lack of Any Alleged Intrastate Misconduct or Substantial Intrastate Effects. ....................................................................64

D. Plaintiffs' CPA Claims Fail in Certain States for Reasons Specific to Those States' Laws. .........................................................................64

1. Three of Plaintiffs' CPA Claims Should Be Dismissed for Failure to Satisfy Filing-Notice Requirements........................................64

2. Plaintiffs' CPA Claims Fail in Ten Jurisdictions Where Antitrust Conspiracies Are Not CPA Violations. .....................................65

E. Plaintiffs' Unjust Enrichment Claims Fail in Certain States for Reasons Specific to Those States' Laws. ............................................................65

1. Plaintiffs' Unjust Enrichment Claims Fail in Four States Where Unjust Enrichment Is Not an Independent Cause of Action.....................65

2. Plaintiffs' Unjust Enrichment Claims Fail in 17 States Because Plaintiffs Have an Adequate Remedy at Law. ............................................65

3. Plaintiffs' Unjust Enrichment Claims Fail in Three States Because Plaintiffs Received Consideration for Their Purchases. ...........................66

F.      Plaintiffs' Indirect-Purchaser Claims Fail in 13 States That Require Direct Conferral of a Benefit. ...........................................................................66

G.      Virtually All of Plaintiffs' State-Law Claims Are Untimely................................67

      1.      Plaintiffs' State Antitrust Claims Are Untimely in All 27 States. .............67

      2.      Plaintiffs' CPA Claims Are Untimely in All 27 States.............................68

      3.      Plaintiffs' Unjust Enrichment Claims Are Untimely in 21 Jurisdictions. ...........................................................................................68

CONCLUSION...........................................................................................................69

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A&M Supply v. Microsoft Corp.*, No. 274164, 2008 WL 540883 (Mich. App. Feb. 28, 2008) ..................................................................................................67

*Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012)......................................30

*Alexander v. Phx. Bond & Indem. Co.*, 149 F. Supp. 2d 989 (N.D. Ill. 2001) .............................38

*Angelini v. Delaney*, 966 P.2d 223 (Or. App. 1998).........................................................68

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................16, 54

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831 (7th Cir. 2021)..............................................................................2, 17

*Bank of Am., N.A. v. Knight*, 725 F.3d 815 (7th Cir. 2013) ....................................3, 33, 37

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................*passim*

*Berkson v. Del Monte Corp.*, 743 F.2d 53 (1st Cir. 1984)............................................47

*Blitz v. Monsanto Co.*, 317 F. Supp. 3d 1042 (W.D. Wis. 2018)......................................67

*Boggs v. Am. Optical Co.*, No. 4:14-cv-1434, 2015 WL 300509 (E.D. Mo. Jan. 22, 2015) ...................................................................................................16, 19

*Bowman v. Monsanto Co.*, 569 U.S. 278 (2013) .........................................................25

*Bray v. Bank of Am.*, No. 4:14-cv-1336, 2016 WL 687818 (E.D. Mo. Feb. 19, 2016).......................................................................................................39

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)....................................56, 57

*Brown v. Medtronic, Inc.*, 628 F.3d 451 (8th Cir. 2010) ............................................62

*Brown v. Pinnacle Restoration LLC*, No. 12-cv-0550, 2013 WL 3148654 (Ariz. App. June 18, 2013)..................................................................................67

*Carlsen v. GameStop, Inc.*, 833 F.3d 903 (8th Cir. 2016) ...........................................62

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)...................................................40

*Cole v. Chevron USA, Inc.*, 554 F. Supp. 2d 655 (S.D. Miss. 2007)................................65

v

*Collins v. eMachines, Inc.*, 134 Cal. Rptr. 3d 588 (Cal. App. 2011) ............................................66

*Color Switch LLC v. Fortafy Games DMCC*, 377 F. Supp. 3d 1075 (E.D. Cal. 2019) ......................................................................................................................34

*Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383 (Fla. Dist. App. 1997) ..........................................................................................66

*Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46 (2d Cir. 2016) ...........................................30

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977).......................................24, 25

*Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761 (8th Cir. 2004) ..............................28

*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001 (8th Cir. 2008) ....................................................................................................50, 51, 55

*Crest Constr. II, Inc. v. Doe*, 660 F.3d 346 (8th Cir. 2011).................................................... *passim*

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)...................................................62

*Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, 791 F. App'x 301 (3d Cir. 2019) ......................................................................................................................56

*Dist. 1199P Health & Welfare Plan v. Janssen, LP*, 784 F. Supp. 2d 508 (D.N.J. 2011) ......................................................................................................................56

*Double D Spotting Serv., Inc. v. SuperValu, Inc.*, 136 F.3d 554 (8th Cir. 1998) ...................18, 30

*Douglas v. Imerys Talc Am., Inc.*, No. 4:18-cv-1141, 2019 WL 626427 (E.D. Mo. Feb. 14, 2019) ..............................................................................................................33

*Dring v. McDonnell Douglas Corp.*, 58 F.3d 1323 (8th Cir. 1995) ........................................44, 45

*Drobnak v. Andersen Corp.*, 561 F.3d 778 (8th Cir. 2009) ..........................................................51

*Dunn v. Rockwell*, 689 S.E.2d 255 (W. Va. 2009) ......................................................................68

*Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575 (11th Cir. 1988).............................................26

*E. Elec. Corp. v. FERD Const., Inc.*, No. 05-cv-303, 2005 WL 3447957 (D.N.H. Dec. 15, 2005).......................................................................................................66

*Edgenet, Inc. v. GS1, AISBL*, 742 F. Supp. 2d 997 (E.D. Wis. 2010) .........................................53

*Effler v. Pyles*, 380 S.E.2d 149 (N.C. App. 1989) ......................................................................67

*Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 411 S.E.2d 916 (N.C. 1992).......................................66

*Estate of Johnson v. Melvin Rose, In*c., No. WO-CV-200400622, 2007 WL
   1832029 (Mass. Super. Ct. May 9, 2017) ............................................................67

*Extraordinary Title Servs. v. Fla. Power & Light Co.*, 1 So. 3d 400 (Fla. Dist. Ct.
   App. 2009) ...........................................................................................................67

*Famous Brand, Inc. v. David Sherman Corp.*, 814 F.2d 517 (8th Cir. 1987) .............26

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042 (D.
   Minn. 1992) ..........................................................................................................29

*Four B Corp. v. Daicel Chem. Indus.*, 253 F. Supp. 2d 1147 (D. Kan. 2003)..............68

*Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512 (Tenn. 2005) ..............64

*Furlough v. Spherion Atl. Workforce, LLC*, 397 S.W.3d 114 (Tenn. 2013)................66

*Gen. Insulation Co. v. Eckman Const.*, 992 A.2d 613 (N.H. 2010)...............................65

*Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655 (8th Cir. 2012) ................................56

*GT Roofing Co. I, LLC v. Killion*, No. 4:14-cv-2018, 2015 WL 4255466 (E.D.
   Mo. July 13, 2015) ..........................................................................................50, 51

*H&Q Props. v. Doll*, 793 F.3d 852 (8th Cir. 2015) .....................................................51

*Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1 (2010) .....................................................56

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253
   (N.D. Ga. 2002) ...................................................................................................37

*House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11-cv-07834, 2014 WL 6845862
   (N.D. Ill. Dec. 4, 2014) .......................................................................................27

*Illig v. Union Elec. Co.*, 652 F.3d 971 (8th Cir. 2011) .................................................42

*In re Actimmune Mktg. Litig. (Actimmune I)*, 614 F. Supp. 2d 1037 (N.D. Cal.
   2009) ...................................................................................................................56

*In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883, 2009 WL 3754041
   (N.D. Ill. Nov. 5, 2009)........................................................................................60

*In re Aluminum Warehousing Antitrust Litig.*, MDL No. 13-2481, 2014 WL
   4743425 (S.D.N.Y. Sept. 15, 2014)................................................................59, 60

*In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918 (N.D. Cal. 2015) ...............61, 62

*In re Cattle Antitrust Litig.*, No. 19-cv-1129, 2020 WL 5884676 (D. Minn. Sept.
   29, 2020) .........................................................................................................17, 19

*In re Cedar Shakes & Shingles Antitrust Litig.*, No. 2:19-cv-00288, 2020 WL
  832324 (W.D. Wash. Feb. 20, 2020) ........................................................32

*In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015) ..................21, 33, 34

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, MDL No. 2031, 2013
  WL 4506000 (N.D. Ill. Aug. 23, 2013) ...................................................63

*In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510 (N.D. Ill. 2019) ..........................64

*In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072
  (N.D. Cal. 2007).....................................................................................64

*In re Dynamic Random Access Memory Indirect Purchaser Litig.*, No. 4:18-cv-
  2518, 2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) .............................32

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007).........................................34

*In re Graphics Processing Units Antitrust Litig. ("GPUs")*, 527 F. Supp. 2d 1011
  (N.D. Cal. 2007).................................................................................36, 65

*In re H&R Block Secs. Litig.*, No. 06-cv-0236, 2008 WL 482403 (W.D. Mo. Feb.
  19, 2008) ...............................................................................................35

*In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811 (N.D. Ill. 2020) ..................59

*In re ICE LIBOR Antitrust Litig.*, No. 19-cv-439, 2020 WL 1467354 (S.D.N.Y.
  Mar. 26, 2020)........................................................................................36

*In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017)....................4, 27

*In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-718, 2019 WL 4478734
  (E.D. Va. Sept. 18, 2019)........................................................................63

*In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007).........................32

*In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155 (N.D. Cal. 2015) .....................................65

*In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395 (D.N.J. 2018)................................................63

*In re Mex. Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380 (S.D.N.Y. 2019) .........21, 22, 33, 34

*In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016 (D. Minn. 1997) .......................................44

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015)..............16, 28

*In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704 (N.D. Ill. 2016) ........................................60

*In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432 (9th Cir. 1990)..........................................40

*In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 772 (D. Minn. 2020) ......................43, 44, 46, 48

*In re Pork Antitrust Litig.*, No. 18-cv-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ........................................................................................................................23

*In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059 (8th Cir. 2017) ..........................49

*In re Pre-Filled Propane Tank Antitrust Litig.*, MDL No. 2567, 2016 WL 6963059 (W.D. Mo. Jan. 13, 2016) ..................................................................................39

*In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) .....................................................................................67

*In re SuperValu, Inc.*, 870 F.3d 763 (8th Cir. 2017) ....................................................................62

*In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121 (E.D.N.Y. 2003) ..........................60

*In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365 (S.D. Fla. 2001) ..............................................................................................................................63

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010) ......................................20, 29

*In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970 (W.D. Ark. 2017) ..........................28, 32

*In re UnitedHealth Grp.*, No. 16-cv-3352, 2017 WL 6512222 (D. Minn. Dec. 19, 2017) ..............................................................................................................................55

*Insulate SB, Inc. v. Adv. Finishing Sys., Inc.*, 797 F.3d 538 (8th Cir. 2015) ...............20, 26, 34, 37

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 13-cv-2664, 2014 WL 943224 (D. Minn. Mar. 11, 2014) .............................................................................................62

*J.P. Morgan Chase Bank, N.A. v. M/Y Brittany Leigh II*, No. 11-cv-246, 2011 WL 4351584 (D.R.I. Aug. 23, 2011) .................................................................................67

*Johnson v. Ross*, 419 F. App'x 357 (4th Cir. 2011) .......................................................................67

*Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000 (Utah 2015) ....................................67

*Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019) ........................................34, 63

*Kampschroer v. Anoka Cty.*, 935 F.3d 645 (8th Cir. 2019) ...........................................................48

*Kawczynski v. Am. Coll. of Cardiology*, 670 F. App'x 398 (7th Cir. 2016) ................................40

*Kilper v. City of Arnold, Mo.*, No. 4:08-cv-0267, 2009 WL 2208404 (E.D. Mo. July 23, 2009)..............................................................................................................51

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ..............................................................46, 48, 49

*Knox ex rel. J.D. v. St. Louis City School Dist.*, No. 4:18-cv-00216, 2018 WL 6524009 (E.D. Mo. Dec. 12, 2018)......................................................................17

*Larey v. Allstate Prop. & Cas. Co.*, No. 4:14-cv-04008, 2014 WL 4823872 (W.D. Ark. Sept. 26, 2014).............................................................................................46

*Lau v. Guam Dep't of Educ.*, No. 10-cv-00035, 2011 WL 2531061 (D. Guam June 23, 2011).......................................................................................................59

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).....................25

*Lewis v. Casey*, 518 U.S. 343 (1996)............................................................................62

*Litovich v. Bank of Am. Corp.*, No. 20-cv-3154, 2021 WL 4952034 (S.D.N.Y. Oct. 25, 2021) ................................................................................................. *passim*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...........................................39, 40

*Marion Diagnostic Ctr. LLC v. Becton, Dickinson & Co.*, No. 3:18-cv-1059, 2021 WL 961728 (S.D. Ill. Mar. 15, 2021) .....................................................................19

*Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832 (7th Cir. 2020) .........................................................................................................................18

*Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920 (Ill. App. Ct. 2009) ..........65

*McAteer v. Target Corp.*, No. 18-cv-349, 2018 WL 3597675 (D. Minn. July 26, 2018) ................................................................................................................61, 62

*Melchior v. New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347 (Cal. App. 2003) ...............65

*Meredith v. Medtronic Inc.*, No. 3:18-cv-00127, 2019 WL 6330677 (S.D. Iowa Oct. 25, 2019) ......................................................................................................30

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)........................26, 27, 29

*Mosebach v. Blythe*, 282 N.W.2d 755 (Iowa App. 1979)..............................................66

*Mountain State Coll. v. Holsinger*, 742 S.E.2d 94 (W. Va. 2013) ...............................66

*Murr Plumbing v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066 (8th Cir. 1995)...........51

*Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 532 S.E.2d 868 (S.C. 2000)...........67

*Nelson v. Nelson*, 205 P.3d 715 (Kan. 2009) ..............................................................66

*Nestlé Purina PetCare Co. v. Blue Buffalo Co.*, 181 F. Supp. 3d 618 (E.D. Mo. 2016) ................................................................................................................51, 53

*New Prime, Inc. v. Eaton Corp.*, No. 16-cv-3407, 2017 WL 5992466 (W.D. Mo. Mar. 16, 2017)..................................................................................................43, 44, 46

*Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417 (8th Cir. 2009)..............................42, 51

*Nitro Distrib., Inc. v. Alticor, Inc.*, No. 6:03-cv-3290, 2008 WL 11451488 (W.D. Mo. Jan. 4, 2008) ..................................................................................................43

*Olstad v. Microsoft Corp.*, 700 N.W.2d 139 (Wisc. 2005)............................................64

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ...........................27

*Pacamor Bearings, Inc. v. Minebea Co.*, 892 F. Supp. 347 (D.N.H. 1995) ..................67

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002 (E.D. Mo. 2018) ........................................................................................................20

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505 (8th Cir. 2018) .......................................................................................................................23

*Paschall's, Inc. v. Dozier*, 407 S.W.2d 150 (Tenn. 1966) ............................................66

*Payton v. Cnty. of Kane*, 308 F.3d 673 (7th Cir. 2002) ...............................................61

*Pilot Inv. Grp. v. Holfarth*, 550 N.W.2d 27 (Neb. 1996)............................................66

*Porter v. Hu*, 169 P.3d 994 (Haw. App. 2007) ...........................................................66

*Powell v. Campbell*, 912 So. 2d 978 (Miss. 2005) .......................................................66

*Pulkkila v. Pulkkila*, 941 N.W.2d 239 (Wis. 2020) ....................................................66

*R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002) .......................................................................................................................61

*Raineri Constr., LLC v. Taylor*, 63 F. Supp. 3d 1017 (E.D. Mo. 2014) .......................51

*Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505 (D. Minn. 2014)........................60

*Regions Bank v. J.R. Oil Co.*, 387 F.3d 721 (8th Cir. 2004)........................................56

*Richards v. Powercraft Homes, Inc.*, 678 P.2d 449 (Ariz. App. 1983) ........................68

*Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008) ....................59

*Rilley v. MoneyMutual, LLC*, No. 16-cv-4001, 2017 WL 3822727 (D. Minn. Aug. 30, 2017) ..............................................................................................50, 54, 55

*Rindal v. Sohler*, 658 N.W.2d 769 (S.D. 2003) ...........................................................66

*Rosemann v. Sigillito*, 956 F. Supp. 2d 1082 (E.D. Mo. 2013) ....................................54

*Rosemann v. Sigillito*, No. 10-cv-1165, 2011 WL 13248373 (E.D. Mo. Oct. 31, 2011) ......................................................................................................................51

*Ruggers Inc. v. U.S. Rugby Football Union, Ltd.*, 843 F. Supp. 2d 139 (D. Mass. 2012) ......................................................................................................................66

*Se. Missouri Hosp. v. C.R. Bard, Inc.*, No. 1:07-cv-0031, 2008 WL 4104534 (E.D. Mo. Aug. 27, 2008) ..........................................................................................43

*Sebrite Agency, Inc. v. Platt,* 884 F. Supp. 2d 912 (D. Minn. 2012) ............................54

*Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869 (D. Minn. 2017).........................16

*Simpson v. Central Me. Motors*, 669 A.2d 1324 (Me. 1996) ........................................67

*Small v. Univ. Med. Ctr. of S. Nev.*, No. 13-cv-00298, 2016 WL 4157309 (D. Nev. Aug. 3, 2016) ......................................................................................................66

*Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W. 2d 137 (Minn. 1992) ......................................................................................................................66

*Spires v. Hosp. Corp. of Am.*, 289 F. App'x 269 (10th Cir. 2008) ...............................67

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ...............................................................39

*State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178 (Miss. 2020)....................64

*State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722, 1980 WL 4696 (Tenn. Ch. Sept. 25, 1980) .......................................................................................................68

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).........................................62

*Subramanian v. Tata Consultancy Servs.*, 352 F. Supp. 3d 908 (D. Minn. 2018)........56

*Sugar Inst. v. United States*, 297 U.S. 553 (1936) .......................................................29

*Summerhill v. Terminix, Inc.*, 637 F.3d 877 (8th Cir. 2011).........................................44

*Tera Grp. Inc. v. Citigroup, Inc.*, No. 17-cv-4302, 2019 WL 3457242 (S.D.N.Y. July 30, 2019)..........................................................................................................38

*TheMLSonline.com, Inc. v. Reg'l Multiple Listing Serv. of Minn., Inc.*, 840 F. Supp. 2d 1174 (D. Minn. 2012) ...........................................................................17

*Thorpe v. Washington City*, 243 P.3d 500 (Utah App. 2010).......................................66

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552
 F.3d 430 (6th Cir. 2008) ...........................................................................37

*Tradesmen Int'l, Inc. v. USPS*, 234 F. Supp. 2d 1191 (D. Kan. 2002) ............................66

*TransUnion LLC v. Ramirez*, 141 S.Ct. 2190 (2021) ...................................................62

*Trustmark Ins. Co. v. Bank One, Ariz.*, 48 P.3d 485 (Ariz. App. 2002) .......................66

*United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9 (D.D.C. 1993) ....................41

*United States v. Bame*, 721 F.3d 1025 (8th Cir. 2013) ................................................66

*United States v. Colgate & Co.*, 250 U.S. 300 (1919) ...........................................24, 26

*United States v. New-Form Mfg. Co.*, 277 F. Supp. 2d 1313 (Ct. Intl. Trade 2003) ...................34

*Varner v. Peterson Farms*, 371 F.3d 1011 (8th Cir. 2004).............................................49

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398
 (2004).........................................................................................................27

*VSA v. Von Weise Gear Co.*, 769 F. Supp. 1080 (E.D. Mo. 1991) ..........................51, 52

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................................61

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824
 (N.D. Ill. 2018).........................................................................................32, 35

*Window World Int'l v. O'Toole*, No. 4:19-cv-2363-SEP, 2020 WL 7041814 (E.D.
 Mo. Nov. 30, 2020)....................................................................................1, 38

*Wisconsin v. Indivior Inc. (In re Suboxone Antitrust Litig.)*, MDL No. 2445, 2017
 WL 4642285 (E.D. Pa. Oct. 17, 2017).............................................................59

*Wong v. Wells Fargo Bank N.A.*, 789 F.3d 889 (8th Cir. 2015) ....................................42

*Zirvi v. Flatley*, 433 F. Supp. 3d 448 (S.D.N.Y. 2020) ..............................................46

**Federal Statutes & Regulations**

40 C.F.R. §§ 152.160-.175.........................................................................................25

15 U.S.C. § 1 .................................................................................................... *passim*

15 U.S.C. § 15(b) ....................................................................................................42

18 U.S.C. § 1962(c) .................................................................................................50

18 U.S.C. § 1962(d) ..........................................................................................51

**Federal Rules**

Fed. R. Civ. P. 9 ............................................................................................*passim*

Fed. R. Civ. P. 12 .....................................................................................17, 42

Fed. R. Evid. 201 ...........................................................................................28

**State Statutes and Rules**

735 ILCS 5/13-205 ........................................................................................68

740 ILCS 10/3 ...............................................................................................58

740 ILCS 10/7 ...............................................................................................67

815 ILCS 505/10a ..........................................................................................68

6 R.I. Gen. Laws § 6-36-4 .............................................................................58

6 R.I. Gen. Laws § 6-36-21 ...........................................................................63

6 R.I. Gen. Laws § 6-36-23 ...........................................................................67

9 R.I. Gen. Laws § 9-1-13(a) .........................................................................69

9 R.I. Gen. Laws § 9-1-36 .............................................................................68

9 Vt. Stat. § 2451a .........................................................................................59

9 Vt. Stat. § 2453a .........................................................................................59

12 Vt. Stat. § 511 ...........................................................................................68

Ariz. Rev. Stat. § 12-541 ...............................................................................68

Ariz. Rev. Stat. § 12-543 ...............................................................................69

Ariz. Rev. Stat. § 44-1402 .............................................................................58

Ariz. Rev. Stat. § 44-1410 .............................................................................67

Ariz. Rev. Stat. § 44-1415 .............................................................................63

Ark. Code § 4-88-115 ....................................................................................68

Cal. Bus. & Prof. Code § 16720 ....................................................................58

Cal. Bus. & Prof. Code § 16726 ...................................................................58

Cal. Bus. & Prof. Code § 16750.1 ................................................................67

Cal. Bus. & Prof. Code § 17208 ..............................................................67, 68

Cal. Civ. Proc. Code § 338 ..........................................................................68

Conn. Gen. Stat. § 35-26 .............................................................................58

Conn. Gen. Stat. § 35-40 .............................................................................67

D.C. Code § 12-301 ...............................................................................68, 69

Fla. Stat. § 95.11 ...................................................................................68, 69

Haw. Rev. Stat. § 480-4 ...............................................................................58

Haw. Rev. Stat. § 480-13.3 .....................................................................63, 64

Haw. Rev. Stat. § 480-24 ........................................................................67, 68

Haw. Rev. Stat. § 657-1 ...............................................................................69

Iowa Code § 553.4 ......................................................................................58

Iowa Code § 553.16 .....................................................................................67

Iowa Code § 614.1 .......................................................................................69

Kan. Stat. § 50-101 .....................................................................................58

Kan. Stat. § 60-512 ...............................................................................68, 69

Mass. Gen Laws ch. 260 § 2A .....................................................................69

Md. Code Com. Law § 11-204 ......................................................................58

Md. Code Com. Law § 11-209 ......................................................................67

Me. Rev. Stat. Title 10 § 1101 .....................................................................58

Me. Rev. Stat. Title 14 § 752 ..................................................................68, 69

Mich. Comp. Laws § 445.772 .......................................................................58

Mich. Comp. Laws § 445.781 .......................................................................67

Mich. Comp. Laws § 445.911 .......................................................................68

Mich. Comp. Laws § 600.5813 ........................................................................................... 69

Minn. Stat. § 325D.51 ......................................................................................................... 58

Minn. Stat. § 325D.64 ......................................................................................................... 67

Minn. Stat. § 541.05 ...................................................................................................... 68, 69

Miss. Code § 15-1-49 .......................................................................................................... 68

Miss. Code § 75-21-1 .......................................................................................................... 58

Mo. Rev. Stat. § 266.011 ..................................................................................................... 25

Mo. Rev. Stat. § 266.031 ..................................................................................................... 25

Mo. Rev. Stat. § 516.120 ................................................................................................. 68, 69

Mont. Code § 27-2-202 ....................................................................................................... 69

Mont. Code § 27-2-211 ....................................................................................................... 68

N.C. Gen. Stat. § 1-52 ......................................................................................................... 69

N.C. Gen. Stat. § 75-1 ......................................................................................................... 58

N.C. Gen. Stat. § 75-16.2 ................................................................................................ 67, 68

N.D. Cent. Code § 51-08.1-02 ............................................................................................ 58

N.D. Cent. Code § 51-08.1-10 ............................................................................................ 67

N.H. Rev. Stat. § 356:2 ....................................................................................................... 58

N.H. Rev. Stat. § 356:12 ..................................................................................................... 67

N.H. Rev. Stat. §358-A:3 .................................................................................................... 68

N.H. Rev. Stat. § 508:4 ....................................................................................................... 68

N.M. Stat. § 37-1-4 ........................................................................................................ 68, 69

N.M. Stat. § 57-1-1 ............................................................................................................. 58

N.M. Stat. § 57-1-12 ........................................................................................................... 67

N.Y. C.P.L.R. 214 ............................................................................................................... 68

N.Y. Gen. Bus. Law § 340 .............................................................................................. 58, 67

Neb. Rev. Stat. § 25-207 ................................................................................69

Neb. Rev. Stat. § 25-212 ................................................................................67

Neb. Rev. Stat. § 59-801 ................................................................................58

Neb. Rev. Stat. § 59-1612 ..............................................................................68

Nev. Rev. Stat. § 11.190 .............................................................................68, 69

Nev. Rev. Stat. § 598A.060 ............................................................................58

Nev. Rev. Stat. § 598A.210 ............................................................................63

Nev. Rev. Stat. § 598A.220 ............................................................................67

Or. Rev. Stat. § 646.638 ............................................................................64, 68

Or. Rev. Stat. § 646.725 ................................................................................58

Or. Rev. Stat. § 646.800 ................................................................................67

S.C. Code § 15-3-530 ....................................................................................69

S.C. Code § 39-5-150 ....................................................................................68

S.D. Codified Laws § 15-2-13 .......................................................................69

S.D. Codified Laws § 37-1-3.1 ......................................................................58

S.D. Codified Laws § 37-1-14.4 ....................................................................67

S.D. Codified Laws § 37-24-33 .....................................................................68

Tenn. Code § 28-3-105 ..................................................................................69

Tenn. Code § 47-18-110 ................................................................................68

Tenn. Code § 47-25-101 ................................................................................58

Tenn. Code §§ 47-25-101, *et seq.* ................................................................68

Utah Code § 13-2-6 .......................................................................................68

Utah Code § 76-10-3104 ...............................................................................58

Utah Code § 76-10-3109 ...............................................................................63

Utah Code § 76-10-3117 ...............................................................................67

xvii

Utah Code § 78B-2-307 ..................................................................................................69

Va. Code 59.1-204.1 .....................................................................................................68

W. Va. Code § 46A-5-101 .............................................................................................68

W. Va. Code § 46A-6-106 .............................................................................................64

W. Va. Code § 47-18-4 ..................................................................................................58

W. Va. Code § 47-18-11 ................................................................................................67

Wis. Stat. § 133.03 ........................................................................................................58

Wis. Stat. § 133.18 ........................................................................................................68

Wis. Stat. § 893.43 ........................................................................................................69

**Other Authorities**

ABA Model Jury Instrs. in Civil Antitrust Cases § 7.A.2 n.4 (2016 ed.)......................44

Phillip E. Areeda, Antitrust Law, ¶ 1421a ....................................................................37

## PRELIMINARY STATEMENT

Plaintiffs are individual purchasers of "seeds and crop protection chemicals such as fungicides, herbicides, and insecticides[.]" Compl. ¶ 3. They allege that beginning "at least as early as January 1, 2014," Defendants—each described as a manufacturer, wholesaler, or retailer—conspired across three distribution levels to restrain trade in a purported market for all "Crop Inputs" in the United States. *Id.* ¶¶ 2-3. Specifically, Plaintiffs allege that Defendants boycotted the entry of so-called "electronic," "ecommerce," or "online sales" platforms ("electronic platforms") into a nationwide marketplace for Crop Inputs. Notably, no electronic platform has brought suit claiming to have been excluded by the supposed "boycott."

Plaintiffs filed the Consolidated Amended Complaint ("Complaint") after ample opportunity to review and address the myriad, fatal deficiencies identified in Defendants' Motions to Dismiss filed in the Southern District of Illinois before transfer to this MDL.[2] The Complaint fails to cure these infirmities. At base, it still lacks factual allegations suggesting the existence of any conspiracy or boycott, and the facts it does allege are suggestive of lawful independent conduct. In short, Plaintiffs have failed to "allege facts to support [the] inferences" they seek to draw, and "Plaintiffs cannot circumvent *Twombly* by proposing unsupported inferences." *Window World Int'l v. O'Toole*, No. 4:19-cv-2363-SEP, 2020 WL 7041814, at *4 (E.D. Mo. Nov. 30, 2020) (dismissing false-advertising claim), *appeal filed*, 21-1108 (8th Cir. 2021).

Specifically, the Complaint fails for several fundamental reasons.

*First*, Plaintiffs' Complaint rests on conclusory allegations that Defendants conspired, and

---

[2] *See, e.g.*, Defs.' Joint Mot. to Dismiss, *Piper v. Bayer CropScience LP*, No. 3:21-cv-00021 (S.D. Ill. May 5, 2021), ECF No. 127. The *Piper* case, filed January 8, 2021 by the Korein Tillery firm, was the first of the "Crop Inputs" putative class actions filed. However, on September 14, 2021, three days before the Complaint was filed, the Korein Tillery firm withdrew from the MDL (No. 4:21-md-02993, ECF No. 95), and the *Piper* case was dismissed without prejudice on September 17, 2021 (No. 4:21-cv-00668, ECF No. 151).

is replete with undifferentiated references to "manufacturers, wholesalers, and retailers." *See, e.g.*, Compl. ¶¶ 3, 93, 239, 242-43. No amount of generalized labeling can overcome the absence of facts evidencing an agreement among Defendants at any level of distribution, much less any agreement up and down three levels of the supply chain. Nor does the Complaint offer the requisite detail as to when or where such a conspiracy was supposedly formed, or who entered into it. "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Despite its length—the Complaint now spans 115 pages—the Complaint's "conspiracy" allegations still boil down to a magazine report of a single trade association gathering in 2017, when unidentified members of CropLife America's PACE Advisory Council voiced concerns about one particular electronic platform, Farmer's Business Network ("FBN"). Compl. ¶ 82. This is the *only* specific allegation that could be construed as "joint" conduct in the asserted geographic market (the United States). Yet even this allegation identifies no particular conduct or communications by any *single* Defendant, let alone collusive conduct between any *two or more* Defendants as required for a Section 1 violation. Plaintiffs' other allegations of "conspiracy" in the alleged geographic market are unsupported *inferences* or *conclusory statements* with no identification of actors, time, or even any alleged communication between Defendants. Allegations such as "[t]he Retailer Defendants and the Wholesaler Defendants . . . conspired to eliminate the [electronic] platforms' product supply . . . [and] induced the Manufacturer Defendants . . . to cut off the supply of Crop Inputs to ecommerce Crop Inputs sales platforms" (*id.* ¶ 93) are wholly insufficient. *See, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021) (affirming dismissal of "conclusory allegations—that the Board 'agreed,' 'conspired,' 'colluded,' or 'induced' agreement, conspiracy, or collusion"—because

"[r]epetition cannot substitute for factual allegations").

The "boycott" allegations are equally defective. The Complaint does not allege even a single instance of any Defendant ever *refusing to sell* a Crop Input in the alleged geographic market to any electronic platform, much less any facts to show a joint refusal resulting from an agreement among Defendants. Plaintiffs merely allege generically that when electronic platforms "attempted to purchase Crop Inputs from the Manufacturer and Wholesaler Defendants, they all refused . . . ." Compl. ¶ 96.

*Second,* Plaintiffs' conspiracy claim must also be dismissed because it is based on impermissible group pleading—that is, conclusory allegations of collective conduct without any differentiation among Defendants. The law is clear that "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of *collective* responsibility *must be dismissed*." *Bank of Am.*, *N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (emphasis added). Indeed, these precepts were again confirmed in a recent decision dismissing a case alleging boycott of electronic platforms with similar theories (*e.g.*, hindering price transparency). *Litovich v. Bank of Am. Corp.*, No. 20-cv-3154, 2021 WL 4952034, at *24 (S.D.N.Y. Oct. 25, 2021) ("It is fundamental to pleading in the post-*Twombly* era that . . . the pleader inform the defendant what it is alleged to have done. It is not sufficient for the plaintiff to allege that a group has done something wrong . . . .").

*Third*, the limited specific conduct alleged is consistent with independent, rational, and non-conspiratorial behavior, and does not support a plausible inference that any conspiracy exists. The "crucial question" in determining whether a complaint adequately alleges an antitrust conspiracy is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express[.]'" *Twombly*, 550 U.S. at 553 (quoting *Theater Enters.,*

3

*Inc. v. Paramount Film Distrib. Corp*., 346 U.S. 537, 540 (1954)). Those allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. That is because "[w]ithout more, parallel conduct does not suggest conspiracy," *id.* at 556-57; it is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id*. at 554. In this case, Plaintiffs fail to allege parallel conduct, or any conduct, that suggests a conspiracy.

Any alleged resistance to electronic platforms was entirely consistent with each individual Defendant's independent commercial interests. Indeed, the Complaint alleges that electronic platforms were going to disrupt the industry (Compl. ¶ 86) and erode already "slim margins" (*id.* ¶ 82). It would be unsurprising if each Defendant, independently perceiving the threat allegedly posed by the platforms, "liked the world the way it was." *Twombly*, 550 U.S. at 568. This provides good reason for each "to maintain the status quo and to discourage, not facilitate . . . [these] platforms from taking root." *In re Interest Rate Swaps Antitrust Litig*., 261 F. Supp. 3d 430, 464 (S.D.N.Y. 2017) (dismissing group boycott claims as implausible because the complaint itself explained why it was in each defendant's interest to oppose new electronic trading platforms). And there is nothing wrong with that. "[R]esisting competition is routine market conduct," and "if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a [Sherman Act] § 1 violation against almost any group of competing businesses would be a sure thing." *Twombly*, 550 U.S. at 566.

*Fourth*, the antitrust claims should be dismissed because Plaintiffs do not allege an essential element for Article III standing—that they suffered an antitrust injury plausibly caused by Defendants' alleged conspiracy. Plaintiffs merely hypothesize that absent the alleged

4

conspiracy there would have been greater price transparency and lower prices in the market. But the Complaint is entirely devoid of facts showing how Plaintiffs were injured by this alleged lack of transparency or how electronic platforms would have impacted competition.

*Fifth*, the Sherman Act § 1 claim should be dismissed because it is barred by the applicable four-year statute of limitations. Plaintiffs effectively concede that their claims are stale by attempting to invoke the doctrine of fraudulent concealment. This effort fails because they do not plead facts supporting the requisite elements of fraudulent concealment—separate acts of concealment by Defendants and reasonable diligence by Plaintiffs. Nor do they plead fraudulent concealment with the particularity required by Federal Rule of Civil Procedure 9(b). As to their "alternative" theory that the continuing violation doctrine saves their untimely claims, Plaintiffs offer only conclusory allegations that are inadequate under controlling law. Additionally, the individual sales Plaintiffs allege are not overt acts in the group boycott context and, thus, do not support Plaintiffs' continuing violation claim. At minimum, the claim should be limited to alleged damages from purported conduct that occurred within the four-year statute of limitations period.

*Sixth*, the RICO claim should be dismissed because Plaintiffs fail to adequately plead or allege: (1) the requisite "who, what, where, when, and how" of the alleged fraud, (2) a pattern of racketeering activity, and (3) the existence of an enterprise. Instead, they impermissibly rely upon conclusory allegations. And they fail to allege that anyone relied on any alleged misrepresentation.

*Finally*, Plaintiffs' state-law claims all fail for the same reasons that their Sherman Act § 1 claim fails—there is no adequately-pled conspiracy or injury. Furthermore, Plaintiffs lack standing to bring claims under 24 of the 35 state laws they invoke because no named Plaintiff resides, or purchased Crop Inputs, in those states. Additionally, Plaintiffs' state-law antitrust, consumer protection, and unjust enrichment claims fail for a multitude of independent, state-specific reasons.

5

In sum, the Complaint does not contain what it must to survive a motion to dismiss: factual matter backing up Plaintiffs' conclusory conspiracy allegations. Neither Plaintiffs' factual allegations nor their legal theories support any viable claim and, as a result, the Complaint should be dismissed in its entirety. Further, because this is effectively Plaintiffs' *third* strike, dismissal should be with prejudice.[3]

## FACTUAL BACKGROUND

## I.    THE PARTIES

Plaintiffs[4] are alleged direct and indirect purchasers of Crop Inputs, which Plaintiffs allege encompass a wide range of products used by growers: "seeds and crop protection chemicals such as fungicides, herbicides, and insecticides[.]" Compl. ¶ 3. Plaintiffs allege that 16 differently situated Defendants conspired to boycott so-called "electronic platforms," resulting in an "opaque" market that purportedly caused higher Crop Input prices. Plaintiffs sued "Manufacturer Defendants" that allegedly manufacture and supply Crop Inputs,[5] "Wholesaler Defendants" that allegedly distribute Crop Inputs ("Wholesaler Defendants"),[6] and "Retailer Defendants" that allegedly sell Crop Inputs at retail.[7] Plaintiffs do not name as defendants, or even as unnamed co-conspirators, a number of significant manufacturers, wholesalers, and retailers of Crop Inputs, and

---

[3] After filing their original complaints, Plaintiffs in the Southern District of Illinois and the Minnesota cases filed Consolidated Amended Complaints in those respective venues, and had the benefit of filing the current Complaint months after Defendants filed motions to dismiss in the Southern District of Illinois.

[4] Named Plaintiffs are Randi Handwerk, Dan Flaten, Ryan Bros., Inc., Michael J. Ryan, Leon Pfaff, Eagle Lake Farms Partnership, Brad DeKrey, Tyler Schultz, Hapka Farms, Inc., Amy Hapka, Beeman Berry Farm, LLC, Wunsch Farms, Kenneth Beck, John Vehrenkamp, Justin Pic, Tom Burke, JSB Farms, LLC, Duane Peiffer, Darren Duncan, Jones Planting Co. III, George Potzner, Melinda Budde, Charles Lex, Jason Canjar, John C. Swanson, and James Koch d/b/a Vienna Eqho Farms. Compl. ¶¶ 22-47.

[5] The "Manufacturer Defendants" are alleged to include: Bayer CropScience Inc.; Bayer CropScience LP; Corteva Inc.; Pioneer Hi-Bred International, Inc.; BASF Corporation; and Syngenta Corporation. *Id.* ¶¶ 5, 49-55.

[6] The "Wholesaler Defendants" are alleged to include: Cargill, Incorporated; Tenkoz Inc.; Winfield Solutions, LLC; and Univar Solutions, Inc. *Id.* ¶¶ 5, 56-59.

[7] The "Retailer Defendants" are alleged to include: CHS Inc.; Nutrien Ag Solutions, Inc.; GROWMARK, Inc.; Simplot AB Retail Sub, Inc.; and Federated Co-operatives Ltd. (a Canadian company). *Id.* ¶¶ 5, 60-65.

they do not explain why certain industry participants have been included and others excluded.

Plaintiffs do not allege that they attempted to buy Crop Inputs through an electronic platform, were prevented from purchasing any Crop Input product, or were unable to obtain price information for any Crop Input product that they sought to purchase. Plaintiffs also do not allege that their own specific Crop Input purchases would have been impacted in any way by the entry of electronic platforms into the marketplace.

Plaintiffs purport "to represent a class and sub-classes consisting of persons and entities who purchased Crop Inputs, for their own use and not for resale, in the United States from at least as early as January 1, 2014, through the present (the 'Class Period') from the Defendants, or through Defendants' authorized retailers." *Id.* ¶ 2. They further divide themselves into sub-classes of direct and indirect purchasers. *See, e.g.*, *id.* ¶ 126 (defining class and subclasses). The Complaint seeks "injunctive relief and damages pursuant to federal law on behalf of the Nationwide Class, damages on behalf of the Direct Purchaser Damages Sub-Class pursuant to federal law, and damages on behalf of the Indirect Purchaser and State Law Damages Sub-Class pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws . . . ." *Id.*

## II.    THE ALLEGED "CROP INPUTS" MARKET

Plaintiffs allege in conclusory fashion that "[t]he relevant market for this lawsuit is the market for Crop Inputs in the United States, including the manufacturing market for Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs." *Id*. ¶ 18. Plaintiffs elsewhere refer to a "Crop Inputs market" in the singular (*e.g.*, *id.* ¶¶ 13, 69, 84) rather than separate retail, wholesale, and manufacturing "markets." Regardless, Plaintiffs do not explain how or why a wide variety of non-interchangeable products (in *thousands* of varieties) falling under their definition of "Crop Inputs" (*e.g.*, different seeds for various crops and different chemicals for various uses) (*id.* ¶¶ 3, 66-68, 146) are somehow part of the same market. For

example, a seed obviously does not compete with a fungicide; a fungicide does not compete with fertilizer. Plaintiffs fare no better in attempting to allege a geographic market; they simply state without support that "[t]he relevant market for this lawsuit is the market for Crop Inputs in the United States . . . ." *Id.* ¶ 18. Plaintiffs further allege in barebones, conclusory fashion that the "market for Crop Inputs is highly concentrated" (*id.* ¶ 146), but fail to make any specific allegations that plausibly allege market concentration at any level, nor offer allegations about the *retail* marketplace in which Plaintiffs purchased their Crop Inputs. For example, there are no allegations regarding the total number of Crop Inputs retailers nationwide or their respective market shares.

Plaintiffs allege that the Crop Inputs market is structured to "maximize opacity to deny farmers access to pricing data and product information that farmers need to make informed decisions about Crop Inputs purchases." *Id.* ¶ 138. The Complaint alleges that wholesalers and retailers contract with Manufacturer Defendants "to purchase and distribute branded Crop Inputs and entitling [them] to special rebates." *Id.* ¶¶ 56-59, 61-65. The Complaint further asserts that the Manufacturer Defendants permit only wholesalers, retailers owned or operated by the manufacturers, and certain "authorized retailers," to sell their products (*id.* ¶ 70), and that those authorized retailers must sign confidentiality provisions prohibiting them from disclosing the Manufacturer Defendants' pricing information to third parties (*id.* ¶ 71). Plaintiffs additionally allege that wholesalers include confidentiality provisions in their contracts, which prohibit retailers from disclosing the prices paid to the wholesalers or the prices at which retailers sell the products to other farmers. *Id.* ¶ 73. Nowhere do Plaintiffs allege that they or other growers were unable to obtain retail quotes for Crop Inputs to make informed choices about their Crop Input purchases.

## III.   THE EMERGENCE OF "ELECTRONIC PLATFORMS"

Plaintiffs claim that "[b]eginning in at least 2014," Defendants entered into a conspiracy to boycott "entities that would have introduced price-reducing electronic sales of Crop Inputs . . . ."

8

*Id.* ¶¶ 144-45. Plaintiffs do not define what an "ecommerce Crop Inputs sales platform" is, and although the Complaint references several platforms by name (*i.e.*, FarmTrade, f/k/a XSAg.com, Agroy, Inc., and FBN), the primary function ascribed to these "platforms" by Plaintiffs is that they purportedly "increased price transparency to farmers." *Id.* ¶¶ 7, 110.

Almost all the allegations in the Complaint are about a single platform, FBN (*id.* ¶ 7), which is referenced 90 times. FBN is described variously as a "sales platform," a retailer, and a "service that provided objective performance data on Crop Inputs." *Id*. ¶¶ 7, 8, 75, 110. Plaintiffs recognize that industry analysts understood the threat posed by entities like FBN, but attribute most of this negative attention to two market observations made by *non-defendants*. For example, Plaintiffs allege that CoBank, a financial institution, issued a report stating that "e-commerce companies pose a threat to brick-and-mortar ag retailers . . . ." *Id.* ¶ 76.

Plaintiffs allege that in February 2016, a trade association magazine published an article critical of electronic platforms. *Id.* ¶ 81. Plaintiffs allege that the trade association's advisory council, composed of unidentified "heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts," discussed "the threat posed by ecommerce Crop Inputs sales platforms to retailers and wholesalers at its 2017 annual meeting." *Id.* ¶ 82. Plaintiffs do not allege which Defendants, if any, were present at this particular meeting, or that any Defendant was represented on the advisory council at any time, or even that *any* Defendant said anything specific, took any specific action, or entered into an agreement facilitated through those statements.[8] There are no specific factual allegations that any specific Defendant either sold or refused to sell to any

---

[8] Plaintiffs also allege that Farrell Growth Group ("FGG"), a non-defendant consulting group, provided opportunities for collusion by providing benchmarking services. *Id.* ¶¶ 87-91. They allege that a non-defendant Canadian company (Winfield United Canada) has a "partnership" with FGG (*id.* ¶ 89), but fail to link this to any *Defendant*, much less explain how one non-defendant providing services to another facilitated any agreement. Moreover, Plaintiffs do not allege any connection between the benchmarking and the claimed anticompetitive *conduct* at issue, nor do they allege what the benchmarking entails. As such, these vague allegations do nothing to advance Plaintiffs' claims.

electronic platform in the United States. Instead, the only conduct in the United States that Plaintiffs attribute to specific Defendants is limited to responses to FBN that are consistent with rational independent conduct and that do not indicate the existence of any agreement to boycott.

## IV.   THE ALLEGED JOINT BOYCOTT

Even though they possess no facts that suggest the existence of an unlawful agreement, Plaintiffs nevertheless surmise that the Retailer Defendants and the Wholesaler Defendants "conspired to eliminate the platforms' product supply" and in order to do so "induced the Manufacturer Defendants—who rely on the Wholesaler and Retailer Defendants to recommend and sell their products to farmers—to cut off the supply of Crop Inputs to ecommerce Crop Inputs sales platforms." *Id.* ¶ 93. Plaintiffs allege that "[b]eginning in at least 2014" (*id.* ¶ 144), the Manufacturer Defendants acceded to the Wholesaler and Retailer Defendants and "initiated a joint boycott" (*id.* ¶ 96). *But Plaintiffs do not allege a single specific communication between any two Defendants about any topic at all, much less about any boycott of electronic platforms.*[9] That alone is fatal to the Complaint.

Plaintiffs allege generally that Defendants refused to supply Crop Inputs to ecommerce Crop Inputs sales platforms. *Id.* But they do not allege any requests by FBN (or any other electronic platform) for supply in the United States; nor do they allege *when* any specific Defendant supposedly refused to supply those products, *what products* they purportedly refused to supply, or the reasons given for the alleged refusal. Plaintiffs claim that "Retailers who failed to comply with the group boycott were penalized by the Defendants," but the only specific allegation offered in

---

[9] The Complaint is also internally inconsistent, alleging on the one hand that the supposed boycott resulted from the request of Retailers and Wholesalers on Manufacturers (*e.g.*, Compl. ¶¶ 93, 96), but on the other hand suggesting that the Retailer Defendants were dragged along through "strict discipline" by non-Retailer Defendants. *Id.* ¶ 8 ("[T]he Manufacturer Defendants and Wholesaler Defendants agreed not to sell to ecommerce Crop Inputs sales platforms and enforced strict discipline on Retailer Defendants who failed to comply with the boycott.").

this regard is a 2018 audit conducted by Defendant Syngenta of its own authorized retailers. *Id.* ¶ 98. A manufacturer can audit its retailers for a variety of legitimate reasons, and the act of auditing is not penal. Although Plaintiffs allege that other Manufacturer Defendants included language in their form contracts permitting similar audits (*id.* ¶ 99), they do not allege that the intent of including the audit provisions was to impede any electronic platform, or that they were inserted only after market entry by an electronic platform. No Defendant is alleged to have taken punitive action as a result of any audit. Plaintiffs allege that a Syngenta employee "question[ed]" the quality of products sold online and raised the concern of the potential for "counterfeit products." *Id.* ¶ 97. Plaintiffs summarily dismiss this concern as "false[]" (*id.*) without support.

Many of Plaintiffs' allegations regarding the purported boycott relate to events in Canada, which is outside the relevant geographic market alleged in the Complaint, and have no alleged impact on Plaintiffs or putative class members. *Id.* ¶¶ 102-07. Indeed, Plaintiffs do not even allege that the products a Canadian retailer (Yorkton Distributors) was unable to buy in Canada are products that are sold in the U.S. market and used by U.S. farmers. Although Plaintiffs allege that the Canadian Competition Bureau ("CCB") "is formally investigating Defendants' Canadian counterparts" (*id.* ¶ 117), and that the United States Department of Justice is "monitoring" that investigation (*id.* ¶ 119), the Complaint does not allege that any antitrust authority has taken enforcement action against any Defendant in any jurisdiction, let alone in the United States.

## V.   DEFENDANT-SPECIFIC ALLEGATIONS

Plaintiffs offer only the following sparse allegations specific to each Defendant:

### A.   Manufacturer Defendants

**Bayer CropScience LP & Bayer CropScience Inc.:** Plaintiffs allege that "Bayer"— without specifying which Bayer entity—maintains contracts with the other non-Manufacturer Defendants, and includes audit rights in its contracts. *Id.* ¶¶ 56-59, 61-65, 99. There is no allegation

as to when those rights were first obtained; nor are there details of any instance when those rights have been exercised. Plaintiffs also allege that "[i]n 2016, Defendant Bayer formed an internal task force to study the long-term competitive impact of FBN's ecommerce Crop Inputs sales platform" (*id.* ¶ 95), and analyzed the competitive significance of FBN (*id.* ¶ 119). In Plaintiffs' discussion of the Canadian market, the Complaint also pleads that "Bayer" (presumably referring to a Canadian entity, as neither named Bayer defendant sells Crop Inputs in Canada and Defendant Bayer CropScience Inc. does not sell Crop Inputs at all) had contracts with Yorkton pre-FBN acquisition, and informed FBN post-acquisition that it would no longer sell, or would limit sales of, Crop Inputs to Yorkton. *Id.* ¶¶ 102, 107. Plaintiffs also assert that CropLife America's Board of Directors formerly included an executive of "Bayer," and that a "Bayer" employee sits on the Board of the Agricultural Retailers Association ("ARA"). *Id.* ¶¶ 80, 85.

**BASF Corporation:** Plaintiffs allege that BASF maintains contracts with the other non-Manufacturer Defendants and includes language in its form contracts with authorized retailers that allow it to "permit audits of authorized retailers' books and records and on-site inspections at any time." *Id.* ¶ 99. There is no allegation as to when those rights were first put in its contracts; nor are there details of any instance when those rights have been exercised. Plaintiffs also allege that BASF analyzed the competitive significance of FBN. *Id.* ¶ 119. Plaintiffs allege that a separate BASF Canadian entity is subject to an investigation in Canada. *Id.* ¶ 117. Plaintiffs also assert that CropLife America's Board of Directors is chaired by an executive of BASF, and a BASF employee sits on the Board of the ARA. *Id.* ¶¶ 80, 85.

**Corteva Inc.:** Plaintiffs allege that Corteva's contracts with unspecified "authorized retailers" allow it to audit those retailers and perform "on-site inspections." *Id.* ¶ 99. There is no allegation as to when those rights were first put in its contracts; nor are there details of any instance

when those rights have been exercised. Plaintiffs allege that "Corteva" (presumably referring to its "Canadian counterpart" (*see id.* ¶ 117)) did not supply or only supplied limited quantities to Yorkton in Canada after FBN bought it, yet they provide no detail as to which products (*id.* ¶ 107). Plaintiffs mention that a Corteva executive was on the Board of CropLife America at some unspecified time and that a Corteva employee sits on the Board of ARA. *Id.* ¶¶ 80, 85.[10]

**Syngenta Corporation:** Plaintiffs allege that Syngenta maintains contracts with the other non-Manufacturer Defendants. Plaintiffs allege that Syngenta initiated an audit of its authorized retailers. *Id.* ¶ 98. Plaintiffs further allege that a Syngenta employee "falsely claimed that ecommerce Crop Inputs sales platforms would deliver counterfeit products . . . ." *Id.* ¶ 97. Plaintiffs allege that Syngenta is a "member" of CropLife America and is represented on the board of the ARA. *Id.* ¶¶ 80, 85.

### B.    Wholesaler Defendants

**Cargill, Incorporated:** Plaintiffs' Complaint does not contain any substantive allegations concerning the named Defendant, Cargill, Incorporated, which sold its U.S. Crop Inputs business in September 2016. *Id.* ¶ 56. Instead, the Complaint's few allegations concerning any conduct by "Cargill" (*id.* ¶¶ 107, 117-18) refer to Cargill's Canadian affiliate, which has not been named as a defendant in this action. Plaintiffs attempt to muddy the waters by claiming that "Cargill" owns and operates a division that sells and distributes Crop Inputs (*id.* ¶ 56), but that too refers to the non-party Canadian affiliate. Plaintiffs' claim that "Cargill" "offers U.S. and Canadian farmers a range of . . . crop inputs, and agronomic services . . . ." misleadingly cites a snippet from Cargill's "North America Farmer Services" webpage. *Id.* However, the cited webpage—just a few sentences below the general introductory language Plaintiffs cite—states specifically that "Cargill offers crop

---

[10] Pioneer Hi-Bred International, a subsidiary of Corteva, is named as a defendant, but there are no factual allegations against it, and the Complaint should therefore be dismissed as to it for that reason as well.

protection, seed, and fertilizer products and services at many locations *in Canada*."[11]

**Tenkoz, Incorporated:** Plaintiffs allege that Tenkoz "is one of the largest Crop Input distributors in the United States" (without including any substantive allegations about the nature or conduct of its business) and that Tenkoz maintains contracts with the Manufacturer Defendants. *Id.* ¶ 57. The Complaint also alleges that an executive of Tenkoz formerly served on the board of CropLife America. *Id.* ¶ 80.

**Univar Solutions, Inc.:** Plaintiffs' Complaint does not contain any substantive allegations concerning Univar Solutions, Inc. Instead, Plaintiffs' allegations focus on the actions of Univar Canada, Ltd., a separate entity from Defendant Univar Solutions, Inc. and not a named Defendant in this action. *See id*. ¶¶ 105-06, 117-18.

**Winfield Solutions, LLC:** Plaintiffs allege that an executive of Winfield's parent company serves on the board of CropLife America (*id.* ¶ 80), and that the board of the ARA includes board members from Defendants, including Winfield (*id.* ¶ 85). Plaintiffs further allege that FBN purchased Yorkton, a Canada-based retailer that had a supply agreement with Winfield, and that after that acquisition, Winfield informed FBN that it would not supply FBN with Crop Inputs. *Id.* ¶¶ 102, 107. Plaintiffs also make three allegations involving Winfield United Canada ULC, a foreign company that is a separate entity from Defendant Winfield and is not named in this action. Plaintiffs allege that the CCB is investigating the conduct of Winfield United Canada (*id.* ¶¶ 117-18), that Winfield United Canada has a "partnership" with a consulting group called FGG (*id.* ¶¶ 87, 89), and Winfield United Canada and Winfield have a common corporate parent (*id.* ¶ 58).

---

[11] *North America Farmer Services*, https://www.cargill.com/agriculture/north-america-farmer-services (last visited Oct. 20, 2021) (emphasis added). Compl. ¶ 56 n.3. Plaintiffs' other cited website is similarly misleading as it refers to Cargill's Canadian website, relating only to Canadian operations. *Agriculture*, https://www.cargill.ca/en/agriculture (last visited Oct. 20, 2021). Compl. ¶ 56 n.2.

## C.     Retailer Defendants

**CHS Incorporated:** Plaintiffs allege that CHS sent a letter to its profit-sharing farmer-owners attempting to "discourag[e] them from using FBN[.]" *Id.* ¶ 77. There are no allegations that CHS agreed with any Defendant to send this marketing letter. Plaintiffs allege that the ARA board includes appointees from Defendants, including CHS. *Id.* ¶ 85. There are no other allegations regarding CHS.

**Federated Co-operatives Limited:** Plaintiffs allege that Federated, a Canadian cooperative[12] operating exclusively in Canada, wrote about FBN's acquisition of Yorkton, a Canadian retailer, stating that "[h]ow our key manufacturing partners decide to engage with this business will be closely observed by us and likely all of our traditional retailing peers across Western Canada." *Id.* ¶ 104. Plaintiffs further allege that Federated is under investigation by the CCB. *Id.* ¶¶ 65, 117. Plaintiffs do not allege that Federated has any operations in the United States.

**GROWMARK, Incorporated:** Plaintiffs allege that GROWMARK[13] is "a large Crop Input retailer[.]" *Id.* ¶ 63. Plaintiffs allege that GROWMARK maintains distribution contracts with the Manufacturer Defendants (*id.*), and that GROWMARK employees serve or served on the boards of CropLife America and the ARA (*id.* ¶¶ 80, 85).

**Nutrien Ag Solutions, Incorporated:** Plaintiffs assert Nutrien operates in the marketplace as a wholesaler and as the "retail division of the world's largest crop inputs company" and maintains the same kind of business contracts as the other defendants. *Id.* ¶ 62. Plaintiffs further assert that someone from Nutrien serves on the board of ARA. *Id.* ¶ 85. There are no other

---

[12] Although the details vary by cooperative, an agricultural supply cooperative is generally owned in large part by its customers, is governed by its customers, and is operated for the benefit of its customers—who are also supposedly class members.

[13] Growmark FS, LLC is listed in paragraph 1 as a defendant, but there are no factual allegations against GROWMARK Inc.'s subsidiary, Growmark FS, LLC. That entity is not referenced anywhere else in the Complaint and the Complaint should therefore be dismissed as to the subsidiary.

allegations regarding Nutrien.

**Simplot AB Retail Sub, Incorporated:** Plaintiffs assert that Simplot operates in the marketplace and has certain contracts. *Id.* ¶ 64. Plaintiffs further allege an executive of Simplot formerly served on the board of CropLife America. *Id.* ¶ 80.

## <u>LEGAL STANDARD</u>

To survive a motion to dismiss, a plaintiff must allege a violation of the antitrust laws and plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To allege a plausible conspiracy in violation of Section 1 of the Sherman Act, a complaint must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. An antitrust plaintiff must plead "evidentiary facts" that sustain a plausible inference of an unlawful agreement, including the "who, did what, to whom (or with whom), where, and when." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015); *see also Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 883 (D. Minn. 2017) (granting motion for partial judgment on pleadings as to antitrust claims due to the absence of "factual allegations to explain [the] why, how, or for what purpose" the conspiracy was needed to exclude plaintiff).

Indiscriminately lumping defendants together by "group pleading" does not meet this standard. To the contrary, such allegations are insufficient at the motion to dismiss stage because they give the court no basis to determine how each defendant may have acted. *See, e.g.*, *Boggs v. Am. Optical Co.*, No. 4:14-cv-1434, 2015 WL 300509, at *2 (E.D. Mo. Jan. 22, 2015) ("A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." (quoting *Tatone v. SunTrust Mortgage, Inc.*,

857 F. Supp. 2d 821, 831 (D. Minn. 2012)); *In re Cattle Antitrust Litig.*, No. 19-cv-1129, 2020 WL 5884676, at *6 (D. Minn. Sept. 29, 2020) ("Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted[.]" (quoting *In re Pork Antitrust Litig.*, No. 18-cv-1776, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019)). And, in antitrust cases where the costs of discovery are typically "enormous," courts must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558-59 (quotation omitted); *Ass'n of Am. Physicians*, 15 F.4th at 835 ("*Twombly* bars the discover-first, plead-later approach that AAPS urges us to adopt. For good reason: modern antitrust litigation is expensive.").

Additionally, "a facial challenge" for lack of subject matter jurisdiction under Rule 12(b)(1) based on lack of standing, as Defendants present here, "is successful if the [pleader] fails to allege an element necessary for subject matter jurisdiction." *Knox ex rel. J.D. v. St. Louis City School Dist.*, No. 4:18-cv-00216, 2018 WL 6524009, at *2 (E.D. Mo. Dec. 12, 2018) (cleaned up).

## ARGUMENT

## I.  PLAINTIFFS FAIL TO PLEAD A CONSPIRACY TO BOYCOTT ELECTRONIC PLATFORMS.

Plaintiffs allege no facts evidencing a conspiracy—no facts are pled as to the "who, what, where, or when" of any agreement or even any competitor communications. Plaintiffs instead ask this Court to *infer* a conspiracy, among 16 separate entities, to boycott "electronic platforms" based on conduct wholly consistent with independent, lawful market behavior.

Unlike the classic anticompetitive group boycott, which involves "firms with market power" at one level in the supply chain boycotting "suppliers or customers in order to discourage them from doing business with a competitor," *TheMLSonline.com, Inc. v. Reg'l Multiple Listing*

*Serv. of Minn., Inc.*, 840 F. Supp. 2d 1174, 1181 (D. Minn. 2012) (quotation omitted), Plaintiffs'
alleged conspiracy implicates market participants at *three* levels of the distribution chain—
manufacturers, wholesalers, and retailers. *See* Compl. ¶¶ 18, 49-65. "[W]here the plaintiffs allege
that participants in a market at different levels of the distribution chain entered into a conspiracy,
the plaintiffs *must show* that similarly situated members of the conspiracy coordinated not only
with the manufacturer, *but also with each other*." *Marion Healthcare, LLC v. Becton Dickinson &
Co.*, 952 F.3d 832, 841-42 (7th Cir. 2020) (emphasis added). In other words, Plaintiffs' entire
theory of liability hinges on both horizontal and vertical agreements to boycott ecommerce
platforms. Yet Plaintiffs fail to plead *any* agreement to conspire, much less the existence of any
horizontal agreement among competitors at any level of the distribution chain. Accordingly, the
Complaint must be dismissed.

Plaintiffs' allegations of vertical agreements in the form of "authorized retailer"
agreements of each Manufacturer Defendant with non-Manufacturer Defendants cannot remedy
this fatal flaw because Plaintiffs do not allege that these agreements, absent any horizontal
conspiracy, are anticompetitive. Nor could they: "Vertical nonprice restrictions are governed by
the rule of reason and are not per se violations, because they 'promote interbrand competition by
allowing the manufacturer to achieve certain efficiencies in the distribution of his products.'"
*Double D Spotting Serv., Inc. v. SuperValu, Inc.*, 136 F.3d 554, 559 (8th Cir. 1998) (quoting *Cont'l
T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54 (1977)). "This 'rule of reason' analysis involves
an inquiry into the market structure and the defendant's market power in order to assess the actual
effect of the restraint." *Double D Spotting Serv.*, 136 F.3d at 558 (citing *Copperweld Corp. v.
Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). The definition of a relevant market, in turn,
includes both a product market and a geographic market. *See Double D Spotting Serv.*, 136 F.3d

at 560. Plaintiffs here allege no facts indicating that any Defendant, or all Defendants together, have market power in any properly defined relevant market. Any vertical agreement allegations must therefore be dismissed for failure to plead a relevant market and market power within that market as required by the rule of reason.

Plaintiffs' failure to plead any horizontal agreement, or any vertical agreement other than "retailer agreements" that cannot state a claim under the rule of reason, are compounded by their improper group pleading. Plaintiffs lump Defendants together without identifying what each Defendant allegedly did (or when) to enter the group boycott. The allegations specific to each Defendant are sparse, and the alleged conduct is entirely consistent with rational, commercially motivated activity. Those allegations cannot sustain a claim. *Boggs*, 2015 WL 300509, at *2; *Twombly*, 550 U.S. at 554 ("[P]arallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."); *Marion Diagnostic Ctr. LLC v. Becton, Dickinson & Co.*, No. 3:18-cv-1059, 2021 WL 961728, at *4 (S.D. Ill. Mar. 15, 2021) (dismissing complaint where allegations suggested "rational, commercially motivated" activity, not anticompetitive conspiracy), *appeal filed* 21-1513 (7th Cir. 2021).

### A.     Plaintiffs Fail to Plead a Conspiracy Through Either Direct or Circumstantial Evidence.

The Complaint fails at its core because Plaintiffs do not adequately plead their antitrust conspiracy through either direct evidence of the conspiracy or circumstantial evidence, which requires sufficient factual allegations of both "parallel conduct" and "plus factors." *In re Cattle*, 2020 WL 5884676, at *5 ("The Eighth Circuit has adopted a rule that to survive a motion to dismiss when the allegations point to parallel conduct, antitrust plaintiffs must also plead plus factors.");

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1013 (E.D. Mo. 2018), *aff'd*, 911 F.3d 505 (8th Cir. 2018).

### 1.   Plaintiffs Allege No Direct Evidence of a Conspiracy.

Direct evidence is the so called "smoking gun," such as "an admission by an employee of one of the conspirators" that "defendants had met and agreed explicitly on the terms of a conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (cleaned up). The Complaint contains nothing remotely approaching direct evidence.

### 2.   Plaintiffs Do Not Plead Circumstantial Evidence of a Conspiracy.

Lacking any allegations that would directly evidence a conspiracy, Plaintiffs attempt to plead their case through circumstantial evidence. To properly plead a circumstantial case, Plaintiffs must allege both (1) parallel conduct and (2) additional "plus factors" that "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 553, 556-57; *Insulate SB, Inc. v. Adv. Finishing Sys., Inc.*, 797 F.3d 538, 544 (8th Cir. 2015) ("Pleading only 'parallel conduct' or other conduct 'merely *consistent with* [an] agreement' is not sufficient to show a conspiracy." (quoting *Twombly*, 550 U.S. at 557)). Plaintiffs fail on both counts.

#### a.   Plaintiffs Do Not Plead Parallel Conduct.

Plaintiffs fail to allege that Defendants engaged in parallel conduct with respect to the alleged U.S. market. Rather, they cite to a few *unilateral* and *dissimilar* actions taken by only certain Defendants (or third parties)—behavior that is not parallel at all. The sum total of Plaintiffs' allegations of specific actions attributed to individual Defendants in the United States is the following:

- Retailer CHS distributed a letter to its profit-sharing farmer-owners discouraging them from using FBN (Compl. ¶ 77);

- One of the Bayer Manufacturer Defendants (Plaintiffs do not say which) formed an internal task force to study the competitive impact of FBN (*id.* ¶¶ 95, 119);

- Manufacturer BASF had "views" concerning the competitive impact of FBN (*id.* ¶ 119);

- An employee of Manufacturer Syngenta stated that some of the products sold on electronic platforms might be counterfeit goods (*id.* ¶ 97); and

- Syngenta audited authorized retailers (*id.* ¶ 98).

Each of these allegations reflects different, unilateral reactions by individual Defendants to the emergence of electronic platforms. None implies the existence of an illegal conspiracy.[14] Indeed, as to most Defendants (Manufacturer Pioneer; Retailers Federated, GROWMARK, Nutrien, and Simplot; and all the Wholesaler Defendants), Plaintiffs do not allege *any* specific U.S. conduct.

Unable to plead parallel conduct in their alleged geographic market, Plaintiffs attempt to rely on alleged conduct by one Defendant in Canada, a wholly distinct and separate market. That fails for multiple reasons. To begin with, the alleged conduct cannot be "parallel," as it involves only a single named Defendant. Allegations of foreign conduct, even if proved, would not support the existence of a conspiracy on behalf of the named defendants in the United States. *See, e.g.*, *In re Mex. Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 391 (S.D.N.Y. 2019) (dismissing complaint relying on government investigations that "state nothing about wrongdoing *on behalf* of Defendants here"); *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015) ("A conspiracy elsewhere, without more, generally does not tend to prove a domestic conspiracy, especially when the conduct observed domestically is just as consistent with lawful interdependence as with an antitrust conspiracy. To hold otherwise would sanction the use of unabashed propensity reasoning . . . .").

---

[14] Although Plaintiffs allege that Manufacturers Bayer, BASF, and Corteva used existing form contract language that "permit[s] audits of authorized retailers[]," supposedly to "ensure" that electronic platforms "could not purchase name brand Crop Inputs" (Compl. ¶ 99), there is no allegation that these provisions were inserted after the emergence of, let alone in reaction to, electronic platforms. These allegations thus do not plead parallel conduct even as to the Manufacturer Defendants.

21

Even if credited, Plaintiffs' allegations of parallel Canadian conduct fail to create an inference of unlawful U.S. activity. Plaintiffs allege that FBN acquired Yorkton, a Canadian-based retailer with "longstanding supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield." Compl. ¶ 102. Plaintiffs claim that certain Manufacturer and Wholesaler Defendants serially terminated or narrowed their supply agreements with Yorkton: "Bayer (on June 15, 2018), Corteva (on August 27, 2018), and Cargill (on August 3, 2018) informed FBN they would no longer sell Crop Inputs, including seeds and pesticides, or sell only limited quantities to Yorkton." Id. ¶ 107. Plaintiffs also claim that "Univar" and "Winfield" announced that they would cease doing business with FBN/Yorkton (id. ¶¶ 105-07), but later identify Univar Canada Ltd. and Winfield United Canada ULC—which are *not* Defendants—as parties under investigation in Canada for the supposed boycott of FBN/Yorkton (*see id.* ¶ 117). Even if deemed true and attributed to the actual named Defendants, and even putting aside the fact that the conduct is not in the relevant market, the mere fact that a few sellers in Canada declined to continue sales or sold less to Yorkton, standing alone, is not evidence of a conspiracy among any non-defendants in Canada (much less Defendants in the United States). Plaintiffs do not allege that any other "Defendant" made a similar announcement; nor do Plaintiffs plead any other relevant parallel conduct even in Canada.[15]

At bottom, the allegations are insufficient to show that Defendants acted in a concerted manner in the United States or anywhere else, much less that they did so in furtherance of the alleged conspiracy. As discussed further *infra*, even if Plaintiffs could show that Defendants engaged in parallel conduct by refusing to sell products to electronic platforms, doing so would be

---

[15] Plaintiffs' use of generic corporate family names, *e.g.*, "BASF," "Syngenta," "Corteva," "Univar," "Cargill," and "Bayer" is misleading. Plaintiffs must identify the precise legal entities engaged in the behavior alleged and cannot attribute the alleged conduct of Canadian entities to American entities simply by grouping them together. *See In re Mex. Gov't Bonds*, 412 F. Supp. 3d at 390-91.

entirely consistent with each Defendant's legitimate and independent business rationales.

### b.   *Plaintiffs Fail to Allege Plus Factors Suggestive of a Conspiracy.*

Because Plaintiffs fail to plead any relevant parallel conduct, and indeed plead facts that contradict the existence of such conduct, "no discussion of any 'plus factors' is necessary," and the Complaint should be dismissed. *Park Irmat Drug Corp. v. Express Scripts Holding Co*., 911 F.3d 505, 516-17 (8th Cir. 2018); *In re Pork*, 2019 WL 3752497, at *7 ("[P]lus factors without plausible allegations of parallel conduct are insufficient to establish an inference of an agreement."). But even if Plaintiffs had adequately alleged parallel conduct, their claims would still fail because they have not sufficiently alleged the requisite plus factors suggesting an anticompetitive conspiracy rather than lawful unilateral behavior. *Twombly*, 550 U.S. at 556-57.

Plaintiffs offer the following alleged plus factors: (i) Defendants' conduct was against their independent self-interests; (ii) opportunities to conspire; (iii) concentration in the "Crop Inputs" market; (iv) certain government investigations; and (v) prior antitrust violations. Compl. ¶¶ 146-51. However, the facts alleged in support of these plus factors do not suggest conspiracy.

### i.   *Each Defendant's Reaction to Electronic Platforms Was Predictable and Consistent With Its Own Self-Interest.*

Plaintiffs speculate that, absent an agreement among Defendants to boycott electronic platforms, the Manufacturer Defendants' alleged refusals to deal with electronic platforms were against each Defendant's independent economic self-interests because the platforms presented an opportunity to expand sales and simplify distribution. Compl. ¶ 150; *see also id.* ¶ 113. Plaintiffs further posit that the "Crop Inputs industry" structure is such that a "boycott could only work if each Manufacturer Defendant agreed to the plan . . . ." *Id.* ¶ 112.

But Plaintiffs' speculation is unfounded, contradicted by other allegations in the Complaint as well as judicially noticeable facts, and contrary to common sense. As detailed below, it would

be entirely consistent with their respective self-interests for Defendants at each level of the distribution chain—manufacturing, wholesale, and retail—to choose independently not to deal with the electronic platforms, as they are free to do under the antitrust laws. *See United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) ("[T]he [Sherman Act] does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal . . . .").

*Manufacturers:* Plaintiffs themselves acknowledge why manufacturers would prefer to deal with established business partners rather than new, untested entrants with new business models. As the Complaint notes, Syngenta had concerns about counterfeit products, including "concerns about product integrity, stewardship, and regulatory compliance" for FBN sales. Compl. ¶¶ 97, 264. Similarly, according to the *Wall Street Journal* article cited in the Complaint, Corteva stated that the "existing dealers, distributors and retailers make sure farmers get reliable products with the best results, and any new sellers would need to meet those standards."[16] Plaintiffs also cite a report recognizing that the electronic platform business model entails a shift away from farmer services that enhance the successful use of the Manufacturer Defendants' products, such as application of pesticide products. Compl. ¶¶ 73, 76.

These and other aspects of the Complaint concede the economic reality: manufacturers rely on wholesalers and retailers to provide value-added sales services to consumers. In light of this reality, the Supreme Court has long recognized that it is entirely rational for manufacturers to choose not to deal with retailers (like electronic platforms) whose business model is to lower prices by reducing or eliminating such value-added sales services. *See Cont'l T.V.*, 433 U.S. at 55

---

[16] Jacob Bunge, *Tech Startup, Trying to Be Amazon for Farms, Runs Into Ag Giants*, Wall Street J., Aug. 30, 2020, *available at* https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850 (referenced *e.g.*, Compl. ¶ 264 n.32).

(recognizing that "service and repair are vital for many products" and that the quality of such "services affect a manufacturer's goodwill and the competitiveness of his product"); *see also Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) (recognizing that retailers furnish services which generate "increased demand").

These economic realities are particularly pronounced with respect to "Crop Inputs," which are regulated and highly specialized products. Some, such as insecticides and herbicides, are hazardous if not handled and used appropriately, with some requiring that an applicator be certified to handle them.[17] Others, such as seed containing genetically modified traits, include patented biotechnology that may not be purchased by farmers but rather only licensed for one-time use, requiring sellers to secure and verify those limited use licenses.[18] It is therefore in a manufacturer's interest "to exert control over the manner in which [these] products are sold and serviced" (*Cont'l T.V.*, 433 U.S. at 55 n.23), especially given each manufacturer's vast expenditures on research and development and the consequent need to maintain the integrity of their products. Such actions are not anticompetitive or against economic self-interest but are, in fact, demanded by society; the Supreme Court has squarely endorsed the notion that "[a]s a result of statutory and common-law developments, society increasingly demands that manufacturers assume direct responsibility for the safety and quality of their products . . . . The legitimacy of these concerns has been recognized in cases involving vertical restrictions." *Id.*[19] For these reasons, a manufacturer is free to choose

---

[17] *See, e.g.*, 40 C.F.R. §§ 152.160-.175.

[18] *See, e.g.*, *Bowman v. Monsanto Co.*, 569 U.S. 278, 285 (2013) (approving licensing of seeds).

[19] Stewardship, and the regulatory schemes in effect to ensure stewardship, are indeed fundamental to the seed and pesticide industries. *See, e.g.*, Mo. Rev. Stat. § 266.011, *et seq.*, Missouri Seed Law; Mo. Rev. Stat. § 266.031.1 ("A separate permit shall be required for each place of business from which seed regulated by this law is sold."). Manufacturers have legitimate interests in exercising discretion over who they trust to comply with the applicable regulatory frameworks and otherwise tend to seed performance, chemical resistance, and other issues. Indeed the Complaint acknowledges a retailer's concern that "'cut[ting] back on services and support'" could have "legal implications" vis-à-vis the significant "regulatory burden." Compl. ¶ 83.

its own preferred system of distribution. *Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1580-81 (11th Cir. 1988) ("It is well established that a merchant, whether he be a manufacturer, distributor, wholesaler, or retailer, may choose with whom he will do business and with whom he will not do business; such action generally does not violate the antitrust laws.") (citation omitted); *Colgate*, 250 U.S. at 307 (Discussing a manufacturer's "long recognized right . . . freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.").[20]

*Retailers and Wholesalers:* Without having alleged any action by the Manufacturer Defendants that is inconsistent with independent and rational economic behavior, Plaintiffs cannot state a claim—regardless of anything they allege against the Retailer and Wholesaler Defendants. But, in any case, Plaintiffs allege only conduct wholly consistent with the legitimate—and separate—interests of retailers and wholesalers to protect their own profits. The Complaint alleges, without naming any specific entity or any communication, that the Retailer and Wholesaler Defendants responded to the entry of electronic platforms by encouraging the Manufacturer Defendants not to deal with the platforms, urging an inference that the Manufacturer Defendants "risked the loss of substantial sales if they did not agree to the boycott." Compl. ¶¶ 93, 94. But courts have stated firmly that complaints by distributors and retailers to their suppliers about their rivals, even if acted upon, do not indicate an antitrust conspiracy. "Complaints about price-cutters are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984) (internal citations omitted). Such complaints "arise in the normal course of business and do not

---

[20] The Eighth Circuit has reiterated this principle. *Insulate*, 797 F.3d at 545, 548 (affirming dismissal of Section 1 claims); *Famous Brand, Inc. v. David Sherman Corp.*, 814 F.2d 517, 523 (8th Cir. 1987) (discussing that *Monsanto* reaffirmed the *Colgate* Doctrine).

indicate illegal concerted action." *Id.* at 763 (citation omitted); *see also, e.g.*, *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11-cv-07834, 2014 WL 6845862, at *5 (N.D. Ill. Dec. 4, 2014) (dismissing complaint where allegations of complaints from other retailers were insufficient to plausibly suggest group boycott among retailers). Moreover, the "loss of substantial sales," Compl. ¶¶ 93-94, is a generic risk inherent in any relationship between a manufacturer and those downstream in the distribution chain. That a dissatisfied wholesaler or retailer might switch to a competing manufacturer's products if a manufacturer did business with a competitor does not support a nefarious inference of an unlawful boycott or conspiracy.

Plaintiffs' own allegations confirm the economic logic of retailers and manufacturers complaining about possible new competition. They allege that FBN's presence in the marketplace had the potential to disrupt the traditional agricultural supply chain. *See, e.g.*, *id.* ¶ 86. Given this allegation, "each [Defendant] had good reason to independently discourage . . . and not encourage . . . development of a new trading paradigm that threatened, some day, to cannibalize their [] profits." *In re Interest Rate Swaps*, 261 F. Supp. 3d at 464. Moreover, Plaintiffs assert that Crop Input retailers' margins were minimal; if so, each Retailer Defendant acting individually would not welcome another competitor. Compl. ¶ 81 ("*Already low margins* were about to race to the bottom." (emphasis added)); ¶ 82 ("FBN had negatively affected their businesses during 2017 by cutting into their *already slim margins* on various products." (emphasis added)). It makes sense that a retailer would choose not to deal with a new rival that intends to compete with it. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004) (recognizing that forcing a company to share its advantage with its rival is "in some tension with the underlying purpose of antitrust law," especially because "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,

555 U.S. 438, 450 (2009). Plaintiffs also allege that FBN sought to cut out wholesalers from the chain of distribution, so naturally no wholesaler would see FBN as a welcome addition to the marketplace. *See* Compl. ¶ 102 (describing FBN's attempt to purchase product directly from manufacturers); *see also id.* ¶ 86 (alleging purpose of purported conspiracy was to "eliminate price transparency and preclude innovative e-commerce solutions from disrupting the traditional agricultural supply chain").[21]

> ii.   *Defendants' Alleged Opportunities to Conspire Are Nothing More than Routine Trade Association Involvement.*

Plaintiffs next allege that 10 of the 16 Defendants' general involvement in trade associations is a plus factor because trade associations create an opportunity to conspire. Compl. ¶¶ 80, 85-86, 149.[22] This purported "plus factor" falls short. "[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement," *In re Musical Instruments*, 798 F.3d at 1196, and "mere membership . . . will not nudge an allegation from the realm of parallelism to the land of agreement." *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 995 (W.D. Ark. 2017); *accord Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004). This is because participation in trade associations serve significant procompetitive ends, and if simply attending such meetings

---

[21] Furthermore, Retailer Defendant CHS is a cooperative that is *owned by farmers*—and thus its profits are shared with the farmers—so naturally CHS and its farmer-owners have an interest in CHS's continued sales and profitability, and not diverting sales to a competitor. *See, e.g.*, CHS, Inc., Annual Report, at 1 (Nov. 4, 2021), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/823277/000082327721000044/chscp-20210831.htm   ("CHS FY2021 10-K") ("Our earnings from cooperative business are allocated to members . . . based on the volume of business they do with us. We allocate these earnings to our patrons in the form of patronage refunds."). Plaintiffs' own quote from the CHS letter references this profit-sharing relationship, noting that FBN does not "return[] any profits to you the farmer[.]" Compl. ¶ 77. Pursuant to Fed. R. Evid. 201, the Court may take judicial notice of CHS's farmer ownership structure, which is described and disclosed in various CHS public filings. *See, e.g.*, CHS FY2021 10-K at 1 ("As a cooperative, we are owned by farmers and ranchers and their member cooperatives (referred to herein as 'members') across the United States.").

[22] The allegations do not differentiate which Bayer entity or GROWMARK entity is a member. Other Defendants not alleged to have been members of ARA or CropLife include: Cargill, Pioneer, Univar, and Federated.

could amount to an antitrust claim, the antitrust laws would have the perverse effect of disincentivizing procompetitive conduct.

Accordingly, when courts have found this plus factor adequately pled, there were far more facts alleged indicating that trade associations were a forum for anticompetitive conduct. For example, in *In re Text Messaging*, the Seventh Circuit cited allegations that defendants "exchanged price information directly" at trade association meetings and that certain defendants met within a sub-group of the association where they "urge[d] its members to substitute 'co-opetition' for competition." 630 F.3d at 628. Nothing of the kind is alleged in the Complaint.[23]

Here, Plaintiffs merely allege that employees of a subset of Defendants serve, or have served, on the boards of directors of CropLife America, the ARA, or in some cases both. Compl. ¶¶ 80, 85. Critically absent is any assertion about whether and to what extent these employees met or otherwise communicated about any alleged conspiracy. The only specific conduct alleged to have taken place at a trade association gathering was not even at a CropLife America or ARA board meeting. Instead, Plaintiffs allege that certain unidentified members of CropLife America's PACE Advisory Council (not its board of directors) voiced concerns about FBN during a 2017 meeting (*id*. ¶ 82), and that a disagreement between FBN and a non-defendant agricultural retail consultant was the "main event" at the ARA 2017 annual conference. (*id.* ¶ 86). Expressing concerns about a competing seller—even by alleged co-conspirators, which Plaintiffs have not alleged—is a far cry from discussing (much less agreeing to) a group boycott. *See Monsanto*, 465

---

[23] Plaintiffs make passing allegations that FGG, a non-defendant consulting group, somehow provided opportunities for collusion by providing benchmarking services. Compl. ¶¶ 87-91. But, benchmarking is not inherently anticompetitive; instead, courts recognize competitive advantages to such services. *See Sugar Inst. v. United States*, 297 U.S. 553, 598-99 (1936) ("[C]ompetition does not become less free merely because of the distribution of knowledge of the essential factors entering into commercial transactions."); *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1052-53 (D. Minn. 1992) ("The Supreme Court has determined that, absent some agreement between competitors to restrain price, the exchange of price and other market information is generally benign conduct that facilitates efficient economic activity.").

U.S. at 763.[24]

   iii. *Market Concentration Is Not a Plus Factor Because Plaintiffs Have Not Adequately Pled That Any Market Is Concentrated.*

  Plaintiffs allege in a conclusory fashion that "the market for Crop Inputs is highly concentrated . . . ." Compl. ¶ 146. That boilerplate allegation should not be credited.

  *First*, Plaintiffs fail to even plead facts indicating the existence of a single "Crop Inputs market" at all, much less one that is concentrated. There are myriad different products alleged to be part of the so-called Crop Inputs market—herbicides, insecticides, fungicides, fertilizers, thousands of seeds for different crops—which are clearly not interchangeable and thus cannot constitute a relevant product market. *See Double D Spotting Serv.*, 136 F.3d at 560 ("The relevant product market includes all reasonably interchangeable products."). Similarly, Plaintiffs claim that the geographic market is national (Compl. ¶ 18), but fail to explain why, for example, a farmer in Nebraska would look to a retail store in Alabama for its seed and pesticide supply. Indeed, the Complaint acknowledges that the markets have historically operated locally, not nationally. *See, e.g., id.* ¶ 111 (alleging "artificially inflated prices for Crop Inputs purchased from local retailers"); ¶ 83 (alleging a "huge price war in chemicals" for only certain "Crop Inputs," in Iowa, not nationwide).[25]

  *Second*, even if Plaintiffs had met their burden to adequately plead a relevant market, they

---

[24] Indeed, it is difficult to square Plaintiffs' allegation that Defendants' mere participation in trade organizations such as CropLife America is a front to facilitate a group boycott of FBN (*see* Compl. ¶¶ 80-84), with the undisputed (and conspicuously omitted) fact that *FBN itself* is a member of that very organization. *See* "Members," *available at* http://www.croplifeamerica.org/members (listing FBN Inputs LLC among CropLife America members); *Meredith v. Medtronic Inc.*, No. 3:18-cv-00127, 2019 WL 6330677, at *1 n.1 (S.D. Iowa Oct. 25, 2019) (judicially noticing website as background information that was "necessarily embraced by the complaint").

[25] As noted *supra* Argument, Section I, Plaintiffs' failure to properly allege with sufficient facts a relevant market and market power by Defendants means that Plaintiffs have not adequately pled a claim based on any vertical agreement among any Defendants—or for that matter, any horizontal agreement or the broad conspiracy alleged in the Complaint. *See, e.g., Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 55 (2d Cir. 2016) (dismissing Sherman Act claims for failure to plead a relevant market); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012).

fail to allege any facts indicating that any purported market is in fact "concentrated." Most importantly, they say *nothing* about concentration at the retailer level—the level at which Plaintiffs and the putative class made their purchases and at which FBN is alleged to compete. No fact pled in the Complaint suggests that the retail market for Crop Inputs is anything other than competitive—indeed, the Complaint alleges slim margins at the retail level (*id.* ¶¶ 81, 82), indicating a highly competitive marketplace.

As to the wholesalers, Plaintiffs generally allege that "seven wholesalers" account for 70% of unspecified "sales volume," but they do not specify the denominator or indicate in what market, so it is a meaningless figure. *Id*. ¶ 146. Even if the denominator were "all Crop Inputs," seven wholesalers accounting for 70% of sales is hardly concentrated, and there could be dozens of wholesalers that occupy the remaining 30%.[26] And even if seven competitors were "concentrated," Plaintiffs do not allege that all or any Wholesaler Defendants are among the seven.

The allegations as to the manufacturers are equally obscure. Plaintiffs allege only that the Manufacturer Defendants account for "85% of the corn seed market, over 75% of the soybean seed market, and over 90% of the cotton seed market." *Id.* ¶ 146. But those "markets" are clearly only subsets of the Crop Inputs market alleged in the Complaint, and one cannot draw any conclusion as to whether the market alleged in the Complaint is concentrated from vague allegations that parts of it are concentrated. *See id*. ¶ 3 (defining Crop Inputs as "seeds and crop protection chemicals such as fungicides, herbicides, and insecticides").

Finally, even if Plaintiffs had adequately alleged concentration of the relevant market, this still would not serve as a plus factor that could "nudge" their alleged conspiracy over the "line" of

---

[26] Plaintiffs allege that one "wholesaler" sells 25% of all crop protection *chemicals* sold in the United States—but they plead nothing about seeds, and they plead nothing about any of the Wholesaler Defendants' share of the various markets for Crop Inputs. *See, e.g., id.* ¶ 57.

plausibility. *Twombly*, 550 U.S. at 570; *Litovich*, 2021 WL 4952034, at *21-22 (rejecting market concentration as a plus factor because the market concentration alleged did not correspond exactly to the relevant market alleged, was not in fact "highly concentrated," and suggested "mere interdependent conduct" in any case); *see also Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 841 (N.D. Ill. 2018) (finding that market concentration "even combined with parallel conduct" did not sustain conspiracy claim); *In re Cedar Shakes & Shingles Antitrust Litig.*, No. 2:19-cv-00288, 2020 WL 832324, at *10 (W.D. Wash. Feb. 20, 2020) (same). Indeed, as noted in *Twombly*, a "common reaction of firms in a concentrated market" is to "recogniz[e] their shared economic interests," and reach similar decisions independently; "[t]hus, even if the alleged market were concentrated, this would not render the asserted conspiracy plausible." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) (quoting *Twombly*, 550 U.S. at 553); *see also In re Dynamic Random Access Memory Indirect Purchaser Litig.*, No. 4:18-cv-2518, 2020 WL 8459279, at *10 (N.D. Cal. Nov. 24, 2020) ("[C]oncentrated markets also make parallel unilateral conduct *more* plausible and thus cannot raise an inference of conspiracy." (emphasis added)); *see also In re Tyson Foods*, 275 F. Supp. 3d at 992.

iv. *Government Investigations of a Subset of Defendants or Affiliates Do Not Render the Allegations Any More Plausible.*

Plaintiffs' allegations of government investigations of certain Defendants merit no weight as a plus factor.

*First*, Plaintiffs refer to an investigation by the Canadian Competition Bureau, or CCB, of "Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC . . . ." Compl. ¶ 117. But only *one* of these

entities, Federated, is a named Defendant, and Plaintiffs fail to link Federated to any of the alleged conduct in the United States—yet another example of Plaintiffs' misleading group pleading that courts discredit. *See Bank of Am.*, 725 F.3d at 818. All the entities (including Federated) are Canadian entities, except Corteva Inc. (which is not specifically alleged to be a subject of investigation but rather described ambiguously as "Corteva Inc. and/or its affiliates"). The Bayer CropScience Inc. entity referenced is not the American entity of the same name included as a Defendant (*see* Compl. ¶¶ 117-18), but a Canadian entity, as reflected on Canadian government websites.[27]

While certain of the alleged subjects of the Canadian investigation are affiliates of the Defendants, they are separate and distinct legal entities. Courts have held that such corporate affiliation is not a basis for imputing motives, knowledge, or actions to others. *See In re Mex. Gov't Bonds*, 412 F. Supp. 3d at 391 (dismissing complaint relying on government investigations that "state nothing about wrongdoing *on behalf* of Defendants here"); *Douglas v. Imerys Talc Am., Inc.*, No. 4:18-cv-1141, 2019 WL 626427, at *5 (E.D. Mo. Feb. 14, 2019) ("'It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation . . . is not liable for the acts of its subsidiaries.'" (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998))); *see also In re Chocolate Confectionary*, 801 F.3d at 404 ("[A] subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship.") (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300,

---

[27] *See Notice of Submission from Monsanto Canada ULC* (Dec. 15, 2020), *available at* https://inspection.canada.ca/plant-varieties/plants-with-novel-traits/notices-of-submission/mon94100/eng/1607633138607/1607633252648. Similarly, Paragraphs 102 and 107 amorphously refer to "Bayer," without specifying *which* of the various Bayer entities Plaintiffs intend to identify. The Complaint references a number of Bayer entities (Bayer CropScience LP, Bayer CropScience Inc. without differentiating between the American and Canadian entities of the same name, Bayer AG, Bayer Canada, Monsanto Canada ULC, and Production Agriscience Canada Inc. (Compl. ¶¶ 1, 5, 49-51, 118)), only two of which (Bayer CropScience LP and the U.S. Bayer CropScience Inc.) are named Defendants. Such vague allegations do not support a claim of conspiracy.

341 n.44 (3d Cir. 2010)).

Significantly, the Complaint alleges only the existence of an investigation—not a final adjudication of a violation. But even assuming (counterfactually) that a violation had been found, Plaintiffs are proffering "if it happened there, it could have happened here" reasoning. Courts have repeatedly rejected such arguments. *See, e.g.*, *Insulate*, 797 F.3d at 546 n.7 (rejecting plaintiff's "suggest[ion] we should infer [defendant's] wrongdoing from the FTC's investigation and consent agreement"); *In re Mex. Gov't Bonds*, 412 F. Supp. 3d at 390 ("It is far from clear that an ongoing government investigation involving Defendants would, in the absence of more substantial allegations, weigh in favor of the complaint's plausibility."); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) ("Without an adequate allegation of facts linking transactions in Europe to transactions and effects here, plaintiffs' conclusory allegations do not 'nudge [their] claims across the line from conceivable to plausible.'" (brackets in original) (quoting *Twombly*, 550 U.S. at 570)); *In re Chocolate Confectionary*, 801 F.3d at 403-04 (rejecting argument that one could infer U.S. conspiracy from CCB investigation evidence, even where the market involved similar participants); *Jones v. Micron Tech. Inc*., 400 F. Supp. 3d 897, 921 (N.D. Cal. 2019) ("allegations of investigations or cases outside of the United States are fully unpersuasive").

Further, Plaintiffs do not (and cannot) allege that the CCB is investigating CHS Inc., GROWMARK, Inc., Nutrien, Simplot, Syngenta or Tenkoz, or any of their respective affiliates. Indeed, judicially noticeable documents[28] from the Canadian court proceedings list allegations

---

[28] This Court can properly take judicial notice of filings in the courts of other countries. *See, e.g.*, *Color Switch LLC v. Fortafy Games DMCC*, 377 F. Supp. 3d 1075, 1089 n.6 (E.D. Cal. 2019), *aff'd*, 818 F. App'x 694 (9th Cir. 2020) (taking judicial notice of court documents from litigation in United Arab Emirates); *United States v. New-Form Mfg. Co.*, 277 F. Supp. 2d 1313, 1325 n.14 (Ct. Intl. Trade 2003) (taking judicial notice of "Canadian court's bankruptcy records to establish the fact that [Defendant] has been adjudged bankrupt in Canada").

relating only to affiliates of other Defendants.[29] This alleged "plus factor" is thus not only insufficient as to all Defendants, but entirely inapplicable to *these* Defendants.

*Second*, Plaintiffs refer to a disclosure by Corteva in a securities filing that it received a subpoena from the Federal Trade Commission seeking documents related to Corteva's sales of "crop protection products generally[.]" Compl. ¶ 120. That subpoena is irrelevant to this case. Neither Corteva's disclosure nor any other allegation indicates that the FTC is investigating any concerted conduct, nor is there any suggestion that the investigation is related to electronic platforms; indeed, the disclosure makes clear that the investigation is focused on a few specific types of pesticides rather than all Crop Inputs.[30] Plaintiffs themselves allege that this investigation, untethered to electronic platforms, is related to a few "crop protection products" (*i.e.*, pesticides)[31] rather than "Crop Inputs" as a whole. Therefore, the Corteva disclosure does not make the conspiracy more probable, nor is the disclosure itself evidence of any wrongdoing. *See Wash. Cnty. Health Care Auth.*, 328 F. Supp. 3d at 842 n.16 ("The mere fact that an investigation is being conducted says nothing about whether unlawful conduct has occurred. Investigations require no minimum predication or threshold of evidence to begin; indeed, the purpose of an investigation is

---

[29] *See* "Order to Produce Records and Make and Deliver Written Returns of Information (Sections 11(1)(b), 11(1)(c) and 11(2))," *Comm'r of Competition v. Winfield United Can. ULC*, T-156-20 (Ottawa, Ontario, Feb. 11, 2020) (granting government's request for production order as to Winfield United Canada ULC in connection with inquiry relating to "allegations that Federated Co-Operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC have engaged in practices reviewable under" Canada's competition law).

[30] *See Corteva, Inc. Quarterly Report*, at 69 (Sept. 30, 2020), *available at* https://sec.report/Document/0001755672-20-000026/. In considering a motion to dismiss, the Court may take judicial notice of SEC filings. *See, e.g.*, *In re H&R Block Secs. Litig.*, No. 06-cv-0236, 2008 WL 482403, at *2 n.3 (W.D. Mo. Feb. 19, 2008), *aff'd in part, rev'd in part sub nom.*, 580 F.3d 755 (8th Cir. 2009).

[31] Within the agriculture industry, "crop protection" refers to pesticide products, and does not include items such as seeds or fertilizers. *See, e.g.*, *Pesticide*, https://en.wikipedia.org/wiki/Pesticide (last visited Nov. 7, 2021) ("Most pesticides are intended to serve as plant protection products (also known as crop protection products), which in general protect plants from weeds, fungi, or insects."); *see also Crop Protection*, https://www.corteva.us/products-and-solutions/crop-protection.html (last visited Nov. 7, 2021) (Corteva website describing its "Crop Protection Solutions" as herbicides, insecticides, fungicides, and nematicides).

to determine *whether* there is evidence of unlawful conduct; its existence does not therefore signal that there must be such conduct.").

*Finally*, Plaintiffs allege that the U.S. DOJ is "monitoring" the CCB's "investigation and is deciding whether to launch its own investigation . . . ." Compl. ¶ 119. Plaintiffs' artful word choice is no coincidence: "monitoring" is even less than an investigation or legal proceeding. Whatever "monitoring" means, the fact that a government authority may observe developments in another jurisdiction's investigation is unremarkable. The Complaint does not allege that the DOJ has commenced an investigation or issued any subpoenas. And, even if it had, such facts would not serve as plus factors. *See In re Graphics Processing Units Antitrust Litig. ("GPUs")*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (holding that a DOJ investigation "carries no weight in pleading an antitrust conspiracy claim," especially when "[i]t is unknown whether the investigation will result in indictments or nothing at all").

<div align="center">

v.     *Prior Antitrust Violations Are Not Indicative of a Conspiracy.*

</div>

Plaintiffs allege that three Defendants or affiliates of those Defendants were identified by a third-party publication as "leading recidivists." Compl. ¶¶ 114, 151. Putting aside the ambiguity in this allegation (which does not distinguish between legal entities or indicate any particular product, jurisdiction, or time period), it is inapposite and does not pertain to the 13 other Defendants.[32] Notwithstanding Plaintiffs' assertions that unnamed "[c]ompetition experts have noted" this factor as relevant (*id.* ¶ 151), courts have held the opposite: evidence of prior violations is not indicative of a conspiracy. *In re ICE LIBOR Antitrust Litig.*, No. 19-cv-439, 2020 WL 1467354, at *7 (S.D.N.Y. Mar. 26, 2020) (dismissing complaint where plaintiffs asserted that

---

[32] The Complaint does not differentiate between Bayer entities in Paragraph 151. There are no allegations of recidivism on the part of Cargill, CHS, Federated, either GROWMARK company, Nutrien, Pioneer Hi-Bred, Simplot, Syngenta, Tenkoz, Univar, or Winfield.

<div align="center">

36

</div>

specific defendants had previously been investigated for price fixing and therefore "have the means to do it again," because allegation did not raise an inference of conspiracy), *appeal filed*, 20-1492 (2d Cir. 2020); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002) ("The law generally disfavors use of such 'historical' evidence."); *see also* Phillip E. Areeda, Antitrust Law, ¶ 1421a, at 125 (1st ed. 1986) ("Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy.").

### B. Plaintiffs Rely on Impermissible Group Pleading.

Even if Plaintiffs had pled any horizontal agreement, any parallel conduct, or any plus factors as to Defendants as a whole (and they do not), the Complaint would still fail because they do not do so as to any Defendant *individually*. At bottom, the Complaint simply alleges that "Defendants," as an undifferentiated group, initiated a group boycott. *See, e.g.*, Compl. ¶¶ 96, 98. Nowhere does it allege the details concerning how and when *each* Defendant entered into and participated in the alleged conspiracy. For some Defendants, the Complaint alleges no specific conduct at all. Such "[g]eneric pleading, alleging misconduct against defendants without specifics as to the role *each played* in the alleged conspiracy, was specifically rejected by *Twombly* . . . ." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (emphasis added); *Litovich*, 2021 WL 4952034, at *27 ("It is not sufficient for the plaintiff to allege that a group has done something wrong . . . .").

Accordingly, "[w]ithout some supporting factual allegations" as to a specific defendant, "the[] conclusions are insufficient" and the complaint must be dismissed as to that Defendant. *Insulate*, 797 F.3d at 546; *Twombly*, 550 U.S. at 556, 565 n.10 (holding that a § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made"; "the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place"); *Bank of Am.*,

725 F.3d at 818 ("Each defendant is entitled to know what he or she did that is asserted to be wrongful" and "[a] complaint based on a theory of collective responsibility *must be dismissed*" (emphasis added)); *see also Alexander v. Phx. Bond & Indem. Co.*, 149 F. Supp. 2d 989, 1000 (N.D. Ill. 2001) ("We will analyze each defendant individually because, even in a conspiracy case, liability remains individual and is not a matter of mass application."). Thus, to avoid dismissal at the pleading stage in a boycott case such as this one, Plaintiffs must specifically link each individual Defendant to the boycott by "provid[ing] *each [d]efendant* with 'fair notice of what the claim is and the grounds on which it rests,' including the *factual connection of that defendant* to the scheme and the identity of its alleged co-conspirators." *Tera Grp. Inc. v. Citigroup, Inc.*, No. 17-cv-4302, 2019 WL 3457242, at *11 (S.D.N.Y. July 30, 2019) (emphasis added and citation omitted). The Complaint fails to do so with respect to any Defendant.

\* \* \*

In short, Plaintiffs fail to plead the parallel conduct that is a necessary precondition of pleading a viable antitrust conspiracy by circumstantial evidence. But even if they had, their allegations regarding plus factors are deficient. The Complaint does not establish that it is more likely that Defendants' conduct flowed from a conspiratorial agreement than from their own rational and independent business priorities. Plaintiffs are asking this Court to infer too much based on too little. *Window World Int'l*, 2020 WL 7041814, at *4 (dismissing false advertising claim because "Plaintiffs cannot circumvent *Twombly* by proposing unsupported inferences"). The only allegations about the existence of a conspiracy between Defendants are conclusory, generalized, and impermissibly based on group pleading—aimed almost exclusively at "Defendants" collectively rather than each Defendant individually. Plaintiffs' allegations are thus insufficient to "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## II. PLAINTIFFS HAVE NOT ALLEGED DEFENDANTS CAUSED AN INJURY THAT WOULD CONFER STANDING TO PURSUE ANTITRUST CLAIMS.

Plaintiffs' claims should also be dismissed because the Complaint does not plausibly allege that Defendants' conduct has caused any injury that would give Plaintiffs standing under Article III of the U.S. Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing has three elements: "'First, the plaintiff must have suffered an injury in fact . . . . Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *In re Pre-Filled Propane Tank Antitrust Litig.*, MDL No. 2567, 2016 WL 6963059, at *2 (W.D. Mo. Jan. 13, 2016) (quoting *Lujan*, 504 U.S. at 560-61), *aff'd in part and remanded in part*, 893 F.3d 1047 (8th Cir. 2018). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Even accepting Plaintiffs' allegations as true, the Complaint does not show any "causal connection between the [alleged] injury and the conduct complained of." *Lujan*, 504 U.S. at 560; *cf. id.* ("the injury has to be 'fairly traceable to the challenged action of the defendant'" (cleaned up) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976))). Indeed, Plaintiffs' own allegations refute any such causal chain. Plaintiffs allege that this structure of opacity (*see* Compl. ¶¶ 69, 71, 73) was *already in place* when, in "2014, ecommerce Crop Inputs sales platforms sought to compete with the opaque and inefficient wholesale and retail systems" (*id.* ¶ 74). Thus, Plaintiffs, do not (and cannot) contend that the "opacity structure" that is the cornerstone of their Complaint was implemented in response to, or even changed as a result of, the emergence of electronic platforms. This alone negates standing. *See, e.g.*, *Bray v. Bank of Am.*, No. 4:14-cv-1336, 2016 WL 687818, at *4-5 (E.D. Mo. Feb. 19, 2016), *aff'd*, 669 F. App'x 821 (8th Cir. 2016) (holding that plaintiff lacked standing where allegations did not establish that the challenged

conduct was a but-for cause of his injuries).

Further, even if Plaintiffs could get past their own self-defeating allegations about the actual cause of price opacity, and tie it to their conclusory assumption that Defendants' alleged "boycott" somehow raised prices, the conjectural causal chain they allege still would not confer standing. Plaintiffs speculate that without Defendants' alleged "conspiracy," electronic platforms like FBN would have introduced greater "transparency" to the various markets for all Crop Inputs nationwide (without ever explaining *how* that might have occurred, particularly given that Plaintiffs effectively allege that if FBN had become an "authorized retailer" of the Manufacturer Defendants, FBN would have likewise been bound by price confidentiality). *E.g.*, Compl. ¶¶ 7, 71, 73, 144. They next posit that some farmers might have then accessed these prices, they might have used them in an attempt to negotiate prices with local retailers, and local retailers might have agreed to greater discounts off their already "slim margins." *Id.* ¶¶ 76, 82. Even if that speculation could properly be credited under *Twombly*, this "theory of standing, which relies on a highly attenuated chain of possibilities," is too speculative. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *cf. Litovich*, 2021 WL 4952034, at *29-30 (dismissing as implausible complaint that "allege[d] harm through the inflation of prices resulting from continued opacity in a market that, in the absence of Defendants' collusive conduct, would have seen the development of robust electronic trading platforms").

In addition, contrary to Plaintiffs' suggestion, "opacity" (Compl. ¶ 138) is not a standalone antitrust injury;[33] and transparency for transparency's sake is not inherently pro-competitive. *See, e.g.*, *In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 446-47, 462 (9th Cir. 1990) (holding

---

[33] Plaintiffs have no "legally protected interest" in greater transparency that could, in itself, be sufficient to confer Article III standing. *Lujan*, 504 U.S. at 560; *see also Kawczynski v. Am. Coll. of Cardiology*, 670 F. App'x 398, 399 (7th Cir. 2016) ("[The plaintiff] has no legally protected right to dictate what information the defendants 'direct' physicians to provide their patients . . . .").

that jury could infer that publication of wholesale prices on gas pumps was intended to effectuate price fixing at the wholesale level); *United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9, 10, 13 (D.D.C. 1993) (approving consent decree prohibiting publication of certain airfares given allegation that "disseminating" that information had "enable[d] defendants to increase prices"— despite consumer groups' objection that the consent decree's prohibitions would "deprive consumers of valuable information"). Plaintiffs' speculative assumptions about electronic platforms, without any plausible explanation of how those platforms would have worked or predictably affected prices, do not support their conclusory allegation that Defendants *caused* Plaintiffs to suffer an injury in fact.

Plaintiffs have thus failed to establish an essential element of Article III standing. They have not alleged a plausible causal connection between (1) any lack of "transparency" that might have been fostered by different electronic platforms and (2) the injury that Plaintiffs claim to have suffered because of supposedly higher prices in the multi-tiered markets for Crop Inputs.

To the extent that Plaintiffs are instead complaining about the alleged exclusion of FBN from retail competition, the claim of injury (and the causal mechanism) is even more tenuous. The apparent premise of Plaintiffs' theory is speculation that FBN in particular—the one electronic platform referenced 90 times in the Complaint—would have somehow disrupted markets for every single Crop Input sold by any of the "Manufacturer Defendants" throughout the United States. But Plaintiffs' allegations do not plausibly support that conclusion. Plaintiffs *imply* that FBN would have offered Crop Inputs for sale at lower prices than other retailers. Compl. ¶¶ 9, 154. But FBN's retail prices naturally would have depended on the costs that it incurred to buy Crop Inputs from other sources, which themselves would have been making similar sales to FBN's competitors. Plaintiffs allege no facts showing that FBN would have systematically been able to lower prices

41

at the highly competitive retail level. Instead, allegations about the number and relative market shares of other competitors, including those that have not been named as Defendants here, are conspicuously absent from the Complaint.[34] Plaintiffs have not plausibly alleged that the retail markets for Crop Inputs (involving both parties and nonparties) are anything other than highly competitive, nor have they shown—even if their allegations were true—that "boycotting" an additional competitor like FBN would meaningfully impact competition or increase retail prices for growers.

In sum, Plaintiffs have not plausibly alleged any injury in fact that is fairly traceable to Defendants' alleged conduct, so have failed to carry their burden under Article III to pursue their claims in federal court. The Complaint should thus be dismissed entirely for lack of jurisdiction.

## III.    PLAINTIFFS' SHERMAN ACT CLAIM IS UNTIMELY.

### A.    Plaintiffs' Claim Should Be Dismissed to the Extent It Is Barred by the Applicable Four-Year Statute of Limitations.

In addition to failing under *Twombly*, Plaintiffs' Sherman Act claim should be dismissed under the applicable four-year statute of limitations. 15 U.S.C. § 15(b); *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 426-27 (8th Cir. 2009).[35] Plaintiffs state that the alleged conspiracy began "at least as early as January 1, 2014" (Compl. ¶¶ 2, 141), but the first of the "Crop Inputs" putative class actions was not filed until more than seven years later, on January 8, 2021. *See* n.2, *supra*. Generally, an antitrust "cause of action accrues 'when a defendant commits an act that injures a plaintiff's business.'" *Nitro Distrib.*, 565 F.3d at 427 (quoting *Zenith Radio Corp. v.*

---

[34] Although the Complaint alleges that "Plaintiffs include persons and entities that purchased directly from Defendants, indirectly from Defendants, or both directly and indirectly from Defendants," it fails to identify from which Defendants *any* named Plaintiff may have purchased Crop Inputs. Compl. ¶ 48.

[35] "A court may dismiss a claim under Rule 12(b)(6) as barred by the statute of limitations if the complaint itself establishes that the claim is time-barred." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (affirming dismissal on statute-of-limitations grounds); *accord Wong v. Wells Fargo Bank N.A.*, 789 F.3d 889, 897 (8th Cir. 2015).

*Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)). Here, the alleged misconduct giving rise to the claim at issue occurred before January 8, 2017 and thus is barred by the applicable statute of limitations. As discussed next, Plaintiffs have not plausibly alleged facts establishing fraudulent concealment, a continuing violation, or any other basis for tolling or extending the limitations period beyond four years.

### B.     Plaintiffs Do Not Plead Fraudulent Concealment.

Recognizing that their claim is stale, Plaintiffs attempt to invoke equitable tolling based on the doctrine of fraudulent concealment. Compl. ¶¶ 136-40. This doctrine does not save their untimely Sherman Act claim. "To invoke fraudulent concealment, Plaintiffs must allege *facts* showing: '(1) Defendants' concealment of Plaintiffs' cause of action, (2) failure by Plaintiffs to discover the existence of their cause of action, and (3) due diligence by Plaintiffs in attempting to discover the claim.'" *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 772 (D. Minn. 2020) (emphasis added) (quoting *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999)); *Nitro Distrib., Inc. v. Alticor, Inc.*, No. 6:03-cv-3290, 2008 WL 11451488, at *3 (W.D. Mo. Jan. 4, 2008). "In the antitrust context, 'a plaintiff who is not reasonably diligent may not assert fraudulent concealment' to avoid the running of the statute of limitations." *Se. Missouri Hosp. v. C.R. Bard, Inc.*, No. 1:07-cv-0031, 2008 WL 4104534, at *4 (E.D. Mo. Aug. 27, 2008) (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-95 (1997)).

"With respect to fraud claims, Rule 9(b) requires a party to allege 'with particularity the circumstances constituting fraud or mistake.' . . . The same pleading standard applies to a 'claim that the doctrine of fraudulent concealment tolls applicable statutes of limitations.'" *New Prime, Inc. v. Eaton Corp.*, No. 16-cv-3407, 2017 WL 5992466, at *2 (W.D. Mo. Mar. 16, 2017) (quoting Fed. R. Civ. P. 9(b)); *In re Pork*, 495 F. Supp. 3d at 772-73 ("To adequately allege fraudulent concealment, Plaintiffs must meet Rule 9(b)'s heightened pleading standard . . . ."). "The Eighth

Circuit has further explained that this rule requires the plaintiff to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *New Prime*, 2017 WL 5992466, at *2 (finding plaintiffs did not adequately plead fraudulent concealment and granting motion to dismiss) (quotations omitted); *In re Pork*, 495 F. Supp. 3d at 772-73 ("To adequately allege fraudulent concealment, Plaintiffs must . . . plead 'the who, what, when, where, and how.'") (quoting *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011)).

Plaintiffs do not plead any facts supporting the three required elements of fraudulent concealment, much less with the particularity required by Rule 9(b).

### 1. Plaintiffs Do Not Plead Separate Acts of Concealment, Let Alone With Participants.

Plaintiffs must plead more than generic statements of secrecy to properly allege fraudulent concealment. "Simply denying the existence of an antitrust violation does not constitute fraudulent concealment, and to hold otherwise 'would effectively nullify the statute of limitations in these cases'" because the courts hold that antitrust conspiracy cases inherently involve allegations of a cover-up. *In re Milk Prod.*, 84 F. Supp. 2d at 1023 (quoting *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987)). Accordingly, Plaintiffs must assert acts of concealment with the *collusion* of each Defendant "above and beyond the wrongdoing upon which the plaintiff's claim is founded . . . ." *Dring v. McDonnell Douglas Corp.*, 58 F.3d 1323, 1329 (8th Cir. 1995). This, in turn, requires Plaintiffs to allege that *each* Defendant "actively concealed its alleged antitrust activities through acts entirely extrinsic to the alleged activity." ABA Model Jury Instrs. in Civil Antitrust Cases § 7.A.2 n.4 (2016 ed.); *see New Prime*, 2017 WL 5992466, at *3 ("Non-disclosure is not enough to qualify as fraudulent concealment.") (quoting *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir. 1990)). And Plaintiffs must allege those acts with particularity. *Summerhill*, 637 F.3d at 880 (affirming district court's holding that

44

plaintiff's "failure to plead any facts regarding when and how he discovered [defendant's] wrongdoing was fatal to his fraudulent concealment claim"). Plaintiffs do nothing of the sort.

Plaintiffs rely on vague and generic allegations. *See, e.g.*, Compl. ¶ 136 (advocating tolling "by reason of Defendants' fraudulent concealment of the conspiracy"); ¶ 137 (vaguely asserting "group boycotts and other antitrust violations are inherently self-concealing"); ¶ 138 (alleging that Defendants have "structured" the Crop Inputs market to "maximize opacity," without explaining whether this "structure" is new, much less whether it was the result of deliberate conduct intended to conceal the alleged conspiracy); ¶ 139 ("Plaintiffs and Class members had neither actual nor constructive knowledge of the facts constituting their claims for relief."). These blanket assertions simply mirror the non-particularized allegations Plaintiffs make in support of their Sherman Act claim. *Compare, e.g., id.* ¶ 138 (arguing for tolling because of concealment through "seed relabeling and bundling"), *with id.* ¶ 148 (alleging that Defendants violated the Sherman Act "through seed relabeling or bundling"). This approach "merges the substantive wrong with the tolling doctrine," and thus cannot support a claim for equitable relief. *See Dring*, 58 F.3d at 1329 (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)).

Plaintiffs' allegations of price opacity do not constitute concealment of the alleged conspiracy—a group boycott—that would toll the statute of limitations. The Complaint references commonplace aspects of many competitive markets, such as a lack of visibility into pricing information. But the alleged conspiracy to boycott had nothing to do with prices, and the unremarkable opaqueness that Plaintiffs allege does not, and cannot, amount to fraudulent concealment of the alleged conspiracy. *Litovich*, 2021 WL 4952034 at *28 (holding that private messages about pricing among defendants was "entirely irrelevant" to concealment of a group boycott claim). Having failed to identify any specific conduct indicating that Defendants "actively

45

concealed" the alleged conspiracy, Plaintiffs' concealment assertion fails. *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 462 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020); *see also New Prime*, 2017 WL 5992466, at *3 ("Plaintiff's Complaint identifies no affirmative misrepresentation . . . that would justify tolling the statute of limitations. Plaintiff's Complaint describes Defendant[]'s actions as 'self-concealing' but non-disclosure is insufficient to toll the statute of limitations."); *see also In re Pork*, 495 F. Supp. 3d at 772.

Further, Plaintiffs fall far short of pleading the requisite "who, what, when, where, and how" of the alleged concealment. *In re Pork*, 495 F. Supp. 3d at 772-73 (quoting *Summerhill*, 637 F.3d at 880); *see also New Prime*, 2017 WL 5992466, at *2; *supra* at Argument, Section I.B (group pleading insufficient). Defendants' supposed fraud consists of vague claims of "opacity" and unspecified meetings involving unspecified participants where unspecified discussions allegedly occurred. Compl. ¶¶ 8, 69, 72-73, 80, 138-39, 148-49. Plaintiffs thus fail to satisfy the heightened pleading standard for fraud under Rule 9(b).

## 2.   **Plaintiffs Do Not Plead Reasonable Diligence.**

Even if the Complaint had adequately alleged separate acts of concealment by each Defendant, Plaintiffs still would fail to meet their burden to plead that they acted with reasonable diligence in investigating any unlawful activity. This pleading requirement recognizes that a primary purpose of civil antitrust cases is "to encourage . . . victims themselves diligently to investigate and thereby to uncover unlawful activity." *Klehr*, 521 U.S. at 195. "[B]y failing to allege when and how they discovered [Defendant's] alleged fraud, Plaintiffs have failed to plead sufficient facts to demonstrate that fraudulent concealment would toll the time period sufficiently to save their otherwise time-barred claims." *Larey v. Allstate Prop. & Cas. Co.*, No. 4:14-cv-04008, 2014 WL 4823872, at *8 (W.D. Ark. Sept. 26, 2014) (citing *Summerhill*, 637 F.3d at 880-81). "Conclusory allegations of due diligence are not sufficient; where a plaintiff has utterly failed

46

to make even the requisite allegations, he cannot claim that his underlying cause of action was fraudulently concealed." *Berkson v. Del Monte Corp.*, 743 F.2d 53, 56-57 (1st Cir. 1984) (internal citations omitted); *see also* Fed. R. Civ. P. 9(f).

The Complaint itself shows that Plaintiffs did not exercise the requisite reasonable diligence in discovering their claims. The Complaint describes publicly available data, including from 2011 and 2016, on Crop Input pricing (Compl. ¶¶ 66-67); a letter to the farmer-owners of CHS in 2016 regarding the alleged threat posed by FBN (*id.* ¶ 77); and the purported struggle companies like FBN faced when entering the Crop Inputs market—despite the support from the "6,000" farmers who initially "signed up for FBN's electronic sales platform" (*id.* ¶¶ 75, 96). Despite alleging ample notice in 2016 (and before) of the conduct complained of, the Complaint identifies *nothing* Plaintiffs did to investigate that conduct in a timely manner.

Plaintiffs nevertheless contend that they lacked visibility into Defendants' pricing and distribution contracts and that Defendants "relabel[ed]" and "bundl[ed]" unspecified "seed[s]" to prevent unspecified "farmers" from accessing unspecified "pricing data and information[.]" *Id.* ¶ 138. Again, price opacity is not relevant here; the concealment must be of the *conspiracy*, and Plaintiffs fail to allege that Defendants concealed their alleged group boycott. *Litovich*, 2021 WL 4952034 at *28 ("Plaintiffs fail to address, however, that the alleged secret communications relate to 'pricing information' . . . not to any group boycott conspiracy.").

At any rate, Plaintiffs were well-aware of their alleged lack of pricing visibility since at least 2016. If a boycott had kept electronic platforms out of the retail Crop Inputs markets, the absence of the platforms would have been obvious to growers that participate regularly in those marketplaces or initially signed up for such platforms. Regardless, what Plaintiffs contend they could *not* see says little about whether they exercised reasonable—or any—diligence. On that

47

point, their allegations allow only one inference: Plaintiffs did nothing until, sometime in 2020, they learned of an investigation by Canadian authorities of conduct in Canada. Compl. ¶ 140.[36] Because Plaintiffs fail to allege that they acted diligently in seeking information about their claims, fraudulent concealment is unavailable to extend the limitations period to damages allegedly suffered more than four years before the filing of the Complaint. *See Kampschroer v. Anoka Cty.*, 935 F.3d 645, 649 (8th Cir. 2019) ("Equitable tolling is an exception to the general rule of enforcing statutes of limitation, and it is therefore appropriate only in extraordinary circumstances.").

### C.    Plaintiffs' "Alternative" Continuing Violation Argument Is Unavailing.

Plaintiffs summarily assert "in the alternative" that "Defendants' anticompetitive acts are continuing violations of the Sherman Act and accordingly each purchase by Plaintiffs at supracompetitive prices re-starts the statute of limitations." Compl. ¶ 141. The "continuing violation" doctrine "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times," but *only* if "separate new overt act[s]" occur during the limitations period. *Klehr*, 521 U.S. at 189 (cleaned up). Plaintiffs merely recite the elements of the continuing violation doctrine and assert that they have been met here. Those are precisely the types of conclusory allegations that courts should ignore in assessing the sufficiency of a complaint. *In re Pork*, 495 F. Supp. 3d at 767 ("Although the Court accepts the complaint's factual allegations as true, it is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Twombly*, 550 U.S. at 555)).

The supposed overt acts Plaintiffs identify are "each purchase by Plaintiffs at supracompetitive prices . . . ." Compl. ¶ 141. Although individual sales may constitute overt acts

---

[36] Although Plaintiffs allege that an *ex parte* application for records production was granted in February 2020 (*id.* ¶ 118), there is no indication when the CCB's investigation began or when or how Plaintiffs learned of it.

in *price-fixing* cases, *see In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1066 (8th Cir. 2017), here Plaintiffs allege a group *boycott*, where "artificially inflated prices" are merely the alleged effect of the "unlawful conduct." *Id.*

> [I]n a group boycott conspiracy, higher prices are not the conspiracy itself but are, at most, the effects of the boycott agreement and actions. As such . . . *because* of the conspiracy, each sale at an inflated price is not part of the antitrust violation— the boycott—but rather merely an effect of the antitrust violation, which therefore does not start the statutory period running again.

*Litovich*, 2021 WL 4952034, at *27. Thus, even if Plaintiffs could allege purchases within the limitations period, such purchases are not overt acts adequate to restart the limitations period.[37]

Even if the continuing violation doctrine did apply, it cannot, as a legal matter, enable Plaintiffs to recover damages for untimely overt acts. It "does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr*, 521 U.S. at 189. Thus, even if the Court determines that Plaintiffs have alleged facts that would support application of the continuing violations doctrine (they have not), their claims should be dismissed to the extent they seek damages for acts outside the four-year limitations period.

## IV.    PLAINTIFFS' RICO CLAIM (COUNT V) FAILS AS A MATTER OF LAW.

The conspiracy alleged by Plaintiffs bears no resemblance to the conduct Congress sought to forestall under RICO—"organized, long-term, habitual criminal activity." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (internal quotation mark omitted). Courts accordingly

---

[37] Plaintiffs' other cursory contention—that Defendants "continued to meet during the Class Period," and these meetings were "overt acts that began a new statute of limitations"—is likewise insufficient. Compl. ¶ 141. "An overt act has two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act, and (2) it must inflict new and accumulating injury on the plaintiff." *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004) (quotation omitted). Only two "meetings" are identified in the Complaint (Compl. ¶¶ 82, 86), and Plaintiffs do not allege that any "agreement" between any Defendants was entered into at either meeting, nor do they even identify which Defendants, *if any*, were present. Plaintiffs contend that the "meetings" were "new and independent acts" because unidentified Defendants were there "refining their agreement" to keep "it current with" and "reflect market conditions." *Id.* ¶ 141. These assertions are impermissibly conclusory and, additionally, make no sense. The alleged "conspiracy" was to not do business with electronic platforms. Plaintiffs fail to explain what "refinement" would be needed, why "market conditions" would necessitate "refinement," or how renewal or refinement could inflict "new and accumulating injury" on them.

routinely reject attempts to transform ordinary civil suits into RICO claims. *See, e.g.*, *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1029 (8th Cir. 2008) ("RICO was not intended to apply to 'ordinary commercial fraud.'"); *GT Roofing Co. I, LLC v. Killion*, No. 4:14-cv-2018, 2015 WL 4255466, at *4 (E.D. Mo. July 13, 2015) ("RICO, however, 'does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'") (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)); *see also Rilley v. MoneyMutual, LLC*, No. 16-cv-4001, 2017 WL 3822727, at *6 (D. Minn. Aug. 30, 2017) (given the "inevitable stigmatizing effect" upon those named as defendants in a RICO action, "courts should strive to flush out frivolous RICO allegations at an early stage in the litigation"). This Court should follow suit and reject Plaintiffs' attempt to recast their threadbare antitrust claim into an ill-conceived RICO claim.

Plaintiffs' RICO claim, asserted under § 1962(c), fails for four independent reasons. *First*, Plaintiffs fail to plead the essential elements of their claim with the particularity required by Rule 9(b), which applies to their fraud-based RICO claim. *Second*, Plaintiffs fail to adequately allege that there was a pattern of racketeering activity, as they fail to allege two or more predicate acts that are criminal in nature. *Third*, in an attempt to plead the existence of an enterprise, they impermissibly rely on conclusory allegations that *at most* suggest only that the Defendants were engaged in parallel conduct. *Fourth*, because Plaintiffs do not allege that they, or anyone, relied on any allegedly fraudulent statements, they cannot show that the alleged pattern of racketeering proximately caused their alleged harm and accordingly they lack standing to assert their RICO claim. And, because Plaintiffs fail to state a claim pursuant to § 1962(c), the great weight of

authority in this District holds that their § 1962(d) claim for RICO conspiracy likewise fails.[38]

### A.    Plaintiffs Fail to Plead the RICO Claim With Particularity.

Plaintiffs have fallen well short of the heightened pleading standard that applies to their RICO claim. To establish a RICO claim, Plaintiffs must plead, as to each individual Defendant, facts that demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Nitro Distrib.*, 565 F.3d at 428; *see also Craig Outdoor*, 528 F.3d at 1028 ("Failure to present sufficient evidence on any one element of a RICO claim means the entire claim fails."). Here, where the alleged predicate acts are mail and wire fraud (Compl. ¶¶ 263-64), Plaintiffs must also allege: "(1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." *H&Q Props. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting *Wisdom v. First Midwest Bank*, 167 F.3d 402, 406 (8th Cir. 1999) (internal quotation mark omitted)). Critically, they must do so with the particularity required by Rule 9(b). *Crest Constr. II*, 660 F.3d at 353 (citing *Nitro Distrib.*, 565 F.3d at 428) (applying Rule 9(b)'s heightened pleading requirements to mail fraud and wire fraud allegations); *Murr Plumbing v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995). That is, Plaintiffs must plead the "time, place, and contents of false representations, as well as the identity of the person making the misrepresentation"; thus, they "must plead the 'who, what, where, when and how' of the alleged fraud." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009).

---

[38] *See, e.g.*, *Nestlé Purina PetCare Co. v. Blue Buffalo Co.*, 181 F. Supp. 3d 618, 634 (E.D. Mo. 2016) ("To allege a RICO conspiracy, a plaintiff must first establish a right to relief under § 1962(c)"); *GT Roofing*, 2015 WL 4255466, at *6; *Raineri Constr., LLC v. Taylor*, 63 F. Supp. 3d 1017, 1031 (E.D. Mo. 2014) ("Because plaintiff does not adequately allege a pattern of racketeering activity to establish a right of relief under § 1962(a)-(c), it therefore also fails to allege a violation of § 1962(d)."); *Kilper v. City of Arnold, Mo.*, No. 4:08-cv-0267, 2009 WL 2208404, at *22 (E.D. Mo. July 23, 2009); *VSA v. Von Weise Gear Co.*, 769 F. Supp. 1080, 1085 (E.D. Mo. 1991); *but see Rosemann v. Sigillito*, No. 10-cv-1165, 2011 WL 13248373, at *18 (E.D. Mo. Oct. 31, 2011) (rejecting the argument "a claim for conspiracy under 18 U.S.C. § 1962(d) fails when the substantive claim on which it is based is without merit").

Plaintiffs' allegations are deficient in all critical respects. With regard to the supposed "mail fraud," Plaintiffs allege "Defendants shipped, or caused to ship, via interstate mail Crop Inputs to wholesalers, retailers, and farmer[s], and others that were distributed and purchased based on Defendants' market manipulation to exclude FBN." Compl. ¶ 264a. There is none of the required "who, what, when, and how" of any misrepresentation; indeed, it is not even clear what constitutes the alleged misrepresentation.

Plaintiffs allegations of "wire fraud" fare no better. Plaintiffs allege "Defendants communicated with farmers via wire to provide false pretenses, misrepresentations, promises, half-truths, omissions, and lulling statements about FBN and their illicit boycott." Compl. ¶ 264b. Again, they provide no detail whatsoever about the supposed "fraud" that Rule 9(b) requires, notably failing to provide the requisite detail about the alleged "misrepresentations." *See Crest Const. II*, 660 F.3d at 356 (stating that conclusory allegations of participation in a "fraudulent scheme" are insufficient to meet a plaintiffs' burden). Plaintiffs allege only a smattering of statements from four of the Defendants as "wire fraud,"[39] thus failing altogether to provide the "who" as to the remaining Defendants. Moreover, as to each of the 16 Defendants, Plaintiffs fail to plead the "what, when, where or how" for the alleged misrepresentations.

The few predicate act statements Plaintiffs include in the Complaint do not remotely suffice to allege a "scheme to defraud." *VSA*, 769 F. Supp. at 1084. One statement was supposedly made by a Retailer Defendant to its farmer-owner customers about why they should purchase from it, and two were supposedly made by the same Manufacturer Defendant expressing concerns about product stewardship and quality. *See, e.g.*, Compl. ¶ 264b ("Upon learning about FBN's 2016 entry into the U.S. Market . . . CHS officials distributed a letter to farmers attempting to discourage them

---

[39] Two of the supposed statements focus on Canada, and are attributed to Canadian entities, and thus are not probative of any supposed pattern of racketeering in the U.S. *See* Compl. ¶ 264b (pages 110-11).

from using FBN" because it sells to farmers "without returning any profits to you the farmer"); *id.* ("Syngenta's Head of U.S. Crop Protection Sales" expressed concerns about "quality" in a letter to vendors stating "concerns about product integrity, stewardship and regulatory compliance"). Plaintiffs fail to allege the detail required by Rule 9(b), including in particular explaining what was fraudulent about these statements or how they connect to any supposed scheme.

### B.   Plaintiffs Fail to Adequately Allege a Pattern of Racketeering.

Even if Plaintiffs' allegations satisfied Rule 9(b), their claims would still fail because they do not plead the requisite pattern of continuous and related activity, *i.e.*, that Defendants engaged in "two or more related acts of racketeering activity that 'amount to or pose a threat of continued criminal activity.'" *Crest Constr. II*, 660 F.3d at 356 (quoting *Nitro Distrib.*, 565 F.3d at 428). As noted above, the Complaint alleges with particularity only a smattering of communications as the basis for Plaintiffs' mail and wire fraud-based RICO claim. But there is nothing unlawful, fraudulent, or even surprising, about a retailer urging its farmer-owner customers to purchase from it nor about a manufacturer expressing concerns about quality and product stewardship. Compl. ¶ 264; *see Edgenet, Inc. v. GS1, AISBL*, 742 F. Supp. 2d 997, 1018 (E.D. Wis. 2010) ("Statements regarding the ability of a business to meet clients' needs are completely subjective" and cannot support a RICO fraud claim). They certainly do not suffice to plead the requisite pattern.

### C.   Plaintiffs Fail to Adequately Allege the Existence of an Enterprise.

Plaintiffs' RICO claim fails for yet an additional reason: the Complaint falls far short of satisfying the requirements for pleading an "association-in-fact" enterprise.

"An association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Nestlé Purina Petcare Co. v. Blue Buffalo Co. Ltd.*, 181 F. Supp. 3d 618, 630-31 (E.D. Mo. 2016) (cleaned up). Thus, a plaintiff must "show that all

persons joined the enterprise for a common racketeering purpose"; a claim "will not survive a motion to dismiss merely by showing parallel conduct." *Rilley*, 2017 WL 3822727, at *6.

The Eighth Circuit has long held that an enterprise must have "an ascertainable structure distinct from the conduct of a pattern of racketeering." *Crest Const. II*, 660 F.3d at 354. That determination "turns on whether the enterprise would still exist if the conduct that constitutes the racketeering activity were absent." *Rosemann v. Sigillito*, 956 F. Supp. 2d 1082, 1095 (E.D. Mo. 2013); *see also Crest Const. II*, 660 F.3d at 354-55 (describing the inquiry as whether "the enterprise would still exist were the predicate acts removed from the equation"). For example, in *Sebrite Agency*, *Inc. v. Platt*, the court dismissed a RICO claim where the plaintiff failed to allege any facts regarding the enterprise structure that were distinct from the predicate acts of wire and mail fraud. 884 F. Supp. 2d 912, 920 (D. Minn. 2012). Plaintiffs here allege that the purported enterprise: "(a) had an existence separate and distinct from each of the Defendants; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities . . . for the common purpose of blocking electronic platforms . . . ." Compl. ¶ 237. This is a quintessential "formulaic recitation of the elements" that the Supreme Court has decried, *Iqbal*, 556 U.S. at 678, and falls far short of adequately alleging an enterprise. *Crest Constr. II*, 660 F.3d at 353. As made clear by the Court in *Sebrite Agency*, relying upon a minimal association between the parties that is based solely upon the pattern of racketeering does not meet Plaintiffs' pleading burden. 884 F. Supp. 2d at 920.

An allegation that entities are merely engaged in parallel conduct also is insufficient to allege the existence of an enterprise. *Rilley* is instructive on this point. There, the plaintiffs alleged that "a network of lenders used [d]efendants to connect with potential borrowers of payday loans." *Rilley*, 2017 WL 3822727, at *6. The court dismissed the RICO claim, reasoning that to

"adequately plead an enterprise, a plaintiff must show that *all persons joined the enterprise for a common racketeering purpose.*" *Id.* (emphasis added); *see also In re UnitedHealth Grp.*, No. 16-cv-3352, 2017 WL 6512222, at *13 (D. Minn. Dec. 19, 2017) ("[A]n association-in-fact enterprise requires more than parallel conduct; it requires relationships among those associated with the enterprise, and it requires those associated with the enterprise to function as a unit, that they be put together to form a whole." (internal quotation marks and citation omitted)). Even if Plaintiffs had adequately alleged parallel conduct (and, as explained *supra* in Argument, Section I.A.2.a, they do not), they still, like the plaintiff in *Rilley*, would have alleged at most that Defendants engaged in nonspecific parallel conduct. Indeed, the Complaint recognizes that each Defendant had its own reasons to unilaterally object to and avoid FBN's entrance to the market. *See supra* Argument, Section I.A.2.b.i. Plaintiffs' conjecture notwithstanding, it is at least as plausible that each Defendant, each of whom may share similar motivations not to associate with FBN, was merely engaged in benign parallel conduct. This is exactly the type of allegation that the court found insufficient to withstand a motion to dismiss in *Rilley.* 2017 WL 3822727, at *6-7.

The Complaint also fails to articulate how the enterprise was structured and the role that each Defendant played within it. This too is insufficient, as Plaintiffs must adequately plead this element with regard to each Defendant. *See Craig Outdoor*, 528 F.3d at 1027. Absent these allegations, Plaintiffs have not adequately alleged the existence of an enterprise and their RICO claim fails.[40]

---

[40] To the extent that Plaintiffs attempt to assert a horizontal conspiracy with vertical components, also referred to as a "hub and spokes" enterprise, this argument, too, fails. To establish the existence of a "hub and spokes" enterprise, a plaintiff must plead facts that demonstrate that a "hub serves as a contact point for other members who otherwise do not interact." *In re UnitedHealth Grp.*, 2017 WL 6512222, at *13. The alleged enterprise, however, "is not sufficiently coherent unless the members['] spokes are connected by a unifying rim." *Id.* Here, Plaintiffs fail to allege a rim and do not articulate *how* the separate entities are connected in any way.

### D.   Plaintiffs Lack Standing to Assert Their RICO Claim.

Lastly, Plaintiffs fail to plead that the alleged RICO violation caused their injury. Accordingly, the RICO claim also should be dismissed for lack of standing. *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012); *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 728 (8th Cir. 2004) ("The phrase 'by reason of' as used in § 1964(c) means causation under the traditional tort 'requirements of proximate or legal causation as opposed to mere factual or "but for" causation.'" (quoting *Bieter Co. v. Blomquist*, 987 F.2d 1319, 1325 (8th Cir. 1993)); *see also Subramanian v. Tata Consultancy Servs.*, 352 F. Supp. 3d 908, 917 (D. Minn. 2018). It is well established that causation requires a plaintiff to "show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992) (internal quotation marks omitted)).

Where a RICO claim is based upon the predicate acts of wire or mail fraud, plaintiffs must show that their loss was "a foreseeable result of *someone's* reliance on the misrepresentation[,]" even if not their own. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656 (2008); *Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, 791 F. App'x 301, 307 (3d Cir. 2019). Thus, courts have consistently held that RICO claims failed where plaintiffs did not allege that anyone specifically relied on any fraudulent misrepresentations. *See, e.g.*, *Dist. 1199P Health & Welfare Plan v. Janssen, LP*, 784 F. Supp. 2d 508, 524-25 (D.N.J. 2011) (conclusory allegations "that physicians relied on Defendants' misrepresentations" were not "sufficient allegations of direct reliance"); *In re Actimmune Mktg. Litig. (Actimmune I)*, 614 F. Supp. 2d 1037, 1052 (N.D. Cal. 2009) ("Plaintiffs have not put forth any specific allegations that *anyone*—the doctors, the plaintiffs themselves, or any other third party—relied on defendants' purportedly fraudulent misrepresentations . . . .").

56

Here, assuming *arguendo* that Plaintiffs adequately alleged that Defendants' communications contained misrepresentations, the Complaint fails to allege *how* any harm Plaintiffs incurred was a foreseeable result of "*someone's* reliance on the" supposed misrepresentations. *Bridge*, 553 U.S. at 656. Instead, Plaintiffs rely upon the kind of conclusory allegations that courts have held insufficient. *See* Compl. ¶ 268 ("the Crop Inputs Market Manipulation Enterprise directly caused farmers to pay more for Crop Inputs than they would have"); ¶ 270 ("All purchasers of the Crop Inputs purchased Crop Inputs in reasonable reliance upon the representations that the marketplace was functioning efficiently and in accordance with the law."). None of these allegations contains any specific factual averments, articulating *which misrepresentations* Plaintiffs or others relied upon or *how* they caused Plaintiffs harm. As such, Plaintiffs have failed to allege that the purported predicate acts—specific instances of mail and wire fraud—were the proximate cause of their harm, and their RICO claim fails as a matter of law.

## V.   ALL OF PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED.

### A.   Plaintiffs' State-Law Claims Fail for the Same Reasons That Their Federal Antitrust Claim Fails.

The gravamen of Plaintiffs' Complaint is that Defendants conspired to injure competition in the Crop Inputs market by boycotting electronic sales platforms. As explained above, Plaintiffs' sole federal claim for violation of Section 1 of the Sherman Act fails because they do not allege sufficient facts to plausibly establish the existence of the requisite conspiratorial "agreement" to restrain trade. *See* 15 U.S.C. § 1 (declaring illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade"); *see also Twombly*, 550 U.S. at 544-45.

Based on the same allegations, Plaintiffs assert 27 state antitrust claims, 27 state consumer protection act ("CPA") claims, and 28 state unjust enrichment claims, under the laws of 35 states, all of which fail for the same reasons Plaintiffs' federal antitrust claim fails and for additional

reasons as well. For ease of reference, charts summarizing the bases for dismissal of each of

Plaintiffs' state-law claims are attached hereto as **Exhibits A** (state antitrust claims), **B** (CPA

claims), **C** (unjust enrichment claims), and **D** (state statutes of limitations).

> 1.  **All of Plaintiffs' State Antitrust Claims Fail Because Plaintiffs Have Not Plausibly Alleged the Requisite Conspiratorial "Agreement."**

Although the terminology of the state antitrust statutes differs slightly, each prohibits

agreements in restraint of trade. Twenty of the statutes use language that is identical or virtually

identical to the language of Section 1 of the Sherman Act.[41] The seven remaining statutes require

proof of joint conduct:

- The California Cartwright Act bars "trusts," Cal. Bus. & Prof. Code § 16726, and defines them as "combination[s] of capital, skill or acts by two or more persons" to restrain trade, reduce production, or increase prices. *Id.* § 16720.

- The Kansas Restraint of Trade Act declares "trusts" to be unlawful and defines them as "combination[s] of capital, skill, or acts by two or more persons" to restrain trade, reduce production, or increase prices. Kan. Stat. § 50-101.

- The Mississippi Antitrust Act declares "trusts" to be unlawful and defines them as a "combination, contract, understanding or agreement, expressed or implied, between two or more persons . . . [t]o restrain trade . . . ." Miss. Code § 75-21-1(a).

- The Nevada Unfair Trade Practices Act prohibits every enumerated "contract, combination or conspiracy in restraint of trade," including "agreements not to sell to specified customers of a competitor." Nev. Rev. Stat. § 598A.060(c).

- The New York Donnelly Act prohibits "[e]very contract, agreement, arrangement or combination" whereby "[c]ompetition . . . in the conduct of any business . . . is or may be restrained." N.Y. Gen. Bus. Law § 340(1).

- The Tennessee Trade Practices Act prohibits "[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition . . . ." Tenn. Code

---

[41] Ariz. Rev. Stat. § 44-1402; Conn. Gen. Stat. § 35-26; Haw. Rev. Stat. § 480-4; Illinois (740 ILCS 10/3(2)); Iowa Code § 553.4; Me. Rev. Stat. Title 10 § 1101; Md. Code Com. Law § 11-204(a)(1); Mich. Comp. Laws § 445.772; Minn. Stat. § 325D.51; Neb. Rev. Stat. § 59-801; N.H. Rev. Stat. § 356:2; N.M. Stat. § 57-1-1; N.C. Gen. Stat. § 75-1; N.D. Cent. Code § 51-08.1-02; Or. Rev. Stat. § 646.725; 6 R.I. Gen. Laws § 6-36-4; S.D. Codified Laws § 37-1-3.1; Utah Code § 76-10-3104; W. Va. Code § 47-18-4; Wis. Stat. § 133.03.

§ 47-25-101.

- The Vermont Consumer Protection Laws prohibit "[c]ollusion," 9 Vt. Stat. § 2453a, defined as "an agreement, contract, combination in the form or trusts or otherwise, or conspiracy . . . ." 9 Vt. Stat. § 2451a(8).

Federal courts routinely dismiss state-law antitrust claims that are derivative of deficient federal antitrust claims. *E.g.*, *Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963, 976 n.5 (9th Cir. 2008)[42]; *In re Humira (Adalimumab) Antitrust Litig.* ("*Humira*"), 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020), *appeal filed* 20-2402 (7th Cir. 2020). Plaintiffs' 27 state-law antitrust claims should therefore be dismissed for the same reasons as Plaintiffs' federal antitrust claims. Ex. A.

### 2.   All of Plaintiffs' CPA Claims Fail Because Plaintiffs Do Not Plausibly Allege the Requisite Misconduct.

All 27 of Plaintiffs' state CPA claims fail for the same reason. Each statute requires Plaintiffs to allege an unfair, deceptive, fraudulent, or unconscionable act. Compl. ¶¶ 192-223. Plaintiffs rely on Defendants' alleged conspiracy to meet this standard. *Id.* "But because the complaint is shaped by its antitrust theories, once those theories fall out of the case it becomes difficult to assess how the allegations satisfy the unfair or unconscionable standards of various states' laws." *Humira*, 465 F. Supp. 3d at 848 (dismissing CPA claims because the factual allegations supporting them were not differentiated from the dismissed antitrust allegations).

"Multiple courts have dismissed state consumer protection and unfair trade practices claims that simply mirror deficient federal antitrust laws." *Wisconsin v. Indivior Inc. (In re Suboxone Antitrust Litig.)*, MDL No. 2445, 2017 WL 4642285, at *12 (E.D. Pa. Oct. 17, 2017); *see also In re Aluminum Warehousing Antitrust Litig.*, MDL No. 13-2481, 2014 WL 4743425, at *1 (S.D.N.Y. Sept. 15, 2014) (dismissing 29 state-law consumer protection, unfair competition,

---

[42] *Rick-Mik* was superseded on other grounds as recognized in *Lau v. Guam Dep't of Educ.*, No. 10-cv-00035, 2011 WL 2531061, at *3 (D. Guam June 23, 2011).

and unfair trade practices claims because they relied on the same allegations that were deficient to state Sherman Act claims); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139-40 (E.D.N.Y. 2003) (dismissing 21 state-law consumer protection and unfair competition claims where the claims track the allegations underlying the deficient federal antitrust claims), *aff'd*, 466 F.3d 187 (2d Cir. 2006). Because Plaintiffs fail to plausibly allege a conspiracy, Plaintiffs' 27 state CPA claims must be dismissed. Ex. B.

### 3.   All of Plaintiffs' State Unjust Enrichment Claims Fail for Deficient Pleading and Failure to Allege "Unjust" Conduct.

Plaintiffs assert unjust enrichment claims under the laws of 28 states (Compl. ¶¶ 224-27), based on their conclusory allegation that Defendants' "unlawful conduct. . . unjustly enriched [them] by the receipt of . . . unlawfully inflated prices" (*id.* ¶ 226). These claims should be dismissed for failure to plead facts that plausibly establish the elements of each claim. The law of unjust enrichment and the elements of unjust enrichment claims vary from state to state. *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 514 (D. Minn. 2014). Therefore, such claims must be pled "under the specific laws of each state," *In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883, 2009 WL 3754041, at *11 (N.D. Ill. Nov. 5, 2009), and will be dismissed when they are "bald assertion[s] that the alleged antitrust conduct violates dozens of non-antitrust laws, or the implication that there are no consequential differences between those laws[.]" *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016).

Further, because unjust or unlawful conduct is a required element of an unjust enrichment claim in every state, Plaintiffs' 28 unjust enrichment claims should also be dismissed for the same reasons that their federal antitrust claim should be dismissed. Ex. C. Defendants' only allegedly unjust or unlawful conduct is their supposed conspiracy to boycott electronic sales platforms, and Plaintiffs fail to allege sufficient facts to plausibly support this claim. *See Aluminum Warehousing*,

2014 WL 4743425, at *4; *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362,

396 (M.D.N.C. 2002) ("Because Plaintiffs do not allege any facts that suggest that Defendant's

conduct is unlawful beyond the conduct that is the basis for their failed federal claims, Plaintiffs'

state common law and statutory claims fail as well."), *aff'd*, 67 F. App'x 810 (4th Cir. 2003).

### B.    Plaintiffs Lack Standing.

#### 1.    All of Plaintiffs' State-Law Claims Fail for Lack of Article III Standing Because Plaintiffs Fail to Allege Cognizable Injuries.

As discussed above, Plaintiffs lack Article III standing because their allegations of price-

opacity are not a cognizable injury, and because their allegations that Defendants allegedly

excluded electronic sales platforms (primarily, a single retail competitor, FBN) do not raise a

plausible inference of the requisite injury to themselves.

#### 2.    Plaintiffs Lack Standing to Sue Under the Laws of 24 States Where They Do Not Reside or Did Not Suffer Injury.

Plaintiffs attempt to plead state-law claims under the laws of 24 states where no named

Plaintiff is alleged to have purchased any product.[43] These state-law claims should be dismissed

for lack of standing. *See McAteer v. Target Corp.*, No. 18-cv-349, 2018 WL 3597675, at *3 (D.

Minn. July 26, 2018) ("Article III standing for state-law claims is necessarily lacking when no

plaintiff is alleged to have purchased a product within the relevant state."); *In re Capacitors*

*Antitrust Litig.*, 154 F. Supp. 3d 918, 924-27 (N.D. Cal. 2015) (same; citing cases).

Plaintiffs "must allege and show that they personally have been injured, not that injury has

been suffered by other, unidentified members of the class to which they belong and which they

purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975); *see also Payton v. Cnty. of Kane*,

---

[43] The 24 states are: Arizona, California, Connecticut, D.C., Florida, Hawaii, Maine, Maryland, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Virginia, and West Virginia.

308 F.3d 673, 682 (7th Cir. 2002) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.").

"[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2208 (2021); *accord DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The Court "must address questions of standing before addressing the merits of [the] case" where "standing is called into question." *Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2010) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)). Standing is a threshold jurisdictional inquiry because "[w]ithout jurisdiction the court cannot proceed at all" and may only dismiss the claims. *Steel Co.*, 523 U.S. at 94. "The requirements for standing do not change in the class action context." *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017). Thus, to represent a class, a named plaintiff must suffer the injury giving rise to the claim. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 910 (8th Cir. 2016).

When, as here, a plaintiff alleges that it suffered over-charges in violation of a state's laws, it must allege that it purchased the goods within the state to establish Article III standing. *Capacitors*, 154 F. Supp. 3d at 927. The Article III analysis is not whether Plaintiffs have standing to bring *any* state claim but instead whether Plaintiffs can bring *each* of the state-law claims they allege. "Without a named Plaintiff who has purchased a product within the relevant state, there can be no determination that an interest was harmed that was legally protected under the relevant state's laws." *McAteer*, 2018 WL 3597675, at *3; *accord Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 13-cv-2664, 2014 WL 943224, at *11 (D. Minn. Mar. 11, 2014) *aff'd*, 797 F.3d 538 (8th

Cir. 2015); *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-718, 2019 WL 4478734, at

*12-13 (E.D. Va. Sept. 18, 2019); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, MDL

No. 2031, 2013 WL 4506000, at *8-9 (N.D. Ill. Aug. 23, 2013); *Jones*, 400 F. Supp. 3d at 911; *In*

*re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1372 (S.D. Fla. 2001).

Plaintiffs allegedly reside or bought Crop Inputs in only 11 of the 35 states under whose

laws Plaintiffs assert claims.[44] Because Plaintiffs lack standing to bring claims under the laws of

the other 24 states, those claims should be dismissed. Exs. A-C.

### C. Plaintiffs' State Antitrust Claims Fail in Certain States for Reasons Specific to Those States' Laws.

#### 1. Five of Plaintiffs' State Antitrust Claims Should Be Dismissed for Failure to Satisfy Filing-Notice Requirements.

Plaintiffs have asserted state-law antitrust claims under the laws of five states that require

private plaintiffs to notify their state attorneys general upon filing such claims.[45] These filing-

notice provisions direct that a plaintiff "shall" meet this requirement and are thus mandatory

prerequisites to suit. *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 412-13 (D.N.J. 2018)

(dismissing Arizona, Hawaii, Nevada, and Utah claims for failure to comply with filing-notice

provisions). As Plaintiffs fail to plead that they complied with these requirements (Compl. ¶¶ 165,

168, 178, 185, 188), their antitrust claims under the laws of Arizona, Hawaii, Nevada, Rhode

Island, and Utah must be dismissed. Ex. A.

---

[44] Arkansas (Eagle Lake Farms Partnership), Illinois (Beck, Duncan), Iowa (Lex, Peiffer, Potzner, Ryan Bros., Inc., Ryan), Kansas (Budde), Michigan (Beeman Berry Farm LLC, Wunsch Farms), Minnesota (Schultz, Hapka Farms, Inc., Hapka, JSB Farms, LLC), Mississippi (Jones Planting Co. III), New York (Swanson, Canjar), North Dakota (Flaten, Pic, DeKray), South Dakota (Handwerk), and Wisconsin (Pfaff, Vehrenkamp, Koch d/b/a Vienna Eqho Farms). Compl. ¶¶ 22-48.

[45] *See, e.g.*, Ariz. Rev. Stat. § 44-1415(A) (plaintiffs "shall simultaneously with the filing of . . . pendent state law claims in the federal court, serve a copy of the complaint . . . on the attorney general," and "[p]roof of service on the attorney general shall be filed with the court"); *accord* Haw. Rev. Stat. § 480-13.3(1); Nev. Rev. Stat. § 598A.210(3); 6 R.I. Gen. Laws § 6-36-21; Utah Code § 76-10-3109(9).

2.      **Four of Plaintiffs' State Antitrust Claims Should Be Dismissed for Lack of Any Alleged Intrastate Misconduct or Substantial Intrastate Effects.**

Plaintiffs have asserted antitrust violations in four states that require plaintiffs to allege that misconduct either occurred within the state or had a substantial effect (beyond price increases) on the state's commerce.[46]

Because the Complaint does not allege that the requisite level of misconduct or effects specifically occurred in the states of Mississippi, South Dakota, Tennessee, and Wisconsin, Plaintiffs' claims under those four states' laws must be dismissed.[47] Ex. A.

D.      **Plaintiffs' CPA Claims Fail in Certain States for Reasons Specific to Those States' Laws.**

1.      **Three of Plaintiffs' CPA Claims Should Be Dismissed for Failure to Satisfy Filing-Notice Requirements.**

Plaintiffs have asserted CPA claims in three states whose acts require a plaintiff to provide notice of the claim either to the state's attorney general (Hawaii)[48] or to the defendants (Oregon and West Virginia).[49] Plaintiffs fail to allege that they provided any notice at all under the laws of these three states (*see* Compl. ¶¶ 200, 213, 221), and Plaintiffs' CPA claims in these states should

---

[46] *See State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1189 (Miss. 2020) (affirming dismissal because plaintiff did not allege any "wholly intrastate" transactions by defendants); *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1099 (N.D. Cal. 2007) (dismissing claims under South Dakota antitrust statute where no misconduct was alleged to have occurred in South Dakota and the only intrastate effect was allegedly inflated prices); *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 524 (Tenn. 2005) (substantial effects on Tennessee commerce are required; allegations that prices were raised as a result of conduct is insufficient); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 549 (N.D. Ill. 2019) (dismissing claims under Wisconsin antitrust statute where no misconduct was alleged to have occurred in Wisconsin and the only intrastate effect was allegedly inflated prices).

[47] Plaintiffs' mere allegation that Crop Inputs were imported and sold in Mississippi and Wisconsin fails to show the requisite level of misconduct or effects. *See In re Pork*, 495 F. Supp. 3d at 779 (dismissing claims under Mississippi antitrust statute because "[v]ague, conclusory statements of intrastate transactions are not enough"); *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wisc. 2005) ("A civil plaintiff filing an action under Wisconsin's antitrust act must allege that (1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state . . . or (2) the conduct complained of 'substantially affects' the people of Wisconsin and has impacts in this state[.]").

[48] *See* Haw. Rev. Stat. § 480-13.3(a)(1). Hawaii requires notice to its attorney general of indirect purchaser class actions.

[49] *See* Or. Rev. Stat. § 646.638(2); W. Va. Code § 46A-6-106(c).

thus be dismissed. Ex. B.

### 2. Plaintiffs' CPA Claims Fail in Ten Jurisdictions Where Antitrust Conspiracies Are Not CPA Violations.

Plaintiffs assert CPA claims in 10 jurisdictions where antitrust conspiracies do not meet the specific standards for unfair, deceptive, or unconscionable conduct.[50] *See In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166-73 (N.D. Cal. 2015) (dismissing CPA claims predicated on denial of generic drug entry in Arkansas, Michigan, Minnesota, Oregon, South Dakota, and West Virginia); *GPUs*, 527 F. Supp. 2d at 1029-31 (dismissing CPA claims predicated on a price-fixing conspiracy in Arkansas, District of Columbia, Kansas, New Mexico, Oregon, Rhode Island, and West Virginia). These 10 CPA claims should be dismissed. Ex. B.

### E. Plaintiffs' Unjust Enrichment Claims Fail in Certain States for Reasons Specific to Those States' Laws.

### 1. Plaintiffs' Unjust Enrichment Claims Fail in Four States Where Unjust Enrichment Is Not an Independent Cause of Action.

Four states recognize unjust enrichment as a remedy but not as an independent cause of action.[51] Therefore, the unjust enrichment claims in California, Illinois, Mississippi, and New Hampshire should be dismissed. Ex. C.

### 2. Plaintiffs' Unjust Enrichment Claims Fail in 17 States Because Plaintiffs Have an Adequate Remedy at Law.

In 17 states, a plaintiff may not pursue an unjust enrichment claim or remedy unless no

---

[50] The 10 jurisdictions are: Arkansas, District of Columbia, Kansas, Michigan, Minnesota, New Mexico, Oregon, Rhode Island, South Dakota, and West Virginia.

[51] *See Melchior v. New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347, 357 (Cal. App. 2003); *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 927 (Ill. App. Ct. 2009); *Cole v. Chevron USA, Inc.*, 554 F. Supp. 2d 655, 671 (S.D. Miss. 2007); *Gen. Insulation Co. v. Eckman Const.*, 992 A.2d 613, 621 (N.H. 2010).

adequate remedy at law exists.[52] Here, Plaintiffs are seeking legal remedies under both federal and state laws. *See* Compl. ¶¶ 142-223. "District courts routinely dismiss unjust enrichment claims where the plaintiff pleaded and pursued both equitable and legal claims simultaneously[.]" *United States v. Bame*, 721 F.3d 1025, 1031 (8th Cir. 2013). Therefore, Plaintiffs' unjust enrichment claims in the 17 states where they pursue a legal remedy should be dismissed. Ex. C.

### 3. Plaintiffs' Unjust Enrichment Claims Fail in Three States Because Plaintiffs Received Consideration for Their Purchases.

Three states do not permit unjust enrichment claims where the defendant has provided consideration for the benefit it allegedly received unjustly.[53] Retention of the benefit under such circumstances is not considered "unjust." Plaintiffs plead that they received Crop Inputs in exchange for payment. Compl. ¶¶ 22-48, 227. Therefore, consideration exists and Plaintiffs' unjust enrichment claims fail in Florida, Kansas, and Tennessee. Ex. C.

### F. Plaintiffs' Indirect-Purchaser Claims Fail in 13 States That Require Direct Conferral of a Benefit.

Plaintiffs bring state-law claims on behalf of a proposed class that encompasses "[a]ll persons and entities . . . who purchased, in an 'Indirect Purchaser' or 'State Law' State, from a retailer other than a Defendant, for their own use and not for resale, a Crop Input manufactured by

---

[52] *Trustmark Ins. Co. v. Bank One, Ariz.*, 48 P.3d 485, 491 (Ariz. App. 2002) ("absence of a legal remedy" is a required element for an unjust enrichment claim); *accord Collins v. eMachines, Inc.*, 134 Cal. Rptr. 3d 588, 596-97 (Cal. App. 2011); *Porter v. Hu*, 169 P.3d 994, 1007 (Haw. App. 2007); *Mosebach v. Blythe*, 282 N.W.2d 755, 761 (Iowa App. 1979); *Nelson v. Nelson*, 205 P.3d 715, 724 (Kan. 2009); *Ruggers Inc. v. U.S. Rugby Football Union, Ltd.*, 843 F. Supp. 2d 139, 147 (D. Mass. 2012); *Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W. 2d 137, 140 (Minn. 1992); *Powell v. Campbell*, 912 So. 2d 978, 982 (Miss. 2005); *Pilot Inv. Grp. v. Holfarth*, 550 N.W.2d 27, 33 (Neb. 1996); *Small v. Univ. Med. Ctr. of S. Nev.*, No. 13-cv-00298, 2016 WL 4157309, at *3 (D. Nev. Aug. 3, 2016); *E. Elec. Corp. v. FERD Const., Inc.*, No. 05-cv-303, 2005 WL 3447957, at *2-3 (D.N.H. Dec. 15, 2005); *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 411 S.E.2d 916, 920 (N.C. 1992); *Rindal v. Sohler*, 658 N.W.2d 769, 772 (S.D. 2003); *Furlough v. Spherion Atl. Workforce, LLC*, 397 S.W.3d 114, 134 (Tenn. 2013); *Thorpe v. Washington City*, 243 P.3d 500, 507 (Utah App. 2010); *Mountain State Coll. v. Holsinger*, 742 S.E.2d 94, 103 (W. Va. 2013); *Pulkkila v. Pulkkila*, 941 N.W.2d 239, 258 (Wis. 2020).

[53] *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 390 (Fla. Dist. App. 1997) (unjust enrichment unavailable where defendant provides consideration to a third party for the benefit it received because retention of the benefit is not unjust); *accord Tradesmen Int'l, Inc. v. USPS*, 234 F. Supp. 2d 1191, 1205-06 (D. Kan. 2002); *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966).

a Manufacturer Defendant during the Class Period." Compl. ¶ 126. In 13 states, a plaintiff alleging an unjust enrichment claim must plead and prove that the defendant received the unjust benefit directly from the plaintiff.[54] Plaintiffs' indirect-purchaser claims, by definition, did not involve direct dealing with any Defendant. *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756, at *26 (E.D. Mich. Apr. 9, 2013) (indirect purchasers do not confer benefits directly on defendants). The Court therefore should dismiss Plaintiffs' claims in the 13 states that require a direct benefit for unjust enrichment. Ex. C.

## G. Virtually All of Plaintiffs' State-Law Claims Are Untimely.

Plaintiffs filed their Complaint more than seven years after Defendants' alleged conspiracy began in January 2014 (Compl. ¶¶ 126, 144), and the statutes of limitations on their state-law claims range from one to six years. Plaintiffs' state-law claims are all untimely like their federal claim, and many are *significantly* untimely.

### 1. Plaintiffs' State Antitrust Claims Are Untimely in All 27 States.

Plaintiffs' antitrust claims in 21 states have four-year statutes of limitation and are untimely for the same reasons and to the same extent their Sherman Act claim is.[55] Plaintiffs' claims are

---

[54] *Brown v. Pinnacle Restoration LLC*, No. 12-cv-0550, 2013 WL 3148654, at *2 (Ariz. App. June 18, 2013); *Extraordinary Title Servs. v. Fla. Power & Light Co.*, 1 So. 3d 400, 404 (Fla. Dist. Ct. App. 2009); *Spires v. Hosp. Corp. of Am.*, 289 F. App'x 269, 273 (10th Cir. 2008) (Kansas law); *Simpson v. Central Me. Motors*, 669 A.2d 1324, 1326 (Me. 1996); *Estate of Johnson v. Melvin Rose, In*c., No. WO-CV-200400622, 2007 WL 1832029, at *39 (Mass. Super. Ct. May 9, 2017); *A&M Supply v. Microsoft Corp.*, No. 274164, 2008 WL 540883, at *2-3 (Mich. App. Feb. 28, 2008); *Pacamor Bearings, Inc. v. Minebea Co.*, 892 F. Supp. 347, 357 (D.N.H. 1995); *Effler v. Pyles*, 380 S.E.2d 149, 152 (N.C. App. 1989); *J.P. Morgan Chase Bank, N.A. v. M/Y Brittany Leigh II*, No. 11-cv-246, 2011 WL 4351584, at *2 (D.R.I. Aug. 23, 2011); *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 532 S.E.2d 868, 872-73 (S.C. 2000); *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1018 (Utah 2015); *Johnson v. Ross*, 419 F. App'x 357, 362 (4th Cir. 2011) (West Virginia law); *Blitz v. Monsanto Co.*, 317 F. Supp. 3d 1042, 1056 (W.D. Wis. 2018).

[55] Ariz. Rev. Stat. § 44-1410; Cal. Bus. & Prof. Code §§ 16750.1, 17208; Conn. Gen. Stat. § 35-40; Haw. Rev. Stat. § 480-24; Illinois (740 ILCS 10/7(2)); Iowa Code § 553.16(2); Md. Code Com. Law § 11-209(d)(1); Mich. Comp. Laws § 445.781; Minn. Stat. § 325D.64; Neb. Rev. Stat. § 25-212; Nev. Rev. Stat. § 598A.220(1), (2)(a); N.H. Rev. Stat. § 356:12.II; N.M. Stat. § 57-1-12; N.Y. Gen. Bus. Law § 340(5); N.C. Gen. Stat. § 75-16.2; N.D. Cent. Code § 51-08.1-10; Or. Rev. Stat. § 646.800(2); 6 R.I. Gen. Laws § 6-36-23; S.D. Codified Laws § 37-1-14.4; Utah Code § 76-10-3117; W. Va. Code § 47-18-11.

even less timely in the three states with three-year antitrust statutes of limitation.[56] The three remaining states have six-year statutes of limitation on antitrust claims.[57] Ex. D.

### 2.    Plaintiffs' CPA Claims Are Untimely in All 27 States.

Plaintiffs' state CPA claims have statutes of limitations ranging from one to six years and, therefore, each of the claims is untimely. Two states have one-year CPA statutes of limitation.[58] Two states have two-year CPA statutes of limitation .[59] Six jurisdictions have three-year CPA statutes of limitations.[60] Ten states have four-year CPA statutes of limitation.[61] Four states have five-year CPA statutes,[62] and three states have six-year CPA statutes.[63] Ex. D.

### 3.    Plaintiffs' Unjust Enrichment Claims Are Untimely in 21 Jurisdictions.

Plaintiffs' claims are untimely in 21 of the 22 states that recognize unjust enrichment claims as an independent cause of action[64] and that have statutes of limitations on unjust enrichment claims.[65] In these 21 states, the statute of limitations on unjust enrichment claims is six

---

[56] Kan. Stat. § 60-512(2); *Four B Corp. v. Daicel Chem. Indus.*, 253 F. Supp. 2d 1147, 1155 (D. Kan. 2003); Miss. Code § 15-1-49(1); *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722, 1980 WL 4696, at *3 (Tenn. Ch. Sept. 25, 1980) (interpreting Tenn. Code §§ 47-25-101 to 112).

[57] Me. Rev. Stat. Title 14 § 752; 12 Vt. Stat. § 511; Wis. Stat. § 133.18(2).

[58] Ariz. Rev. Stat. § 12-541; *Richards v. Powercraft Homes, Inc.*, 678 P.2d 449, 450 (Ariz. App. 1983), *approved in part, vacated in part*, 678 P.2d 427 (Ariz. 1984) (en banc); Or. Rev. Stat. § 646.638(6).

[59] Mont. Code § 27-2-211(1)(c); Va. Code § 59.1-204.1.

[60] D.C. Code § 12-301(8); 815 ILCS 505/10a(e); Kan. Stat. § 60-512; N.H. Rev. Stat. §358-A:3.IV-a; N.Y. C.P.L.R. 214(2); S.C. Code § 39-5-150.

[61] Cal. Bus. & Prof. Code § 17208; Fla. Stat. § 95.11(3)(f); Haw. Rev. Stat. § 480-24; Neb. Rev. Stat. § 59-1612; Nev. Rev. Stat. § 11.190(2)(d); N.M. Stat. § 37-1-4; N.C. Gen. Stat. § 75-16.2; 9 R.I Gen. Laws § 9-1-36; S.D. Codified Laws § 37-24-33; W. Va. Code § 46A-5-101.

[62] Ark. Code § 4-88-115; Mo. Rev. Stat. § 516.120; Tenn. Code § 47-18-110; Utah Code § 13-2-6(6)(b).

[63] Mich. Comp. Laws § 445.911(9); Minn. Stat. § 541.05, subd. 1(2); 12 Vt. Stat. § 511.

[64] As noted, four states (California, Illinois, Mississippi, and New Hampshire) do not recognize unjust enrichment as an independent cause of action. Nevertheless, if these states were to recognize unjust enrichment claims, the statutes of limitations would be three years (Cal. Civ. Proc. Code § 338(d); Miss. Code § 15-1-49(1); N.H. Rev. Stat. § 508:4) or five years (735 ILCS 5/13-205), as applicable.

[65] Two states (Oregon, West Virginia) do not have statutes of limitations for unjust enrichment claims but instead apply the doctrine of laches. *Angelini v. Delaney*, 966 P.2d 223, 229 (Or. App. 1998); *Dunn v. Rockwell*, 689 S.E.2d 255, 266 (W. Va. 2009).

years or less.[66] Eight states have three-year unjust enrichment statutes of limitations.[67] Five states have four-year unjust enrichment statutes of limitations.[68] Two states have five-year unjust enrichment statutes of limitations,[69] and six states have six-year unjust enrichment statutes of limitation.[70] Ex. D.

All of Plaintiffs' state-law claims should be dismissed to the extent they are time-barred under the applicable statute of limitations.

## CONCLUSION

Plaintiffs allege only conclusory and generalized allegations of conspiracy insufficient to adequately state a claim. Those allegations are consistent with independent, rational, and competitive behavior and do not imply any conspiracy. Plaintiffs' Complaint also should be dismissed because Plaintiffs do not allege that they suffered an antitrust injury plausibly caused by Defendants' alleged conspiracy, and to the extent they assert conduct prior to the Sherman Act's four-year statute of limitations. Finally, Plaintiffs' RICO and state-law claims likewise fail. The bases for dismissal are fundamental flaws that cannot be cured, and have not been even after Plaintiffs' third attempt at so doing. For the foregoing reasons, Defendants respectfully request the Complaint be dismissed with prejudice.

---

[66] The only exception is Rhode Island, which has a 10-year statute of limitations on unjust enrichment claims. 9 R.I. Gen. Laws § 9-1-13(a).

[67] Ariz. Rev. Stat. § 12-543(1); D.C. Code § 12-301(7), (8); Kan. Stat. § 60-512; Mass. Gen Laws ch. 260 § 2A; Mont. Code § 27-2-202(3); N.C. Gen. Stat. § 1-52(1); S.C. Code § 15-3-530; Tenn. Code § 28-3-105.

[68] Fla. Stat. § 95.11(3)(k); Neb. Rev. Stat. § 25-207; Nev. Rev. Stat. § 11.190(2)(d); N.M. Stat. § 37-1-4; Utah Code § 78B-2-307(3).

[69] Iowa Code § 614.1(4); Mo. Rev. Stat. § 516.120.

[70] Haw. Rev. Stat. § 657-1; 14 Me. Rev. Stat. § 752; Mich. Comp. Laws § 600.5813; Minn. Stat. § 541.05, subd. 1(1); S.D. Codified Laws § 15-2-13; Wis. Stat. § 893.43(1).

Dated:  November 10, 2021                              Respectfully Submitted,

/s/ *Troy Bozarth* (with consent)               /s/ *Edwin G. Harvey*
Troy A. Bozarth                                 Christopher M. Hohn
**HEPLERBROOM LLC**                             Sharon B. Rosenberg
130 N. Main St.                                 Edwin G. Harvey
P.O. Box 510                                    **THOMPSON COBURN LLP**
Edwardsville, IL 62025                          One US Bank Plaza
Tel: (618) 656-0184                             St. Louis MO 63101
tab@heplerbroom.com                             Phone: (314) 552-6000
                                                chohn@thompsoncoburn.com
David J. Lender                                 srosenberg@thompsoncoburn.com
Adam C. Hemlock                                 eharvey@thompsoncoburn.com
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue                                Jonathan I. Gleklen
New York, NY 10153                              Laura S. Shores
Tel: (212) 310-8000                             **ARNOLD & PORTER KAYE SCHOLER**
David.Lender@weil.com                           **LLP**
Adam.Hemlock@weil.com                           601 Massachusetts Ave., NW
                                                Washington, DC 20001
Lara B. Bach                                    Phone: (202) 942-5000
**WEIL, GOTSHAL & MANGES LLP**                  jonathan.gleklen@arnoldporter.com
1395 Brickell Avenue, Suite 1200                laura.shores@arnoldporter.com
Miami, FL 33131
Tel: (305) 577-3100                             *Counsel for Defendants Bayer CropScience LP*
Lara.Bach@weil.com                              *and Bayer CropScience Inc.*

*Counsel for Defendant BASF Corporation*
                                                /s/ *Kathy L. Osborn* (with consent)
                                                Kathy L. Osborn
/s/ *Eric Mahr* (with consent)                  **FAEGRE DRINKER BIDDLE & REATH**
Eric Mahr                                       **LLP**
**FRESHFIELDS         BRUCKHAUS**               300 N. Meridian St., Suite 2500
**DERINGER US LLP**                             Indianapolis, IN 46204
700 13th Street NW, 10th Floor                  Telephone: (317) 237-8261
Washington, DC 20005-3960                       Email: kathy.osborn@faegredrinker.com
Tel: (202) 777-4545
Fax: (202) 777-4555                             Colby Anne Kingsbury
eric.mahr@freshfields.com                       **FAEGRE DRINKER BIDDLE & REATH**
                                                **LLP**
*Counsel for Defendant Cargill,*                311 S. Wacker Dr., #4400
*Incorporated*                                  Chicago, IL 60606
                                                Telephone: (312) 212-6573
                                                Email: colby.kingsbury@faegredrinker.com

*Counsel for Defendant CHS Inc.*

/s/ *Jason Leckerman* (with consent)
Leslie E. John
Jason A. Leckerman
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Tel: (215) 665-8500
johnl@ballardspahr.com
leckermanj@ballardspahr.com

Donald M. Flack
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
**ARMSTRONG TEASDALE LLP**
Tel: 314.621.5070
dflack@atllp.com

*Counsel for Defendants Corteva, Inc.
and Pioneer Hi-Bred International, Inc.*

/s/ *Michael L. McCluggage* (with consent)
Michael L. McCluggage
Barack S. Echols
**EIMER STAHL LLP**
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600 (telephone)
(312) 692-1718 (facsimile)
mmccluggage@eimerstahl.com
bechols@eimerstahl.com

Collin J. Vierra
**EIMER STAHL LLP**
99 South Almaden Boulevard
Suite 662
San Jose, CA 85113
(669) 231-8755 (telephone)
(312) 692-1718 (facsimile)
cvierra@eimerstahl.com

/s/ *Barry S. Noeltner* (with consent)
Barry S. Noeltner
**HEYL, ROYSTER, VOELKER &
ALLEN, P.C.**
Suite 100
Mark Twain Plaza III
105 West Vandalia Street
Edwardsville, Illinois 62025
Telephone: 618.656.4646
PRIMARY          E-SERVICE          -
edwecf@heylroyster.com
SECONDARY          E-SERVICE          –
bnoeltner@heylroyster.com

Michael A. Lindsay (MN Lic. #0163466)
F. Matthew Ralph (MN Lic. #0323202)
Jaime Stilson (MN Lic. #0392913)
**DORSEY & WHITNEY LLP**
50 South Sixth Street Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
lindsay.michael@dorsey.com
ralph.matthew@dorsey.com
stilson.jaime@dorsey.com

*Counsel for Defendants GROWMARK, Inc.
and GROWMARK FS, LLC*

71

*Counsel for Defendant Federated*
*Co-operatives Limited*

/s/ *G. Patrick Watson* (with consent)
G. Patrick Watson
Lindsay S. Johnson
**BRYAN CAVE LEIGHTON PAISNER LLP**
1201 West Peachtree Street NW
Suite 1400
Atlanta, Georgia 30309
(404) 572-6600
(404) 572-6999 (facsimile)
patrick.watson@bclplaw.com
lindsay.johnson@bclplaw.com

Paul J. Lopach
Michael J. Hofmann
**BRYAN CAVE LEIGHTON PAISNER LLP**
1700 Lincoln Street
Suite 4100
Denver, CO 80203
(303) 861-7000
(303) 866-0200 (facsimile)
paul.lopach@bclplaw.com
michael.hofmann@bclplaw.com

Travis H. Campbell
**BRYAN CAVE LEIGHTON PAISNER LLP**
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102
(314) 259-2000
(314) 259-2020 (facsimile)
travis.campbell@bclplaw.com

*Counsel for Defendant Nutrien Ag Solutions, Inc.*

/s/ *Eric D. Brandfonbrener* (with consent)
Eric D. Brandfonbrener
**PERKINS COIE, LLP**
131 S. Dearborn St., Suite 1700
Chicago, IL 60603
(312) 324-8400
(312) 324-9400(facsimile)
ebrand@perkinscoie.com

Shylah R. Alfonso
**PERKINS COIE, LLP**
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
(206) 359-3980
(206) 359-4980 (facsimile)
salfonso@perkinscoie.com

*Counsel for Defendant Simplot AB Retail Sub, Inc.*

/s/ *Paul S. Mishkin* (with consent)
Paul S. Mishkin
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, NY 10017
Tel: 212-450-4292
paul.mishkin@davispolk.com

Robert T. Haar – #30044MO
Jozef J. Kopchick - #67685MO
HAAR & WOODS, LLP
1010 Market Street, Suite 1620
St. Louis, Missouri 63101
(314) 241-2224
(314) 241-2227 (Facsimile)
roberthaar@haar-woods.com
jkopchick@haar-woods.com

*Counsel for Defendant Syngenta Corporation*

/s/ *Lee A. Peifer*  (with consent)
Lee A. Peifer
James R. McGibbon
**EVERSHEDS SUTHERLAND (US) LLP**
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Tel: 404-853-8000
Fax: 404-853-8806
leepeifer@eversheds-sutherland.com
jimmcgibbon@eversheds-sutherland.com

*Counsel for Defendant Tenkoz, Inc.*

/s/ *Nathan P. Eimer* (with consent)
Nathan P. Eimer
Vanessa G. Jacobsen
Brian Y. Chang
Sarah H. Catalano
**EIMER STAHL LLP**
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Tel: 312-660-7600
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
bchang@eimerstahl.com
scatalano@eimerstahl.com

*Counsel for Defendant Winfield Solutions,*
*LLC*

/s/ *Craig C. Martin* (with consent)
Craig C. Martin
Matt D. Basil
**WILLKIE FARR & GALLAGHER LLP**
300 North LaSalle
Chicago, IL 60654-3406
Telephone: (312) 728-9000
cmartin@willkie.com
mbasil@willkie.com

/s/ J. Nicci Warr (with consent)
J. Nicci Warr, #59975
7700 Forsyth Boulevard, Suite 1100
St. Louis, MO 63105
(314) 863-0800 (telephone)
(314) 863-9388 (facsimile)
nicci.warr@stinson.com

Alexander C. Barrett, #68695
230 West McCarty Street
Jefferson City, Missouri 65101
(573) 636-6263 (telephone)
(573) 556-3637 (facsimile)
alexander.barrett@stinson.com

*Counsel for Defendant Univar Solutions Inc.*

**CERTIFICATE OF SERVICE**

I, Edwin G. Harvey, hereby certify that on November 10, 2021, I electronically filed the foregoing Memorandum in Support of Motion to Dismiss using the CM/ECF system, which will send notification of such filing to all parties of record.


/s/ *Edwin G. Harvey*
Edwin G. Harvey