**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: CROP INPUTS ANTITRUST LITIGATION | Case No. 4:21-md-02993-SEP |
| | MDL No. 2993 |
| This Document Relates To: | |
| ALL CASES | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iv

I. LEGAL STANDARD ................................................................................1

II. STATEMENT OF FACTS ........................................................................2

    A.    Defendants' Group Boycott. ...........................................................5

        1.    Each Group of Defendants was Motivated to Join the Conspiracy. ............5

        2.    Defendants Used Trade Organizations and Publications to Maintain Their Conspiracy. .............................................................7

III. PLAINTIFFS PROPERLY PLEAD A CONSPIRACY TO BOYCOTT THE ECOMMERCE PLATFORMS ...........................................................9

    A.    Plaintiffs Adequately Allege Circumstantial Evidence of a Conspiracy. ..............11

        1.    Plaintiffs' Parallel Conduct Allegations Support a Plausible Conspiracy. 12

            a.    Plaintiffs' Boycott Allegations ....................................................12

            b.    Defendants, Through Trade Organizations, Perpetuated the Boycott...........................................................14

        2.    Plaintiffs' Plus-Factor Allegations Support a Plausible Conspiracy. ........15

            a.    Defendants Acted Against Rational Economic Self-Interest.........16

            b.    Defendants Had Ample Opportunity To Conspire. .......................18

            c.    The Relevant Market for Crop Inputs is Highly Concentrated......19

            d.    Defendants' Conduct Is Under Governmental Investigation.........20

            e.    Defendants Have a History of Committing Antitrust Violations...22

    B.    Plaintiffs' Allegations of Collective Conduct are Proper and Sufficiently Pled. ..23

IV. PLAINTIFFS HAVE STANDING TO PURSUE THEIR ANTITRUST CLAIMS. .............25

V. DEFENDANTS' CONTINUING VIOLATION AND FRAUDULENT CONCEALMENT MAKE PLAINTIFFS' CLAIMS TIMELY. ..................................................28

    A.    The CAC Pleads a Continuing Violation..................................................29

B.      Any Applicable Statute of Limitations is Tolled by Defendants' Fraudulent Concealment. ...................................................................................31

      1.      Defendants Concealed Their Violations from Plaintiffs............................33

      2.      Plaintiffs Did Not Discover Their Claims Until 2020. ..............................34

      3.      Plaintiffs Diligently Pursued Their Claims...............................................35

VI. PLAINTIFFS SUFFICIENTLY PLEAD THEIR RICO CLAIM. ..........................................36

A.      Plaintiffs Plead Mail/Wire Fraud Predicate Acts with Sufficient Particularity. ....37

B.      Defendants' Long-Running and Ongoing Actions Demonstrate a Pattern of Racketeering Activities............................................................................................39

C.      Long-Term Relationships and Collective Efforts Constitute a RICO Enterprise..41

D.      Plaintiffs Have Standing as the Direct and Foreseeable Victims of the Conspiracy. ..................................................................................................................44

VII. DEFENDANTS' STATE-SPECIFIC ARGUMENTS ARE WITHOUT MERIT.................46

A.      Plaintiffs Plausibly Allege a Conspiratorial Agreement to Restrain Trade. ..........46

      1.      Plaintiffs' Allegations of Defendants' Conspiracy is Sufficient to State a Claim Under the State Antitrust and Consumer Protection Laws. ............46

      2.      Plaintiffs Are Not Required to Plead the Specific Elements of Each State's Unjust Enrichment Regime......................................................................46

B.      Plaintiffs Sufficiently Allege Facts Demonstrating They Have Standing. ............47

C.      Plaintiffs Have Adequately Alleged Each of Their State Antitrust Law Claims...47

      1.      Plaintiffs Complied with the Applicable Filing Notice Requirements. .....47

      2.      Plaintiffs Allege Intrastate Misconduct or Substantial Intrastate Effects. .48

D.      Plaintiffs Have Adequately Alleged Their State Consumer Protection Act Claims. ..................................................................................................................51

      1.      Plaintiffs Complied with the Relevant Notice Requirements...................51

      2.      Plaintiffs Sufficiently Allege Their State Consumer Protection Claims. ..51

E.      Plaintiffs Adequately Allege Their Unjust Enrichment Claims. ..........................57

      1.      Unjust Enrichment Constitutes an Independent Cause of Action.............57

      2.      Plaintiffs May Plead Both Equitable and Legal Remedies. ....................... 58

      3.      Inadequate Consideration Does Not Defeat Unjust Enrichment Claims. ... 59

F.      Conferral of a Direct Benefit is Not Required for the Unjust Enrichment Claims. ................................................................................................................... 59

G.     Plaintiffs' State Law Claims Are Timely ................................................................ 64

H.     Plaintiffs Have Article III Standing for All Claims. ............................................ 64

      1.      Plaintiffs Adequately Allege Their Individual Article III Standing. ......... 64

      2.      Plaintiffs Allege They Suffered the Same Type of Injury as the Proposed Class Members. ............................................................................................... 64

      3.      The Court Should Defer Further Analysis Until Class Certification. ......... 69

VIII. CONCLUSION ............................................................................................................. 70

## TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*A & M Supply v. Microsoft Corp.*,
  No. 274164, 2008 WL 540883 (Mich. App. Feb. 28, 2008) .................................................61

*Abecassis v. Wyatt*,
  902 F. Supp. 2d 881 (S.D. Tex. 2012) ...............................................................................32, 35

*Abels v. Farmers Commodities Corp.*,
  259 F.3d 910 (8th Cir. 2001) ...............................................................................37, 38, 39, 40

*Aguilar v. PNC Bank, N.A.*,
  No. 14-cv-985, 2014 WL 12700618 (E.D. Mo. Nov. 19, 2014).........................................42

*Aladdin Elec. Assocs. v. Town of Old Orchard Beach*,
  645 A.2d 1142 (Me. 1994)...................................................................................................60

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016).....................................................................................20

*Allstate Ins. Co. v. Linea Latina de Accidentes, Inc.*,
  781 F. Supp. 2d 837 (D. Minn. 2011) ...............................................................................37, 42

*Allstate Ins. Co. v. Plambeck*,
  802 F.3d 665 (5th Cir. 2015) ...............................................................................................44

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..............................................................................................................69

*Anderson v. Travelex Ins. Servs., Inc.*,
  No. 8:18-CV-362, 2020 WL 1323489 (D. Neb. Mar. 20, 2020) ...........................................65

*Ashcroft v. Iqbal*,
  556 U.S. 663 (2009)...............................................................................................................31

*Atlas Piling Driving Co. v. DiCon Fin. Co.*,
  886 F.2d 986 (8th Cir. 1989) ................................................................................................40

*Babyage.com, Inc. v. Toys "R" Us, Inc.*,
  558 F. Supp. 2d 575 (E.D. Pa. 2008) ...............................................................................15, 17

*Bailey v. Glover*,
  88 U.S. (21 Wall.) 342 (1874) ...........................................................................................31, 33

*Bandy v. Gibson*,
    No. 16 CVS 456, 2017 WL 3207068 (N.C. Super. July 26, 2017) ........................................62

*Baptist Health v. Murphy*,
    226 S.W. 3d 800 (Ark. 2006) ..................................................................................................52

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................1, 9

*Blitz v. Monsanto Co.*,
    317 F. Supp. 3d 1042 (W.D. Wis. 2018) ................................................................................63

*Boyle v. U.S.*,
    556 U.S. 938 (2009) ..........................................................................................36, 41, 42, 43

*Bray v. Bank of Am., N.A.*,
    No. 4:14-CV-1336, 2016 WL 687818 (E.D. Mo. Feb. 19, 2016) ..........................................28

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ..........................................................................................37, 40, 44, 45

*Brooks v. Ross*,
    578 F.3d 574 (7th Cir. 2009) ..................................................................................................24

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
    429 U.S. 477 (1977) ................................................................................................................26

*Buchta v. Air Evac EMS, Inc.*,
    No. 4:19-CV-00976 SRC, 2019 WL 4468943 (E.D. Mo. Sept. 18, 2019) ............................69

*Carrier Corp v. Outokumpu Oyj*,
    673 F.3d 430 (6th Cir. 2012) ..................................................................................................32

*CGC Holding Co. v. Broad and Cassel*,
    773 F.3d 1076 (10th Cir. 2014) ..............................................................................................44

*Champagne Metals v. Ken-Mac Metals, Inc.*,
    458 F.3d 1073 (10th Cir. 2006) ..............................................................................................29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................................28

*Cleary v. Philip Morris Inc.*,
    656 F.3d 511 (7th Cir. 2011) ..................................................................................................57

*Cole v. Hewlett Packard Co.*,
    84 P.3d 1047 (Kan. Ct. App. 2004) ........................................................................................53

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ................................................................16, 21, 22

*Cottrell v. Alcon Labs.*,
    874 F.3d 154 (3d Cir. 2017) ................................................................25

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    363 F.3d 761 (8th Cir. 2004) ................................................................11

*Crest Constr. II v. Doe*,
    660 F.3d 346 (8th Cir. 2011) ................................................................41, 42

*Custom Hair Designs by Sandy v. Cent. Payment Co., LLC ("CPAY")*,
    984 F.3d 595 (8th Cir. 2020) ................................................................36, 44, 45

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
    136 F.3d 554 (8th Cir. 1998) ................................................................1

*Doyel v. McDonald's Corp.*,
    No. 4:08-CV-1198, 2009 WL 350627 (E.D. Mo. Feb. 10, 2009) ..........................67

*Dunlap v. Hinkle*,
    317 S.E. 2d 508 (W. Va. 1984) ................................................................63

*E-Shops Corp. v. U.S. Bank Nat'l Ass'n*,
    678 F.3d 659 (8th Cir. 2012) ................................................................37

*Edwards v. Nat'l Milk Producers Fed'n*,
    No. C 11-04766, 2012 WL 12951848 (N.D. Cal. Oct. 30, 2012) ....................35

*Effler v. Pyles*,
    380 S.E. 2d 149 (N.C. Ct. App. 1989) ................................................................62

*Embree Construction Group, Inc. v. Rafcor, Inc.*,
    411 S.E.2d 916 (N.C. 1992) ................................................................62

*Emergency Physicians Integrated Care v. Salt Lake Cty.*,
    167 P.3d 1080 (Utah 2007) ................................................................62

*Emirat AG v. High Point Printing LLC*,
    248 F. Supp. 3d 911 (E.D. Wis. 2017) ................................................................63

*Energizer Brands, LLC v. Procter & Gamble Co.*,
    No. 4:16-CV-223, 2016 WL 2894708 (E.D. Mo. May 18, 2016) ..........................1

*ES Dev., Inc. v. RWM Enters., Inc.*,
    939 F.2d 547 (8th Cir. 1991) ................................................................11

*Estate of Johnson v. Melvin Rose, Inc.*,
   No. WOCV200400622, 2007 WL 1832029 (Mass. Super. May 9, 2007) ............................61

*Evergreen Partnering Grp. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013).................................................................................9, 18, 19

*Fallick v. Nationwide Mut. Ins. Co.*,
   162 F.3d 410 (6th Cir. 1998) .......................................................................................66

*Fox v. Ritz-Carlton Hotel Co., L.L.C.*,
   977 F.3d 1039 (11th Cir. 2020) ...................................................................................64

*Freeman Industries, LLC v. Eastman Chemical Co.*,
   172 S.W.3d 512 (Tenn. 2005).......................................................................................50

*Freeman v. Toyota Motor Sales, USA, Inc.*,
   No. 4:19-cv-02550, 2020 WL 7041810 (E.D. Mo. Nov. 30, 2020) ................................1

*Ghirardo v. Antonioli*,
   924 P.2d 996 (Cal. 1996) .............................................................................................57

*Grasso Enters., LLC v. Express Scripts, Inc.*,
   No. 4:14CV1932, 2017 WL 365434 (E.D. Mo. Jan. 25, 2017).............................12, 14

*Greenwald v. Chase Manhattan Mortg. Corp.*,
   241 F.3d 76 (1st Cir. 2001).........................................................................................61

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989)..............................................................................................36, 39

*Haley Paint Co. v. E.I. Dupont De Nemours & Co.*,
   804 F. Supp. 2d 419 (D. Md. 2011) ............................................................................19

*Handeen v. Lemaire*,
   112 F.3d 1339 (8th Cir. 1997) .....................................................................................43

*Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*,
   910 P.2d 839 (Kan. 1996) ...........................................................................................60

*Hemi Grp., LLC v. City of New York, N.Y.*,
   559 U.S. 1 (2010)........................................................................................................44

*Hennegan v. Pacifico Creative Serv., Inc.*
   787 F.2d 1299 (9th Cir. 1986) ....................................................................................29

*HM Compounding Servs., Inc. v. Express Scripts, Inc.*,
   No. 4:14-CV-1858, 2015 WL 4162762 (E.D. Mo. July 9, 2015)..................1, 18, 19

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992) ............................................................................................44

*In re Aftermarket Filters Antitrust Litig.*,
    No. 08-C-4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ...................................47

*In re Animation Workers Antitrust Litig.*,
    123 F. Supp. 3d 1175 (N.D. Cal. 2015) ..........................................................31, 32

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) ................................................................................66

*In re Auto. Parts Antitrust Litig.*,
    29 F. Supp. 3d 982 (E.D. Mich. 2014) ................................................................63

*In re Auto. Parts Antitrust Litig.*,
    50 F. Supp. 3d 836 (E.D. Mich. 2014) ..........................................................49, 62

*In re Auto. Parts Antitrust Litig.*,
    50 F. Supp. 3d 869 (E.D. Mich. 2014) ................................................................59

*In re Auto. Parts Antitrust Litig.*,
    No. 12-md-02311, 2014 WL 4272772 (E. D. Mich. Aug. 29, 2014) ..................32, 35

*In re Automotive Parts Antitrust Litigation*,
    No. 12-md-02311, 2015 WL 10376960 (E.D. Mich. Dec. 30, 2015) ......................34

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) .................................................23, 47, 48, 67

*In re Bulk Popcorn Antitrust Litig.*,
    783 F. Supp. 1194 (D. Minn. 1991) .....................................................................24

*In re Bulk Popcorn Antitrust Litig.*,
    No. 3-89-0710, 1990 WL 123753 (D. Minn. June 19, 1990) ...........................32, 34

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
    78 F. Supp. 3d 1051 (N.D. Cal. 2015) .................................................................67

*In re Chocolate Confectionary Antitrust Litig.*,
    602 F. Supp. 2d 538 (M.D. Pa. 2009) .............................................20, 21, 49, 52

*In re Chocolate Confectionary Antitrust Litig.*,
    749 F. Supp. 2d 224 (M.D. Pa. 2010) .................................................................61

*In re Chocolate Confectionary Antitrust Litigation*,
    801 F.3d 383 (3d Cir. 2015) ...............................................................................21

*In re Credit Default Swaps Antitrust Litig.*,
    No. 13-MD-2476, 2014 WL 4379112 (S.D.N.Y. Sep. 4, 2014)...........................................24

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    362 F. Supp. 3d 510 (N.D. Ill. 2019) ...................................................................56

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
    733 F. Supp. 2d 1348 (N.D. Ga. 2010) ................................................................18

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011)...................................................................48

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.C. Cir. 2016)............................................................15, 17

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007).................................................................................22

*In re EpiPen Direct Purchaser Litig.*,
    No. 20-CV-0827, 2021 WL 147166 (D. Minn. Jan. 15, 2021)...................37, 39, 43

*In re EpiPen Mktg., Sales Practices and Antitrust Litig.*,
    336 F. Supp. 3d 1256 (D. Kan. 2018) ................................................................45

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*,
    362 F. Supp. 3d 1295 (N.D. Ga. 2019) ..............................................................67

*In re Fasteners Antitrust Litig.*,
    No. 8-md-1912, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011)...................32, 33, 35

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) ..............................................................22

*In re Flonase Antitrust Litig.*,
    692 F. Supp. 2d 524 (E.D. Pa. 2010) .................................................................50

*In re Generic Pharms. Pricing Antitrust Litig.*,
    368 F. Supp. 3d 814 (E.D. Pa. 2019) ....................................................46, 47, 58

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................52, 55

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
    No. 19-md-02918, 2021 WL 4306018 (N.D. Cal. Sept. 22, 2021)...................59, 60

*In re Int. Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017).................................................................2

*In re JUUL Labs Inc., Mktg., Sales Practices, and Prods. Liab. Litig.*,
    497 F. Supp. 3d 552 (N.D. Cal. 2020) ........................................................................43

*In re K–Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ............................................................................59

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ............................................................25, 26, 27

*In re Lidoderm Antitrust Litigation*,
    103 F. Supp. 3d 1155 (N.D. Cal. 2015) ................................................................54, 59

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
    No. 16-md-2687, 2017 WL 3131977 (D.N.J. July 20, 2017) ......................................55

*In re Loestrin 24 FE Antitrust Litig.*,
    410 F. Supp. 3d 352 (D.R.I. 2019) ........................................................53, 57, 62, 63

*In re Mercedes-Benz Anti-Trust Litig.*,
    157 F. Supp. 2d 355 (D.N.J. 2001) ......................................................... 32, 33, 34

*In re Mexican Government Bonds Antitrust Litigation*,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019) ......................................................................22

*In re Nat. Gas Commodity Litig.*,
    337 F. Supp. 2d 498 (S.D.N.Y. 2004) ......................................................................23

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    350 F. Supp. 2d 160 (D. Me. 2004) ....................................................................49, 50

*In re Niaspan Antitrust Litig.*,
    42 F. Supp. 3d 735 (E.D. Pa. 2014) ...................................................................56, 58

*In re Opana ER Antitrust Litig.*,
    162 F. Supp. 3d 704 (N.D. Ill. 2016) ........................................................................47

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010) ....................................................................22

*In re Packaged Seafood Prod. Antitrust Litig.*,
    242 F. Supp. 3d 1033 (S.D. Cal. 2017) ............................................................ *passim*

*In re Polyurethane Foam Antitrust Litig.*,
    86 F. Supp. 3d 769 (N.D. Ohio 2015) ......................................................................24

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    988 F. Supp. 2d 696 (E.D. La. 2013) ..................................................................17, 22

*In re Pork Antitrust Litig.*,
　495 F. Supp. 3d 753 (D. Minn. 2020)............................................................ *passim*

*In re Pre-Filled Propane Tank Antitrust Litig.*,
　860 F.3d 1059 (8th Cir. 2017) (en banc) ...........................................28, 29, 30, 31

*In re Processed Egg Prods. Antitrust Litig.*,
　851 F. Supp. 2d 867 (E.D. Pa. 2012) ................................................58, 59, 60, 62

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
　No. 14-md-02503, 2015 WL 5458570 (D. Mass. Sept. 16, 2015)...................58, 60

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
　580 F. Supp. 2d 896 (N.D. Cal. 2008) ..............................................................23

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
　64 F. Supp. 3d 665 (E.D. Pa. 2014) ............................................................46, 49

*In re SuperValu, Inc.*,
　870 F.3d 763 (8th Cir. 2017) .....................................................................64, 68

*In re Text Messaging Antitrust Litig.*,
　630 F.3d 622 (7th Cir. 2010) .....................................................................17, 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　586 F. Supp. 2d 1109 (N.D. Cal. 2008) ..............................................................55

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　599 F. Supp. 2d 1179 (N.D. Cal. 2009) ..............................................................23

*In re Wholesale Grocery Prods. Antitrust Litig.*,
　752 F.3d 728 (8th Cir. 2014) ................................................................29, 30, 31

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
　No. 20-MD-02966, 2021 WL 3612497 (N.D. Cal. Aug. 13, 2021) ........................67

*In re Zetia (Ezetimibe) Antitrust Litig.*,
　No. CV 2:18-MD-2836, 2019 WL 1397228 (E.D. Va. Feb. 6, 2019) ...............48, 51

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
　No. 13-2664, 2014 WL 943224 (D. Minn. 2014) ..................................................69

*Iowa League of Cities v. Env't Prot. Agency*,
　711 F.3d 844 (8th Cir. 2013) ...........................................................................44

*Johnson v. Ross*,
　419 Fed. App'x 357 (4th Cir. 2011) ...................................................................63

*Kammer Asphalt Paving Co. v. East China Twp. Schools*,
    504 N.W. 2d 635 (Mich. 1993) ................................................................................ 61

*Kansas City, Mo. v. Fed. Pac. Elec. Co.*,
    310 F.2d 271 (8th Cir. 1962) ............................................................................ 32, 33

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) .................................................................. 20

*Klehr v. A.O. Smith Corp.*,
    521 US 179 (1997) ................................................................................................ 29

*Knapp v. Hobbs*,
    50 N.H. 476 (N.H. 1871) ...................................................................................... 61

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
    897 F.3d 88 (2d Cir. 2018) .................................................................................... 66

*Larey v. Allstate Prop. and Cas. Co.*,
    No. 4:14-cv-04008, 2014 WL 4823872 (W.D. Ark. Sept. 26, 2014) ..................... 34

*Lau v. Constable*,
    16 CVS 4393, 2017 WL 536361 (N.C. Super. Feb. 7, 2017) ................................ 62

*Litovich v. Bank of Am. Corp.*,
    No. 20-CV-3154, 2021 WL 4952034 (S.D.N.Y. Oct. 25, 2021) ..................... 28, 31

*Luckey v. Alside, Inc.*,
    245 F. Supp. 3d 1080 (D. Minn. 2017) ................................................................ 61

*Marks v. CDW Computer Ctrs., Inc.*,
    122 F.3d 363 (7th Cir. 1997) ............................................................................... 35

*Martinez v. Wexford Health Servs., Inc.*,
    No. 3:18-cv-50164, 2021 WL1546429 (N.D. Ill. Apr. 20, 2021) .......................... 23

*Massachusetts v. Mylan Labs.*,
    357 F. Supp. 2d 314 (D. Mass. 2005) .................................................................. 61

*Mayor of Baltimore v. Actelion Pharms. Ltd.*,
    995 F.3d 123 (4th Cir. 2021) ................................................................... 66, 67, 70

*McAteer v. Target Corp.*,
    No. 18-cv-349, 2018 WL 3597675 (D. Minn. July 26, 2018) ............................... 68

*Merkle v. Aetna Health, Inc.*,
    No. 04-61713-CIV, 2005 WL 6151455 (S.D. Fla. Apr. 27, 2005) ......................... 17

*Miami Prods. & Chem. Co. v. Olin Corp.*,
 Nos. 1:19-CV-00385, 1:19-CV-00975, 1:19-CV-00990, 2021 WL 2588090
 (W.D.N.Y. June 24, 2021) ...............................................................................47, 48

*Moehrl v. Nat'l Ass'n of Realtors*,
 492 F. Supp.3d 768 (N.D. Ill. 2020) .........................................................................1

*Molock v. Whole Foods Mkt. Grp., Inc.*,
 952 F.3d 293 (D.C. Cir. 2020) .......................................................................66, 70

*Moore v. Compass Group USA, Inc.*,
 No. 4:18-CV-1962, 2019 WL 4723077 (E.D. Mo. Sept. 26, 2019) .......................69

*Morrison v. YTB Intern., Inc.*,
 649 F.3d 533 (7th Cir. 2011) ..................................................................................66

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
 198 F.3d 823 (11th Cir. 1999) ...................................................................28, 35, 36

*New Prime, Inc. v. Eaton Corp.*,
 No. 16-cv-3407, 2017 WL 5992466 (W.D. Mo. March 16, 2017)..........................33

*Nitro Distributing Inc. v. Alticor, Inc.*,
 565 F.3d 417 (8th Cir. 2009) ..................................................................................28

*NTD I, LLC v. Alliant Asset Mgmt. Co. LLC*,
 No. 4:16CV1246, 2017 WL 605324 (E.D. Mo. Feb. 15, 2017) ...............................1

*Oakley v. Coast Prof'l, Inc.*,
 No. 1:21-00021, 2021 WL 5150165 (S.D.W. Va. Nov. 4, 2021)............................51

*Olstad v. Microsoft Corp.*,
 700 N.W.2d 139 (Wis. 2005) ..................................................................................50

*Osborn v. Visa, Inc.*,
 797 F.3d 1057 (D.C. Cir. 2015) ..............................................................................28

*Owens Corning v. R.J. Reynolds Tobacco Co.*,
 868 So. 2d 331 (Miss. 2004) ...................................................................................57

*Pacamor Bearings, Inc. v. Minebea Co.*,
 892 F. Supp. 347 (D.N.H. 1995)..............................................................................62

*Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm.
 Co. Ltd.*,
 943 F.3d 1243 (9th Cir. 2019) ................................................................................36

*Payton v. County of Kane*,
   308 F.3d 673 (7th Cir. 2002) ............................................................68

*Penrose v. Buffalo Trace Distillery, Inc.*,
   4:17-CV-294, 2018 WL 705054 (E.D. Mo. Feb. 5, 2018) ...............................65, 69

*Platz Associates v. Finley*,
   973 A.2d 743 (Me. 2009) ...............................................................60

*Precision Rx Compounding, LLC v. Express Scripts Holding Co.*,
   No. 4:16-CV-0069, 2016 WL 4446801 (E.D. Mo. Aug. 24, 2016) ...............................*passim*

*Regional Multiple Listing Service of Minnesota, Inc. v. American Home Realty Network, Inc.*,
   960 F. Supp. 2d 958 (D. Minn. 2013) ..................................................26, 27

*Riggs National Bank of Washington D.C. v. District of Columbia*,
   581 A.2d 1229 (D.C. 1990) ...............................................................52

*Rossi v. Standard Roofing, Inc.*,
   156 F.3d 452 (3d Cir. 1998) ............................................................26

*Roth v. Life Time Fitness, Inc.*,
   No. 15-3270, 2016 WL 3911875 (D. Minn. 2016) ............................................69

*Sandee's Catering v. Agri Stats, Inc.*,
   No. 20 C 2295, 2020 WL 6273477 (N.D. Ill. Oct. 26, 2020) ...............................48, 49, 50

*Sandee's Catering v. Agri Stats, Inc.*,
   No. 20 C 2295, 2021 WL 963812 (N.D. Ill. March 15, 2021) ...............................59, 60

*Sands v. Menard*,
   904 N.W.2d 789 (Wis. 2017) .............................................................63

*Secure Energy, Inc. v. Coal Synthetics*,
   No. 4:08-cv-01719, 2009 WL 10694916 (E.D. Mo. June 8, 2009) ............................43

*Sedima, S.P.R.L. v. Imrex Co. Inc.*,
   473 U.S. 479 (1985) ....................................................................36

*Sherwood v. Microsoft Corp.*,
   No. M2000-01850, 2003 WL 21780975 (Tenn. Ct. App. July 31, 2003) ......................49

*Sierra Club v. U.S. Army Corps of Engineers*,
   645 F.3d 978 (8th Cir. 2011) ..........................................................25

*Simpson v. Cent. Me. Motors, Inc.*,
   669 A.2d 1324 (Me. 1996) ...............................................................60

*Sitzer v. Nat'l Ass'n of Realtors*,
 420 F. Supp. 3d 903 (W.D. Mo. 2019) ...............................................................1

*Smith v. United States*,
 568 U.S. 106 (2013)...........................................................................................28

*Southeast Mo. Hosp. v. C.R. Bard, Inc.*,
 No. 1:07-cv-0031, 2008 WL 4104534 (W.D. Mo. Aug. 27, 2008) .....................30

*Spires v. Hosp. Corp. of Am.*,
 289 Fed. App'x. 269 (10th Cir. 2008) ..............................................................60

*Staley v. Gilead Scis., Inc.*,
 446 F. Supp. 3d 578 (N.D. Cal. 2020) ..............................................................47

*Starr v. Sony BMG Music Entertainment*,
 592 F.3d 314 (2d Cir. 2010)..........................................................10, 11, 19, 20

*Summerhill v. Terminix, Inc.*,
 637 F.3d 877 (8th Cir. 2011) ...........................................................................34

*Target Corp. v. LCH Pavement Consultants, LLC*,
 No. 12-1912, 2013 WL 2470148 (D. Minn. June 7, 2013)....................................42

*Tera Grp., Inc. v. Citigroup, Inc.*,
 No. 17 Civ. 4302, 2019 WL 3457242 (S.D.N.Y. July 30, 2019) ...................*passim*

*TMT Mgmt. Grp. v. U.S. Bank Nat'l Assoc.*,
 No. 14-4692, 2016 WL 730254 (D. Minn. Jan. 4, 2016)....................................26

*Torres v. SGE Mgmt., LLC*,
 838 F.3d 629 (5th Cir. 2016) ...........................................................................45

*United States v. Earles*,
 955 F.2d 1175 (8th Cir. 1992) ..........................................................................39

*United States v. Bame*,
 721 F.3d 1025 (8th Cir. 2013) ..........................................................................58

*United States v. Fiorito*,
 640 F.3d 338 (8th Cir. 2011) ...........................................................................37

*United States v. Garcia*,
 785 F. 2d 214 (8th Cir. 1986) ..........................................................................24

*United States v. Hutchinson*,
 573 F.3d 1011 (10th Cir. 2009) .......................................................................42

*United States v. Patten*,
 226 U.S. 525 (1913)............................................................................................16

*United States v. Socony-Vacuum Oil Co.*,
 310 U.S. 150 (1940)...........................................................................................9

*United States v. Turkette*,
 452 U.S. 576 (1981)...........................................................................................42

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)...........................................................................................65

*Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*,
 437 F. Supp. 3d 693 (D. Minn. 2020) ...............................................................28

*Wright v. Genesee Cty.*,
 934 N.W.2d 805 (Mich. 2019) ...........................................................................61

*Young v. Wells Fargo & Co.*,
 671 F. Supp. 2d 1006 (S.D. Iowa 2009) .....................................................37, 66

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 401 U.S. 321 (1971)...........................................................................................29

**RULES**

Fed. R. Civ. P. 8...........................................................................................28, 58

Fed. R. Civ. P. 9...........................................................................................32, 37

Fed. R. Civ. P. 12...............................................................................................19

Fed. R. Civ. P. 23.......................................................................................47, 65

**STATUTES**

18 U.S.C. § 1961..........................................................................................39, 41

18 U.S.C. § 1962.................................................................................................39

Ark. Code Ann. § 4–88–107(a)(10)...................................................................52

Kan. Stat. Ann. §§ 50–626(a), (b)(3) ................................................................53

Minn. Stat. § 325F .............................................................................................54

N.M. Rev. Stat. § 57–12 ..............................................................................54, 55

Or. Rev. Stat. § 646.638(2)................................................................................51

S.D. Codified Laws § 37–24–6(1) ........................................................................56

S.D. Codified Laws § 37-1-3.1 ............................................................................49

W. Va. Code § 46A–6–101 ..................................................................................56

W. Va. Code § 46A-5-108 ....................................................................................51

W. Va. Code § 46A-6-106(c) ...............................................................................51

**OTHER AUTHORITIES**

2021 West Virginia Senate Bill No. 5, West Virginia Eighty-Fifth Legislature -
    Regular Session, 2021, Feb. 25, 2021 ..............................................................51

7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice
    & Procedure § 1785.1 (3d ed. 2005) .................................................................67

William B. Rubenstein et al., 1 Newberg on Class Actions § 2.7 (4th ed. 2008).........67

# I.   LEGAL STANDARD

A complaint need only contain "enough facts to state a claim to relief that is plausible on its face" and there is no "heightened fact pleading of specifics." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[1] The inquiry is not "whether the plaintiff will ultimately prevail" but whether a plaintiff should be allowed to present evidence of their claim. *Freeman v. Toyota Motor Sales, USA, Inc.*, No. 4:19-cv-02550, 2020 WL 7041810, at *1 (E.D. Mo. Nov. 30, 2020).

Antitrust claims need only "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. No allegations of a "formal or explicit agreement" are required; the complaint is sufficient if it plausibly shows the defendants shared "a unity of purpose or a common design and understanding, or a meeting of the minds." *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 911-12 (W.D. Mo. 2019). Since "proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators," *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998), courts are hesitant to dismiss actions "before the parties have had an opportunity for discovery." *HM Compounding Servs., Inc. v. Express Scripts, Inc.*, No. 4:14-CV-1858, 2015 WL 4162762, at *3 (E.D. Mo. July 9, 2015).

A complaint referring to co-conspirators collectively is sufficient if it alleges a "basis for holding the individual defendants liable." *Energizer Brands, LLC v. Procter & Gamble Co.*, No. 4:16-CV-223, 2016 WL 2894708, at *2 (E.D. Mo. May 18, 2016); *see also NTD I, LLC v. Alliant Asset Mgmt. Co. LLC*, No. 4:16CV1246, 2017 WL 605324, at *10 (E.D. Mo. Feb. 15, 2017). Rather than "detailed 'defendant by defendant' allegations," a complaint should allege that each defendant "joined the conspiracy and played some role in it." *Moehrl v. Nat'l Ass'n of Realtors*,

---

[1] Unless otherwise noted, all internal quotation marks and citations are omitted from case citations.

492 F. Supp.3d 768, 777 (N.D. Ill. 2020). "[I]t is natural" for a plaintiff alleging a "collective boycott" to allege "factual allegations collectively." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 478 (S.D.N.Y. 2017). Only if the complaint fails to provide a defendant with "fair notice of what the claim is and the grounds on which it rests" are the allegations insufficient. *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17 Civ. 4302, 2019 WL 3457242, at *11 (S.D.N.Y. July 30, 2019).

## II.   STATEMENT OF FACTS

The United States Crop Inputs market exceeds $65 billion. (¶4.)[2] Farmers' profits have not kept pace with the quickly-rising prices of Crop Inputs, with 80% of farmers reporting in 2018 that their costs continued to increase; many farmers now cannot pay their outstanding operating debts. (¶¶6, 67.) Meanwhile, the tiered network of manufacturers, wholesalers, and retailers that sell Crop Inputs to farmers work closely to protect and maximize their profits. (¶¶70-73.)[3]

Manufacturers sell Crop Inputs only through wholesalers, manufacturer-owned retailers, or licensed "authorized retailers." (¶70). Wholesalers purchase branded Crop Inputs from manufacturers and sell them to retailers, and the retailers operate networks that sell the Crop Inputs to the end users, farmers. (¶¶56-59, 60-65.) The major players, although ostensibly competitors, regularly work together through trade organizations to collectively defend their profitability and market power. (¶84.) Trade organizations like CropLife America ("CropLife") and the Agricultural Retailers Association ("ARA") aggressively defend its members' interests. (¶85.) CropLife's PACE Advisory Council includes "heads of major ag retailers, market suppliers,

---

[2] All "¶" references are to the Consolidated Amended Complaint (Dkt. No. 104 (the "CAC")).

[3] There are three categories of Defendants alleged in the CAC: "Manufacturer Defendants," the "Wholesaler Defendants," and the "Retailer Defendants" and are defined in ¶5 of the CAC.

equipment makers, and other agricultural analysts." (¶82.) The ARA's board of directors is chaired by an employee of Defendant Growmark and includes board members from Defendants Nutrien, CHS, Winfield Solutions, Corteva, Bayer, BASF, and Syngenta, among others. (¶85.) There is not a single farmer or farmer's group on CropLife's board of directors, which is entirely made up of representatives from large manufacturers, distributors, and retailers. (¶80.) These trade organizations organize committees and conferences, and issue industry publications such as CropLife Magazine. (¶¶81, 86.) They also serve as the public mouthpiece for the industry when their members face businesses, government investigations, or court decisions that are antagonistic. (*See, e.g.*, ¶84.) CropLife and the ARA have chosen to neither represent nor protect farmers' interests. (¶80.)

Farmers have historically been ill-positioned to compare prices of Crop Inputs, which are often sold bundled with other products and services under a single price. (¶76.) Pricing in the Crop Inputs industry is intentionally opaque. (¶72.) This allows manufacturers to employ tactics like repackaging and selling seeds that have been on the market for years under new names for higher prices. *Id.* Even where competing manufacturers' products serve the same purpose or include the same active ingredients as competitors', the traditional Crops Inputs' retail system has made it nearly impossible to compare prices between products. (¶94.) The contractual relationships between the traditional players in the Crop Inputs market further contribute to this opacity. Manufacturer Defendants mandate strict price confidentiality from authorized retailers, preventing the retailers from disclosing manufacturers' prices, incentives, rebates, or commissions offered by the manufacturers to the authorized retailers. (¶71.) Likewise, Wholesaler Defendants' contracts with authorized retailers contain similar confidentiality mandates and prevent the retailers from telling customers how much other customers are paying for the same Crop Inputs. (¶73.)

Around 2014, new ecommerce sales platforms for Crop Inputs disrupted the traditional tiered system and began selling Crop Inputs and related performance data directly to farmers. (¶7.) Farmer's Business Network ("FBN") and Agroy, Inc. began offering pricing comparisons allowing farmers to view what others were paying for the same Crop Inputs. (*Id.*) This transparency also gave farmers the ability to see which products were interchangeable and comparison shop between virtually identical products. (¶76.) An additional benefit of these platforms was the ability to purchase Crop Inputs sold as single products, unbundled with other warranties or services. (*Id.*) The information gave farmers leverage—something they lacked in the traditional tiered system: (*Id.*) Sellers of Crop Inputs were left with no choice but to compete on prices in these ecommerce systems, which helped level the playing field for farmers. Unsurprisingly, thousands of farmers signed up to receive Crop Inputs data and to access FBN's sales platform. (¶75.)

The success of these platforms was seen as nothing less than an existential threat by the traditional industry participants. CropLife Magazine decried the "devil known as price transparency" and stated that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces." (¶81.) Publications of other Defendant-associated organizations reported that the price transparency on ecommerce platforms enabled farmers to negotiate with Crop Inputs Retailers and decrease profit margins on these products. (¶76.) The issue of ecommerce's threat to profitability dominated talk at CropLife meetings. (¶82.) In 2018, CropLife's Magazine reported warnings from retailers that "ag retailers need to get proactive" in dealing with the threat. (¶83.) Defendants soon heeded that call, implementing a multi-level group boycott of the ecommerce platforms aimed at eliminating the serious threat posed to Defendants' bottom line. (¶8.)

### A.   Defendants' Group Boycott.

Seeing the success of the ecommerce platforms and their imminent threat to the traditional system of sales, Defendants took action to stamp out this competition. (¶8.) As early as 2014, Defendants at each level of the distribution chain agreed to boycott the ecommerce platforms. (¶96.) Manufacturer and Wholesaler Defendants refused to sell to the ecommerce platforms, offering pretextual excuses for their refusal. (*Id.*) Defendants also began making baseless suggestions that FBN was selling counterfeit Crop Inputs and "was lining the pockets of investors and big data companies like Google." (¶¶97, 77.) Without Defendants' products to sell to farmers, the ecommerce platforms were effectively neutralized as a threat to the existing Crop Inputs market structure. (¶9.)

Defendants conspired with the goal of eliminating the transparency ecommerce platforms provided, leverage that threatened the viability of the current opaque and highly profitable distribution structure. (¶¶69, 71, 76.) Through this conspiracy, Defendants were able to charge supracompetitive prices that farmers were forced to pay.[4] (¶4.) Defendants' conduct did not go unnoticed. Both the Canadian Competition Bureau ("CCB") and the Federal Trade Commission ("FTC") have active anticompetitive investigations regarding the Crop Inputs market. (¶¶11-13.)

### 1.   Each Group of Defendants Was Motivated To Join the Conspiracy.

Each group of Defendants alleged here—"Manufacturer Defendants," "Wholesaler Defendants," and "Retailer Defendants"—was highly motivated to collude with each other to preserve the opaque market structure. (¶148.) Defendants effectively implemented the group

---

[4] Farmers' costs for Crop Inputs increased from 32% of revenue in 2006 to 48% of crop revenue in 2015. (¶67.) In 2018, 80% of farmers reported their costs continued to increase. In recent years, farmers struggle to pay outstanding operating debts—estimated as well over $400 billion in 2019, and the rate of farm bankruptcies have accelerated at a staggering rate. (*Id.*)

boycott due to their collective control of the large majority of the highly concentrated Crop Inputs market. (¶¶70, 146.) Manufacturer Defendants BASF, Corteva, Syngenta, and Bayer AG together control 85% of the corn seed market, over 75% of the soybean seed market, and over 90% of the cotton seed market. (¶146.) The wholesale market is just as concentrated, with seven wholesalers, including Defendants Cargill Incorporated, Tenkoz Inc., Winfield Solutions, LLC, and Univar Solutions, Inc., accounting for 70% of all sales volume. (¶146.) The Retailer Defendants are among the largest brick-and-mortar stores selling Crop Inputs in the country. (¶¶60-65.)

The Wholesaler and Retailer Defendants were motivated to keep prices for Crop Inputs secret and had the necessary leverage to enforce a boycott. (*See* ¶104.) If ecommerce platforms were able to publish price lists, Wholesaler and Retailer Defendants could not keep up the practice of charging variable prices between customers nor continue their practices of relabeling or bundling to increase profits. (¶148.) The Wholesaler and Retailer Defendants, collectively represent a significant share of Crop Inputs sales and have both the leverage and the motivation to pressure the Manufacturer Defendants to not sell through these new platforms. (¶¶101, 148.) This was demonstrated in 2018 when FBN purchased Yorkton Distributors ("Yorkton"). (¶¶102-09.) Prior to its purchase, Yorkton maintained Crop Inputs supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield. (¶102.) FBN confirmed that those contracts would remain in place after the purchase was completed. (*Id.*) However, within months after completing the purchase, Wholesaler and Retailer Defendants began pressuring the Manufacturer Defendants to stop doing business with Yorkton. (¶¶103-09.) Wholesaler Univar and Retailer Federated both made statements warning the Manufacturer Defendants of the consequences should the Manufacturer Defendants choose to continue doing business with FBN. (¶¶104-06.) Within months of FBN's purchase, the Manufacturer Defendants cancelled their contracts and Yorkton

lost two-thirds of its product lines. (¶¶107-09.) This conduct mirrored the industry response in the United States when FBN was launched in 2014. (¶108.)

As Wholesaler and Retailer Defendants exerted pressure on the upstream Manufacturer Defendants, Manufacturer Defendants also exerted control over their downstream distribution networks to enforce the boycott. Manufacturer Defendants also benefitted from the higher prices the Wholesaler and Retailer Defendants could charge for Crop Inputs in a market unencumbered by price transparency. (¶9.) To enforce compliance with the boycott, Syngenta and other Manufacturer Defendants wielded their power to audit their authorized retailers' records to identify and punish retailers who had sold Crop Inputs to the ecommerce platforms. (¶¶98-99.) Several of the Defendants are antitrust recidivists, indicating that they know how to operate a conspiracy. (¶¶114, 151.) Indeed, the conspiracy's reach was felt even among non-Defendant manufacturers of generic Crop Inputs. One CEO of a generic Crop Input company indicated they feared potential retaliation from the industry if they were to sell to the ecommerce platforms; they confessed in an ideal world that they would sell to these platforms "in a heartbeat," but they were worried it would anger existing sales channels. (¶100.)

### 2. Defendants Used Trade Organizations and Publications to Maintain Their Conspiracy.

Defendants maintained their conspiracy to stamp out "the devil of price transparency"[5] via direct communications and signaling through third parties. Defendants are well represented in CropLife's leadership structure, committees, and meetings, making the organization an ideal

---

[5] *See supra* p.4.

forum for collusion.[6] (¶149.) CropLife also regularly advocates and acts as mouthpiece on behalf of Defendants. (¶84.) When Senator Warren targeted Defendants Bayer, Corteva, and Syngenta regarding recent mergers consolidating the Crop Inputs industry and squeezing out family farms, CropLife spoke on Defendants' behalf to justify the consolidation. (*Id.*) Similarly, when the Ninth Circuit concluded the EPA had not adequately considered anticompetitive effects of Manufacturer Defendants' dicamba pesticide, CropLife wrote in support of Defendants. (*Id.*) CropLife's CEO amplified Defendants' unsubstantiated fearmongering that FBN sold counterfeit Crop Inputs. (¶¶97, 257.) When CropLife publications and speakers called for action to address the rising threat posed by the ecommerce platforms, Defendants listened. (*See* ¶83.)

Similarly, ARA's leadership is comprised of employees of the Retailer Defendants. (¶92.) At the 2017 ARA "Conference & Expo" with representation from 85% of the industry, Steve Watts of Farrell Growth Group ("FGG") explicitly announced it was time for the Crop Inputs retailers to take steps to affirmatively combat the intrusion of ecommerce entities. (¶86.) Defendants had the benefit of FGG's industry benchmarking information that "analyz[es] industry trends along with retail performance side by side with industry averages… at an individual company level." (¶87.) The FGG "MIX" reports provided Defendants with opportunities for coordination and collusion of market pricing and stability. (¶¶87-89.) With this information, one conspirator could ensure that no one else was cheating. (¶90.) This type of report is very similar to the meat industry benchmarking reports that have since prompted federal criminal charges. (¶87.)

---

[6] CropLife's Board of Directors is chaired by an executive from BASF. The position was previously held by Corteva's Suzanne Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, Growmark, Tenkoz, and Simplot. (¶256.)

### III.    PLAINTIFFS PROPERLY PLEAD A CONSPIRACY TO BOYCOTT THE ECOMMERCE PLATFORMS.

Section 1 of the Sherman Act declares illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. §1. Where, as here, Defendants collude with the purpose or effect of "raising, depressing, fixing, pegging, or stabilizing prices," they commit a *per se* violation of Section 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

The CAC identifies conspiratorial acts Defendants committed, names participants in the conspiracy, sets out the time period, and describes how the conspiracy was enforced, alleging a clear outline of the agreement and circumstances that establishes a plausible inference of an agreement among Defendants. *See Evergreen Partnering Grp. v. Pactiv Corp.*, 720 F.3d 33, 45-46 (1st Cir. 2013) (evidence can give rise to multiple inferences at the motion to dismiss stage). Plaintiffs' burden under *Twombly* "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

Plaintiffs' allegations here are similar to those in *Precision Rx Compounding, LLC v. Express Scripts Holding Co.*, No. 4:16-CV-0069, 2016 WL 4446801, at *1 (E.D. Mo. Aug. 24, 2016), where a motion to dismiss was denied because claimants identified an unreasonable restraint of trade, the individuals who restricted trade, and the actions taken to restrict trade. In *Precision Rx*, plaintiffs alleged that a group of pharmacy benefit managers conspired to boycott compounding pharmacies and eliminate them from the market. 2016 WL 4446801, at *1. The plaintiffs alleged parallel conduct by describing "a combination of techniques defendants and their co-conspirators all used for the unified purpose of eliminating plaintiffs and other independent compounding pharmacies from the market." *Id.* at *3. The defendants had opportunities to conspire through their joint trade association involvement, the market was highly concentrated, and

defendants engaged in public signaling and actions that would be against their self-interest in the absence of a conspiracy. *Id.* at *3-4. The court found the parallel conduct and plus factors sufficient to support the inference of an agreement. *Id.* at *5.

Plaintiffs' factual allegations here similarly allow the inference of a plausible illegal agreement among Defendants. *Precision Rx*, 2016 WL 4446801, at *5. Plaintiffs allege Defendants agreed to boycott ecommerce platforms to prevent pricing transparency and exclude these platforms from the market with the goal of artificially inflating the prices of Crop Inputs. (¶121.) Plaintiffs also allege Defendants engaged in public signaling through trader groups and publications. (¶149.) The highly-concentrated Crop Inputs market also enabled Defendants' conspiracy. (¶146.) Defendants' actions were against their self-interest in the absence of a conspiracy, <u>and would not work absent cooperation among Defendants. (¶112.) For any one or more Defendants to provide Crop Inputs to ecommerce platforms presented a significant business opportunity because those platforms: (1) represented</u> well-financed customers ready to purchase in bulk quantity; (2) would simplify the distribution channel and permit Manufacturer Defendants to retain more profits by, among other things, reducing incentive programs to wholesalers and retailers; and; (3) presented an opportunity for Manufacturer Defendants to grow their market share nationwide, not merely where their authorized retailers were. (¶¶112-113.) Plaintiffs finally allege that the conspiracy worked, driving up prices of Crop Inputs. (¶¶9-10.)

Plaintiffs' allegations also are similar to those in *Starr v. Sony BMG Music Entertainment*, where the court found a plausible conspiracy to fix the price of digital music based on allegations that: thirteen defendants controlled 80% of the market; "some form of agreement among defendants would have been needed to render the enterprises profitable;" one company's CEO suggested that the conduct occurred as an attempt to stop eroding profit margins; defendants

attempted to hide their conduct to avoid antitrust scrutiny; defendants' pricing decisions would have been irrational in the absence of a conspiracy; and there was a DOJ investigation. 592 F.3d 314, 323-24 (2d Cir. 2010). As in *Starr*, here Plaintiffs allege Defendants' control of the market (¶¶70, 146), that Defendants made statements about falling profit margins related to the transparency introduced by (¶82); the fact that an agreement needed to be among all Manufacturer Defendants to render the conduct profitable and not against self-interest (¶¶112-13); and that there are government investigations related to Defendants' alleged conduct. (¶¶117-20.)

In addition to these other facts supporting an inference of a plausible conspiracy, Plaintiffs allege the Crop Inputs market exhibits unusual pricing behavior, in that the market is purposefully built to obscure pricing and product information farmers need to make informed purchasing decisions. (¶69.) Wholesalers' contracts with authorized retailers contain strict confidentiality provisions, prohibiting retailers from disclosing the price paid to the wholesaler for Crop Inputs or the price at which retailers sell those exact same Crop Inputs to other farmers. (¶73.)

**A.  Plaintiffs Adequately Allege Circumstantial Evidence of a Conspiracy.**

Plaintiffs plausibly allege circumstantial evidence of an antitrust conspiracy. Plaintiffs can, and almost always do, adequately allege antitrust conspiracies without the smoking gun of direct evidence because defendants "typically cannot be relied on to confess that they have entered into an unlawful agreement." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004). "[T]he typical conspiracy is 'rarely evidenced by explicit agreements,' but must almost always be proved by 'inferences that may be drawn from the behavior of the alleged conspirators.'" *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553-54 (8th Cir. 1991). "[I]t is possible to infer the existence of an agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence—often referred to as the 'plus factors.'" *Precision Rx*, 2016 WL 4446801, at *2. Plaintiffs allege parallel conduct in combination

with plus factors to support an inference Defendants agreed with each other to jointly boycott ecommerce Crop Input platforms.

### 1.   Plaintiffs' Parallel Conduct Allegations Support a Plausible Conspiracy.

The CAC alleges Defendants engaged in parallel conduct through their use of a combination of techniques for the unified purpose of eliminating ecommerce platforms from the market. *See Grasso Enters., LLC v. Express Scripts, Inc.*, No. 4:14CV1932, 2017 WL 365434, at *3 (E.D. Mo. Jan. 25, 2017) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted similarly.")). Plaintiffs allege Defendants made public statements decrying ecommerce platforms and their effect on the Crop Inputs market, refused to extend FBN's contracts, and instituted a group boycott of ecommerce platforms.

The CAC is replete with Defendants' independent actions which, taken together and in the light most favorable to Plaintiffs, plausibly demonstrate Defendants engaged in concerted, parallel conduct in furtherance of their joint conspiracy to boycott ecommerce Crop Inputs platforms:

### a.   Plaintiffs' Boycott Allegations

| | | |
|---|---|---|
| • | ¶77 | In 2016, Retailer Defendant CHS sent a letter to farmers discouraging them from using FBN. |
| • | ¶95 | Also in 2016, Defendant Bayer formed an internal task force to study the long term competitive impact of FBN's ecommerce Crop Inputs sales platform. |
| • | ¶97 | When Syngenta's head of crop protection sales found out that a small number of branded Crop Inputs had been sold on an ecommerce platform, he falsely claimed they would deliver counterfeit products. |
| • | ¶98 | Retailers who failed to comply with the boycott were penalized by Defendants. For example, in 2018 Syngenta initiated an audit of its authorized retailers to identify and punish retailers which had sold Crop Inputs to ecommerce platforms despite the boycott. |
| • | ¶99 | Defendants Bayer, BASF and Corteva use contractual provisions in their contracts with authorized retailers that allow them to audit the retailers' books and records and on-site inspections at any time, which |

| | | |
|---|---|---|
| | | ensure that ecommerce platforms could not purchase name brand Crop Inputs from an authorized retailer. |
| • | ¶¶93, 102-03 | In Spring 2018, when FBN purchased Yorkton, a retailer with longstanding supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield, those agreements would have provided FBN with inventory to sell to farmers. (¶102.) However, the Wholesaler and Retailer Defendants, which constitute a significant share of the sales of the Manufacturer Defendants, threatened to retaliate against the Manufacturer Defendants if they honored FBN's newly acquired supply agreements from Yorkton. |
| • | ¶103 | As a result, the Manufacturer and Wholesaler Defendants collectively agreed to boycott Yorkton and canceled those supply agreements only a few months after FBN's acquisition of Yorkton |
| • | ¶104 | On March 31, 2018, four days after FBN announced its purchase of Yorkton, Federated warned that FBN would upend their business models, writing, "[h]ow our key manufacturing partners decide to engage with this business will be closely observed by us and likely all of our traditional retailing peers across Western Canada." |
| • | ¶105 | On April 6, 2018, Univar also emailed retailers after FBN's purchase of Yorkton, declaring it would cease conducting business with FBN after July 31, 2018, due to FBN's model of pricing transparency, and stating "If anyone thinks socialism is going to feed the world just call Russia first and see how that worked out." |
| • | ¶106 | Also on April 6, 2018, Univar sent an email notifying its suppliers of its decision not to do business with FBN and provided false and misleading talking points to justify its decision on April 6, 2018. |
| • | ¶107 | On May 8, 2018, Winfield advised that it would not supply FBN with Crop Inputs. |
| • | ¶107 | On June 15, 2018, Bayer informed FBN it would no longer sell Crop Inputs to Yorkton. |
| • | ¶107 | On August 3, 2018, Cargill informed FBN it would no longer sell Crop Inputs to Yorkton. |
| • | ¶107 | On August 27, 2018, Corteva informed FBN it would no longer sell Crop Inputs to Yorkton. |

### b.   Defendants, Through Trade Organizations, Perpetuated the Boycott.

.

| | |
|---|---|
| • ¶80 | Paul Rea, an employee of Defendant BASF, currently serves as chair for the board of directors of CropLife. Suzanne Wesson from Defendant Corteva previously served as the chair of the board of directors Similarly, Defendants Winfield Solutions' parent company Land O'Lakes has a current executive on the CropLife board. (*Id.*) Defendants Bayer, Growmark, Tenkoz, and Simplot had executives on the board from 2016-19, and Syngenta's Crop Protection section is a member of CropLife. |
| • ¶81 | In February 2016, CropLife stated it was "concerned that the retailer could be disintermediated—i.e., that ecommerce platforms would 'cut out the middle man'—allowing growers to find product conveniently and at a lower market price," and decried the "devil known as 'price transparency,'" stating that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom." |
| • ¶110 | Also in February 2016, CropLife described ecommerce platforms, such as FarmTrade, as "draconian" for allowing growers to find product conveniently and at a lower market price. |
| • ¶82 | FBN was the main topic of CropLife's PACE Advisory Council's 2017 annual meeting, where several council members described how FBN had negatively affected their business by cutting into their "already slim margins." |
| • ¶83 | In February 2018, CropLife reported on a local "huge price war in chemicals" in Iowa as a result of FBN competing in the Market |
| • ¶¶92, 85 | Over the last decade, CropLife has reported that it has improved cooperation and camaraderie with ARA. Defendants Nutrien, CHS, Winfield Solutions, Corteva, Growmark, Bayer, BASF, and Syngenta all have employees on the board of directors of the ARA. Like CropLife, influential members of the ARA identified FBN and ecommerce entities as an enemy and called its members to action. |
| • ¶86 | At the 2017 ARA conference, Steve Watts of Farrell Growth Group ("FGG") announced that it was time for the Crop Inputs retailers to take steps to affirmatively combat the intrusion of ecommerce entities. Once FBN left the conference, the ARA members had ample opportunity to build on Mr. Watts' calls to action. |

### 2.   Plaintiffs' Plus-Factor Allegations Support a Plausible Conspiracy.

Plaintiffs also sufficiently plead plus factors supporting a plausible conspiracy. Plus factors are "circumstances demonstrating that the wrongful conduct was conscious and not the result of independent business decisions of the competitors." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 58 (D.C. Cir. 2016). Plus factors courts include: "(1) a common motive to conspire, (2) evidence that shows that the parallel acts were against the apparent individual economic self-interests of the alleged conspirators, and (3) evidence of a high level of interfirm communications." *Precision Rx,* 2016 WL 4446801, at *2. *Precision Rx* also found joint trade association involvement and signaling that revealed confidential information were plus-factors. *See id*. at *2-4. A retailer's coercive power and threatened retaliation have also been recognized as a plus factor. *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 558 F. Supp. 2d 575, 582 (E.D. Pa. 2008).

Defendants had a common motive to conspire to boycott the ecommerce platforms, in that they were all similarly motivated to keep pricing of Crop Inputs opaque and fence out new price-cutting competitors so they could continue charging higher prices. (*See* ¶¶148, 239; *see* ¶¶70, 71, 73, 93, 94 (incentives to preserve existing system).) However, an effective boycott of the ecommerce platforms would not have been feasible without coordination and compliance from all Defendants. (¶¶112, 113, 150, 243.) Otherwise, a Manufacturer Defendant breaking from the boycott could establish itself as the primary supplier to ecommerce platforms and could gain a significant number of new customers. (¶112.) Defendants also had a high degree of inter-firm communication through CropLife and other trade organizations. (¶149.) Plaintiffs also allege the following plus factors set out in further detail below: (i) conduct against Defendants' independent self-interests; (ii) Defendants' opportunities to conspire; (iii) concentration in the Crop Inputs market; (iv) government investigations; and (v) prior antitrust violations. (¶¶146-51.)

Plaintiffs' plus factor allegations together demonstrate a plausible inference of conspiracy. Isolated attacks on plus factors—asking whether a plus factor on its own gives rise to a plausible inference of a conspiracy—must be rejected. (*See* Dkt. 142 at 42-56.) "It hardly needs statement that the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States v. Patten*, 226 U.S. 525, 544 (1913); *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

### a.  Defendants Acted Against Rational Economic Self-Interest.

Defendants' actions were against their apparent economic self-interest in the absence of an agreement. First, providing Crop Inputs to ecommerce platforms presented a significant business opportunity. (¶150.) Ecommerce Crop Inputs platforms represented well-financed customers that were ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant, which would simplify the distribution channel and permit Manufacturer Defendants to retain greater profit by eliminating transport costs, rebates, and incentive programs to wholesalers and retailers. (*Id.*) Ecommerce Crop Inputs platforms further presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located. (*Id.*)[7]

Statements addressing the industry as a whole, like the public statements Defendants made regarding their refusal to do business with ecommerce platforms, are particularly indicative of a plausible conspiracy. In *Domestic Airline Travel Antitrust Litigation*, the court found plausible "the inference that [d]efendants' conduct was the result of an agreement," because the defendants

---

[7] Defendants recite a litany of excuses why their actions were not against economic self-interest, (Dkt. 142 at 42-47), but "based on the factual allegations in the complaint and reasonable inferences drawn therefrom . . . the alternative explanation [] is not 'obvious' or 'more likely' than [P]laintiffs' plausible claims." *Precision Rx*, 2016 WL 4446801, at *4.

"made public statements about their own commitment to capacity discipline as well as the importance of maintaining the capacity discipline within the industry." 221 F. Supp. 3d at 62. There, the court stated that the defendants' "discussion of the need for capacity discipline within the industry as a whole is notable because it involves more than a mere announcement of Defendant's own planned course of conduct." *Id.* at 62-63; *Precision Rx*, 2016 WL 4446801 at *4 (signaling revealing boycotting steps was against self-interest, but co-conspirators implemented same tactic); *cf.*, *Babyage.com*, 558 F. Supp.2d at 582 (minimum price policy contrary to individual interest in increasing sales volumes). Plaintiffs allege similar conduct here. (*See* ¶77 (CHS sent a letter to farmers discouraging them from using FBN); ¶97 (Syngenta suggests that branded Crop Inputs sold on ecommerce platform in violation of the boycott were counterfeit); ¶¶104-06 (describing emails announcing Defendants would not do business with FBN).)[8]

Plaintiffs plead that Defendants all publicly stated their boycott of ecommerce platforms around the same time. (*See* ¶107.) This timing is indicative of a conspiracy. *See Precision R*x, 2016 WL 4446801, at *4 ("These policy changes, made at or around the same time by multiple competitors, are also indicative of conspiracy."); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) ("[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy.").

---

[8] "The broadcasting of sensitive business information, plans or strategies is further circumstantial evidence of a conspiracy among competitors." *Precision Rx*, 2016 WL 4446801, at *4; *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013) (noting courts have identified signaling as a plus factor); *Merkle v. Aetna Health, Inc.*, No. 04-61713-CIV, 2005 WL 6151455, at *5 n.7 (S.D. Fla. Apr. 27, 2005) ("Examples of 'plus' factors include: (1) signaling of intentions . . . (4) actions taken contrary to economic self-interest . . . ).

### b.   Defendants Had Ample Opportunity To Conspire.

Defendants' memberships in CropLife, ARA and other trade associations provide ample opportunities for collusion, which facilitated a high degree of intrafirm communication. *See HM Compounding Servs.*, 2015 WL 4162762, at *5 ("Membership and participation in a trade group facilitates collusion" and provides opportunities to conspire); *Evergreen*, 720 F.3d at 49 (exchanges between defendants through common membership in a business group "may serve as practices facilitating collusion as they provide a basis for notifying alleged members of the conspiracy of the agreed-upon refusal to deal as well as to keep tabs on members"); *Text Messaging*, 630 F.3d at 628 (allegation that defendants belong to a trade association and exchanged price information directly at association meetings identified a practice that facilitates price fixing that would be "difficult for the authorities to detect"). Plaintiffs allege that the parallel conduct occurred during and following the CropLife PACE Advisory Council annual meeting and the ARA annual conference. (¶¶81-83, 86.) This provides a correlation to support an inference of a plausible relationship between the meetings and Defendants' concerted actions. *See HM Compounding Servs.*, 2015 WL 4162762, at *6 ("The timing of, and similarity between, [the defendant's] and the co-conspirators' actions following their [trade association] meeting in 2013, provides a plausible relationship between the [trade association] meeting and these actions."); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) ("[C]ollusive communications can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways.").

### c.   The Relevant Market for Crop Inputs is Highly Concentrated.

### i.   Plaintiffs Adequately Define the Relevant Crop Inputs Market.

"There is no requirement that market definition be pled with specificity." *HM Compounding Servs.*, 2015 WL 4162762, at *8. An antitrust complaint survives at the motion to dismiss stage unless "it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Id.* And, because it is a factual rather than legal issue, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing on summary judgment or at trial. *Id.* Under this standard, Plaintiffs sufficiently define the Crop Inputs Market as the relevant market. Plaintiffs allege that the relevant geographic market is the United States, and the relevant product market is the manufacturing market for Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs. (¶18.)

Furthermore, Defendants' conspiracy was instituted nationwide. Plaintiffs allege that ecommerce platforms such as FBN and Agroy, Inc. became successful with farmers by providing price comparison tools allowing farmers to view what other farmers were paying for the same Crop Inputs. (¶7.) Defendants ignore the fact that FBN and other ecommerce platforms were providing price transparency for Crop Inputs via a website, which by its very nature is accessible nationwide, and Defendants' boycott prohibited ecommerce platforms such as FBN from purchasing Crop Inputs from Defendants, anywhere in the country. (¶9.)

### ii.   The Crop Inputs Market is Highly Concentrated.

Plaintiffs allege that Defendants BASF, Corteva, Syngenta, and Bayer AG dominate production in virtually every Crop Input category, and control 85% of the corn seed market, over 75% of the soybean seed market, and over 90% of the cotton seed market. (¶146.) The wholesale market is just as concentrated, with seven wholesalers accounting for 70% of all sales volume. (*Id.*) The Wholesaler Defendants and Retailer Defendants' leverage also helped them control the

Manufacturing Defendants' market power. (¶93.) This degree of concentration supports a plausible inference of conspiracy. *See Evergreen Partnering Grp.*, 720 F.3d at 48 (circumstantial evidence established a context for a plausible agreement with highly concentrated defendants); *Starr*, 592 F.3d at 323 (13 defendants' combined 80% market share is a persuasive plus factor); *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 804 F. Supp. 2d 419, 421, 426 (D. Md. 2011) (high market concentration where defendants controlled 70% of the market); *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1081 (N.D. Ill. 2011) (consolidated nature of the industry and inability of one firm to control the market supports the inference of a conspiracy).

### d.   Defendants' Conduct Is Under Governmental Investigation.

The anticompetitive conduct alleged by Plaintiff is the subject of ongoing investigations by the CCB and the FTC. (¶¶11-13.) At least one Defendant, Corteva, has been subpoenaed by the FTC, requiring it to submit documents "in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct." (¶13.) Defendants posit that the fact that they are currently under investigation by not only Canadian, but U.S. governmental entities "merit[s] no weight" as to plus factors. (Dkt. 142 at 51.) However, the existence of relevant government investigations is an antitrust plus factor. *See, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) (existence of investigation, combined with parallel behavior, may permit inference of agreement); *see also Starr*, 592 F.3d at 323-25 (investigations coupled with other allegations may be suggestive of a conspiracy).

District courts also have found that allegations of anticompetitive conduct in Canada specifically enhance the plausibility of a U.S. price-fixing conspiracy. *See, e.g., In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576-77 (M.D. Pa. 2009). Although Defendants rely on the procedurally distinguishable summary judgment decision in *Chocolate Confectionary*,

at the motion to dismiss stage, that court in fact gave considerable weight to the connection between the Canadian and U.S. markets:

> Both the U.S. and Canadian markets are structured in a similar manner, the Canadian defendants allegedly transport chocolate candy into the U.S., and defendants have developed integrated distribution systems that service both markets. The Canadian defendants exchanged numerous pricing communications and raised Canadian prices concurrently with uniform price increases in the United States . . . . *The operational and structural similarities between the American and Canadian markets lend plausibility to plaintiffs' allegations of conspiratorial pricing agreements in the U.S. Moreover, defendants had ample opportunity to consult with one another about the U.S. and Canadian price increases.* Sherman Act notwithstanding, the alleged anticompetitive activity also makes economic sense. In a saturated, declining market, defendants faced stagnant or decreasing demand with limited capacity for market growth. Plaintiffs' contention that defendants sought to increase revenue through non-competitive means is a plausible reaction to harsh market realities. . ..
>
> *These allegations satisfy Twombly's pleading standard.*

*Id*. at 576-77 (emphasis added). As in *Chocolate*, Defendants and their U.S. and Canadian markets are linked. Defendants are multinational enterprises that operate and sell Crop Inputs both in the U.S. and Canada, with most of Defendants headquartered in the U.S. (*E.g.*, ¶¶ 54 (BASF), 56 (Cargill), 57 (Tenkoz, a distributor).) Defendants communicated with each other at trade meetings, which facilitated their businesses and their boycott. Further, Crop Inputs are closely related products because they are typically sold by retailers in groups. (¶73.)

The CAC's alleges the boycott in this case was part of a single conspiracy that "was effectuated both here and abroad." *Cont'l Ore Co.*, 370 U.S. at 706. The CAC describes widespread communications about cancelling contracts with Yorkton after it was acquired by FBN. A Canadian court found "sufficient evidence" to require Canadian Defendants to "produce records concerning their coordinated anticompetitive conduct in the United States as well" as Canada. (¶118.) DOJ uncovered internal BASF records substantively discussing FBN's U.S.

21

competitive significance. (¶119.) The FTC subpoenaed Corteva records regarding crop protection products and business plans. (¶120.)

In *In re Chocolate Confectionary Antitrust Litigation*, the court discounted *at summary judgment* the presence of an unrelated foreign government investigation because the plaintiffs did not allege a conspiracy to which the foreign government investigation was related. 801 F.3d 383, 403 n.13 (3d Cir. 2015) (contrasting *Cont'l Ore*). This is consistent with other cases that seek a relationship between the conduct at the center of a foreign government investigation and plaintiffs' claims for that investigation to count as a plus factor. *See In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1146 (N.D. Cal. 2009) ("overlap between the companion antitrust investigations"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1010 (E.D. Mich. 2010) (distinguishing *Elevators* based on conspiracy links). Further, the Yorkton boycott could not have succeeded without the cooperation of both U.S. and Canadian entities because FBN was located in the U.S. and Yorkton was in Canada. (*See* ¶¶105-09, 112, 147, 243 (cooperation required among Defendants).) This structure also distinguishes *In re Mexican Government Bonds Antitrust Litigation*, 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019) (distinguishing another case where the conspiracy would not have worked absent cooperation among parents and subsidiaries). Accordingly, the structure of this market necessarily requires cooperation between Defendants to succeed, and court findings support the conspiracy as "effectuated both here and abroad," making the government investigations found here significant as a plus factor. *Cont'l Ore Co.*, 370 U.S. at 706.

### e.  Defendants Have a History of Committing Antitrust Violations.

Several Defendants are also recidivist antitrust violators. (¶¶114, 151.) Competition Policy International maintains a list of the "fifty-two leading recidivists," in which Defendants BASF and Bayer are listed among the top 5, and Defendant Corteva is identified. (*Id.*) This suggests that

Defendants are not only comfortable in joining a conspiracy, but also know how to operate a conspiracy profitably. Competition experts note that past participation in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. (¶114.) Such allegations support plausibility. *See, e.g.*, *Pool Prods. Distribution Mkt.*, 988 F. Supp. 2d at 711 (involvement in other conspiracies was plus factor supporting inference of conspiracy); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (guilty pleas with respect to a different product supported an inference of a conspiracy in the SRAM industry); *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 500-01 (S.D.N.Y. 2004) (noting Defendants are not "ingénues making their first appearance at the debutante ball.").

### B.  Plaintiffs' Allegations of Collective Conduct Are Proper and Sufficiently Pled.

"A price fixing conspiracy would be expected to leave little publicly available evidence of its existence;" therefore, such conspiracies are "often inferred from context." *In re Broiler Chicken Antitrust Litig.* ("*Broilers*"), 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017). Allegations that include that each defendant participated in the parallel conduct and participated in meetings that provided the opportunity to collude are sufficient to "allege participation in the agreement." *Id.* at 804.

Defendants' attempt to escape culpability by arguing that the CAC employs improper "group pleading" falls short. There is *no per se* rule against grouping defendants for the purpose of asserting allegations. *See Martinez v. Wexford Health Servs., Inc.*, No. 3:18-cv-50164, 2021 WL1546429, at *3 (N.D. Ill. Apr. 20, 2021) (holding that "engaging in group pleading is not per se improper" and noting group pleading at the motion to dismiss stage is not prohibited). This is because "any direct evidence of the agreement will only be uncovered through discovery." *Broilers*, 290 F. Supp. 3d at 804.

Plaintiffs satisfy the requirement of pleading each Defendant's individual involvement in the conspiracy, as well as detailed allegations that pertain to all Defendants. Such allegations are plead specifically when viewed in the context of this case—a conspiracy occurring at multiple levels of a distribution chain. *See In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*TFT-LCD I*"), 599 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009) (each defendant's involvement was adequately pled by allegations that as a whole plausibly suggested all defendants participated in the conspiracy). As noted *supra*, Plaintiffs make allegations pertaining to the involvement of all Defendants. *See Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009). These allegations are sufficient at the pleading stage to allege personal involvement, as they describe specific unlawful conduct by all Defendants. *Id.* The allegations are not a formulaic recitation of the cause of action, but provide detail—with reference to specific Defendants, and in some instances specific individuals employed by Defendants—to explain the contours of the conspiracy. *Id.*; *see also In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2014 WL 4379112, at *10 (S.D.N.Y. Sep. 4, 2014) (rejecting argument that "references to 'Dealer-Defendants' as a group are insufficiently particular to render the allegations plausible").

The CAC further alleges specific conduct by each individual Defendant showing it joined and committed acts in furtherance of the conspiracy. (*See* ¶¶80, 84, 85, 95, 99, 102, 107, 114, 117, 118, 119, 146, 151, 256 (Bayer); ¶¶80, 84, 85, 99, 102, 107, 114, 117, 120, 140, 146, 151, 256 (Corteva); ¶118 (Pioneer Hi-Bred, a Corteva subsidiary); ¶¶80, 85, 99, 102, 114, 117, 118, 119, 146, 151, 256 (BASF); ¶¶80, 84, 85, 97, 98, 102, 146, 264 (Syngenta); ¶¶107, 117, 118 (Cargill); ¶¶80, 256 (Tenkoz); ¶¶80, 85, 87, 89, 102, 107 (Winfield); ¶¶105, 106, 264 (Univar); ¶¶77, 85, 264 (CHS); ¶85 (Nutrien); ¶¶80, 85, 256 (Growmark); ¶¶80, 256 (Simplot); ¶¶104, 117 (Federated).) These allegations are more than sufficient to establish each Defendant's participation

in the conspiracy. *See In re Bulk Popcorn Antitrust Litig.*, 783 F. Supp. 1194, 1197 (D. Minn. 1991) ("Once a conspiracy is established, even *slight* evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement.") (citing *United States v. Garcia*, 785 F. 2d 214, 225 (8th Cir. 1986)); *In re Polyurethane Foam Antitrust Litig.*, 86 F. Supp. 3d 769, 786 (N.D. Ohio 2015) (noting that once a conspiracy is demonstrated, the evidentiary burden of demonstrating a specific defendants' involvement in a conspiracy "is not onerous").

## IV.     PLAINTIFFS HAVE STANDING TO PURSUE THEIR ANTITRUST CLAIMS.

Plaintiffs have both Article III and antitrust standing.[9] Defendants make two arguments to the contrary, which are both easily rejected. First, Defendants misconstrue Plaintiffs' alleged injury and argue against a position Plaintiffs never took; second, Defendants ask the Court to ignore Plaintiffs' detailed allegations of a plausible group boycott claim, instead asking the Court to give credence to arguments easily debunked by the CAC.[10]

As an initial matter, "[t]he injury-in-fact requirement is very generous to claimants, demanding only that the claimant allege some specific, identifiable trifle of injury." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017); *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 988 (8th Cir. 2011) ("[A]n identifiable trifle will suffice."). Plaintiffs must allege they suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Cottrell*, 874 F.3d at 162-163.

---

[9] Defendants do not explicitly challenge Plaintiffs' antitrust standing.

[10] "The Supreme Court 'has long held that . . .group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.* ("*Keurig*"), 383 F. Supp. 3d 187, 245 (S.D.N.Y. 2019).

The CAC alleges Defendants injured Plaintiffs by charging supracompetitive prices for Crop Inputs. (*See* ¶¶9-10, 93, 144, 148.) As a result, Plaintiffs sustained financial injury. (*Id.*) Plaintiffs' allegations of financial harm here "easily satisfy each of the components [to establish an injury-in-fact], as financial harm is a classic and paradigmatic form of injury in fact" to a "legally protected interest that is concrete and particularized." *Cottrell*, 874 F.3d at 163, 169. No reading of the CAC suggests that the antitrust harm alleged by Plaintiffs was the opacity of the market itself, as Defendants suggest. (Dkt. 142 at 40.) For example, Defendants cite to ¶138, a paragraph alleging that the opaque market structure *contributed to Defendants' concealment* of the conspiracy, to support their mischaracterization of plaintiff's alleged antitrust injury. (Dkt. 142 at 40.) But Plaintiffs unambiguously and repeatedly set out the causal connection between their antitrust injury (payment of inflated prices) and Defendants' conduct. (*See* ¶¶5, 9, 68, 111, 121, 141, 157.) Plaintiffs have established standing, injury-in-fact, and antitrust injury.

Defendants' challenge to the plausibility of Plaintiffs' claims also fails. Although framed as an Article III challenge, the thrust of Defendants' argument is whether Plaintiffs plausibly allege the anticompetitive effects of, and injury resulting from, Defendants' group boycott. (*See* Dkt. 142 at 41.) To establish antitrust injury, "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *TMT Mgmt. Grp. v. U.S. Bank Nat'l Assoc.*, No. 14-4692, 2016 WL 730254, at *22 (D. Minn. Jan. 4, 2016) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* 429 U.S. 477, 489 (1977).)

Group boycotts as Plaintiffs allege here are "so likely to restrict competition" that they are considered *per se antitrust* violations. *See Keurig*, 383 F. Supp. 3d at 245. Courts routinely find parties plead plausible anticompetitive effect and antitrust injury based on similar group boycott allegations. In *Regional Multiple Listing Service of Minnesota, Inc. v. American Home Realty*

26

*Network, Inc.* ("*MLS*"), 960 F. Supp. 2d 958, 983 (D. Minn. 2013), modified 960 F. Supp. 2d 988

(D. Minn. 2013), the court noted that group boycotts among horizontal competitors are analyzed

under a "per se" designation where

> the boycott cuts off access to a supply, facility, or market necessary to enable the
> boycotted firm to compete, the boycotting firms possess a dominant position in the
> relevant market, and the challenged practices are generally not justified by plausible
> agreements they were intended to enhance overall efficiency and make markets
> more competitive.

A *per se* violation is presumed to have an anticompetitive effect "without elaborate inquiry as to

the precise harm it has caused." *Id.* (citing *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 (3d

Cir. 1998). Here, Plaintiffs allege that Defendants' collectively cut off access to a supply necessary

for the ecommerce platforms to compete (¶9), the boycotting firms collectively possess a dominant

position in the relevant market (¶¶20, 146, 242, 259); and Defendants' conduct was not justified

by agreements that were intended to enhance overall efficiency. (¶153.) Even if analyzed under

the rule of reason standard, Plaintiffs can demonstrate antitrust injury as a proximate result of

Defendants' conspiracy. *Cf. MLS*, 960 F. Supp at 984-86 (alternatively analyzing group boycott

claim brought by competitor under rule of reason and finding competitor alleged plausible effect

of conspiracy where it alleged that the opposing party's conduct resulted in less negotiation on

behalf of consumers, as well as alleging that conduct increased the price by excluding competitor

from the market). *See also Keurig*, 383 F. Supp. 3d at 245 (allegations of overpayment was not

speculative injury, where defendant engaged in a group boycott that excluded competitors).

Furthermore, Defendants' arguments against the plausibility of the alleged anticompetitive

effects of the group boycott are themselves implausible and easily dismissed based on a cursory

reading of the CAC. (*See* Dkt. 142 at 41-42.) Defendants suggest that the threat posed by FBN was

speculative, but Defendants' own words demonstrate that the nascent competition from the

ecommerce platforms was a concrete threat to their profits. (*See* ¶¶76, 81-83 (Defendants

repeatedly expressing concerns that ecommerce platforms would increase farmers' bargaining power and, consequently, depress Defendants' profit margins).) Plaintiffs here also readily identify the mechanism by which the Defendants injured Plaintiffs. (¶¶8-10, 77, 93, 96-100.) Plaintiffs offer significant, factual support for their group boycott claims. (*See, e.g.*, ¶¶96-108, 121-25.) These concrete allegations are more than sufficient to demonstrate plausible anticompetitive effect of Defendants' group boycott and the resulting injury. Defendants' cases are misleadingly cited and provide no meaningful support for their position.[11]

## V.   DEFENDANTS' CONTINUING VIOLATION AND FRAUDULENT CONCEALMENT MAKE PLAINTIFFS' CLAIMS TIMELY.

It is Defendants' burden to plead and prove the affirmative defense of statute of limitations. Fed. R. Civ. P. 8(c); *see Willis Elec. Co. v. Polygroup Macau Ltd. (BVI),* 437 F. Supp. 3d 693, 705-06 (D. Minn. 2020) (denying motion to dismiss where defendants failed to prove that plaintiffs' claims were subject to a shorter limitations period). "The commencement of the statute of limitations is a question of fact" that should not be decided on a motion to dismiss when the accrual date is disputed. *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th

---

[11] *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (applying inapplicable summary judgment standard of review and noting that dismissed claims were based on allegations of hypothetical, future harms); *Litovich v. Bank of Am. Corp.*, No. 20-CV-3154, 2021 WL 4952034, at *2 (S.D.N.Y. Oct. 25, 2021) (finding injury not properly alleged due to threadbare allegations amounting only to a recitation of the required elements, and where antitrust injury was only brought up in one paragraph with no reference to a connection with a group boycott); *Bray v. Bank of Am., N.A.*, No. 4:14-CV-1336, 2016 WL 687818, at *4 (E.D. Mo. Feb. 19, 2016) (plaintiff failed to include *any* allegation that the alleged violation cause injury). Cases cited by Defendants regarding occasional pro-competitive impact of opacity are wholly irrelevant.

Cir. 1999).[12] Since Plaintiffs plead a continuing violation of the Sherman Act and Defendants' fraudulent concealment, dismissal of this action based on the statute of limitations is improper.

### A. The CAC Pleads a Continuing Violation.

A continuing violation "restarts the statute of limitations period each time the defendant commits an overt act." *In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane*"), 860 F.3d 1059, 1063 (8th Cir. 2017) (en banc); *see also Klehr v. A.O. Smith Corp.*, 521 US 179, 189 (1997) (same); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (cause of action accrues each time defendants' actions cause injury and statute runs from action). This is true "regardless of the plaintiffs' knowledge of the alleged illegality." *Propane*, 860 F.3d at 1066-67 (citing *Klehr*, 521 U.S. at 189). The continuing violation doctrine preserves claims for ongoing antitrust violations and protects buyers if, for example, two parties agree to divide markets to raise prices and then wait years to raise prices. *See In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014). Otherwise, defendants would be allowed to reap profits "with impunity because any antitrust claims would be time barred" which is "not the law." *Id.*

Courts have applied the continuing violation doctrine to group boycott claims like the claims here. For instance, a continuing violation existed when the distributors "decided to pressure third parties—the mills—not to supply aluminum" to the plaintiff. *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1089 (10th Cir. 2006) (noting active steps to pressure third parties). A continuing group boycott violation was also found where defendants paid third parties to divert business from the plaintiff. *Hennegan v. Pacifico Creative Serv., Inc.* 787 F.2d 1299, 1300-01 (9th

---

[12] "[A]bsent an affirmative showing" that defendants terminated it, a conspiracy is "presumed to have continued." *Id.* at 828-29; *see also Smith v. United States*, 568 U.S. 106, 112, 114 (2013) (defendant bears burden of proving withdrawal from conspiracy); *Osborn v. Visa, Inc.*, 797 F.3d 1057, 1067-68 (D.C. Cir. 2015) (same, civil antitrust case). *Nitro Distributing Inc. v. Alticor, Inc.*, 565 F.3d 417 (8th Cir. 2009) is inapplicable as it is an appeal of a summary judgment decision.

Cir. 1986). Courts have applied the doctrine to other antitrust violations as well. *E.g.*, *Zenith Radio*, 401 U.S. at 338 (participating in patent pools); *Propane*, 860 F.3d at 1071 (conspiring to reduce propane tank fill); *Wholesale Grocery Prods.*, 752 F.3d at 736-37 (camouflaged market division).

Allegations of (1) an ongoing antitrust conspiracy; (2) bringing about "'a series of unlawfully high priced sales' during the class period; and (3) 'sale[s] to the plaintiff[s]' during the class period" demonstrate a continuing violation. *Propane*, 860 F.3d at 1068 (alterations in original).[13] "Specific facts" are not required – only "sufficient factual information to provide the grounds on which the claim rests, and to raise a right to relief above a speculative level." *Id.* at 1070. Plaintiffs' allegations easily meet this standard.

In this case, Plaintiffs allege that Defendants engaged in an ongoing unlawful agreement "to artificially increase and fix the prices of" Crop Inputs used by farmers, including new overt acts that perpetuated Defendants' agreement. (¶¶3, 141.) Defendants continued to meet during the Class Period, creating opportunities to fix prices. (¶¶80, 82, 86, 141.) Defendants committed overt acts furthering their conspiracy during the Class Period, well within four years of Plaintiffs' complaints. For example, after would-be competitor FBN bought Yorkton to obtain a source of inventory in March 2018, Defendant Federated emailed other industry participants and explicitly warned them that it would carefully observe how its "key manufacturing partners" responded to FBN and Yorkton. (¶104.) Univar emailed retailers on April 6, 2018, stating that it would cease doing business with FBN that summer. (¶105.) Defendants cancelled their supply contacts with

---

[13] *Southeast Mo. Hosp. v. C.R. Bard, Inc*., No. 1:07-cv-0031, 2008 WL 4104534 (W.D. Mo. Aug. 27, 2008) is contrary to the circuit court decisions in, *Propane*, 860 F.3d at 1071 and *Wholesale Grocery Prods.*, 752 F.3d at 736. *Southeast Missouri Hospital* is also distinguishable because Plaintiffs here allege overt acts during the limitations period, such as cutting off a competitor's supplies, while the defendant in *Southeast Missouri Hospital* only continued the effects of a deal arranged before the limitations period.

Yorkton in 2018, thereby cutting off FBN's source of supply, pursuant to Defendants' conspiracy. (¶107.) Defendant Syngenta audited authorized retailers in 2018 after learning some retailers had sold Crop Inputs to ecommerce platforms, contrary to Defendants' conspiracy. (¶98.) Plaintiffs also allege that Defendants' conspiracy brought about a series of sales at elevated prices during the Class Period and the limitations period. They allege that by "renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs, Class, and Sub-Class members." (¶141.) Defendants' conduct fixed, raised, stabilized, or maintained Crop Inputs prices. (¶¶121 (a) & 156 (a).) Finally, Plaintiffs allege that they purchased Defendants' Crop Inputs during the Class Period, and in so doing paid supracompetitive prices. (¶¶22-48, 121 (d), 157, 222.)

Defendants' overt acts in recent years hamstrung their would-be competitors, reducing competition. The reduced competition plus Defendants' price-fixing allowed them to increase their prices for Crop Inputs bought by Plaintiffs during the limitations period.[14] Accordingly, construing the CAC in a light most favorable to Plaintiffs, "these allegations 'plausibly give rise to an entitlement to relief'" based on the continuing violation doctrine. *Propane*, 860 F.3d at 1070 (quoting *Ashcroft v. Iqbal*, 556 U.S. 663, 679 (2009)).

**B.   Any Applicable Statute of Limitations Is Tolled by Defendants' Fraudulent Concealment.**

Fraudulent concealment "prevent[s] a defendant from 'concealing a fraud … until such a time as the party committing the fraud could plead the statute of limitations to protect it.'" *In re*

---

[14] This chain of Defendants' meetings, overt boycotting acts, price-fixing, sales, and supracompetitively priced purchases distinguishes this case from Defendants' cited case of *Litovich*, 2021 WL 4952034, at *27. Further, Defendants' argument to limit continuing violations to pure price-fixing alone is inconsistent with *Wholesale Grocery Prods.*, 752 F.3d at 736 (applying continuing violations to market allocation).

*Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015) (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349 (1874)). The Eighth Circuit aptly described fraudulent concealment for antitrust purposes:

> Fraudulent concealment comprehends two elements—the use of fraudulent means by the party who raises the ban of the statute and successful concealment from the injured party. In [*Bailey*], the Supreme Court held the doctrine applicable when there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud which is the basis of the suit, and when the fraud has been concealed or is of such character as to conceal itself.

*Kansas City, Mo. v. Fed. Pac. Elec. Co.*, 310 F.2d 271, 278 n.9 (8th Cir. 1962); *In re Bulk Popcorn Antitrust Litig.*, No. 3-89-0710, 1990 WL 123753, at *5 (D. Minn. June 19, 1990) (fraudulent means and concealment from injured party); *accord Abecassis v. Wyatt*, 902 F. Supp. 2d 881, 897 (S.D. Tex. 2012) (similar two elements). Fraudulent concealment tolls the limitations period unless the plaintiff "failed in reasonable diligence to discover" the deception. *Kansas City, Mo.*, 310 F.2d at 276; *see also, e.g.*, *Carrier Corp v. Outokumpu Oyj*, 673 F.3d 430, 447 (6th Cir. 2012).

Fraudulent concealment allegations need not be "extensive." *In re Auto. Parts Antitrust Litig.* ("*Auto Parts I*"), No. 12-md-02311, 2014 WL 4272772, at *12 (E. D. Mich. Aug. 29, 2014) (*Carrier Corp.'s* allegations "were not extensive" but were deemed sufficient); *Animation Workers*, 123 F. Supp.3d at 1208 (no absolute requirement complaint "must identify false statements made by each and every defendant"); *In re Fasteners Antitrust Litig.*, No. 8-md-1912, 2011 WL 3563989, at *3 (E.D. Pa. Aug. 12, 2011) (Rule 9 standard "relaxed … when factual information is peculiarly within the defendants' knowledge or control"); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 368 (D.N.J. 2001) (Rule 9 does not require pleading "facts that, by the nature of the alleged fraud, are within the defendants' control"). Further, resolving "allegations of fraudulent concealment at the motion to dismiss stage" is "generally inappropriate."

*Animation Workers*, 123 F. Supp. 3d at 1194. This is especially true when the evidence of the fraudulent concealment "is alleged to be largely in the hands of the alleged conspirators." *Id.*

### 1. Defendants Concealed Their Violations from Plaintiffs.

The first concealment element, concealing the violation, is shown either by a self-concealing conspiracy or by acts of concealment. The Eighth Circuit expressly described concealment to include fraud that "has been concealed, *or is of such character as to conceal itself.*" *Kansas City, Mo.*, 310 F.2d at 278 n.9 (emphasis added). "The notion of a self-concealing conspiracy dates back to [*Bailey*]." *Fasteners*, 2011 WL 3563989, at *5. Courts in other circuits have adopted the self-concealing doctrine. *Id.* at *4 ("[F]or the most part courts in this Circuit have applied the 'self-concealing' standard to antitrust conspiracies."). Another court went so far as to say "*Bailey* remains sound and binding on this Court, and that the self-concealing conspiracy concept is established in the anti-trust case law." *Mercedes-Benz*, 157 F. Supp. 2d at 371. Finding a self-concealing conspiracy when secrecy is intertwined with the conspiracy's aims is particularly "consistent with the policies the fraudulent concealment doctrine is intended to serve." *Id.* [15]

Plaintiffs allege that "group boycotts and other antitrust violations are inherently self-concealing," and Defendants engaged in "secret conspiracies that did not reveal facts that would put Plaintiffs or the Class and sub-classes on inquiry notice that there was a conspiracy to fix prices of Crop Inputs." (¶137.) Defendants designed their system for opacity. For example, Manufacturer Defendants limited sales to licensed "authorized retailers." (¶¶69-71.) Manufacturer and Wholesaler Defendants' licenses to authorized retailers "contain strict confidentiality provision" hiding prices, incentives, rebates and commissions. (¶¶71, 73.) Retailer's bundling of Crop Inputs

---

[15] *New Prime, Inc. v. Eaton Corp.*, No. 16-cv-3407, 2017 WL 5992466 (W.D. Mo. March 16, 2017) is inconsistent with *Kansas City, Mo.*, 310 F.2d at 278 n.9 and *Bailey*, 88 U.S. at 349-50, and is distinguishable from the extensive allegations here that are beyond mere "non-disclosure."

"further prevent farmers . . . from accessing pricing data and information about the Crop Inputs market." (¶138.) The ecommerce platforms emerged to modernize the market to avoid exactly this opaque distribution system controlled by Defendants (¶74), so Defendants committed their unlawful group boycott to preserve their secrecy and control of the market. Defendants intertwined secrecy with this conspiracy by deliberately eliminating ecommerce platforms as a transparent lower-priced alternative, denying farmers accurate pricing information and forcing them "to accept opaque price increases" for Crop Inputs. (¶¶9-10.)

Allegations that defendants acted to conceal their conduct also satisfy the concealment element. Basic allegations of concealment are "sufficient to sustain a charge of fraudulent concealment." *Mercedes-Benz*, 157 F. Supp. 2d at 372 (collecting cases); *Bulk Popcorn*, 1990 WL 123753, at *4 (clandestine communications, rigged bids, and meeting through trade association to "cloak" conspiracy). Defendants hid their violations from Plaintiffs and the Class members by conducting a secret conspiracy, affirmatively hiding their conspiracy from Plaintiffs and deflecting attention from it with pretexts. (¶137.) Defendants' executives met at the CropLife and ARA boards, allowing them to cloak their boycotting and price-fixing discussions in official activities. (¶¶80, 85, 149.) Other executives attended the CropLife PACE Advisory Council meeting, where they discussed at least FBN and their margins. (¶82.) Defendants' pretextual attacks on ecommerce platforms to deflect attention from their conspiracy included data privacy claims and Syngenta's claims about, "product integrity, stewardship, and regulatory compliance." (¶264.)

### 2.   Plaintiffs Did Not Discover Their Claims Until 2020.

Because of the self-concealing nature of the conspiracy and Defendants' affirmative concealment, Plaintiffs and class members were unaware of the conspiracy before government investigations became publicly known. Neither Plaintiffs nor other class members had actual or constructive notice of Defendants' conspiracy until the CCB issued subpoenas in February 2020,

or Defendant Corteva disclosed its FTC subpoena in September 2020. (¶140.)[16] In *In re Automotive Parts Antitrust Litigation,* No. 12-md-02311, 2015 WL 10376960, at *5 (E.D. Mich. Dec. 30, 2015), the court held that plaintiffs "lacked the means to discover the conspiracy" until the investigating body officially announced an enforcement action, despite substantial publicity of an investigation of defendants for a similar conspiracy. Thus, neither Plaintiffs nor other Class members discovered or could have discovered the conspiracy through reasonable diligence until shortly before filing their complaints. (¶139.)

### 3. Plaintiffs Diligently Pursued Their Claims.

A moving party has the burden to point to undisputed facts "which demonstrate conclusively that plaintiffs had notice of their claims, and, that, had they exercised reasonable diligence, they would have discovered adequate grounds for filing this antitrust lawsuit during the limitations period." *Morton's Mkt.,* 198 F.3d at 832; *Fasteners*, 2011 WL 3563989, at *5 (same, for motion to dismiss). Accordingly, whether a party fulfilled its duty of reasonable diligence "is typically a fact issue appropriate for a jury." *Abecassis*, 902 F. Supp.2d at 904; *see Edwards v. Nat'l Milk Producers Fed'n*, No. C 11-04766, 2012 WL 12951848, at *6 (N.D. Cal. Oct. 30, 2012) (finding when reasonable plaintiff should have discovered misconduct "is a factual question which may not be resolved on a motion to dismiss").

Inquiry notice does not begin to run unless the plaintiff "is able, with the exercise of due diligence (*whether or [not] actually exercised*), to ascertain the information needed to file suit." *Morton's Mkt.,* 198 F.3d at 835 (quoting *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 368 (7th Cir. 1997)). The statute begins to run when the plaintiff "should have discovered the facts

---

[16] This triggering event distinguishes *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880-81 (8th Cir. 2011) and *Larey v. Allstate Prop. and Cas. Co.*, No. 4:14-cv-04008, 2014 WL 4823872, at *8 (W.D. Ark. Sept. 26, 2014).

supporting their claims. This is true regardless of whether they actually investigated." *Morton's Mkt.*, 198 F.3d at 835 (citing *Marks*, 122 F.3d at 368). Even when some information is public, courts have found such information did not trigger investigative duties unless the information clearly pointed to the defendants and the facts needed to write a complaint. *See, e.g., Auto Parts I*, 2014 WL 4272772, at *13 (rejecting argument public data showing substantial price increases and susceptible market meant plaintiffs should have discovered conspiracy).

Ironically, while Defendants argue that public information regarding their hostility toward new ecommerce platforms is not sufficient to state a claim, they simultaneously argue Plaintiffs should have pleaded their case based on this information alone, even before the Canadian and U.S. investigations became public. (Dkt. 142 at 47-48.) As demonstrated by the case law above, this position has no merit. Defendants "have made virtually no showing at all regarding what [P]laintiffs would have discovered had they" investigated at that time. *Morton's Mkt.*, 198 F.3d at 833. Based on the self-concealing nature of their conspiracy, Defendant's affirmative concealment, and their continuing antitrust violations, the Court should reject their statute of limitations defense.

## VI.   PLAINTIFFS SUFFICIENTLY PLEAD THEIR RICO CLAIM.

RICO is "read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co. Inc.*, 473 U.S. 479, 497-98 (1985); *accord Boyle v. U.S.*, 556 U.S. 938, 950-51 (2009) (noting RICO's "clear but expansive text"). Although "originally enacted to combat organized crime, 'it has become a tool for everyday fraud cases brought against respected and legitimate enterprises.'" *Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019). For example, the Eighth Circuit recently affirmed the class certification of RICO claims for business-to-business overpayments stemming from a systemic scheme to defraud. *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC ("CPAY")*, 984 F.3d 595, 602 (8th Cir. 2020). RICO applies the same in criminal and

civil cases. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989). Defendants repeatedly misstate the law by omitting or misrepresenting controlling Supreme Court precedent and ignore the detailed factual allegations in the CAC while cherry-picking individual allegations.

### A. Plaintiffs Plead Mail/Wire Fraud Predicate Acts with Sufficient Particularity.

The heightened Rule 9(b) standard applies *only* to allegations of mail and wire fraud, not to the entire RICO claim. *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 919-21 (8th Cir. 2001) (reversing dismissal on this ground). The "gravamen" of mail/wire fraud is the "scheme to defraud;" "the indictable act" is "the use of the mails with the purpose of executing or attempting to execute a scheme to defraud." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647, 652 (2008). The use of the mails and wires "need not be an essential element of the scheme. It is sufficient if the mailing is incident to an essential part of the scheme, or a step in [the] plot." *United States v. Fiorito*, 640 F.3d 338, 347 (8th Cir. 2011). In reviewing the scheme, the "fraudulent aspect is measured by a non-technical standard" and considers if Defendants' conduct "fails to conform to standards of moral uprightness, fundamental honesty, and fair play." *Abels*, 259 F.3d at 918.

The purpose of Rule 9(b) is to provide notice so a defendant can respond. *In re EpiPen Direct Purchaser Litig.* ("*EpiPen*"), No. 20-CV-0827, 2021 WL 147166, at *19 (D. Minn. Jan. 15, 2021). "The level of particularity required depends on the nature of a case." *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012). A plaintiff "need not allege the specific details of every fraudulent claim …[but instead ] some representative examples of the fraudulent conduct with particularity." *Allstate Ins. Co. v. Linea Latina de Accidentes, Inc.*, 781 F. Supp. 2d 837, 846 (D. Minn. 2011); *accord Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1031 (S.D. Iowa 2009).

Plaintiffs are also not expected to provide highly specific detail on facts exclusively within a defendant's control. "Where a plaintiff is not a party to a communication, particularity in pleading may become impracticable." *Abels*, 259 F.3d at 921. It is "only fair to give" plaintiffs "the benefit of discovery" before requiring they "plead facts that remain within the defendants' private knowledge." *Id.* Thus, this Circuit has "declined to require, before discovery, the pleading of dates and times of communications in furtherance of a scheme to defraud, where the complaint alleges facts supporting the inference that the mails or wires were used." *Id.*

Plaintiffs set out in detail how Defendants worked together as an association-in-fact enterprise to manipulate the Crop Inputs market by blocking access by ecommerce platforms. Plaintiffs provided representative examples of specific mails and wires used to further this scheme where public information is available. These include:

- As FBN launched, Defendants sent mails and wires with false claims, half-truths, and material omissions to discourage consumers' use of the platform: (1) in 2016, Defendant CHS sent a letter to farmers through the mails/wires; (2) in fall 2018, Syngenta executive gave an interview over the wires. (¶¶77, 97, 264.) It was reasonably foreseeable that these statements would be disseminated widely over the wires.

- In March 2018, Defendant Syngenta sent a letter to vendors over the mails and wires regarding its audit initiative to stop sales to FBN. (¶¶98, 264.) Defendants Bayer, BASF, and Corteva also used audits to stop sales. (¶99.) It is also a reasonable inference that steps in these audits required further uses of the mails and wires.

- On March 31, 2018, Defendant Federated sent an email over the wires pressuring its manufacturing partner to not do business with FBN. (¶¶104, 264.)

- On April 16, 2018, Defendant Univar distributed talking points to retailers and manufacturers with false representations, half-truths, and omissions about FBN to further the scheme to keep these platforms off the market. (¶¶105, 264.)

- Defendants refused to sell or provide products to FBN or other ecommerce platforms. In Canada, these refusals were done through written communications. (¶107.) It is a reasonable inference that the mails and wires were similarly used by all Defendants here.

- Defendants could not have accomplished an industry-wide boycott of FBN and other ecommerce platforms without some use of the mails and wires to coordinate. (¶96.) As

demonstrated by the investigations into the part of the scheme carried out in Canada, multiple internal and external communications were used to coordinate that part of the boycott. (¶¶102-08.) Accordingly, there is also a reasonable inference that the mails and wires were used to further the scheme. *See Abels*, 259 F.3d at 921.

- ▪ Additionally, Defendants' use of benchmarking services to privately coordinate presumably relied on wires to disseminate benchmarking information. (¶¶87-91.)

Because the scheme was accomplished largely through private communications among Defendants, this level of specificity is sufficient. Indeed, Defendants have exclusive control of these communications and Plaintiffs cannot be expected to know their content without discovery. *Abels*, 259 F.3d at 921; *EpiPen*, 2021 WL 147166, at *19. Finally, Defendants are already well-noticed to "potentially damaging allegations" as evidenced by government investigations into their possible anticompetitive actions. (¶¶11, 13, 117-20.)

## B. Defendants' Long-Running and Ongoing Actions Demonstrate a Pattern of Racketeering Activities.

Defendants engaged in a systematic pattern of racketeering through their repeated use of mails and wires to perpetuate the scheme to defraud. A pattern of racketeering is "at least two acts of racketeering activity" occurring within a ten-year period. 18 U.S.C. § 1961(5). This generally requires that the racketeering predicate acts be (1) "related" and (2) "that they amount to or pose a threat of continued criminal activity." *H.J.*, 492 U.S. at 239. Defendants participated in a far-reaching and continued use of the mails and wires to perpetuate the scheme to defraud which violated the foundational tenets of "moral uprightness, fundamental honesty, and fair play." *Abels*, 259 F.3d at 918. Because each Defendant had fraudulent intent,[17] they are equally liable. *U.S. v. Earles*, 955 F.2d 1175, 1177 (8th Cir. 1992) ("One who knowingly participates in an ongoing mail

---

[17] Defendants do not challenge Plaintiffs' intent allegations.

fraud devised by another is guilty of mail fraud."). RICO reaches all who play some part in directing the enterprise's affairs whether "directly or indirectly." 18 U.S.C. § 1962(c).

"[R]outine business communications" *can* constitute mails and wires in furtherance of a scheme to defraud." *Abels*, 259 F.3d at 918, 921. In fact, "no misrepresentations need be transmitted by mail or wire: even routine business communications in these media may suffice to make a scheme of false dealing into a federal offense." *Id.* at 918; *accord Bridge*, 553 U.S. at 652 (stating that "the indictable act" is "not the fraudulent misrepresentation, but rather the use of the mails with the purpose of executing or attempting to execute a scheme to defraud"). Moreover, a coordinated group boycott violating the principles of fair play went far beyond the use of the mails and wires for routine purposes. The predicate acts alleged had the "common purpose" to artificially maintain high prices and retain farmer data by blocking ecommerce platforms. *Abels*, 259 F.3d at 919.

Plaintiffs allege predicate acts reaching back to at least 2016. (¶¶71, 104-06, 264.) At least five years of ongoing fraud is more than enough to demonstrate repeated behavior, and not "sporadic activity." *Atlas Piling Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 994 (8th Cir. 1989) (three years sufficient). The pattern of racketeering is also open-ended because the scheme to defraud continues today; FBN and other online crop input sellers still cannot reliably access Manufacturer Defendants' products. (¶¶109-10.) As a result of this open-ended threat, farmers continue to pay artificially inflated prices for their Crop Inputs.

Further, the acts of racketeering are related because their purpose is to prevent access to cheaper alternatives and obscure market structure by manipulating the market to eliminate ecommerce crop input platforms. (¶¶71, 104-06, 264.) These mails and wires are all aimed at exploiting similar victims: American farmers who use the Crop Inputs on their own land.

Defendants rely on the complex web of entities and participants to carry out these acts of mail and wire fraud, enriching one another and the group in such a manner that no individual participant could have achieved by itself engaged in a unilateral fraud scheme.

### C. Long-Term Relationships and Collective Efforts Constitute a RICO Enterprise.

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs allege that Defendants engaged as a "group of individuals associated in fact although not a legal entity," also known as an association-in-fact ("AIF") enterprise. In its seminal case on this element, the Supreme Court stressed that the enterprise element is "expansive," "obviously broad," and was written to have a "wide reach." *Boyle*, 556 U.S. at 944. And this element, like RICO overall, must be "liberally construed" in plaintiff's favor. *Id.* Defendants ignore the three-factor test set out in *Boyle* (they fail to even cite it), which only requires that plaintiffs allege "three structural features": (1) a common purpose; (2) relationship among those associated with the enterprise; and (3) longevity. *Id.* at 946. Defendants claim the Eighth Circuit also requires a plaintiff show "an ascertainable structure distinct from the conduct of a pattern of racketeering[,]" relying heavily on *Crest Constr. II v. Doe*, 660 F.3d 346, 354 (8th Cir. 2011). (Dkt. 142 at 54.) But such a formulation was rejected in *Boyle* and there is no indication the Eighth Circuit intended to reject the Supreme Court's formulation in *Boyle* when it simply quoted pre-*Boyle* legal standards without analysis.

***No Independent Ascertainable Structure Requirement***. In *Boyle*, the Supreme Court rejected decisions that required the "structure" of the enterprise to be tangible. 556 U.S. at 947-49. It also expressly rebuffed the defendant's suggestions that the jury should have been instructed that an "ascertainable structure" was required and that the structure could not be shown through the pattern of racketeering activity, saying ascertainability was "redundant and potentially

misleading." *Id.* at 947. The Supreme Court held that while enterprise is a distinct element from racketeering, it would be "incorrect" to say "that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Id.* In fact, evidence of these elements may "coalesce" and "a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." *Id.* at 947-48; *accord United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009) (Gorsuch, J.) (explaining the change post-*Boyle* and concluding "no purpose or economic significance beyond or independent of the group's pattern of racketeering activity" is required). As this Court concluded, after *Boyle*, the enterprise element is "more flexible" because an enterprise can be inferred by proof of nothing more than the pattern of racketeering activity. *Aguilar v. PNC Bank, N.A.*, No. 14-cv-985, 2014 WL 12700618, at *9 (E.D. Mo. Nov. 19, 2014).

Ignoring *Boyle*, Defendants insist that the Eighth Circuit requires: (1) an "ascertainable structure," (2) evidence that "the enterprise would still exist were the predicate acts removed from the equation." (Dkt. 142 at 73.) Defendants rely on *Crest*. But, as multiple courts in this Circuit have explained, that decision is not to the contrary:

> [T]he Eighth Circuit in *Crest* determined that the plaintiffs' complaint failed "to establish how the Defendants are associated with each other or the RICO enterprise." Notably, the complaint in *Crest* is not quoted at length . . . and is not publicly available . . . . It is nevertheless evident from the Eighth Circuit's opinion that the adequacy of the enterprise allegations did not present a close question. The circuit, therefore, was not called upon to parse the rule of *Boyle*. The *Crest* opinion's quotations of pre-*Boyle* cases . . . are not accompanied by analysis of the effect of *Boyle*'s holding. It is not reasonable, in this Court's opinion, to infer from the inclusion of those references a considered decision on the part of the Eighth Circuit to deviate from a rule clearly set out by the Supreme Court.

*Target Corp. v. LCH Pavement Consultants, LLC*, No. 12-1912, 2013 WL 2470148, at *3 (D. Minn. June 7, 2013); *Allstate*, 781 F. Supp. 2d at 843-44 (same and citing four other circuits).

**Boyle** *Test*. Plaintiffs have amply demonstrated all requirements for an enterprise (purpose, relationship, and longevity). Defendants do not directly challenge sufficiency on any of the actual *Boyle* requirements. Defendants "associated together for a common purpose of engaging in a course of conduct[,]" *United States v. Turkette*, 452 U.S. 576, 583 (1981), to institute their scheme to maintain supracompetitive prices, unfettered access to crucial farmer data, and deny farmers access to market information by stifling transparent pricing and product information services like FBN.[18] Each member of the enterprise acted to further the enterprise's goals, and the "mutual benefit" to the Defendants "shows that [the] enterprise[] had a common purpose." *EpiPen*, 2021 WL 147166, at *9. Indeed, as in *EpiPen*, Defendants' actions would not make economic sense unless they are understood through coordinated, illicit activity. (¶¶71, 93-96, 111-15.)

Plaintiffs also allege relationships between Defendants, and not just parallel activity. These relationships existed through their regular business transactions as well as through regular trade association meetings. (¶¶80, 82, 85-86, 256.) These relationships would continue to exist even if Defendants were not also working together to boycott FBN and other ecommerce provisions. Accordingly, Plaintiffs have also met the pre-*Boyle* standard of showing a distinct structure outside the pattern of racketeering. *EpiPen*, 2021 WL 147166, at *10 (concluding distinct structure shown when defendants also had ongoing legitimate business interactions); *Handeen v. Lemaire*, 112 F.3d 1339, 1352 (8th Cir. 1997) (concluding legal entities with ongoing operations meet the independent structure requirement); *Secure Energy, Inc. v. Coal Synthetics*, No. 4:08-cv-01719, 2009 WL 10694916, at *9 (E.D. Mo. June 8, 2009) (same).

---

[18] The "common purpose" of the enterprise "does not itself have to be fraudulent." *In re JUUL Labs Inc., Mktg., Sales Practices, and Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 598 (N.D. Cal. 2020). *Boyle* says only "common purpose."

Defendants fault Plaintiffs for not alleging the structure of the AIF enterprise or Defendants' roles. (Dkt. 142 at 74.) But there is no requirement for any particular structure beyond showing a "continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948. There is no need to allege "a hierarchical structure," "chain of command," particular method of decision making, "fixed roles," "regular meetings," or "established rules and regulations." *Id.* Defendants' suggestion that Plaintiffs must set out particular roles and structures is directly counter to *Boyle*.

### D.  Plaintiffs Have Standing as the Direct and Foreseeable Victims of the Conspiracy.

Standing is decided on the pleadings, and "general factual allegations" are sufficient. *Iowa League of Cities v. Env't Prot. Agency*, 711 F.3d 844, 869 (8th Cir. 2013). A civil RICO plaintiff must show the injury occurred "by reason of" the racketeering. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 278-79 (1992). This requires a RICO plaintiff show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268. To meet this requirement, Plaintiffs must plausibly allege that Defendants' predicate acts were both the "but-for" and "proximate" causes of their injuries. *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010). As the Eighth Circuit recently emphasized, the central question for proximate causation is not about reliance but "whether the alleged violation led directly to the plaintiff's injuries." *CPAY*, 984 F.3d at 602.

The Supreme Court has concluded that reliance is simply evidence to be weighed in the larger causal analysis; it is not a separate burden or element. *Bridge*, 553 U.S. at 659. While the Supreme Court noted that third-party reliance evidence would likely exist in "most cases" premised on false representations, it did not make it an absolute pleading requirement for all scheme to defraud cases as represented by Defendants. *Id.* After *Bridge*, "[t]he necessity of individual reliance is no longer an aspect of a civil RICO claim." *CGC Holding Co. v. Broad and Cassel*, 773 F.3d 1076, 1092 n.10 (10th Cir. 2014); *accord Allstate Ins. Co. v. Plambeck*, 802 F.3d

665, 676 (5th Cir. 2015) ("In cases predicated on mail or wire fraud, reliance is not necessary."). That is especially true in a case like this where fraudulent concealment and group coercion are central to the scheme to defraud and result in uniform overpayment by all consumers. Such was the central holding of a recent Eighth Circuit RICO class decision when the Court rejected a reliance requirement and found that overpayments, on their own, resulting from a scheme to defraud would satisfy RICO causation and be common to class members. *CPAY*, 984 F.3d at 602-03; *see also Torres v. SGE Mgmt., LLC*, 838 F.3d 629, 640 (5th Cir. 2016) (no reliance was necessary because the scheme's "structure" and "inherent concealment" led to inevitable injuries regardless of reliance).

Plaintiffs do not need to show that any particular false representation or concealment caused their injuries because *it is the scheme to defraud*, and not any particular mail or wire, that is the "gravamen" of the predicate act. *Bridge*, 553 U.S. at 647, 652. And Plaintiffs have done just that: they are the "primary and intended victims of the scheme to defraud." *Id.* at 650. As alleged, the direct and foreseeable result of a scheme to block ecommerce platforms was to artificially increase Crop Input prices and decrease choice to Plaintiffs. (¶¶1, 5-6, 10, 68-69, 111.) *See CPAY*, 984 F.3d at 602-03; *Torres*, 838 F.3d at 640; *In re EpiPen Mktg., Sales Practices and Antitrust Litig.*, 336 F. Supp. 3d 1256, 1321 (D. Kan. 2018) (allegations of paying artificially inflated prices due to the scheme to defraud were sufficient). Plaintiffs here can draw a straight line from the scheme to defraud and the injuries suffered and that is sufficient.

Even though reliance is not an element, *someone* had to rely on Defendants' scheme to defraud resulting in Plaintiffs' injuries. This situation is like *Bridge*, where if the county (a third party) had not accepted defendant's false attestations, the plaintiff's injury never would have materialized. 553 U.S. at 658-59. Had there been no reliance on the coordinated boycott, there

45

would have been Crop Input products available through ecommerce platforms. A boycott only works if those involved follow the benchmarking and coordinated agreements.

## VII.   DEFENDANTS' STATE-SPECIFIC ARGUMENTS ARE WITHOUT MERIT.

### A.   Plaintiffs Plausibly Allege a Conspiratorial Agreement to Restrain Trade.

#### 1.   Plaintiffs' Allegations of Defendants' Conspiracy Is Sufficient to State a Claim Under the State Antitrust and Consumer Protection Laws.

Plaintiffs have plausibly alleged the existence of the requisite conspiratorial agreement. Plaintiffs have thus sufficiently alleged the existence of the anticompetitive conduct necessary to maintain their state antitrust, consumer protection, and unjust enrichment claims. *See In re Generic Pharms. Pricing Antitrust Litig.* ("*Generic Drugs*"), 368 F. Supp. 3d 814, 832-33, 839-40 (E.D. Pa. 2019) (denying dismissal of state antitrust and consumer protection claims predicated on allegations sufficient to state claim under overlapping federal antitrust laws); *see, e.g., In re Pork Antitrust Litig.* ("*Pork*"), 495 F. Supp. 3d 753, 791 (D. Minn. 2020) ("Because the Court will deny Defendants' Motion to Dismiss as to the antitrust claims, so too will it deny the Motion as to the Illinois unjust-enrichment claim.").

#### 2.   Plaintiffs Are Not Required to Plead the Specific Elements of Each State's Unjust Enrichment Regime.

Unjust enrichment claims in "almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.* ("*Suboxone*"), 64 F. Supp. 3d 665, 703 (E.D. Pa. 2014). At the motion to dismiss phase, courts analyze whether there are sufficient allegations to plausibly allege unjust enrichment generally and reserve the more individualized inquiry until a motion for summary judgment is brought. *See Pork*, 495 F. Supp. 3d at 790-91 (determining plaintiffs plausibly alleged a claim for unjust enrichment generally and declining to analyze individual elements of each state's

unjust enrichment regime at the motion to dismiss phase).[19] Plaintiffs, therefore, are not required to engage in the seriatim pleading that Defendants incorrectly claim is required.

**B. Plaintiffs Sufficiently Allege Facts Demonstrating They Have Standing.**

Defendants challenge Plaintiffs' Article III standing on two grounds. First, Plaintiffs supposedly failed to allege cognizable injuries sufficient to confer standing but how that is incorrect is addressed in detail in Section IV *supra*. Defendants' second standing argument incorrectly frames Plaintiffs' ability to bring claims on behalf of absent class members as an Article III issue. As discussed Section VII.H *infra,* Defendants confuse individual standing under Article III with Rule 23's commonality requirement, which is properly addressed at class certification.

**C. Plaintiffs Have Adequately Alleged Each of Their State Antitrust Law Claims.**

**1. Plaintiffs Complied with the Applicable Filing Notice Requirements.**

State law filing notice requirements cannot be used as a "shield to avoid answering for alleged anti-competitive behavior." *In re Aftermarket Filters Antitrust Litig.*, No. 08-C-4883, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009). Courts repeatedly decline to dismiss state law claims based on the timing of the notice or even the failure to comply at all. *See Generic Drugs*, 368 F. Supp. 3d at 835 ("[T]he relevant notice provisions . . . do not alter the substantive elements of Plaintiffs' claims and are not a pleading requirement[.]"); *Broilers*, 290 F. Supp. 3d at 817 (declining to dismiss claims for failure to comply with notice provisions when the plaintiffs filed late notices with state attorneys general); *Staley v. Gilead Scis., Inc.,* 446 F. Supp. 3d 578, 623-

---

[19] Even if the Court were inclined to adopt Defendants' argument regarding specifically pleading the elements of each state's unjust enrichment laws, leave to amend should be granted. *See, e.g., Miami Prods. & Chem. Co. v. Olin Corp.*, Nos. 1:19-CV-00385, 1:19-CV-00975, 1:19-CV-00990, 2021 WL 2588090, at *13-15 (W.D.N.Y. June 24, 2021) (granting leave to replead unjust enrichment claims with greater specificity)); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016) (same).

624 (N.D. Cal. 2020) (denying motion to dismiss state law antitrust claims for failure to comply with notice requirements because the plaintiffs had actually provided the requisite notice and were not required to plead the same to state a claim).

Regardless, Plaintiffs did comply with the statutory notice provisions for each of the states (Arizona, Hawaii, Nevada, Rhode Island, and Utah) identified in Section V.C.1. of Defendants' motion to dismiss on September 21, 2021. *See* Declaration of Derek Y. Brandt ("Brandt Decl."), Exs. B-D, F, G. Even if Plaintiffs had not complied with these notice provisions, such a failure is curable. *Miami Prods. & Chem. Co. v. Olin Corp*., No. 1:19-CV-00385 EAW, 2021 WL 2588090, at *12 (W.D.N.Y. June 24, 2021) (concluding the notice provisions of Arizona, Nevada, and Utah statutes each permit notice to their respective attorney general simultaneous with or after the filing of complaint); *Broilers*, 290 F. Supp. 3d at 817 (declining to dismiss Arizona and Rhode Island claims for failure to comply with notice provisions when plaintiffs filed late notices with state attorneys general*); In re Zetia (Ezetimibe) Antitrust Litig.* ("*Zetia*"), No. CV 2:18-MD-2836, 2019 WL 1397228, at *25 (E.D. Va. Feb. 6, 2019), report and recommendation adopted as modified, 400 F. Supp. 3d 418 (E.D. Va. 2019) (recommending denial of motion to dismiss Arizona, Hawaii, Nevada, Rhode Island, and Utah claims where notice was provided to attorneys general after initiation of suit but early in litigation).

### 2. Plaintiffs Allege Intrastate Misconduct or Substantial Intrastate Effects.

Allegations of a nationwide antitrust or consumer protection violation satisfy "intrastate" pleading requirements so long as the impact of the conduct was felt within each state. *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 408 (S.D.N.Y. 2011) (collecting cases). Plaintiffs sufficiently plead intrastate conduct for each of the challenged states, as set forth below.

*Mississippi:* "Mississippi's Antitrust Act requires at least some conduct that is intrastate." *Sandee's Catering v. Agri Stats, Inc.* ("*Sandee's Catering*"), No. 20 C 2295, 2020 WL 6273477,

at *8 (N.D. Ill. Oct. 26, 2020). Plaintiffs allege that "Defendants' Crop Inputs were imported into Mississippi and then sold through Defendants' agents to Mississippi customers . . . at anticompetitive prices," and that this conduct "substantially affected Mississippi commerce." (¶176(a), (c).) Plaintiffs also allege Defendants' conduct caused consumers to pay artificially higher prices for the Crop Inputs purchased in Mississippi. (¶176(b).) Courts consistently find that such allegations establish the requisite intrastate conduct under Mississippi's Antitrust Act. *See Sandee's Catering*, 2020 WL 6273477, at *8 (finding allegations identical to Plaintiffs' satisfied the requirement to plead intrastate conduct); *Suboxone*, 64 F. Supp. 3d at 698-99 (allegations that anticompetitive conduct had "substantial intrastate effects" that foreclosed retailers within a state from offering cheaper prices were sufficient).

**South Dakota:** South Dakota's antitrust statute states, "[a] contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful." S.D. Codified Laws § 37-1-3.1. Courts find that this language requires that a plaintiff allege "only that defendant's conduct produced anticompetitive effects within South Dakota." *Chocolate Confectionary*, 602 F. Supp. 2d at 581 (quoting *In re New Motor Vehicles Canadian Export Antitrust Litig.*, ("*NMV*"), 350 F. Supp. 2d 160, 172 (D. Me. 2004)); *see also*, *In re Auto. Parts Antitrust Litig.* ("*Auto Parts II*"), 50 F. Supp. 3d 836, 857-58 (E.D. Mich. 2014) (allegations that plaintiffs paid supracompetitive prices in South Dakota were sufficient under South Dakota's antitrust statute). Plaintiffs satisfy this requirement by alleging that Defendants' conduct resulted in South Dakota purchasers paying supracompetitive prices and which had a substantial effect on South Dakota commerce. (¶186(a)-b.)

**Tennessee:** The Tennessee Trade Practices Act ("TTPA"), "applies to activity that has substantial effects on commerce within the state[.]." *Sherwood v. Microsoft Corp.*, No. M2000-

49

01850, 2003 WL 21780975, at *1 (Tenn. Ct. App. July 31, 2003). This requirement is satisfied by allegations that Tennessee citizens paid more for a product in Tennessee than they otherwise would have but for the alleged anticompetitive conduct. *See NMV*, 350 F. Supp. 2d at 173 ("the Tennessee legislature clearly intended that the [TTPA] apply to anticompetitive conduct that decreases competition in or increases the price of goods paid by consumers in Tennessee even though those goods may have arrived in Tennessee through interstate commerce."). Plaintiffs meet this standard by alleging that Defendants' conduct resulted in Tennessee purchasers paying supracompetitive prices, which had a substantial effect Tennessee commerce. (*See* ¶187(a)-(b).)

Defendants' reliance on *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 524 (Tenn. 2005), is misplaced. The Supreme Court of Tennessee did not conclude that "allegations that prices were raised as a result of [anticompetitive] conduct [are] insufficient" to satisfy the substantial effects requirement. (*See* Dkt. 142 at 83, n 46.) Instead, the Court determined the allegations in that case were insufficient because they "primarily relate[d] to the defendants' actions in conspiring and implementing the conspiracy" rather than the "*effects* of the conduct on Tennessee commerce." *Freeman*, 172 S.W.3d at 524.

**Wisconsin:** Wisconsin's antitrust act requires a plaintiff to allege that the conduct complained of "substantially affects the people of Wisconsin and has impacts in this state, *even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state.*" *Olstad v. Microsoft Corp.*, 700 N.W. 2d 139, 141 (Wis. 2005) (emphasis added). To satisfy the "substantially affects" requirement, it is sufficient to allege that "the putative Wisconsin class members paid higher prices because of Defendants' alleged anticompetitive conduct and substantially affected the people of Wisconsin." *Sandee's Catering*, 2020 WL 6273477, at *8; *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 535 (E.D. Pa. 2010) (same). Plaintiffs satisfy this

50

standard by alleging that Defendants' Crop Inputs were imported into Wisconsin and then sold through their agents to Wisconsin customers at anticompetitive inflated prices. (¶191(a)-(b).)

**D. Plaintiffs Have Adequately Alleged Their State Consumer Protection Act Claims.**

**1. Plaintiffs Complied with the Relevant Notice Requirements.**

State filing notice requirements do not protect Defendants from the consequences of their anticompetitive conduct. Furthermore, Plaintiffs complied with the filing notice requirements under the Hawaii and Oregon statutes on September 21, 2021. *See* Brandt Decl., Exs. C, E.[20]

Defendants' argument that Plaintiffs' West Virginia consumer protection claim must be dismissed for failure to comply with the right-to-cure provision contained in W. Va. Code § 46A-6-106(c) is a defunct argument. This provision was eliminated following the statute's amendment in July 2021. *See* 2021 West Virginia Senate Bill No. 5, West Virginia Eighty-Fifth Legislature - Regular Session, 2021, Feb. 25, 2021. Assuming West Virginia's new right-to-cure provision, W. Va. Code § 46A-5-108, applies, Plaintiffs should be permitted to submit a post-filing notice and amend their complaint accordingly. *See Oakley v. Coast Prof'l, Inc.*, No. 1:21-00021, 2021 WL 5150165, at *3 (S.D.W. Va. Nov. 4, 2021) (indicating the language of Va. Code § 46A-5-108(a) suggests post-filing right-to-cure notices are permissible); *see also Zetia*, 400 F. Supp. 3d at 440.

**2. Plaintiffs Sufficiently Allege Their State Consumer Protection Claims.**

Defendants summarily assert that Plaintiffs cannot proceed with their consumer protection claims in ten jurisdictions where, they claim, the specific standards for unfair, deceptive, or unconscionable conduct are not satisfied by allegations of an antitrust conspiracy. (*See* Dkt. 142 at 84.) Yet Defendants cite scant authority in support of this sweeping argument and fail to offer

---

[20] Contrary to Defendants' assertion, Plaintiffs are only required to provide notice to Oregon's Attorney General under Or. Rev. Stat. § 646.638(2).

any analysis. In fact, courts have repeatedly found that antitrust conspiracies are sufficient to satisfy the pleading requirements of each state's consumer protection statute, as set forth below.

*Arkansas:* "The Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4–88–107(a)(10), makes illegal any trade practice which is unconscionable, which includes conduct violative of public policy or statute." *Baptist Health v. Murphy*, 226 S.W. 3d 800, 811 (Ark. 2006). As numerous courts have concluded, allegations of anticompetitive conduct, and collusion in particular, are sufficient to establish the requisite unconscionable conduct under the ADTPA. *See Pork*, 495 F. Supp. 3d at 785 (plaintiffs' plausible allegations of a price-fixing were "unconscionable" acts under the ADTPA); *Chocolate Confectionary*, 602 F. Supp. 2d at 583 (same).

*District of Columbia:* Defendants omit a key aspect of the court's ruling in the sole case cited in support of dismissing the D.C. consumer protection claim. In *In re Graphics Processing Units Antitrust Litigation*, the court stated that pleading unconscionability "requires something more than merely alleging that the price of a product was unfairly high." 527 F. Supp. 2d 1011, 1029 (N.D. Cal. 2007). The court relied on *Riggs National Bank of Washington D.C. v. District of Columbia*, which held that unconscionability requires pleading that one of the parties lacked a meaningful choice and that the terms of the contract are unreasonably favorable to the other party. 581 A.2d 1229, 1251 (D.C. 1990). Plaintiffs here allege both elements and thus sufficiently allege unconscionability under D.C. law. (*See* ¶198(b).) Furthermore, numerous courts have concluded that a violation of federal antitrust law by itself constitutes a violation of the D.C.'s Consumer Protection Procedures Act ("DCCPPA"). *See Pork*, 495 F. Supp. 3d at 782 (a federal antitrust claim is a basis for a CPPA claim); *In re Packaged Seafood Prod. Antitrust Litig.* ("*Packaged*

*Seafood*"), 242 F. Supp. 3d 1033, 1073 (S.D. Cal. 2017) (same). Plaintiffs allege a violation of federal law here.

*Kansas:* The Kansas Consumer Protection Act ("KCPA") prohibits a supplier from "engag[ing] in any deceptive act or practice in connection with a consumer transaction," including "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." Kan. Stat. Ann. §§50–626(a), (b)(3). Establishing a claim under this section requires that Plaintiffs allege: (1) Plaintiffs were consumers; (2) Defendants were suppliers; (3) Defendants willfully failed to state, concealed, suppressed, or omitted, a certain matter or information; and (4) that certain matter or information was a material fact. *Cole v. Hewlett Packard Co.*, 84 P.3d 1047 (Table) (Kan. Ct. App. 2004). Plaintiffs sufficiently allege each element. (*See* ¶¶22-48 (Plaintiffs are consumers); ¶¶49-65 (Defendants are suppliers); ¶¶5, 69-73, 137-41, 233-62 (Defendants willfully failed to state, concealed, suppressed or omitted certain information); ¶¶66-120, 202, 137-41, 202 (alleging the information Defendants failed to disclose was a material fact).)

*Michigan:* Plaintiffs' allegations are sufficient to establish a violation of the Michigan Consumer Protection Act ("MCPA"). Courts have concluded that allegations of anticompetitive joint conduct are sufficient to constitute actionable deception under the MCPA. *See, e.g.*, *Packaged Seafood*, 242 F. Supp. 3d at 1077 (allegations of secret meetings, misrepresentations to customers, and surreptitious communications among defendants, as well as public statements and explanations, were sufficient to plead a fraud-based claim under the MCPA). Conspiracy allegations are also sufficient to maintain a claim under provisions of the MCPA not predicated on the failure to disclose or the omission of information. *See In re Loestrin 24 FE Antitrust Litig.* ("*Loestrin*"), 410 F. Supp. 3d 352, 378 (D.R.I. 2019) (finding overcharges caused by Defendants'

anticompetitive conduct fell squarely within Mich. Comp. Laws Ann. § 445.903(1)(z) and denying motion to dismiss). Plaintiffs thus sufficiently allege a claim under the MCPA. (*See* ¶¶5, 69-73, 137-41, 203, 233-62 (Defendants actively concealed their conspiracy and Michigan consumers were overcharged).) Defendants overstate the holding in *In re Lidoderm Antitrust Litigation*, 103 F. Supp. 3d 1155 (N.D. Cal. 2015), where the court did not address whether allegations of a concealed group boycott and other concerted conduct would be sufficient to establish a MCPCA violation. Instead, the court in *Lidoderm* focused only on whether the plaintiffs' allegations of a pay-for-delay generic drug scheme and failure to disclose information to the USPTO were sufficient to establish actionable deception under the MCPA. *Id.* at 1169.

*Minnesota*: Minnesota's Prevention of Consumer Fraud Act ("MPCFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69. Plaintiffs' allegations of Defendants affirmative efforts to conceal their conduct are sufficient to state a MPCFA claim. (*See* ¶¶5, 69-73, 137-41, 204, 233-62 (Defendants actively concealed their conspiracy and that Minnesota consumers were overcharged)); *Packaged Seafood*, 242 F. Supp. 3d at 1078 (allegations of secret meetings, misrepresentations to customers, and surreptitious communications, combined with public statements and explanations, sufficient to state a claim under the MPCFA).

*New Mexico:* The New Mexico Unfair Practices Act ("NMUP") prohibits "unconscionable trade practices in the conduct of any trade or commerce." N.M. Rev. Stat. § 57–12–3. An unconscionable trade practice is "an act or practice . . . which to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair;

or (2) results in a gross disparity between the value received by a person and the price paid." 57 N.M. Rev. Stat. § 57–12–2(E). Plaintiffs allege that Defendants' conspiracy caused consumers to pay artificially high prices for Crop Inputs, which resulted in a "gross disparity" between the price paid and the value received. (*See* ¶210(b).) Such allegations are sufficient to state a claim under the NMUP. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*TFT-LCD II*"), 586 F. Supp. 2d 1109, 1127 (N.D. Cal. 2008) (denying dismissal of NMUP claim where plaintiffs alleged "gross disparity" between the price paid and the value received and distinguishing *In re Graphics Processing Units Antitrust Litigation* ("*GPU*"), 527 F. Supp. 2d 1011, 1030 (N.D. Cal. 2007) by noting *GPU* plaintiffs did not allege a gross disparity as a result of defendants' alleged price fixing).

**Oregon:** The Oregon Unfair Trade Practices Act ("OUTPA") should be "liberally construed in order to maximize protection of consumers." *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2687, 2017 WL 3131977, at *27 (D.N.J. July 20, 2017). "[T]he [OUTPA] is designed to prevent 'false or misleading representations of fact' relating to the consumer's cost for goods." *Id*. Accordingly, where plaintiffs "plausibly allege affirmative misrepresentations regarding and concealment of the alleged conspiracy," courts will allow antitrust claims to proceed. *Packaged Seafood*, 242 F. Supp. 3d at 1084. Plaintiffs thus sufficiently allege their OUTPA claim. (*See* ¶¶5, 69-73, 137-41, 233-62.)

**Rhode Island:** In determining whether a practice is "unfair" under the Rhode Island's Unfair Trade Practices and Consumer Protection Act ("UTPCPA"), courts consider "whether the practice offends public policy as it has been established by statutes, the common law, or otherwise; whether it is immoral, unethical, oppressive, or unscrupulous; and whether it causes substantial injury to consumers." *TFT-LCD II*, 586 F. Supp. 2d 1109 at 1129-1130. Pursuant to this standard,

55

allegations of collusion are sufficient to meet the UTPCPA's standard for "unfair" conduct. *See In re Niaspan Antitrust Litig.* ("*Niaspan*"), 42 F. Supp. 3d 735, 762 (E.D. Pa. 2014) (collecting cases). Plaintiffs' allegations thus satisfy this standard. (*See* ¶¶66-120, 185.)

**South Dakota:** Under the South Dakota Deceptive Trade Practices Act ("SDDTPA"), it is a deceptive trade practice to "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or . . . conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged." S.D. Codified Laws § 37–24–6(1). Plaintiffs' allegations regarding the existence and extent of Defendants' affirmative efforts to conceal their anticompetitive conduct fall squarely within the ambit of the SDDTPA's prohibition on such conduct. (*See* ¶¶5, 69-73, 137-41, 233-62.)

**West Virginia:** West Virginia's Consumer Credit and Protection Act ("WVCCPA") was amended in 2015 to include the explicit directive that "in construing this article, the courts be guided by the policies of the [FTC] and interpretations given by the [FTC] and the federal courts to Section 5(a)(1) of the [FTC] Act[.]" W. Va. Code § 46A–6–101. Guided by this, courts have concluded that allegations that defendants engaged in a conspiracy and concealed it from plaintiffs are sufficient to state a claim under the WVCCPA. *See Packaged Seafood*, 242 F. Supp. 3d at 1094 (denying dismissal where plaintiffs alleged a conspiracy, an aspect of which was fraudulently concealed from plaintiffs); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 552 (N.D. Ill. 2019) (applying *Packaged Seafood* to deny motion to dismiss WCCPA claim). As Plaintiffs allege the existence of a conspiracy, and Defendants' concealment thereof, Plaintiffs sufficiently state a claim under the WVCCPA. (*See* ¶¶5, 66-120, 137-41, 233-62.)

56

**E.   Plaintiffs Adequately Allege Their Unjust Enrichment Claims.**

**1.   Unjust Enrichment Constitutes an Independent Cause of Action.**

Plaintiffs adequately allege their unjust enrichment claims under the laws of California, Illinois, Mississippi, and New Hampshire, all of which permit independent causes of action for unjust enrichment.

*California:* Unjust enrichment has been held to be an independent cause of action in California courts. *See Ghirardo v. Antonioli*, 924 P.2d 996, 1002–03 (Cal. 1996) (holding that a vendor could recover from a debtor without statutory claims for relief because California had incorporated the common-law concept of unjust enrichment). Despite an apparent intrastate split of authority on this issue, the California Supreme Court's holding in *Ghirardo* has led courts to conclude independent enrichment claims may proceed under California law. *See Pork*, 495 F. Supp. 3d at 791 (relying on *Ghirardo* to conclude that independent unjust enrichment claims are not expressly disallowed denying motion to dismiss California unjust enrichment claim); *Loestrin*, 410 F. Supp. 3d at 381 (same).

*Illinois:* Illinois law similarly recognizes unjust enrichment as an independent claim. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) ("The Illinois Supreme Court appears to recognize unjust enrichment as an independent cause of action."); *Pork*, 495 F. Supp. 3d at 791 (recognizing existence of independent claim for unjust enrichment under Illinois law and denying dismissal of claim on that basis).

*Mississippi:* A claim under Mississippi law for unjust enrichment may also be brought as an independent cause of action. *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 342 (Miss. 2004) ("Mississippi law provides that, in an action for unjust enrichment, the plaintiff need only allege and show that the defendant holds money which in equity and good conscience

belongs to the plaintiff."); *Pork*, 495 F. Supp. 3d at 792 (recognizing existence of independent claim for unjust enrichment under Mississippi law and denying dismissal of claim on that basis).

*New Hampshire:* Under New Hampshire law, "courts have allowed indirect purchasers to bring [] unjust-enrichment claims based on defendants' violations of New Hampshire's consumer-protection statute." *Niaspan*, 42 F. Supp. 3d at 767. Given that Defendants do not challenge the sufficiency of Plaintiffs' New Hampshire consumer protection allegations, the Court should decline to dismiss Plaintiffs' New Hampshire unjust enrichment claim on the same basis.

### 2.   Plaintiffs May Plead Both Equitable and Legal Remedies.

Plaintiffs are entitled to plead unjust enrichment claims in the alternative to their legal claims. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.* ("*Solodyn*"), No. 14-md-02503, 2015 WL 5458570, at *19 (D. Mass. Sept. 16, 2015) (end-payor plaintiffs could "plead in the alternative equitable claims along with legal claims"); *Generic Drugs*, 368 F. Supp. 3d 814 at 851 (denying dismissal of unjust-enrichment claim because it failed to allege a lack of legal remedy, citing Rule 8(d)(2)'s "permissiveness" of pleading in the alternative; *In re Processed Egg Prods. Antitrust Litig.* ("*Processed Egg*"), 851 F. Supp. 2d 867, 918 (E.D. Pa. 2012) (same).

Moreover, Defendants' reliance on *United States v. Bame*, 721 F.3d 1025 (8th Cir. 2013) is misplaced. The issue on appeal in *Bame* was not whether a plaintiff may *plead* both legal and equitable claims, but rather whether summary judgment was appropriately granted on the unjust enrichment claim. *Id.* at 1026. Indeed, the Eighth Circuit explained, "the issue here is not one of pleading" and observed that whether an unjust enrichment claim may be maintained despite the existence of other legal remedies "'presents a serious question that we need not resolve at this time[.]" *Id.* at 1029, 1031. Accordingly, pleading unjust enrichment claims in states where Plaintiffs also have asserted legal claims is not basis for dismissal.

### 3.   Inadequate Consideration Does Not Defeat Unjust Enrichment Claims.

Plaintiffs' unjust enrichment claims are not vitiated because Plaintiffs received *some* consideration. Because the consideration Plaintiffs received was inadequate, Defendants were still unjustly enriched. *See, e.g.*, *In re K–Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 545-46 (D.N.J. 2004) (noting "Plaintiffs' receipt of valuable medicine for their payments does not, as Defendants contend, bar an unjust enrichment claim" and collecting cases). Courts regularly decline to dismiss unjust enrichment claims in each of the states challenged by Defendants on this basis. *See Lidoderm*, 103 F. Supp. 3d at 1177, 1177-1180 (declining to dismiss Kansas and Tennessee unjust enrichment claims on ground that plaintiffs received consideration); *In re Auto. Parts Antitrust Litig.* ("*Auto Parts III*"), 50 F. Supp. 3d 869, 895-96 (E.D. Mich. 2014) (same regarding Florida).

### F.   Conferral of a Direct Benefit Is Not Required for the Unjust Enrichment Claims.

Though some Plaintiffs are not "direct purchasers" of Crop Inputs, in the sense the term is used in the antitrust law context, this does not mean those Plaintiffs failed to confer a direct benefit on Defendants as contemplated by unjust enrichment law. *See, e.g.*, *Processed Egg*, 851 F. Supp. 2d at 928-36 (acknowledging some jurisdictions use "direct benefit" terminology but concluding that precedent in those states found a direct benefit in the absence of a direct relationship or direct payment, where the benefit conferred was not merely incidental). In reviewing each jurisdiction individually, it is clear that conferral of a direct benefit is not required.

*Arizona:* Numerous courts have held that Arizona does not require a plaintiff confer any direct benefit on a defendant. *See, e.g.*, *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.* ("*HDD*"), No. 19-md-02918, 2021 WL 4306018, at *25 (N.D. Cal. Sept. 22, 2021) (rejecting argument that direct benefit is required and denying dismissal of Arizona unjust enrichment claim); *Sandee's Catering v. Agri Stats, Inc.* ("*Sandee's Catering II*"), No. 20 C 2295, 2021 WL 963812, at *4 (N.D. Ill. March 15, 2021) (same) (citing cases).

*Florida:* The weight of authority supports the conclusion that conferral of a direct benefit is not required under Florida law. *See Solodyn*, 2015 WL 5458570, at *18 (rejecting argument that Florida unjust enrichment law requires a conferral of a direct benefit); *Processed Egg*, 851 F. Supp. 2d at 929 ("Given that Florida law does not appear to require the conferral of a direct benefit exclusively [] the Court cannot dismiss the Florida unjust enrichment claims as a matter of law.").

*Kansas:* The Supreme Court of Kansas has held an unjust enrichment claim "does not depend on privity." *See Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996). Defendants fail to cite any relevant authority that could overcome this, relying only on an unpublished Tenth Circuit opinion that upheld dismissal of a Kansas unjust enrichment claim because the plaintiffs failed to cite to any Kansas law supporting it. *Spires v. Hosp. Corp. of Am.*, 289 Fed. App'x. 269, 273 (10th Cir. 2008). *Spires* notably does not identify any Kansas authority indicating a direct benefit is required. Accordingly, courts have declined to conclude that Kansas requires such a showing. *See Packaged Seafood*, 242 F. Supp. 3d at 1090 ("[I]n the absence of contrary authority, the Court concludes that Kansas does not require a showing of direct benefit.").

*Maine:* The Supreme Judicial Court of Maine has held that "lack of privity . . . do[es] not bar an action for unjust enrichment." *Aladdin Elec. Assocs. v. Town of Old Orchard Beach*, 645 A.2d 1142, 1144 (Me. 1994). Although a plaintiff must demonstrate that he "conferred a benefit" on the defendant, *Platz Associates v. Finley*, 973 A.2d 743, 750 (Me. 2009), courts have concluded that this benefit need not be conferred directly. *See Sandee's Catering II*, 2021 WL 963812, at *4 ("Maine's unjust enrichment laws do not require a showing of a direct benefit"); *HDD*, 2021 WL 4306018, at *26 (same). Defendants' authority does not support a contrary conclusion. *See Simpson v. Cent. Me. Motors, Inc.*, 669 A.2d 1324, 1326 (Me. 1996) (summary judgment was properly granted because the benefit alleged was not supported by the record).

**Massachusetts:** "Unjust enrichment [under Massachusetts law] does not require that a defendant receive direct payments from a plaintiff." *Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314, 323 (D. Mass. 2005) (citing *Greenwald v. Chase Manhattan Mortg. Corp.*, 241 F.3d 76, 81 (1st Cir. 2001)); *see also In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 237 (M.D. Pa. 2010)*,* (upholding indirect purchaser's unjust enrichment claim under Massachusetts law). Defendants cite *Estate of Johnson v. Melvin Rose, Inc.*, No. WOCV200400622, 2007 WL 1832029 (Mass. Super. May 9, 2007) to argue otherwise, but this case is unpersuasive. *See Pork*, 495 F. Supp. 3d at 794 (*Estate of Johnson* is unpersuasive as it applied the wrong state's law and relied on a misreading of a prior case).

**Michigan:** Conferral of a direct benefit is not required under Michigan law. *See Kammer Asphalt Paving Co. v. East China Twp. Schools*, 504 N.W. 2d 635, 641 (Mich. 1993) (plaintiff who "indirectly provided defendant a benefit," and had "no contract" with defendant, was entitled to proceed with unjust enrichment claim). Courts analyzing Michigan law have determined that the focus is more appropriately placed on the benefit itself. *See Pork*, 495 F. Supp. 3d at 795 (noting that the language used by the Michigan Supreme Court in *Wright v. Genesee Cty.*, 934 N.W.2d 805, 809 (Mich. 2019) suggests "that the focus is on the benefit, rather than on how that benefit was transferred."). Defendants' authority is insufficient to reach a different conclusion. *See Pork*, 495 F. Supp. 3d at 795 (criticizing application of *A & M Supply v. Microsoft Corp.*, No. 274164, 2008 WL 540883 (Mich. App. Feb. 28, 2008) in this context).

**New Hampshire:** New Hampshire state law does not require the conferral of a direct benefit on the defendant. *See Knapp v. Hobbs*, 50 N.H. 476, 478 (N.H. 1871) (no privity required to establish unjust enrichment); *see also Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1098-99 (D. Minn. 2017) (holding that no direct benefit is required, but dismissing because there was no

benefit, direct or indirect, pleaded). Defendants' authority merely reiterates that a benefit must be conferred to the defendant by the plaintiff and rejected the characterization of defendants' increased profits and revenues, at plaintiff's expense, because of defendant's violation of state and federal laws as "the conferral of a benefit." *Pacamor Bearings, Inc. v. Minebea Co.*, 892 F. Supp. 347, 357 (D.N.H. 1995). The court did not, however, conclude a direct benefit was required, and this Court should decline to adopt Defendants' overinclusive reading.

**North Carolina:** The North Carolina Supreme Court has *not* expressly required that a benefit be directly conferred in order to support a claim for unjust enrichment. In fact, the court's decision in *Embree Construction Group, Inc. v. Rafcor, Inc.*, 411 S.E.2d 916 (N.C. 1992), suggests that an unjust enrichment claim does not always require a direct benefit. *Bandy v. Gibson*, No. 16 CVS 456, 2017 WL 3207068, at *5 (N.C. Super. July 26, 2017). Defendants rely on *Effler v. Pyles,* 380 S.E. 2d 149 (N.C. Ct. App. 1989) in support of their position, but "cases decided after *Effler* have held that an indirect benefit can support an unjust enrichment claim." *Lau v. Constable*, 16 CVS 4393, 2017 WL 536361, at *5 (N.C. Super. Feb. 7, 2017).

**Rhode Island:** Numerous courts have concluded that Rhode Island does not require a benefit be conferred directly on a defendant to plead a claim for unjust enrichment. *See, e.g.*, *Loestrin*, 410 F. Supp. 3d at 383 (collecting cases).

**South Carolina:** Courts analyzing South Carolina law have concluded that a conferral of direct benefit is not required for unjust enrichment claims. *See Auto Parts II*, 50 F. Supp. 3d at 865 (rejecting unjust enrichment claim where benefit to defendant was "incidental")).

**Utah: "**Utah law does not mandate that a plaintiff demonstrate that she directly conferred a benefit upon a defendant." *Processed Egg*, 851 F. Supp. 2d at 934; *see also Emergency Physicians Integrated Care v. Salt Lake Cty.*, 167 P.3d 1080, 1085 (Utah 2007).

*West Virginia:* Under West Virginia law, "[r]ecovery of damages based upon the theories of quasi contract or unjust enrichment does not necessitate a finding of privity of contract between the parties." *Dunlap v. Hinkle*, 317 S.E. 2d 508, 512 n.2 (W. Va. 1984). Defendants' reliance on *Johnson v. Ross* is misplaced, as the Fourth Circuit concluded that the West Virginia Court of Appeals had not yet decided the direct-benefit question and expressly "decline[d] [the] invitation to settle this state-law question[.]" 419 Fed. App'x 357, 362 (4th Cir. 2011).

*Wisconsin:* Courts analyzing unjust enrichment claims have rejected any requirement to plead a direct benefit under Wisconsin law. *See In re Auto. Parts Antitrust Litig.* ("*Auto Parts IV*"), 29 F. Supp. 3d 982, 1028 (E.D. Mich. 2014); *Loestrin*, 410 F. Supp. at 383. Defendants cited authority, *Blitz v. Monsanto Co.*, 317 F. Supp. 3d 1042, 1056 (W.D. Wis. 2018), was predicated on an overextension of the cases on which it relies. *Blitz* concludes that a direct benefit is required based on its interpretation of *Sands v. Menard*, 904 N.W.2d 789, 798 (Wis. 2017) and *Emirat AG v. High Point Printing LLC*, 248 F. Supp. 3d 911, 937 (E.D. Wis. 2017). *Sands* is cited for the unremarkable proposition that to plead an unjust enrichment claim, a party must allege sufficient facts to satisfy the court the elements of the claim are present. *Blitz*, 317 F. Supp. 3d at 1055-56. In *Emirat*, the court found there was no actual benefit conferred at all. 248 F. Supp. 3d at 937. Although the *Emirat* court characterized a potential, alternative benefit as "indirect at most," *id.,* this suggests that the hypothetical benefit was merely too attenuated to be considered a benefit for purposes of the unjust enrichment claim. The court did not, however, suggest that a direct benefit would be necessary to succeed on the claim. Accordingly, the weight of authority supports Plaintiffs' position that direct benefit is not required under Wisconsin law.

### G. Plaintiffs' State Law Claims Are Timely.

Plaintiffs' state antitrust, consumer protection, and unjust enrichment claims are timely due to the self-concealing nature of Defendants' conspiracy and the discovery doctrine, as well as because Defendants' anticompetitive acts are continuing violations. *See* Section V.

### H. Plaintiffs Have Article III Standing for All Claims.

Defendants seek dismissal of Plaintiffs' representative claims under Rule 23 for states where the named Plaintiffs do not have personal claims. Defendants' argument confuses justiciability under Article III with the propriety of asserting representative claims under Rule 23.

#### 1. Plaintiffs Adequately Allege Their Individual Article III Standing.

Article III requires that a plaintiff "suffered an injury in fact that is fairly traceable to the defendant's conduct and that is likely to be redressed by the relief [they] seek[]." *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017). Once the class representative's threshold standing is met, there is no further, separate "class action standing" requirement. *Id.* at 773. Defendants do not argue that Plaintiffs lack individual Article III standing in the states where they reside or bought Crop Inputs. (*See* Dkt. 142 at 63.) Plaintiffs also allege their injury caused by Defendants' conspiracy are redressable through damages and injunctive relief. (*See* ¶125.)

#### 2. Plaintiffs Allege They Suffered the Same Type of Injury as the Proposed Class Members.

The relevant inquiry at the pleading stage is whether Plaintiffs have Article III standing to pursue claims they assert in their *individual* capacity. Defendants confuse this inquiry by "conflat[ing] the requirements for individual standing with those for a class representative." *Fox v. Ritz-Carlton Hotel Co., L.L.C.*, 977 F.3d 1039, 1047 (11th Cir. 2020).

> Class actions, by their very nature, involve named plaintiffs litigating injuries that they personally would not have standing to litigate. Because named plaintiffs are not required to have individual standing to litigate claims belonging to unnamed class members, it makes no sense to dismiss unnamed class members' claims for

lack of standing when there is no requirement that the named plaintiffs have individual standing to litigate those claims.

*Anderson v. Travelex Ins. Servs., Inc.*, No. 8:18-CV-362, 2020 WL 1323489, *4 (D. Neb. Mar. 20, 2020).

Beyond demonstrating their individual standing to sue, Plaintiffs have also alleged that they suffered the same type of injury as the proposed class members that stemmed from the same conduct by Defendants. Named plaintiffs have sufficient stake in the outcome of the putative class members' claims when they all possess the same interest and have suffered the same injury. *Id*. The requirements of Rule 23(a) ensure that the appropriate representative for the class of claims to be litigated is the named plaintiff, and "effectively limits class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011); *see also Penrose v. Buffalo Trace Distillery, Inc*., 4:17-CV-294, 2018 WL 705054, at *5 (E.D. Mo. Feb. 5, 2018) ("the class certification approach has the benefit of resolving any disjuncture between a named plaintiff's injuries and the class's […]."). Plaintiffs clearly have individual standing for their claims, and do not assert that they have individual standing for states in which they do not reside or did not purchase Crop Inputs. Rather, Plaintiffs allege that they suffered the same injury as the proposed class members (i.e., paying too much for Crop Inputs), and therefore can bring absent class members' claims on a representative basis under Rule 23.

Defendants' related argument that that there must be a named Plaintiff with individual standing to assert each state law claim is wrong. The Eighth Circuit has never held that a class representative is required from each state for which a representative claim is asserted, let alone at the pleading stage. The proper inquiry focuses on the similarity of the injury suffered and whether the named plaintiff has a sufficient stake in the outcome of the putative class members' claim when they all possess the same interest and have suffered the same injury. *See Anderson*, 2020 WL

1323489, at *4 (in denying a motion to dismiss, noting the "absence of evidence suggesting that the plaintiff's claim and alleged injury is so different from the possible claims and injuries of putative class members.").

Every circuit to address the specific issue of whether there must be a named plaintiff from every state under which a claim is asserted has rejected Defendants' argument. *See Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 133-34 (4th Cir. 2021) (standing requires only that named plaintiffs show "they *personally* have been injured, not that injury has been suffered by other, unidentified members of the class" and that representation of absent class members in other states depends on whether Rule 23 is satisfied); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018) (rejecting argument that plaintiffs lacked Article III standing in states where they did not make purchases); *Langan v. Johnson & Johnson Consumer Cos., Inc.,* 897 F.3d 88, 92-93 (2d Cir. 2018) (where named plaintiffs have individual standing, the question of absent class members with claims subject to different state laws is a question of predominance). *Cf. Morrison v. YTB Intern., Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (permitting Illinois state-law claims on behalf of residents of other states and rejecting arguments that choice of law and absent class members in other states have anything to do with standing). [21]

Moreover, district courts within the Eighth Circuit also have held with near uniformity that class certification issues are logically antecedent to Article III concerns in similar cases. *See*, *e.g.*, *Wells Fargo*, 671 F. Supp. 2d at 1023 (noting the circuit split and noting that the "Court concurs

---

[21] Other circuits' cases show that Defendants' argument is a premature attempt to litigate the Rule 23 requirements at this stage. *See Molock v. Whole Foods Mkt. Grp., Inc*., 952 F.3d 293, 297-298 (D.C. Cir. 2020) (holding that putative class members are not parties subject to dismissal before class certification, rendering motion to dismiss premature); *Fallick v. Nationwide Mut. Ins. Co*., 162 F.3d 410, 423 (6th Cir. 1998) ("whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet [] Rule 23").

with the view 'that the question whether [representative parties] may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.'") (citing 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1785.1 (3d ed. 2005); William B. Rubenstein et al., 1 Newberg on Class Actions § 2.7 (4th ed. 2008) ("Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions.")); *Doyel v. McDonald's Corp.*, No. 4:08-CV-1198, 2009 WL 350627, at \*5 (E.D. Mo. Feb. 10, 2009) (denying dismissal of claims made on behalf of purported class members on the grounds that the argument went to the plaintiffs' ability to certify a class pursuant to Rule 23 and the plaintiffs had adequately asserted their individual Article III standing).

Aside from this majority of district courts this Circuit, courts in the other circuits that have not addressed the issue have acknowledged the "growing consensus" and reached the same conclusion. *See, e.g.*, *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1072 (N.D. Cal. 2015); *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, No. 20-MD-02966, 2021 WL 3612497, at \*46 (N.D. Cal. Aug. 13, 2021) (relying on *Mayor of Baltimore* and concluding plaintiffs' class claims "need not be stricken or disregarded" at the motion to dismiss stage); *Broilers,* 290 F. Supp. 3d at 809-10 (declining to dismiss plaintiffs' "claims under laws for states in which they do not allege any of the named plaintiffs purchased"); *see also, e.g., In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1344 (N.D. Ga. 2019) ("it is sufficient to allege that individuals nationwide, including individuals in [unrepresented territories], suffered injury.").

Defendants ignore the overwhelming quantity and weight of cases that reject their argument and cite cases several cases that are either inapposite or that undermine their own argument. For example, *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002), cited in ostensible support for the assertion that the Plaintiffs must demonstrate individual standing for every state law claim, in fact supports the opposite conclusion. Defendants quote *Payton*'s statement that "a person cannot predicate standing *on injury which he does not share*." *Id.* (emphasis added). Plaintiffs have plainly alleged that their representative status is based on shared injury. Moreover, the *Payton* court went on to provide examples of where individual standing may be lacking, but where a named plaintiff could adequately serve as a representative in a class action. *See id.* at 681 ("[T]here is little trouble with the named plaintiffs representing this class under a standard 'commonality' or 'adequacy of representation' inquiry…Most importantly, there are cases where appropriate relief may only be obtained through one broad suit...").

Other cases cited by Defendants fail to provide the support they suggest. *McAteer v. Target Corp.,* No. 18-cv-349, 2018 WL 3597675, at *3 (D. Minn. July 26, 2018), is inapposite, as the court found the single named plaintiff lacked individual standing for *any* claim that would have rendered federal jurisdiction proper. *In re SuperValu, Inc.*, 870 F.3d 763, 767 (8th Cir. 2017), similarly did not address the question of standing in a representative capacity and centered on whether any named plaintiff had alleged injury sufficient to demonstrate individual standing. Defendants cite no binding case law that remotely supports the conclusion named Plaintiffs' alleged injuries are sufficiently different from the putative class members' injuries brought under other state antitrust statutes. Nor do the cases cited by Defendant adequately support the position that named plaintiffs' individual standing is required for every asserted claim in a class action.

The few district courts that have held individual standing was required for all representative claims are in the minority, and this approach has largely fallen out of favor. Although Defendants cite a single case within this Circuit that held individual standing was required for all representative claims, numerous recent cases in this Circuit have rejected its reasoning. *Compare Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-2664, 2014 WL 943224, at *10-11 (D. Minn. 2014), *with Roth v. Life Time Fitness, Inc.*, No. 15-3270, 2016 WL 3911875, at *4-5 (D. Minn. 2016) (deferring standing question to class certification); *Buchta v. Air Evac EMS, Inc.*, No. 4:19CV00976 SRC, 2019 WL 4468943, at *3-4 (E.D. Mo. Sept. 18, 2019) (analyzing split in district courts and finding a determination of standing was best addressed through Rule 23 requirements); *Moore v. Compass Group USA, Inc.*, No. 4:18-CV-1962, 2019 WL 4723077, at *6-7 (E.D. Mo. Sept. 26, 2019) (same); *see also Penrose*, 2018 WL 705054, at *5 (the "*majority of the authorities* that follow the class certification approach [and] limiting the standing inquiry to the named plaintiff[], and deferring consideration of whether the plaintiff may represent others to a later stage.") (emphasis added).

### 3.   The Court Should Defer Further Analysis Until Class Certification.

Any remaining questions about the standing of putative absent class members should be resolved at class certification. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997) (holding standing need not be analyzed at pleading stage when class certification issues are "logically antecedent" to Article III analysis). The same is true of questions about whether Plaintiffs will satisfy the requirements of Rule 23. *Pork*, 495 F. Supp. 3d at 775-76 (deferring consideration of "the standing issues until after class certification, which is 'logically antecedent' to the question raised by Defendants; whether [plaintiffs] can bring claims under the laws of states in which no representative plaintiff currently resides."). Defendants' claim that such questions must be answered now is not supported by any binding case law and contradicts sound case

management and efficiency principles. *See Mayor of Baltimore*, 995 F.3d at 134 (refusing to strike

class claims as they would be appropriately considered under a Rule 23 analysis). This Court

should defer any questions about the named Plaintiffs' ability to represent absent class members

in other states. *See Molock*, 952 F.3d at 297 (jurisdictional questions about claims of class members

are premature prior to class certification).

## VIII.     CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: December 20, 2021                     Respectfully submitted,

 *s/ Derek Y. Brandt*
**MCCUNE WRIGHT AREVALO, LLP**
Derek Y. Brandt (6228895 IL)
Leigh M. Perica (6316856 IL)
Connor P. Lemire (704702 MA)
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

*Plaintiffs' Liaison Counsel*

 *s/ W. Joseph Bruckner (w/consent)*
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
W. Joseph Bruckner (0147758 MN)
Robert K. Shelquist (21310x MN)
Brian D. Clark (0390069 MN)
Rebecca A. Peterson (0392663 MN)
Craig S. Davis (0148192 MN)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
wjbruckner@locklaw.com
rkshelquist@locklaw.com
bdclark@locklaw.com
rapeterson@locklaw.com
csdavis@locklaw.com

*s/ Michelle J. Looby (w/consent)*

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson (202241 MN)
Michelle J. Looby (0388166 MN)
Daniel C. Hedlund (258337 MN)
Daniel J. Nordin (0392393 MN)
Kaitlyn L. Dennis (0397433 MN)
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
kdennis@gustafsongluek.com

*s/ Sterling Aldridge (w/consent)*

**BARRETT LAW GROUP, P.A.**
John W. "Don" Barrett (2063 MS)
Sterling Aldridge (104277 MS)
Katherine Barrett Riley (99109 MS)
David McMullan, Jr. (8494 MS)
P.O. Box 927
404 Court Square North
Lexington, MS 39095
Telephone: (662) 834-2488
Facsimile: (662) 834-2628
dbarrett@barrettlawgroup.com
sstarns@barrettlawgroup.com
kbriley@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

***Plaintiffs' Interim Co-Lead Counsel***

**COTCHETT, PITRE & MCCARTHY, LLP**
Adam Zapala (245748 CA)
Elizabeth Castillo (280502 CA)
Joseph W. Cotchett (36324 CA)
Karin B. Swope (24015 WA)
James G.B. Dallal (277826 CA)
Reid W. Gaa (330141 CA)
840 Malcom Road, Suite 200
Burlingame, CA 94010

Telephone: (650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jcotchett@cpmlegal.com
kswope@cpmlegal.com
jdallal@cpmlegal.com
rgaa@cpmlegal.com

**EDELSON LECHTZIN LLP**
Marc Edelson (51834 PA)
Sati Gibson (90316 PA)
3 Terry Drive, Suite 205
Newton, PA 18940
Telephone: (215) 867-2399
Medelson@edelson-law.com
sgibson@edelson-law.com

**HELLMUTH & JOHNSON PLLC**
Michael R. Cashman (206945 MN)
Anne T. Regan (0333852 MN)
Nathan D. Prosser (0329745 MN)
8050 West 78th Street
Edina, MN 55439
Telephone: (952) 941-4005
Facsimile: (952) 941-2337
mcashman@hjlawfirm.com
aregan@hjlawfirm.com
nprosser@hjlawfirm.com

**LABATON SUCHAROW LLP**
Greg Asciolla (2635241 NY)
Karin Garvey (2997831 NY)
Jonathan S. Crevier (5592753 NY)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
jcrevier@labaton.com

**PAUL LLP**
Richard M. Paul III (44233 MO)
Ashlea G. Schwarz (60102 MO)
601 Walnut Street, Suite 300
Kansas City, MO 64106
Telephone: (816) 984-8100

Facsimile: (816) 984-8108
Rick@PaulLLP.com
Ashlea@PaulLLP.com

**REINHARDT WENDORF & BLANCHFIELD**
Mark Reinhardt (90530 MN)
Garrett D. Blanchfield (209855 MN)
Roberta A. Yard (322295 MN)
332 Minnesota Street, Suite W1050
St. Paul, MN 55101
Telephone: (651) 287-2100
Facsimile: (651) 287-2103
m.reinhardt@rwblawfirm.com
g.blanchfield@rwblawfirm.com
r.yard@rwblawfirm.com

**SHARP LAW LLP**
Ruth Anne French-Hodson (65461 MO)
Rex. A. Sharp (51205 KS)
5301 W. 75th Street
Prairie Village, KS 66208
Telephone: (913) 901-0505
Facsimile: (913) 901-0419
rsharp@midwest-law.com
rafrenchhodson@midwest-law.com

Isaac Diel (39503 (MO))
Greg Bentz (33369 (MO))
6900 College Blvd., Suite 285
Overland Park, KS 66211
Telephone: (913) 901-0505
Facsimile:  (913) 901-0419
idiel@midwest-law.com
gbentz@midwest-law.com

**SPECTOR, ROSEMAN & KODROFF, PC**
William G. Caldes (00062-1995 NJ; 75842 PA)
Icee N. Etheridge (20256-2016 NJ; 322630 PA)
Jeffrey J. Corrigan (03078-1999 NJ); 2372654 PA)
Jeffrey L. Spector (03375-2007 NJ; 207208 PA)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
bcaldes@srkattorneys.com
ietheridge@srkattorneys.com

jcorrigan@srkattorneys.com
jspector@srkattorneys.com

**TAUS, CEBULASH & LANDAU LLP**
Archana Tamoshunas (3065661 NY)
Brett Cebulash (2612190 NY)
Kevin Landau (2835668 NY)
Evan Rosin (5255153 NY)
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (212) 931-0704
atamoshunas@tcllaw.com
bcebulash@tcllaw.com
klandau@tcllaw.com
erosin@tcllaw.com

**ZIMMERMAN REED**
David M. Cialkowski (306526 MN)
Brian C. Gudmundson (336695 MN)
1100 IDS Center, 80 S. 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
David.cialkowski@zimmreed.com
Brian.gudmundson@zimmreed.com

Hart Robinovitch (240515 MN)
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Telephone: (480) 348-6415
Hart.robinovitch@zimmreed.com

*Executive Committee for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Derek Y. Brandt, hereby certify that on December 20, 2021, a copy of the foregoing was

electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send

notification of the filing to all counsel of record.

*/s/ Derek Y. Brandt*
Derek Y. Brandt

563801.1