# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

IN RE: CROP INPUTS      )          4:21-md-02993 SEP
ANTITRUST LITIGATION   )
                            )         **ALL CASES**

## MEMORANDUM AND ORDER

Before the Court is Defendants'[1] Joint Motion to Dismiss Plaintiffs'[2] Consolidated Amended Complaint. Doc. [141]. For the reasons set forth below, the motion is granted.

## I. FACTS AND BACKGROUND[3]

This multidistrict litigation[4] challenges an alleged conspiracy beginning "at least as early as January 1, 2014," to restrain trade across three distribution levels in a purported market for all "Crop Inputs" sold in the United States.[5] Doc. [104] ¶¶ 2-3. Plaintiffs are direct and indirect purchasers of Crop Inputs, which are broadly defined to include "seeds and crop protection chemicals such as fungicides, herbicides, and insecticides[.]" *Id.* ¶ 3. Defendants are

---

[1] The Manufacturer Defendants include Bayer CropScience LP; Bayer CropScience Inc.; BASF Corporation; Corteva Incorporated; Pioneer Hi-Bred International; and Syngenta Corporation. The Wholesaler Defendants include Cargill, Incorporated; Tenkoz Incorporated; Univar Solutions, Incorporated; and Winfield Solutions, LLC (Winfield). The Retailer Defendants include CHS Incorporated; Federated Co-operatives Limited; GROWMARK Inc.; Nutrien Ag Solutions, Incorporated; and Simplot AB Retail Sub Incorporated. Separate motions to dismiss have been filed by Cargill Inc.; Federated Co-operative Ltd.; Syngenta Corp.; and Univar Solutions, Inc., (Docs. [143], [145], [147], [149]) but each of those Defendants also joins fully in the instant motion to dismiss.

[2] Named Plaintiffs include Darren Duncan; Jones Planting Co.; Charles Lex; John C. Swanson; James Koch d/b/a as Vienna Eqho Farms; Melinda Budde; Randi Handwerk; John Vehrenkamp; Justin Pic; Dan Flaten; Ryan Bros., Inc.; Michael J. Ryan; Leon Pfaff; Jason J. Canjar d/b/a Yedinak Registered Holsteins; Eagle Lake Farms Partnership; Brad DeKrey; Tyler Schultz; Hapka Farms, Inc.; Amy Hapka; Beeman Berry Farm, LLC; Wunsch Farms; Kenneth Beck; Duane Peiffer; Tom Burke; George Potzner; JSB Farms, LLC; Mark Krieger, and Krieger Family Farms LLC.

[3] On review of a motion to dismiss, the Court assumes all well-pled facts in the Consolidated Amended Complaint to be true. *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

[4] The first Crop Inputs class action in this MDL was filed in the Southern District of Illinois on January 8, 2021. *See Piper v. Bayer CropScience LP*, No. 3:21-cv-00021 (S.D. Ill. Jan. 8, 2021). After that, multiple similar cases were filed in various courts across the United States, and on June 8, 2021, those actions, along with any later filed related matters, were transferred to this Court by the Judicial Panel on Multidistrict Litigation. Doc. [1].

[5] Plaintiffs allege that the relevant geographic and product market for this lawsuit is the market for Crop Inputs in the United States. Doc. [104] ¶ 18.

Manufacturers of Crop Inputs, as well as Wholesalers and Retailers that sell Crop Inputs to farmers across the United States.  *Id*. ¶ 5.  As described more fully below, Plaintiffs claim that Defendants have created a secretive distribution process that keeps Crop Inputs prices inflated at supracompetitive levels by denying farmers access to transparent pricing terms that would allow comparison shopping and better-informed purchasing decisions—a scheme that is facilitated by Defendants' boycott of electronic sales platforms, with their purportedly greater price transparency.

According to Plaintiffs, Defendants have "structured the Crop Inputs market to be both secretive and opaque to obscure pricing data and product information that farmers need to make informed purchasing decisions." *Id*. ¶ 69.  "Manufacturer Defendants, who develop and produce between 75% to 90% of name brand Crop Inputs, guard their product prices from consumers . . . [and] allow their products to be sold only by wholesalers, including the Wholesaler Defendants, retailers owned or operated by the manufacturer, and licensed 'authorized retailers' such as the Retailer Defendants." *Id*. ¶ 70.  Manufacturer Defendants also "prohibit 'authorized retailers' from disclosing to their customers the manufacturers' prices or any incentives, rebates, or commissions offered by the manufacturers to the authorized retailers." *Id*. ¶ 71.  The lack of transparency increases Manufacturer Defendants' profits and provides "an incentive to collude with each other and with Wholesalers and Retailers to prevent actions . . . that would result in price transparency." *Id*.  And retailers are prohibited "from disclosing the price paid to the wholesaler for Crop Inputs or the price at which retailers sell those exact same Crop Inputs to other farmers." *Id*. ¶ 73.

More specifically, Plaintiffs' boycott allegations relate to the rise of ecommerce sales platforms, such as Farmer's Business Network (FBN), FarmTrade, and Agroy, Inc., the use of which would increase price transparency in the Crop Inputs market.[6] *Id*. ¶¶ 7, 74, 110.  "Beginning in at least 2014," Plaintiffs claim, Defendants conspired to boycott ecommerce platforms because their entry into the marketplace "would have introduced price-reducing electronic sales of Crop Inputs." *Id*. ¶¶ 144-45.  Electronic sales platforms "sought to compete with the opaque and inefficient wholesale and retail systems by offering modernization, increased price transparency, and direct access to Crop Inputs." *Id*.  Ecommerce sites were

---

[6] Neither FBN, FarmTrade, Agroy, nor any other electronic platform is a party to this lawsuit.

initially successful, attracting thousands of farmers to their sales platforms. *Id.* ¶ 75. But ecommerce Crop Inputs platforms were perceived as a threat by traditional wholesalers and retailers. *Id.* ¶ 76. For example, a report published by CoBank, a cooperative partly owned by certain non-Defendant Crop Inputs retailers, stated that "ecommerce companies pose a threat to brick-and-mortar ag retailers" because they "will erode sales and margins to some degree," and will "increase transparency for product prices" by "provid[ing] farmers with several sources of product price information" that they can "leverage . . . in negotiations with local brick-and-mortar retailers." *Id.* In 2016, "Defendant Bayer"[7] formed an internal task force to study the long-term impact of FBN's ecommerce Crop Inputs sales platform. *Id.* ¶ 95.

In furtherance of the purported boycott, Defendants attempted to discourage farmers from using FBN. *Id.* ¶ 77. As an example, Plaintiffs cite an occasion in 2016, when Retailer Defendant CHS, a farmer-owned coop, sent a letter to its member farmers stating that even though FBN may offer products at lower costs, "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google." *Id.* ¶¶ 77-78. Plaintiffs also note a statement[8] by Manufacturer Defendant Syngenta's Head of Crop Protection Sales in the United States, Michael Boden, claiming "that ecommerce Crop Inputs sales platforms would deliver counterfeit products," and that "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality." *Id.* ¶ 97.

Plaintiffs point to a 2017 meeting of the CropLife PACE Advisory Council[9] as further evidence that ecommerce, and particularly FBN, was regarded as a competitive threat to traditional manufacturers, wholesalers, and retailers. *Id.* ¶¶ 80-82. Discussion of FBN and ecommerce allegedly dominated the event, and certain unidentified members of the Council

---

[7] Plaintiffs do not specify which of the Bayer-affiliated Defendants formed the task force. Plaintiffs frequently apply generic names to corporate affiliates throughout the CAC, making it difficult for the Court to determine to which specific Defendants Plaintiffs mean to refer.

[8] Plaintiffs do not state how or to whom Boden allegedly communicated the statement—e.g., orally or in writing; internally within Syngenta or publicly.

[9] CropLife America is a trade association made up of Crop Inputs manufacturers, wholesalers, and retailers. At the time the CAC was filed, its Board of Directors was chaired by an executive from Manufacturer Defendant BASF, and in 2017 its Board included executives from Defendants Bayer, Growmark, Tenkoz, and Simplot. *See* Doc. [104] ¶ 80.

"described how FBN had negatively affected their business in 2017."[10]  *Id*. ¶ 82.  One unidentified PACE Council member stated that he or she thought "it would be crazy, stupid to ignore [FBN]," because "[e]ven if they end up going away, the business model they've introduced to agriculture will probably be tried by someone else."  *Id*.  The threat posed by FBN was likewise a hot topic at the Agricultural Retailers Association's 2017 Conference and Expo. *Id*. ¶ 86.  Events like the PACE Council annual gathering and the ARA conference provided "ample opportunity" for retailers to "coordinate and collude to eliminate price transparency and preclude innovative ecommerce solutions from disrupting the traditional agricultural supply chain."  *Id*.

According to the CAC, due to their concerns about competition and price transparency, Defendants conspired to collectively boycott electronic platforms that sold Crop Inputs in the United States market.  *Id*. ¶¶ 8, 93, 155.  The "Retailer and Wholesaler Defendants induced the Manufacturer Defendants—who rely on the Wholesaler and Retailer Defendants to recommend and sell their products to farmers—to cut off the supply of Crop Inputs to ecommerce Crop Inputs sales platforms."  *Id*. ¶ 93.  And because the Retailer and Wholesalers Defendants "are among the largest retailers and wholesalers of Crop Inputs in the United States," the Manufacturer Defendants "knew they risked the loss of substantial sales if they did not agree to the boycott."  *Id*.  Therefore, the "Manufacturer Defendants agreed with the Wholesaler and Retailer Defendants to cut off the supply of Crop Inputs to ecommerce Crop Inputs sales platforms and Defendants initiated a joint boycott [whereby] when ecommerce Crop Inputs sales platforms attempted to purchase Crop Inputs from the Manufacturer and Wholesaler Defendants, they all refused and offered only pretextual excuses for their refusal."  *Id*. ¶ 96.

Plaintiffs claim that "[r]etailers who failed to comply with the group boycott were penalized by the Defendants," and they allege one example of such a penalty:  that Manufacturer Defendant Syngenta, after learning that certain retailers had sold Crop Inputs to ecommerce sales platforms, initiated an audit of its authorized retailers to discover and punish those retailers.  *Id*. ¶ 98.  But they do not point to any punitive action taken by Syngenta as a result of that audit. Plaintiffs also claim that Manufacturer Defendants Bayer, BASF, and Corteva used form contract language permitting audits and on-site inspections of authorized retailers to "ensure that

---

[10] Plaintiffs do not allege that any Defendant was a member of the PACE Council or attended its 2017 meeting.

ecommerce Crop Inputs sales platforms could not purchase name brand Crop Inputs" from authorized retailers. *Id*. ¶ 99. But they cite no specific instance of such an audit. *Id*.

The CAC also describes events that transpired in Canada and involved non-Defendant Canadian companies.[11] For example, in 2018, after FBN purchased Yorkton Distributors—a Canadian retailer with existing supply agreements with non-Defendant Canadian affiliates of Bayer, Syngenta, BASF, Corteva, and Winfield—the Canadian manufacturer and wholesaler entities agreed to boycott Yorkton and canceled their supply contracts. *Id*. ¶¶ 102-03. And in the fall of 2019, the Canadian Competition Bureau (CCB) opened an investigation of Defendants' Canadian counterparts for collusion under Section 10 of Canada's Competition Act. *Id*. ¶ 117. The CCB inquiry was focused on the conduct of Canadian entities, including Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc., and Bayer CropScience Inc. and its subsidiary Monsanto Canada ULC, and investigated whether those entities had engaged in anticompetitive practices in the seed and crop protection markets.[12] *Id*.

According to Plaintiffs, because of Defendants' boycott, "farmers . . . have been deprived of the opportunity to purchase Crop Inputs at transparent, competitive prices from ecommerce Crop Inputs platforms."[13] *Id*. ¶ 111. Instead, farmers have been "forced to continue paying artificially inflated prices for Crop Inputs purchased from local retailers subject to Defendants' confidentiality requirements and seed relabeling practices." *Id*. And, "[g]iven the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of ecommerce Crop Inputs sales platforms would not have

---

[11] Many of Plaintiffs' allegations regarding the purported boycott relate to events in Canada, which is outside the relevant geographical market alleged in the CAC.

[12] The Court takes judicial notice that on March 15, 2022, the CCB announced in a Press Release and Position Statement that it had closed the investigation after determining the evidence did not demonstrate an agreement existed between competitors with respect to FBN. *See* Docs. [194], [194-1], [194-2]. The CCB's Position Statement also stated that there was insufficient evidence to establish that "FBN's price transparency tool would increase price competition in one or more markets" or that "the Targets' conduct resulted in a substantial lessening or prevention of competition in one or more markets for crop inputs in western Canada." Doc. [194] at 2.

[13] Plaintiffs do not allege that any of them ever attempted to buy or were prevented from purchasing Crop Inputs through an electronic platform, that they were unable to obtain pricing information for a Crop Input product, or that their own Crop Input purchases were or would have been impacted by the entry of ecommerce platforms into the relevant marketplace.

been feasible absent actual coordination and cooperation among Defendants." *Id*. ¶ 112. Because each Manufacturer Defendant could have gained a significant competitive advantage by flouting the boycott and "establish[ing] itself as the primary supplier to ecommerce platforms," the success of the boycott is evidence of coordination among Defendants. *Id*.

Plaintiffs bring this action on behalf of themselves and as a purported class action on behalf of a Nationwide Class defined as "[a]ll persons and entities in the United States and its territories who purchased, for their own use and not for resale, a Crop Input manufactured by a Manufacturer Defendant during the Class Period." *Id*. ¶ 126.  The Class Period is defined as the period between January 1, 2014, through September 17, 2021. *Id*. ¶ 2.  Plaintiffs also bring this action on behalf of two purported Sub-Classes. *Id*. ¶ 126.  One Sub-Class is the Direct Purchaser Damages Sub-Class, defined as "[a]ll persons and entities in the United States and its territories who purchased, from a Defendant, for their own use and not for resale, a Crop Input manufactured by a Manufacturer Defendant during the Class Period." *Id*.  The other Sub-Class is the Indirect Purchaser and State Law Damages Sub-Class, defined as "[a]ll persons and entities in the United States and its territories who purchased, in an 'Indirect Purchaser' or 'State Law' State, from a retailer other than a Defendant, for their own use and not for resale, a Crop Input manufactured by a Manufacturer Defendant during the Class Period." *Id*.  Plaintiffs bring claims for conspiracy to restrain trade in violation of Section 1 of the Sherman Act (Count 1); violation of state antitrust statutes (Count 2); violation of state consumer protection statutes (Count 3); unjust enrichment (Count 4); and violation of Sections (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, or RICO (Count 5).

Defendants filed the Joint Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, arguing failure to state a claim and lack of standing.  Doc. [141]; *see* Fed. R. Civ. P. 12(b)(1), (b)(6).  Plaintiffs responded in opposition, Doc. [164], Defendants replied, Doc. [175], and the Joint Motion to Dismiss is thus fully briefed and ripe for resolution.  Separate motions to dismiss were contemporaneously filed by certain Defendants (Cargill Inc., Federated Co-operatives Ltd., Syngenta Corp., and Univar Solutions, Inc.) based on individualized issues. *See* Docs. [143], [145], [147], and [149]  Each of those Defendants also joins fully the Joint Motion to Dismiss.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  The notice pleading standard of Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to give "a short and plain statement . . . showing that the pleader is entitled to relief."  To meet this standard and survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Determining if well-pled factual allegations "plausibly give rise to an entitlement to relief" is a "context-specific task" requiring the court to "draw on its judicial experience and common sense."  *Id*. at 679.  The factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012)).  The well-pled facts must establish more than a "mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff," *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010), and "grant all reasonable inferences in favor of the nonmoving party."  *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Although courts must accept all well-pled factual allegations as true, they "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Id*. (quoting *Twombly*, 550 U.S. at 555).  "[T]he crucial question [in an antitrust case] is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at 553 (internal quotations, citations, and alterations omitted).  Thus, to plausibly allege a conspiracy in violation of Section 1 of the Sherman Act, a complaint must plead "enough factual matter (taken as true) to suggest that an agreement was made."  *Id.* at 556.

Before *Twombly*, courts were hesitant to dismiss antitrust claims.  *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) ("[I]n antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity

for discovery should be granted very sparingly." (cleaned up)).  But in *Twombly* the Supreme Court noted that "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive."  *Twombly*, 550 U.S. at 558 (internal citations omitted).  The United States Court of Appeals for the Eighth Circuit and other federal appellate courts have acknowledged that shift, noting that, due to "the unusually high cost of discovery in antitrust cases . . . [and] the threat that discovery expense will push cost-conscious defendants to settle even anemic cases[,] the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage."  *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (cleaned up); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 835 (7th Cir. 2021) ("*Twombly* bars the discovery-first, plead-later approach that [plaintiff] urges us to adopt.  For good reason: modern antitrust litigation is expensive.  Only by requiring plaintiffs to plead facts plausibly suggesting conspiracy can we 'avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal evidence to support a § 1 claim.'") (quoting *Twombly*, 550 U.S. at 559).

## III.  DISCUSSION

Defendants move to dismiss the CAC on multiple grounds.  First, they argue that Plaintiffs have not pled a plausible boycott conspiracy through either direct or circumstantial evidence, and that the CAC impermissibly relies on group pleading by failing to differentiate among Defendants.  Second, they argue that Plaintiffs have failed to allege that Defendants caused an injury that would confer standing to pursue antitrust claims.  Third, they argue that Plaintiffs' Sherman Act claim is time-barred.  Fourth, they assert that all of Plaintiffs' state law claims fail for the same reasons that their federal antitrust claims fail, and that certain of the state claims fail for reasons related to state law.  Finally, they argue that Plaintiffs' RICO claim fails as a matter of law.

### A.  Plaintiffs fail to plausibly plead a boycott conspiracy.

Plaintiffs central claim is that Defendants conspired to boycott ecommerce platforms in violation of Section 1 of the Sherman Act, which prohibits a "contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  To establish a claim under Section 1 of the Sherman Act, a plaintiff must demonstrate that:  "(1) [] there was a contract, combination, or conspiracy; (2) [] the agreement unreasonably restrained

trade under either a *per se* rule of illegality or a rule of reason analysis; and (3) [] the restraint affected interstate commerce." *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc*., 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009). Plaintiffs allege an anticompetitive group boycott implicating market participants at all three levels of the distribution chain, including manufacturers, wholesalers, and retailers. "[W]here the plaintiffs allege that participants in a market at different levels of the distribution chain entered into a conspiracy, the plaintiffs must show that similarly situated members of the conspiracy coordinated not only with the manufacturer, but also with each other." *Marion Healthcare, LLC v. Becton Dickinson & Co*., 952 F.3d 832, 841-42 (7th Cir. 2020). In order to state a claim for anticompetitive conspiracy, then, Plaintiffs must plausibly plead a web of horizontal and vertical agreements,[14] including horizontal agreements between all Wholesaler Defendants, all Retailer Defendants, and all Manufacturer Defendants, as well as vertical agreements between each of the Defendants at all three levels of distribution to boycott ecommerce platforms.

Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (cleaned up). To adequately allege concerted parallel action, a plaintiff "must demonstrate that the defendants shared a unity of purpose, a common design and understanding, or a meeting of the minds." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc*., 797 F.3d 538, 543 (8th Cir. 2015) (internal quotation marks omitted). "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556. Also, "common motive does not suggest an agreement," because a market, such as that for crop inputs, may be interdependent, with market participants engaging "in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement." *In re Musical Instruments and Equip. Antitrust Litig*., 798 F.3d 1186, 1194-95 (9th Cir. 2015).

---

[14] Agreements that fall within the scope of § 1 are characterized as either "horizontal" or "vertical." *See United States v. Topco Assocs., Inc.,* 405 U.S. 596, 608 (1972). A horizontal agreement is an "agreement between competitors at the same level of the market structure," while a vertical agreement is a "combination[ ] of persons at different levels of the market structure." *Id.*

"Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 564). But direct evidence of an explicit agreement is rare, and so an agreement must usually be shown by "inferences that may be drawn from the behavior of the alleged conspirators." *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553-54 (8th Cir. 1991). Parallel conduct among defendants that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" could be circumstantial evidence of concerted action. *Twombly*, 550 U.S. at 556, n.4 (cleaned up). But the Eighth Circuit has adopted a rule that, to survive a motion to dismiss, alleging a pattern of parallel conduct, by itself, not sufficient; rather, antitrust plaintiffs must also plead "plus factors." *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.,* 203 F.3d 1028, 1033 (8th Cir. 2000) ("An agreement is properly inferred from conscious parallelism only when certain 'plus factors' exist."). "[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated conduct." *In re Musical Instruments*, 798 F.3d at 1194. There is no finite list of plus factors, but examples include a shared motive to conspire, actions taken against self-interest, and a substantial amount of interfirm communication in conjunction with the parallel conduct. *Id*. at 1194-95.

Here, Plaintiffs concede that they have no direct evidence of a conspiracy, Doc. [164] at 29, so they must plead the existence of the alleged conspiracy through circumstantial evidence showing parallel conduct accompanied by plus factors. Defendants argue that Plaintiffs have failed to plausibly plead parallel conduct and frequently engage in impermissible group pleading as opposed to providing nonconclusory factual allegations connecting specific Defendants to the alleged conspiracy. Doc. [175] at 13. For the reasons set forth below, the Court agrees.

A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted "similarly." *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1243 (3d Cir. 1993); *see also Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 320 (6th Cir. 2014) (considering whether the defendants' actions were "uniform"). And while allegations of parallel conduct without more—the "more" being plus factors—do not ground a plausible inference of conspiracy, the failure to plausibly plead concerted parallel conduct by the defendants, by itself, is fatal to a § 1 conspiracy claim. *See Park Irmat Drug Corp. v. Express*

*Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (affirming dismissal of plaintiff's § 1 conspiracy claim for failure to adequately plead parallel conduct and declining to consider adequacy of "plus factors" as unnecessary in light of such failure). Defendants assert that, rather than alleging similar conduct taken by each Defendant in the relevant time frame and geographic market, Plaintiffs make conclusory allegations of a conspiracy and support their allegations by pointing to unilateral and dissimilar conduct by only a handful of Defendants (as well as non-party entities and individuals), and at different times. *See* Doc. [142] at 39-41; [175] at 13-15.

In their memorandum in opposition to Defendants' motion to dismiss, Plaintiffs respond that the CAC is "replete" with allegations of Defendants' "concerted, parallel conduct in furtherance of their joint conspiracy to boycott ecommerce Crop Inputs platforms," and deny that group pleading undermines their allegations. Doc. [164] at 30, 41. Plaintiffs include in their memorandum a chart listing each instance of purportedly parallel conduct alleged in the 119-page CAC. *Id*. at 30-31 (Chart entitled "Plaintiffs' Boycott Allegations"). Notably, that chart includes only a handful of actions allegedly taken by specific Defendants in the relevant geographic market during the relevant period. Of the twelve "Boycott Allegations" listed by Plaintiffs, only half refer to conduct in the market for Crop Inputs in the United States. The rest refer to conduct in the Canadian market in connection with the Yorkton transaction and other actions taken by non-Defendants[15] outside the relevant geographic market for the alleged boycott. The Court will discuss each allegation that relates to the United States market in turn.

Plaintiffs allege that electronic platforms entered the United States Crop Inputs market in 2014 and that Defendants commenced their boycott that same year. *See* Docs. [104] ¶¶ 141, 144; [164] at 4-5. Yet the first alleged overt act in furtherance of the conspiracy is two years later in 2016, when Retailer Defendant CHS (a farmer-owned coop) sent a letter to its farmer members discouraging them from using FBN and asserting that, while FBN may offer the same products at a lower cost, it does so "without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google." Docs. [104] ¶ 77; [164] at 30. Plaintiffs do not allege that CHS agreed with any other Defendant to send such a marketing letter, nor do they

---

[15] The Court notes one exception: Retailer Defendant Federated Co-operatives Limited, which is a Canadian federated cooperative that operates exclusively in Canada and is not alleged to have any U.S. operations, was implicated in the Yorkton allegations. *See* Doc. [104] ¶¶ 102-07. Federated has filed a motion to dismiss for lack of personal jurisdiction based on its status as a Canadian entity that has no contacts with the forum in which it has been sued. *See* Doc. [149].

allege similar conduct by any other Defendant.  And there is an obvious alternative explanation—aside from an unlawful agreement to boycott ecommerce platforms—for CHS's attempt to discourage farmers from using FBN's services.  It is unsurprising that CHS, a retailer, would independently encourage its customers to refrain from doing business with an emerging retail competitor.  *See Twombly*, 550 U.S. at 566 ("Resisting competition is routine market conduct," with "no need for joint encouragement to resist," and there is "no reason to infer" that the defendants "had agreed among themselves to do what was only natural anyway."); *see also St. Francis Med. Ctr. v. C.R. Bard, Inc*., 657 F. Supp. 2d 1069, 1098 (E.D. Mo. 2009) ("Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition." (quoting *Gen. Indus. Corp. v. Hartz. Mountain Corp*., 810 F.2d 795, 804 (8th Cir. 1987))).  Because CHS's attempt to persuade its customers to stick with them rather than jumping ship to a competitor makes sense as an independent decision to protect its business interests, it is not indicative of an illicit agreement with Defendants.  *See Twombly*, 550 U.S. at 554 (Such conduct suggests a "rational and competitive business strategy unilaterally prompted by . . . perceptions of the market.").

Then Plaintiffs allege that, also in 2016, Manufacturer Defendant Bayer[16] "formed an internal task force to study the long term competitive impact of FBN's ecommerce Crop Inputs sales platform."  Doc. [164] at 12; *see also* Doc. [104] ¶ 95.  Again, there is no allegation that any other Defendant took any similar action during the relevant time period.  *See SD3, LLC v. Black & Decker (U.S.) Inc*., 801 F.3d 412, 427 (4th Cir. 2015) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling–Del. Co., Inc*., 998 F.2d 1224, 1243 (3d Cir. 1993))); *Hyland v. HomeServices of Am., Inc*., 771 F.3d 310, 320 (6th Cir. 2014) (considering whether the defendants' actions were "uniform").  And again, forming a task force to study a novel entrant to one's business market is facially innocuous behavior and is not alleged to have been done in coordination with other Defendants.

Plaintiffs' next allegation is that, in 2018, when Syngenta's Head of Crop Protection Sales discovered that a small number of branded Crop Inputs had been sold on ecommerce platforms, he claimed that such purchasers should "be concerned about the quality" of the

---

[16]  As noted above, Plaintiffs do not indicate which Bayer entity formed the task force.

products.  *See* Docs. [104] ¶¶ 97, 264(b); [164] at 30.  Plaintiffs again fail to plead that any other Defendant cooperated in the communication or engaged in similar conduct. They also neglect to mention to whom the statement was made and whether it was internal or public.

Plaintiffs also point to the allegation that "Retailers who failed to comply with the group boycott were penalized by the Defendants."  *See* Docs. [104] ¶ 98; [164] at 30.  They allege only one specific instance of such retaliation:  that Manufacturer Defendant Syngenta "initiated an audit of its authorized retailers after learning that some retailers had sold Crop Inputs to ecommerce platforms . . . in order to identify and punish the retailers" who made sales in defiance of the alleged boycott.  *Id*.  Plaintiffs do not allege that Syngenta took any punitive action as a result of the audit; nor do they explain how the audit itself was punitive in nature. Plaintiffs also do not allege that the Defendants entered into any specific agreement to penalize noncompliant retailers through audits, or that any Defendant other than Syngenta initiated such an audit.  The vague assertion that retailers who failed to fall in line "were penalized by Defendants" is not a plausible allegation of parallel conduct.  *Id*.  Rather, it is an example of impermissible group pleading.

*Twombly* makes clear that at the pleading stage in an antitrust case, each defendant is entitled to know how it is alleged to have conspired, with whom, and for what purpose.  *See Twombly*, 550 U.S. at 557-58.  Mere generalizations as to any particular defendant, or defendants as a group, are not sufficient.  *Id*. at 555-56.  When alleging a conspiracy, the law is clear that "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful," and a "complaint based on a theory of collective responsibility must be dismissed."  *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013); *see also In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) ("An antitrust complaint that fails to connect each or any individual entity to the overarching conspiracy . . . cannot ordinarily survive a motion to dismiss." (cleaned up)).  Here, instead of identifying any *particular* Defendant (other than Syngenta) that "penalized" retailers, the CAC merely refers to allegedly punitive audits by "Defendants."  *See Litovich v. Bank of Am. Corp.*, 568 F.Supp.3d 398, 434 (S.D.N.Y. 2021) ("'[C]laims as to the motivations or actions of [defendants] as a general collective bloc, or generalized claims of parallel conduct, must . . . be set aside . . . as impermissible group pleading.'") (vacated and remanded for reasons unrelated to this issue by Litovich v. Bank of Am. Corp., 106 F.4th 218 (2nd Cir 2024) (quoting *In re Interest Rate Swaps Antitrust Litig.*

("*IRS II*"), 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018)).  Even with respect to Syngenta, Plaintiffs do not allege that Syngenta conducted an audit of any Retailer Defendants who are purportedly participants in the boycott.  They chose instead to use the generic term "retailers." *See* Docs. [104] ¶ 98; [164] at 30.  (Syngenta "initiated an audit of its authorized retailers after learning that some retailers had sold Crop Inputs to ecommerce platforms . . ..").

Plaintiffs point next to their allegation that Bayer, BASF, and Corteva included contractual provisions in their contracts with retailers that would allow them to audit the retailers' books and records and conduct on-site inspections to ensure that ecommerce platforms could not purchase name brand Crop Inputs from an authorized retailer.  *See* Docs. [104] ¶ 99; [164] at 30-31.  Plaintiffs do not explain how audits are inherently punitive, nor do they allege that such contractual provisions were out of the ordinary for the industry.  Plaintiffs also do not allege that the three Defendants agreed amongst themselves to add such provisions to their contracts, or that the audit provisions were added to their standard contracts only *after* ecommerce trading platforms entered the marketplace.  The allegation that certain retail contracts contained similar audit provisions does not, by itself, provide "plausible grounds to infer an agreement," *Twombly*, 550 U.S. at 556, as "[s]imilar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate)."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 557).  And Plaintiffs do not allege that Bayer, BASF, or Corteva ever commenced an audit of any retailer, let alone did so for the purpose of curtailing sales to ecommerce platforms.

The five allegations analyzed thus far comprise *all* of Plaintiffs' allegations of specific actions by specific Defendants in the relevant geographic market.  So, with respect to most of the Defendants, including Manufacturer Pioneer, Retailers Federated, GROWMARK, Nutrien, and Simplot, and Wholesalers Cargill, Tenkoz, Winfield, and Univar, Plaintiffs are unable to point to any allegations of concerted parallel conduct in the alleged geographic market.  And what they do impute to specific Defendants—i.e., that CHS sent a letter to its farmer members discouraging them from using a new competitor; that Bayer formed a task force to study the emerging competition; that an unidentified person at Syngenta expressed concerns about the quality of products purchased through ecommerce platforms; that Syngenta conducted one audit allegedly in response to sales to unauthorized retailers; and that Bayer, Corteva, and Syngenta have

provisions in their standard contracts with retailers that authorize audits—fails to plausibly plead parallel conduct suggestive of conspiracy.

The next entry in Plaintiffs' chart cites the CAC's allegations (a) that the "Retailer Defendants and the Wholesaler Defendants knew that retaining their market positions, power and profit margins depended on excluding ecommerce sales platforms from the market, so they conspired to eliminate the platforms' product supply," and (b) that to achieve that end, the Retailers and Wholesalers "induced the Manufacturer Defendants . . . to cut off the supply of Crop Inputs to ecommerce Crop Inputs sales platforms."[17] *See* Docs. [104] ¶ 93; [164] at 31. Because the Retailer and Wholesaler Defendants "are among the largest retailers and wholesalers of Crop Inputs in the United States," Plaintiffs allege, the "Manufacturer Defendants knew they risked the loss of substantial sales if they did not agree to the boycott." *Id.*

Such allegations are not only conclusory and speculative; they are also another example of impermissible group pleading. *Litovich*, 568 F.Supp.3d at 435 (alleging actions of defendants "as a general collective bloc" constitutes "impermissible group pleading"). Plaintiffs point to no specific action by any identified Defendant(s); rather, they assert that "Wholesaler and Retailer Defendants" *generally* conspired to induce "Manufacturer Defendants" *generally* to cut off the supply of Crop Inputs to ecommerce platforms. *See* Docs. [104] ¶ 93; [164] at 31. Such generic pleading lacks the requisite specificity needed to plausibly allege a conspiracy. "Without specific information regarding each defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted[.]" *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019); *see also In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *6 (D. Minn. Sept. 29, 2020) ("One important reason for the requirement of specific pleading when it comes to parallel conduct is that it allows the Court to conclude whether the allegations are plausible in the face of an 'obvious alternative explanation.'" (quoting *Twombly*, 550 U.S. at 567-68))).

The rest of the allegations cited by Plaintiffs in their "Boycott Allegations" chart to "plausibly demonstrate Defendants engaged in concerted, parallel conduct in furtherance of their

---

[17] The CAC is at times unclear about the character of the alleged boycott. For example, Plaintiffs' allegation that the Retailers and Wholesalers had to *induce* the Manufacturer Defendants to participate in the boycott seems inconsistent with their allegation that "Retailers who failed to comply with the group boycott were penalized" by the Manufacturer Defendants. Doc. [104] ¶¶ 93, 98.

joint conspiracy to boycott ecommerce Crop Inputs platforms," Doc. [164] at 30, miss the mark entirely. They relate to events that allegedly occurred in the Canadian market after FBN purchased Yorkton Distributors, a Canada-based retailer of Crop Inputs, and that culminated in an investigation by the Canadian Competition Bureau. *See* Docs. [104] ¶¶ 102-107; [164] at 31. But the alleged geographic market in this matter is the United States market for Crop Inputs. *See* Doc. [104] ¶ 18 (Plaintiffs allege that the "relevant market for this lawsuit is the market for Crop Inputs in the United States."); *see Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.,* 763 F.2d 604, 610 n. 10 (4th Cir. 1985) (Generally, "[i]n addition to establishing a conspiracy, a successful plaintiff must also show . . . that the conspiracy produced adverse, anti-competitive effects within the relevant product and geographic market[.]"); *Agnew v. Nat'l Collegiate Ath. Ass'n,* 683 F.3d 328, 335 (7th Cir. 2012) (In a viable complaint, "the plaintiff must allege, not only an injury to himself, but an injury to the [relevant geographic] market as well.").

The Canadian investigation might not be entirely irrelevant to Plaintiff's conspiracy claim, but if it were to be considered at all, it would be as a possible plus factor *after* parallel conduct had been adequately pled. *See, e.g.*, *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1295-96 (M.D. Fla. 2016) (Foreign investigations into the contact lens industry are relevant "circumstantial evidence in the form of 'plus factors,' which create a plausible inference of horizontal agreement to restrain trade.").[18] Plaintiffs acknowledge as much, stating in their memorandum in opposition that the Canadian investigation is "significant as a plus factor." Doc. [164] at 40. But because Plaintiffs have not adequately pled parallel conduct, the Court does not reach the adequacy of Plaintiffs' alleged plus factors. *See In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019) (Just as parallel conduct without accompanying plus factors is not sufficient to state a claim, plus factors, in the absence of adequately pled parallel conduct, are "insufficient to state an antitrust claim.").

---

[18] *But see, e.g.*, *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016) ("[T]he mere fact that regulatory entities have investigated, and may still be investigating, the possibility of misconduct . . . is not a plus factor." (internal quotation marks omitted)); *In re London Silver Fixing, Ltd. Antitrust Litig.*, 213 F. Supp. 3d 530, 561 (S.D.N.Y. 2016) ("[T]he mere fact that regulatory entities are investigating the possibility of . . . misconduct . . . is not a plus factor." (internal quotation marks omitted)); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) ("This Court agrees that the various investigations, inquiries, and subpoenas do not make the [complaint's] allegations plausible, for the purposes of deciding a motion to dismiss under the standards as laid out in *Twombly* and *Iqbal*.").

Even if the Court were to reach that question and credit the Canadian investigation as a plus factor supporting the involvement of certain Defendants in an antitrust conspiracy, those allegations would carry little persuasive weight.  The Canadian investigation, during which the targets were compelled to produce extensive documentation and information to the Canadian Competition Bureau, *see* Doc. [104] ¶ 118, concluded without a finding of anticompetitive conduct in the Canadian Crop Inputs market.  *See* Doc. [194-2] at 7, 9 (The Canadian Competition Bureau concluded its investigation after determining that the evidence did not "establish an agreement or arrangement between competitors" regarding supply of crop inputs to FBN, and the alleged actions by certain of Defendants' Canadian counterparts did not result in a "lessening or prevention of competition in one or more markets for crop inputs in western Canada.").

After careful review of the CAC, the Court cannot agree with Plaintiffs that it is "replete" with examples of Defendants' "concerted, parallel conduct in furtherance of their joint conspiracy to boycott ecommerce Crop Inputs platforms."  Doc. [164] at 30.  It is replete, however, with examples of impermissible group pleading, alleged actions taken by non-Defendant third parties, and formulaic allegations of conspiracy.  *See, e.g.*, Doc. [104] ¶ 3 ("Defendants" entered into an "unlawful agreement . . . to artificially increase and fix the prices of seeds and crop protection chemicals."); ¶ 8 ("Defendants conspired to boycott ecommerce Crop Inputs sales platforms."); ¶ 9 ("Defendants' boycott succeeded . . . as a result of Defendants' anticompetitive conduct."); ¶ 10 ("Defendants have maintained supracompetitive prices for Crop Inputs by denying farmers access to accurate pricing."); ¶ 69 ("Defendants purposefully structured the Crop Inputs market to be both secretive and opaque to obscure pricing data."); ¶ 81 ("CropLife Magazine [which is neither owned, managed, or operated by any Defendant] stated it was concerned that the retailer could be disintermediated—*i.e.*, that electronic platforms would 'cut out the middleman'—allowing growers to find product . . . at a lower market price."); ¶ 82 ("Several members of the PACE Advisory Council [of which no Defendant was alleged to be a member, nor to have been present at the meeting] described how FBN had negatively affected their business during 2017 by cutting into their already slim margins."); ¶ 86 ("Steve Watts of Farrell Growth Group [not a Defendant]. . . announced his belief that it was time for the Crop Inputs retailers to take steps to affirmatively combat the intrusion of ecommerce entities."); ¶ 93 (The Retailer Defendants and the Wholesaler

Defendants . . . conspired to eliminate the [ecommerce] platforms' product supply."); ¶ 96 ("The Manufacturer Defendants agreed with the Wholesaler and Retailer Defendants to cut off the supply of Crop Inputs to ecommerce Crop Inputs sales platforms and Defendants initiated a joint boycott."); ¶ 98 ("Retailers who failed to comply with the group boycott were penalized by the Defendants."); ¶ 101 ("Wholesalers and Retailers collectively constitute a significant share of the sales of the Manufacturer Defendants, and they were willing to leverage this fact against the Manufacturer Defendants when necessary."); ¶ 103 ("Wholesaler and Retailer Defendants threatened to retaliate against the Manufacturer Defendants" if they failed to honor the boycott.); ¶ 144 ("Defendants . . . have explicitly or implicitly colluded to jointly boycott entities that would have introduced price-reducing electronic sales of Crop Inputs in the United States . . .."); ¶ 155 ("Defendants did those things that they combined and conspired to do, including agreeing to boycott ecommerce Crop Inputs sales platforms by refusing to supply Crop Inputs manufactured by Manufacturer Defendants."); ¶ 161 ("Defendants engaged in a continuing contract, combination, or conspiracy with respect to sale of Crop Inputs in an unreasonable restraint of trade . . .."). Such generic and conclusory allegations are wholly insufficient, no matter how frequently asserted. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. Of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021) (affirming dismissal of "conclusory allegations—that the Board 'agreed,' 'conspired,' colluded,' or 'induced' agreement, conspiracy, or collusion"—because "[r]epetition cannot substitute for factual allegations").

Plaintiffs argue that group pleading does not undermine their claims. Citing *In re Broiler Chicken Antitrust Litig*., 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017), they claim that group pleading is allowed when alleging a conspiracy, because conspiracies are "'expected to leave little publicly available evidence'" of their existence. Doc. [164] at 41. And because participation in conspiracies is "'often inferred from context,' . . . '[a]llegations that each defendant participated in the parallel conduct'" are "sufficient to 'allege participation in the agreement.'" *Id.* (quoting *Broiler Chicken*, 290 F. Supp. 3d at 804).

Plaintiffs misconstrue *Broiler Chicken*, which by no means endorsed group pleading in conspiracy cases. The defendants in *Broiler Chicken* did argue that the plaintiffs had failed to adequately allege their individual involvement in a conspiracy. *Broiler Chicken*, 290 F. Supp. 3d at 803-04. But the defendants did not assert that the allegations improperly lumped them together in a vague and undifferentiated manner, as Defendants maintain here. *Id*. Rather, the

defendants' objections in that case "boil[ed] down to the contention that Plaintiffs' allegations [we]re wrong" as a matter of fact. *Id*. After reciting at length the plaintiffs' *specific* allegations against *individual* defendants, the *Broiler Chicken* court concluded that "allegations of participation of this magnitude" were sufficient, explaining that the accuracy of the allegations was not relevant to their sufficiency, because the allegations "should be tested by discovery." *Id*. at 804. Thus, *Broiler Chicken*'s analysis does not speak to the issue of group pleading at all.

Plaintiffs also cite *Martinez v. Wexford Health Servs., Inc*., 2021 WL 1546429, at *3 (N.D. Ill. Apr. 20, 2021), in support of the sufficiency of their allegations. *See* Doc. [164] at 41. That case does state that "group pleading is not per se improper," and while the practice is "not ideal," it may be acceptable in certain circumstances. *Id*. (quoting *Sibley v. Dart*, 2019 WL 670270, at *4, (N.D. Ill. 2019). Specifically, the *Martinez* court explains, where a complaint "'lumps Defendants together as a group,'" it may nonetheless survive a motion to dismiss where the allegations as a whole enable the court to "'discern[ ] which defendants are allegedly responsible for which allegedly unlawful acts.'" *Id*. (quoting *Bailey v. Mansfield Indep. Sch. Dist*., 425 F. Supp. 3d 696, 713 (N.D. Tex. 2019). The court elaborates:

> [T]he underlying analysis is whether the complaint, as a whole, creates the plausible inference that each defendant is liable for the act complained of. If any group pleadings, taken along with any individual pleadings, create such a plausible inference, then the complaint is sufficient and survives a motion to dismiss. On the other hand, if the group allegations, combined with any individual allegations and reasonable inferences, fail to put a specific defendant on notice as to their alleged personal involvement in the injury, the Court must grant that defendant's motion to dismiss. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy.")

*Id*. In *Martinez*, although the plaintiff had engaged "in some group pleadings against some defendants, there [we]re no defendants who ha[d] solely been lumped into an undifferentiated amalgam of 'defendants.'" *Id*. The opposite is true here, where Plaintiffs have made anemic allegations against only a few individual Defendants, while the rest have been "lumped into an undifferentiated amalgam" of "Defendants," "Retailers," "Manufacturers," or "Wholesalers," and only summarily alleged to have taken part in the conspiracy. *See, e.g*., Doc. [104] at ¶¶ 3, 8, 9, 10, 69, 93, 96, 98, 101, 103, 144, 155, 161. Thus, *Martinez* does not help Plaintiffs.

Plaintiffs also cite to *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009), but that case, like *Martinez*, stands for the proposition that group pleading may be permissible where it supplements—not supplants—adequate defendant-specific allegations. *See id.* at 1184-85. In sum, "[p]ost-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim" for the plausible existence of an antitrust conspiracy. *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) (emphasis in original). Thus, in order to survive Defendants' motion to dismiss, Plaintiffs' allegations have to support a plausible inference that each *individual* Defendant participated in the alleged conspiracy, but the CAC contains almost no individualized allegations at all.

Plaintiffs do attempt to argue that the CAC "alleges specific conduct by each individual Defendant showing it joined and committed acts in furtherance of the conspiracy," citing in support a litany of paragraphs in the CAC. Doc. [164] at 42. On closer examination, that litany appears to be little more than a recitation of every time the CAC refers to a Defendant by its corporate name rather than by the generic "Defendants," "Retailers," "Manufacturers," or "Wholesalers." *See* Doc. [164] at 42 ("¶¶ 80, 85, 95, 99, 102, 107, 114, 117, 118, 119, 146, 151, and 256 (Bayer); ¶¶ 80, 84, 85, 99, 102, 107, 114, 117, 120, 140, 146, 151, and 256 (Corteva); ¶ 118 (Pioneer Hi-Bred); ¶¶ 80, 99, 102, 114, 117, 118, 119, 146, 151, and 256 (BASF); 84, 85, 97, 98, 102, 146, 264 (Syngenta); ¶¶ 107, 117, and 118 (Cargill); ¶¶ 80, 256 (Tenkoz); ¶¶ 80, 85, 87, 89, 102, and 107 (Winfield); ¶¶ 105, 106, and 264 (Univar); ¶¶ 77, 85, and 264 (CHS); ¶ 85 (Nutrien); ¶¶ 80, 85, and 256 (Growmark); ¶¶ 80, 256 (Simplot); and ¶¶ 104, 117 (Federated)"). Plaintiffs do not discuss the content of the cited paragraphs; they simply assert that the allegations therein are "more than sufficient" to establish each Defendant's participation in the conspiracy, because "'[o]nce a conspiracy is established, even *slight* evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement.'" Doc. [164] at 42-43 (quoting *In re Bulk Popcorn Antitrust Litig.*, 783 F. Supp. 1194, 1197 (D. Minn. 1991)).

That argument rests on the assumption that Plaintiffs have already successfully "established" a conspiracy, which the Court rejects for the reasons already stated. But the Court cannot quibble with Plaintiffs' appraisal of the cited evidence of individual participation by each

Defendant as "slight." *Id*. Examination of the cited paragraphs flatly contradicts Plaintiffs' claim that they are "more than sufficient" to establish each Defendant's participation.

For example, Plaintiffs point to ¶¶ 80 and 256 of the CAC as supporting the participation of Corteva, BASF, Bayer, Growmark, Tenkoz, Syngenta, Winfield, and Simplot in the alleged conspiracy. Those paragraphs allege that CropLife America is a trade association made up of major Crop Inputs manufacturers, wholesalers, and retailers; that its board of directors has, at different times, been chaired by executives from Corteva and BASF and has included executives from Winfield's parent company and from Bayer, Growmark, Tenkoz, and Simplot; and that, at the time of the filing of the CAC, Syngenta was a member. Similarly, in ¶ 85, Plaintiffs describe the Agricultural Retailers Association as a non-profit trade association that represents Crop Inputs retailers and distributors in the United States and note that its board was chaired in 2021 by a Growmark executive and that board members included individuals associated with Defendants Nutrien, CHS, Winfield, Corteva, Bayer, BASF, and Syngenta. Plaintiffs allege that trade associations are "ideal vehicle[s] of collusion." ¶ 80. But Plaintiffs allege no action taken by any Defendant in furtherance of a conspiracy, and common membership on a board or participation in a trade association is not indicative of an illegal conspiracy. *See, e.g., In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) (citing *Iqbal*, 556 U.S. at 679) ("[M]ere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [the purported co-conspirators'] presence at trade meetings is more likely explained by their lawful, free-market behavior."); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (participation by defendants on same board of directors is insufficient to support antitrust conspiracy claim); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy . . ..").

Plaintiffs also cite to ¶¶ 102, 107, and 117-19 as supporting the participation of numerous specific Defendants in the alleged conspiracy, but those paragraphs merely recount the events in Canada and describe the investigation of certain Canadian entities. And Plaintiffs point to ¶¶ 114 and 151, which allege only that a third-party publication, Competition Policy

International[19] has included BASF, Bayer, and Corteva on a list of purportedly "recidivist" antitrust violators.  The cited paragraphs contain no allegations of any activity by particular Defendants relevant to the instant action.  Plaintiffs likewise cite to ¶ 146 several times, but that paragraph merely alleges that the market for Crop Inputs is highly concentrated, particularly when one considers the dominance of BASF, Corteva, Syngenta, and Bayer.

The Court cannot fathom how Plaintiffs believe the cited paragraphs suffice to allege the participation of individual Defendants in the purported conspiracy.  At most, the Canadian investigation and the allegations concerning recidivist behavior and market concentration could be relevant to Plaintiffs' alleged plus factors, but, as noted above, the Court does not reach the adequacy of plus factors if the conspiracy itself is not sufficiently pled.  *See In re Pork Antitrust Litigation*, 495 F. Supp. 3d 753, 768 (D. Minn. 2020) ("[P]lus factors might include . . . market concentration."); *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1295-96 (M.D. Fla. 2016) (Foreign investigations into the contact lens industry are relevant "circumstantial evidence in the form of plus factors."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2009) (A defendant's prior guilty plea to conspiracy regarding another product supported an inference of a conspiracy in the SRAM industry.).  The cited paragraphs do not provide "more than sufficient" allegations to establish each Defendant's participation in the conspiracy alleged here.  Doc. [164] at 42-43

The Court has examined all of the paragraphs cited and is not persuaded that Plaintiffs have made allegations against "[e]ach defendant [sufficient to allow it to] know what he or she did that is asserted to be wrongful."  *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).  Rather, the CAC is based mostly "on a theory of collective responsibility," leaving it vulnerable to dismissal.  *Id.*

Having considered the CAC's allegations as a whole, the Court concludes that Plaintiffs have failed in their attempt to weave dissimilar events involving only a handful of explicitly identified Defendants at different levels of the distribution chain into a coherent and actionable conspiracy.  Their allegations do not plausibly rebut the inference that Defendants' conduct served their respective individual, legitimate business interests to maintain a profitable market

---

[19] Competition Policy International is an "independent knowledge-sharing organization that delivers commentary and analysis on antitrust and competition policy matters" through daily publications on a global basis.  *See* https://www.pymnts.com/cpi/about-us/, last visited September 12, 2024.

structure. *Twombly*, 550 U.S. at 554 ("[A] § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."). And the alleged "parallel behavior" is not the sort "that would probably not result from chance, coincidence, [or] independent responses to common stimuli"; nor does it constitute "parallel conduct . . . that might be sufficient under *Twombly's* standard." *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). Rather, Defendants' alleged actions appear to have been "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market[,]" and the CAC does not plausibly allege that such actions were aided "by an advance understanding among the parties." *Twombly*, at 553-54, 556 n.4 (internal quotation marks omitted). Notably absent from the CAC is an allegation of even one communication between any two Defendants about any topic at all, much less about a boycott of ecommerce platforms. Also, while Plaintiffs allege generally that Defendants refused to supply Crop Inputs to electronic platforms, they do not allege any specific request by FBN or any other ecommerce platform for supply in the alleged geographic market; nor are there any allegations that any specific Defendant refused to supply products, what products a Defendant supposedly refused to supply, or the allegedly pretextual reasons given for such refusal. Considering Plaintiffs' allegations in their totality, as the Court must at the pleading stage, they are insufficient to create a plausible inference of an anticompetitive boycott agreement amongst Defendants.

The Court finds that Plaintiffs have not adequately pled parallel conduct, which is essential to their Sherman Act claim. The Court will therefore grant Defendants' Motion to Dismiss as to Count I. Because Plaintiffs' failure to plausibly plead a boycott conspiracy is fatal to their Sherman Act claims, the Court does not reach Defendants' other arguments for dismissal of Count I.

### B.  Plaintiffs fail to plausibly plead a RICO claim.

In Count Five, Plaintiffs bring a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c), 1962(d), against Defendants, alleging that all Defendants "operated or managed" an association-in-fact enterprise,[20] which was "formed for

---

[20] A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise must have at least three structural features: a purpose,

the purpose of engaging in a fraudulent scheme to block electronic platforms from access to Crop Inputs by agreeing not to sell products to these platforms."  Doc. [104] ¶¶ 234-36.

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"  18 U.S.C. § 1962(c).  As the Eighth Circuit has repeatedly cautioned, "RICO does not cover all instances of wrongdoing.  Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity."  *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015) (internal quotation marks omitted).  Courts must reject "attempts to convert ordinary civil disputes into RICO cases . . . RICO was not intended to apply to ordinary commercial fraud."  *Id.* (internal quotation marks omitted).

To establish a civil claim under RICO, Plaintiffs must show that Defendants engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *H&Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (internal citations omitted).  "Failure to present sufficient evidence on any one element of a RICO claim means the entire claim fails."  *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1028 (8th Cir. 2008).  And even if a plaintiff adequately pleads that a defendant violated RICO, the claim will fail if the plaintiff has not "1) sustained an injury to business or property 2) that was caused by [the] RICO violation."  *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012).

The racketeering activity prong must be established by pleading two predicate acts committed by each Defendant.  *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 358 (8th Cir. 2011); *see also In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 767 (8th Cir. 2003).  Here, Plaintiffs allege that Defendants conducted their enterprise through mail and wire fraud.  Doc. [104] ¶ 263.  Where the alleged predicate acts involve mail or wire fraud, Plaintiffs must allege:  "(1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme."  *H&Q Props.*, 793 F.3d at 856; *see also* 18 U.S.C. §§ 1341, 1343.  Plaintiffs must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b) by pleading with particularity the "who, what, when, where, and how" of the alleged fraud.  *Crest Constr. II,*

---

relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009).

*Inc.*, 660 F.3d at 353; *see also Abels v. Farmers Commodities Corp*., 259 F.3d 910, 9120 (8th Cir. 2001) ("[A] plaintiff must specifically allege the 'circumstances constituting fraud . . ..''). The "[c]ircumstances" of the fraud include "such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *H&Q Props.*, 793 F.3d. at 856 (internal citations and quotation marks omitted). "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (internal quotations omitted).

Defendants argue that Plaintiffs fail to state a § 1962(c) RICO claim because they have not pled fraud with the requisite particularity; they have not sufficiently alleged a pattern of racketeering activity; and they have not alleged the existence of an enterprise. Defendants also argue that Plaintiffs lack standing because they have not sufficiently alleged that the racketeering activity proximately caused any harm. *See* Doc. [142] at 69. And Defendants argue that Plaintiffs' § 1962(d) claim for RICO conspiracy necessarily fails as a consequence of their failure to state a § 1962(c) claim. *Id*. at 69-70.

In the CAC, Plaintiffs allege that "Defendants used the mails in furtherance of their scheme to defraud" when they "shipped, or caused to ship, via interstate mail Crop Inputs to wholesalers, retailers, and farmers, and others that were distributed and purchased based on Defendants' market manipulation to exclude FBN," and Defendants "could not have accomplished their scheme to defraud without using the mails…" Doc. [104] ¶ 264. They also allege that Defendants committed wire fraud when they "communicated with farmers via wire to provide false pretenses, misrepresentations, promises, half-truths, omissions, and lulling statements about FBN and their illicit boycott" and when they "used the interstate wires to receive and process payments from their illicit sales of Crop Inputs based on a scheme to defraud to block electronic platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including FBN, and misrepresenting the reasons for that decision." *Id*.

Plaintiffs argue that the CAC sufficiently alleges the use of the mails and wires in furtherance of the alleged fraudulent scheme to boycott ecommerce platforms, pointing to the

following allegations:[21]  (1) in 2016, CHS "distributed a letter to farmers attempting to discourage them from using FBN"; (2) in March of 2018, Syngenta's Head of Crop Protection Sales in the United States, Michael Boden, sent a letter to vendors stating that Syngenta's audit initiative was undertaken because they had "concerns about product integrity, stewardship, and regulatory compliance"; (3) in November of 2018, Mr. Boden of Syngenta gave an interview, "presumably conducted over the wires," in which he stated that "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality"; (4) in 2018, Canadian entity and non-Defendant Univar distributed talking points about its decision not to deal with FBN in Canada and criticized FBN's business model; and (5) in 2018, Canadian entity Federated sent an email message stating that "this business [FBN] will be closely observed by us and likely all of our traditional retailing peers across Western Canada." Doc. [164] at 56-57.

According to Defendants, Plaintiffs have not sufficiently pled mail or wire fraud under the heightened standard of Rule 9(b), and "it is not even clear what constitutes the alleged misrepresentation." Doc. [142] at 70-71. Plaintiffs counter that, because the facts of the fraudulent scheme to boycott ecommerce are exclusively within Defendants' control, they cannot be expected to provide more particularity until after further discovery. Doc. [164] at 56.

Plaintiffs cite *Abels v. Farmers Commodities Corporation* for the proposition that they should not be required to plead the RICO predicate acts with specificity because they have not yet had an opportunity to conduct discovery. *See* Doc. [164] at 56-57 (citing *Abels*, 259 F.3d at 921). In *Abels*, the Eighth Circuit reversed a district court's decision that certain RICO predicate acts were not sufficiently pled under Rule 9(b). *Id*. The plaintiffs in *Abels* had not alleged specific dates, times, and contents of some of the communications that they argued were mail and wire fraud predicates for their RICO claim, and the district court faulted them under Rule 9(b). *Id*. at 920. The Eighth Circuit in *Abels* reversed, noting that it would be "fair to give" plaintiffs "the benefit of discovery" before requiring that they "plead facts that remain within the defendant's private knowledge." *Id*.

---

[21] Plaintiffs also argue that Defendants Bayer, BASF, and Corteva committed wire fraud when they used audits to stop sales to FBN, because it is "a reasonable inference that . . . the audits required use of mails and wires." Doc. [164] at 56. But the CAC contains no allegation that Bayer, BASF, or Corteva ever conducted any audit, so the Court cannot reasonably infer that they used the mails or wires in that context.

But the Eighth Circuit did not excuse the plaintiffs in *Abels* from meeting the heightened pleading requirements under Rule 9(b); in fact, it explicitly reiterated that "a plaintiff must specifically allege the 'circumstances constituting fraud,' Fed. R. Civ. P. 9(b), including 'such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentations and what was obtained or given up thereby.'" *Id*. at 920 (quoting *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982)). What *Abels* counsels, then, is that a plaintiff may be excused from providing "highly specific" detail on facts exclusively within a defendant's control when that plaintiff *has* pled "facts supporting the inference that the mails or wires were used" in furtherance of a scheme to defraud. *Id*. at 921. The complaint in *Abels* satisfied Rule 9(b), notwithstanding some missing details, because:

> "[t]he complaint set[ ] forth times and places of numerous meetings, marketing seminars, and private conversations in which misrepresentations are claimed to have been made. It name[d] the parties to those communications and describe[d] the content of the claimed false statements. It name[d] the plaintiffs who allegedly relied on these statements . . . [and] it state[d] the specific monetary damage to each plaintiff that is claimed to have resulted from that [allegedly fraudulent] venture."

*Id*. at 920.

The fraud allegations in this case are nowhere near as detailed as those that passed muster in *Abels*. Plaintiffs make conclusory allegations that Defendants committed mail and wire fraud when they "shipped, or caused to ship, via interstate mail Crop Inputs to wholesalers, retailers, and farmers, and others that were distributed and purchased based on Defendants' market manipulation to exclude FBN," and when they "communicated with farmers via wire to provide false pretenses, misrepresentations, promises, half-truths, omissions, and lulling statements about FBN and their illicit boycott." Doc. [104] ¶ 264. Plaintiffs also allege, in an equally conclusory manner, that Defendants "could not have accomplished their scheme to defraud without using the mails…" Such allegations are not sufficient under Rule 9(b). *See Iqbal*, 556 U.S. at 677 ("Threadbare recitals" of the elements of a RICO claim, "supported by mere conclusory statements, do not suffice."); *Drobnak*, 561 F.3d at 783 ("[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." (quoting *Schaller Tel. Co. v. Golden Sky Sys. Inc.*, 298 F.3d 736, 746 (8th Cir. 2022)). And Plaintiffs' few specific examples of alleged mail and wire fraud fare no better. It was not manifestly fraudulent for CHS to discourage its customers from using the services of a competitor, for Syngenta to

conduct an audit due to concerns about product integrity and regulatory compliance, or for Univar to criticize a competitor's business model.

Accepting allegations that do not support a reasonable inference of a scheme to defraud "would eviscerate Rule 9(b)'s requirement that fraud be pled with particularity." *Stark v. Monson*, 2008 WL 189959, at *9 (D. Minn. Jan. 22, 2008). "This is particularly true when there are multiple defendants—as the [CAC] is currently pled, Defendants are not on notice of the claim against them because it is not clear which Defendants allegedly committed the fraudulent acts." *Id*. Thus, the CAC fails to adequately allege the racketeering activity prong of the RICO claim. Because that is an independent basis for dismissal, the Court does not reach Defendants' additional arguments for dismissal, including lack of standing. *See Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428-29 (plaintiff's RICO claim was properly dismissed for failure to set forth the predicate acts of mail and wire fraud with the particularity required under Rule 9(b)).

Plaintiffs' failure to adequately allege that Defendants participated in a RICO enterprise is also fatal to their RICO conspiracy claim under § 1962(d), because "[t]o allege a RICO conspiracy, a plaintiff must first establish a right to relief under § 1962(c)[.]" *Nestlé Purina PetCare Co. v. Blue Buffalo Co., Ltd.*, 181 F. Supp. 3d 618, 634 (E.D. Mo. 2016); *see also GT Roofing Co. I, LLC v. Killion*, 2015 WL 4255466, at *6 (E.D. Mo. July 13, 2015) ("Here, plaintiffs have failed to allege wrongful RICO activity and therefore they fail to state a claim of RICO conspiracy under §1962(d)."); *Raineri Constr., LLC v. Taylor*, 63 F. Supp. 3d 1017, 1031 (E.D. Mo. 2014) ("Because plaintiff does not adequately allege a pattern of racketeering activity to establish a right of relief under § 1962(a)-(c), it therefore also fails to allege a violation of § 1962(d)."); *Kilper v. City of Arnold, Mo*., 2009 WL 2208404, at *22 (E.D. Mo. July 23, 2009); *VSA v. Von Weise Gear Co*., 769 F. Supp. 1080, 1085 (E.D. Mo. 1991). Therefore, the RICO conspiracy claim under § 1962(d) is also dismissed.

### C. The Court declines to exercise jurisdiction over the state law claims.

As Plaintiffs' federal claims are all being dismissed, the Court declines to exercise supplemental jurisdiction over their state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.").

## IV.    CONCLUSION

The CAC is Plaintiffs' third attempt to state viable claims.  After filing their original complaints, Plaintiffs in the Southern District of Illinois and Minnesota filed consolidated amended complaints, and Defendants filed motions to dismiss in the Southern District of Illinois. Thus, Plaintiffs were on notice of the deficiencies identified in the motion to dismiss for months before they filed the CAC.  Despite that opportunity, Plaintiffs did not supplement their pleadings with allegations sufficient to overcome those deficiencies.  Because the CAC evidently contains as much specificity as Plaintiffs can muster, even with ample time and advance notice, the Sherman Act and RICO claims will be dismissed with prejudice.  As the Court declines to exercise jurisdiction over the state claims, those claims will be dismissed without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Joint Motion to Dismiss the Consolidated Amended Complaint (Doc. [104]) is **GRANTED.**

**IT IS FURTHER ORDERED** that Count One and Count Five of the Consolidated Amended Complaint are **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over the state law claims brought by Plaintiffs in Counts Two, Three, and Four, and those Counts are **DISMISSED** without prejudice.

**IT IS FURTHER ORDERED** that all other pending motions in this multidistrict litigation and in all the cases that were consolidated into this multidistrict litigation are **DENIED** as moot.

**IT IS FINALLY ORDERED** that because all claims in this multidistrict litigation action have been dismissed, this multidistrict litigation case is **CLOSED**.

A separate Order of Dismissal will accompany this Memorandum and Order.

Dated this 13th day of September, 2024.


SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE